UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW CONWAY, LILIANA CONWAY<br>d/b/a ZEKE THE ZEBRA,<br><br>　　　　　　　Plaintiffs<br><br>v.<br><br>SAM LICATA a/k/a PHOENIX STONE;<br>SYBIL HALL a/k/a SBYILL LICATA;<br>STONEHALL ENTERTAINMENT, LLC, a California<br>Limited Liability Company;<br>STONEHALL MERCHANDISE, LLC, a California<br>Limited Liability Company;<br>STONEHALL MUSIC PUBLISHING, LLC, a California<br>Limited Liability Company;<br>STONEHALL RECORDS, LLC, a California<br>Limited Liability Company;<br>STONEHALL TELEVISION, LLC, a California<br>Limited Liability Company; and<br>STONEHALL TOURING, LLC, a California<br>Limited Liability Company,<br><br>　　　　　　　Defendants | Docket No.:<br>1:13-cv-12193-WGY<br><br><br><br>**Leave to File<br>Granted on 2/25/2014** |

## AMENDED ANSWER AND COUNTERCLAIMS

　　　Defendants Sam Licata, Sybil Hall, Stonehall Entertainment, LLC, Stonehall Merchandise, LLC, Stonehall Music Publishing, LLC, Stonehall Records, LLC, Stonehall Television, LLC, and Stonehall Touring, LLC (collectively "Defendants") answer the numbered paragraphs of the Plaintiffs' Complaint as follows[1]:

---

[1] Unless otherwise noted, capitalized terms are defined in the Plaintiffs' Complaint.

### Parties

1.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

2.      Denied. Answering further, upon information and belief, Ms. Conway resides in Nashville, Tennessee.

3.      Defendants deny that Stone resides in California.  Defendants admit the remaining allegations in this paragraph.

4.      Defendants deny that Hall resides in California.  Defendants admit the remaining allegations in this paragraph.

5.      Admitted.

6.      Admitted.  Answering further, this company was formed in 2009 but never operated.

7.      Admitted.

8.      Admitted.

9.      Admitted. Answering further, this company was formed in 2009 but never operated.

10.      Admitted. Answering further, this company was formed in 2009 but never operated.

11.      Admitted.

12.      Admitted.

### Jurisdiction

13.      This paragraph consists solely of conclusions of law to which no response is required.

2

14.     This paragraph consists solely of conclusions of law to which no response is required.

15.     Denied.

16.     This paragraph consists solely of conclusions of law to which no response is required.

17.     Denied.

18.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

## Claims for Relief

## Count I – Fraud and Negligent Misrepresentation Against All Defendants

19.     Defendants incorporate herein their responses to all foregoing paragraphs.

20.     Denied.

21.     Denied.

22.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

23.     This paragraph contains conclusions of law and Plaintiffs' characterizations of their claims, no response is required.  Defendants admit making representations about their experience in the music industry.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in this Paragraph.

24.     This paragraph contains conclusions of law and Plaintiffs' characterizations of their claims, no response is required.  To the extent a response is required, Defendants deny the allegations contained in this paragraph.

**A.  Background.**

25.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

26.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

27.      Admitted.

28.      Denied.

29.      Denied.  Answering further, Hall and Stone manage Stonehall Records.

30.      Defendants deny that Ms. Conway composed all the songs she performed. Answering further, Stone co-wrote or wrote virtually all of the songs Ms. Conway performed and released all songs she put into marketplace on the record called "Sunrise," the six-song EP called "No Turning Back," and the single "Beautiful Day."

31.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations set forth in this Paragraph.

32.      Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations that Ms. Conway spoke to Hall and Stone from Massachusetts. Defendants admit the remaining allegations in this paragraph.

33.      Admitted.

34.      Admitted.

35.      Denied.

36.      Denied.

37.     Denied.   Answering further, the parties had an agreement to form a company together that was memorialized on or about January 27, 2012 in the Operating Agreement of Great Lines, LLC.

**B.  [Defendants deny the allegations in the title of this section.]**

38.     Defendants admit that they participated in numerous phone calls with Plaintiffs in or around June 2010.  Defendants deny that they misrepresented their experience, connections and influence in the music industry.

39.     Denied.

40.     Admitted.

41.     Denied.  Answering further, Defendants told the Plaintiffs that Ke$ha is a close family friend.

42.     Admitted.

43.     Admitted.

44.     Denied.

45.     Defendants deny the first sentence of this paragraph and admit the second sentence of this paragraph.

46.     Admitted.

47.     Admitted.

48.     Denied.

49.     Admitted.

50.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

51.     Admitted.

52.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

53.     Denied. Answering further, Mr. Greg told the Plaintiffs that he did not sign Ms. Conway because she needed more development.

54.     Denied.

55.     Admitted.

56.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

57.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

   **C.  [This title contains conclusions of law, to which no response is required. To the extent the title makes factual allegations, Defendants deny the allegations in the title of this section.]**

58.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

59.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Admitted.

64.     Defendants admit that from 2010 through June 2011, they agreed they not be fully compensated for the services they provided in connection with Ms. Conway's career.  Answering

further, from July 2011 through August 2012 the parties agreed that Mr. Conway would pay Defendants $25,000 per month, a portion of which was paid to Defendants as consulting fees.

65.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

66.    Defendants admit that Mr. Conway transferred the funds to them by wire. Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations that his bank accounts were located in Massachusetts.

D.    **[This title contains conclusions of law, to which no response is required. To the extent the title makes factual allegations, Defendants deny the allegations in the title of this section.]**

67.    Denied.

68.    Admitted.

69.    Admitted.

70.    Admitted.

71.    Denied. Defendants deny that they discouraged approaching a major label. Defendants admit telling Mr. Conway that major labels spend approximately $750,000 up to $5 million to produce, promote and market a new artist.

72.    Denied.

73.    Denied.

74.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph.

75.    Admitted.

76.    Admitted.

77.    Admitted.

78.     Denied.

79.     Defendants admit that they were in charge of the creative design and branding of Ms. Conway's album.   Answering further, Mr. Conway and Ms. Conway also provided significant creative input.  Defendants deny the remaining allegations contained in this.

80.     Admitted. Answering further, the first song on Ms. Conway's album was released on August 9, 2011, and a six-song EP was released in December 2011.  A complete album was released in August of 2012.

81.     Denied.

82.     Defendants deny that they did not schedule any live performances for Ms. Conway.    Defendants admit the remaining allegations contained in this paragraph.

83.     Denied.  Answering further, Defendants suggested that Ms. Conway release a single in the summer of 2011.

84.     Denied. Answering further, Defendants gathered information from listeners and industry experts to determine which of Ms. Conway's songs to first release.

85.     Denied.

86.     Denied. Answering further, Defendants provided services at a discounted rate based on the agreement among the parties.

87.     Defendants admit that Ms. Conway's album was released in August 2012. Defendants deny the remaining allegations in this paragraph.

**E.   [This title contains conclusions of law, to which no response is required. To the extent the title makes factual allegations, Defendants deny the allegations in the title of this section.]**

88.     Denied.     Answering further, all financial decisions and actions taken by Defendants concerning Ms. Conway's career were authorized by Plaintiffs consistent with Section 16 of the Operating Agreement of Great Lines, LLC.

89.     Admitted.

90.     Admitted.

91.     Denied.

92.     Denied.

93.     Admitted.

94.     Admitted.

95.     Admitted.

96.     Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations concerning Plaintiffs' state of mind.   Defendants deny the remaining allegations in this paragraph.

97.     Denied.

98.     Denied.  Answering further, Mr. Conway asked Defendants to work exclusively on Ms. Conway's career, meaning the Defendants would not work with other artists.  Defendants agreed to this arrangement for $25,000 a month, with expenses for promoting Ms. Conway's career to come from these payments, and Defendants would keep the remainder as their fees.

99.     Admitted. Answering further, Mr. Conway asked Defendants to work exclusively on Ms. Conway's career, meaning the Defendants would not work with other artists. Defendants

agreed to this arrangement for $25,000 a month, with expenses for promoting Ms. Conway's career to come from these payments, and Defendants would keep the remainder as their fees.

100.   Denied.

101.   Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations concerning Mr. Conway's state of mind. Defendants admit that Mr. Conway paid them $25,000 per month, with expenses for promoting Ms. Conway's career to come from these payments, from July 2011 to August 2012, when he abruptly stopped payments in the middle of the album promotions.

102.   Denied.

**F.   [This title contains conclusions of law, to which no response is required. To the extent the title makes factual allegations, Defendants deny the allegations in the title of this section.]**

103.   Admitted.

104.   Admitted.

105.   Admitted.  Answering further, Ms. Conway requested the third photo shoot.

106.   Denied.   Answering further, all financial decisions and actions taken by Defendants concerning Ms. Conway's career were authorized by Plaintiffs consistent with Section 16 of the Operating Agreement of Great Lines, LLC.

107.   Admitted.

108.   Denied.

109.   Denied.

110.   Defendants deny the Plaintiffs' characterization of the cost of the photo shoot. Defendants admit the remaining allegations in this paragraph.

111.    Admitted. Answering further, Defendants provided services at a discounted rate based on the agreement among the parties.

112.    Admitted. Answering further, Defendants provided services at a discounted rate based on the agreement among the parties.

113.    Admitted.

114.    Denied. Answering further, Defendants signed a contract with the music supervisor to provide a song that Ms. Conway would sing for the film.  Defendants had no control over whether the song would actually appear in the final edited version of the film.

115.    Admitted.

116.    Admitted.

117.    Admitted.

118.    Denied.

**G.  [This title contains conclusions of law, to which no response is required. To the extent the title makes factual allegations, Defendants deny the allegations in the title of this section.]**

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Defendants admit the first sentence in this paragraph. Defendants deny the remaining allegations of this paragraph.  Answering further, all financial decisions and actions taken by Defendants concerning Ms. Conway's career were authorized by Plaintiffs consistent with Section 16 of the Operating Agreement of Great Lines, LLC.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

**H.  [Defendants deny the allegations in the title of this section.]**

132.    Denied.

133.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

134.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

135.    Denied.

136.    Denied.

137.    Denied.   Answering further, Ms. Conway always had input into the decisions concerning her career.

138.    Denied. Answering further, Defendants consistently provided detailed invoices to Plaintiffs.

139.    Denied.

140.    Denied. Answering further, at Mr. Conway's insistence, the parties negotiated and drafted a written agreement in January of 2012 to establish a company that would engage solely in the business of developing, promoting, marketing, and otherwise exploiting the career of Ms.

12

Conway, and all other related activities.  In fact, Mr. Conway hired and paid the attorney that drafted the operating agreement.

141.    This paragraph is unclear as to which statements and omissions it references and therefore Defendants cannot admit or deny the allegations in this paragraph. Answering further, Defendants deny making any false statements or omissions to Plaintiffs.

142.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.  Answering further, Defendants deny making any false statements or omissions to Plaintiffs.

143.    Denied.

## Count II
## Breach of Contract and the Covenant of Good Faith and Fair Dealing
## Against All Defendants

144.    Defendants incorporate herein their responses to all foregoing paragraphs.

145.    Admitted.

146.    Admitted.

147.    Defendants admit that from 2010 through June 2011, they agreed they would not be fully compensated for the services they provided in connection with Ms. Conway's career. Answering further, from July 2011 through August 2012 the parties agreed that Mr. Conway would pay Defendants $25,000 per month, a portion of which was paid to Defendants as consulting fees.

148.    Admitted.

149.    Admitted.

150.    Denied.

151.    Denied. Answering further, the only funds Defendants kept for themselves were the agreed upon fees for Defendants' services.

152.    Denied.

153.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

154.    Denied.

**Count III**
**Quantum Meruit Against All Defendants**

155.    Defendants incorporate herein their responses to all foregoing paragraphs.

156.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.  Answering further, Defendants performed all promised marketing, recording, promotional and other services.

157.    Denied.

158.    Defendants deny that from 2010 through June 2011 they kept any funds from Mr. Conway (with limited exceptions).   Answering further, the only funds Defendants kept for themselves were the agreed upon fees for Defendants' services.

159.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

**Count IV**
**Money Had and Received Against All Defendants**

160.    Defendants incorporate herein their responses to all foregoing paragraphs.

14

161.    Defendants admit that they received money from Mr. Conway.  Defendants admit that they agreed to perform services in furtherance of Ms. Conway's career.  To the extent that this paragraph consists of conclusions of law, no response is required.

162.    Denied.

163.     This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

164.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

**Count V**
**Unjust Enrichment Against All Defendants**

165.    Defendants incorporate herein their responses to all foregoing paragraphs.

166.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

167.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

168.    To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

169.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

## Count VI
## Conversion Against All Defendants

170.     Defendants incorporate herein their responses to all foregoing paragraphs.

171.     Defendants admit that they received money from Mr. Conway. Defendants admit that they agreed to perform services in furtherance of Ms. Conway's career.  To the extent that this paragraph consists of conclusions of law, no response is required.

172.     Denied.

173.     Denied.

174.     Admitted.    Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.  Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof.  Thus, Plaintiffs alone had no legal interest in said materials.

175.     Admitted.    Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.  Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof.  Thus, Plaintiffs alone had no legal interest in said materials.

176.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

177.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

178.    Denied.

### Count VII
### Copyright Infringement Pursuant to Title 17 USC Against All Defendants

179.    Defendants incorporate herein their responses to all foregoing paragraphs.

180.    Admitted. Answering further, Stone co-wrote or wrote virtually all of the songs Ms. Conway performed and released all songs she put into marketplace on the record called "Sunrise," the six-song EP called "No Turning Back," and the single "Beautiful Day."

181.    Admitted. Answering further, Stone co-wrote or wrote virtually all of the songs Ms. Conway performed and released all songs she put into marketplace on the record called "Sunrise," the six-song EP called "No Turning Back," and the single "Beautiful Day."

182.    Denied.

183.    Defendants admit that Plaintiffs attempted to revoke any copyright licenses that existed between Plaintiffs and Defendants.  Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.  Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights,

titles, and interest in and to all sound recordings and any reproductions and duplications thereof. Thus, the Plaintiffs had no legal right to revoke any copyright or other licenses.

184.    Admitted.    Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.   Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof.   Thus, the Plaintiffs had no legal interest in said materials.

185.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants admit that Ms. Conway's performances continue to be distributed. Defendants deny all remaining allegations in this paragraph. Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.   Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof.   Thus, the Plaintiffs had no legal interest in said materials.

186.    This paragraph consists solely of conclusions of law to which no response is required.   To the extent this paragraph requires a response, Defendants deny the allegations contained in this paragraph.   Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and

interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof. Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof. Thus, the Plaintiffs had no legal interest in said materials.

187.    Admitted.

188.    Admitted.

189.    Admitted.

190.    Admitted.

191.    Denied.

192.    Denied.

193.    Denied.

194.    Denied.

## Count VIII
## Defamation Against All Defendants

195.    Defendants incorporate herein their responses to all foregoing paragraphs.

196.    Denied.

197.    Admitted.

198.    Admitted.

199.    Denied.

200.    Denied.

## Count IX
## Breach of Fiduciary Duty Against All Defendants

201.    Defendants incorporate herein their responses to all foregoing paragraphs.

202.   This paragraph consists solely of conclusions of law to which no response is required.

203.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

204.   Defendants incorporate herein their responses to the paragraphs in Count I.

205.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

206.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

207.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

208.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

209.   This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

210.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

211.    Denied.

### Count X
### Concert of Action Against All Defendants

212.    Defendants incorporate herein their responses to all foregoing paragraphs.

213.    Denied.

214.    Denied.

215.    Denied.

### Count XI
### Aiding and Abetting Against the Stonehall LLCs

216.    Defendants incorporate herein their responses to all foregoing paragraphs.

217.    Denied.

218.    Denied.

219.    Denied.

220.    Denied.

### Count XII
### Piercing the Corporate Veil Against All Defendants

221.    Defendants incorporate herein their responses to all foregoing paragraphs.

222.    Denied.

223.    Denied.

224.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

225.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

226.    Denied.

227.    Denied.

228.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

## Count XIII
### Violation of M.G.L. c. 93A, §§ 2 and 11 Against All Defendants

229.    Defendants incorporate herein their responses to all foregoing paragraphs.

230.    Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

231.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

232.    Denied.

233.    Denied.

## Count XIV
### Violation of M.G.L. c. 214, § 3A Against All Defendants

234.    Defendants incorporate herein their responses to all foregoing paragraphs.

235.    Denied.

236.    Denied.

237.    Denied.

238.   Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph.

239.   Denied.

240.   This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

## Count XV
## Declaratory Judgment Against All Defendants

241.   Defendants incorporate herein their responses to all foregoing paragraphs.

242.   This paragraph consists solely of conclusions of law to which no response is required.

243.   This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

## Count XVI
## Accounting Against All Defendants

244.   Defendants incorporate herein their responses to all foregoing paragraphs.

245.   Denied.

246.   Denied.

247.   Denied.

248.   Defendants admit the first sentence of this paragraph. Defendants deny the second sentence of this paragraph.

249.   This paragraph consists solely of conclusions of law to which no response is required.

## Count XVII
## Replevin Against All Defendants

250.   Defendants incorporate herein their responses to all foregoing paragraphs.

251.   Denied.

252.   Denied.

253.   Denied.

254.   Defendants deny that they retained any goods purchased with Mr. Conway's money and on that basis deny the allegations in this paragraph.   Answering further, all goods purchased with Mr. Conway's money were purchased at Ms. Conway's request and have been retained by Ms. Conway.

255.   Admitted.   Answering further, pursuant to Section 4.02 of the Operating Agreement of Great Lines, LLC, Ms. Conway assigned to Great Lines, LLC all rights, titles and interests in the result, products, copyrights, trademarks, and merchandising of Ms. Conway's activities in the entertainment industry, and proceeds thereof.   Moreover, pursuant to Section 4.03, Ms. Conway and Great Lines, LLC assigned to Stonehall Records, LLC all rights, titles, and interest in and to all sound recordings and any reproductions and duplications thereof.   Thus, Plaintiffs alone had no legal interest in said materials.

256.   Defendants deny that they retained any goods purchased with Mr. Conway's money and on that basis deny the allegations in this paragraph.   Answering further, all goods purchased with Mr. Conway's money were purchased at Ms. Conway's request and have been retained by Ms. Conway.

257.   This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

24

**Count XVIII**
**Injunctive Relief Against All Defendants**

258.    Defendants incorporate herein their responses to all foregoing paragraphs.

259.    Denied.

260.    This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

261.    This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

262.    This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

263.    This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

264.    This paragraph consists solely of Plaintiffs' characterization of their claims and, accordingly, no response is required.

**Count XIX**
**Violation of 18 U.S.C. §1961, et seq.,**
**the Racketeer Influenced and Corrupt Organizations Act Against Stone and Hall**

265.    Defendants incorporate herein their responses to all foregoing paragraphs.

266.    This paragraph consists solely of conclusions of law to which no response is required.

267.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

268.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

269.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

270.    Denied.

271.    Denied.

272.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

273.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

274.    This paragraph consists solely of conclusions of law to which no response is required.  To the extent this paragraph requires a response, Defendants deny all allegations in this paragraph.

275.    Denied.

## **AFFIRMATIVE DEFENSES**

First Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted.

Second Affirmative Defense

The Plaintiffs are barred from recovery by the applicable statutes of limitations and repose.

Third Affirmative Defense

The Plaintiffs' action is barred in whole or in part by the doctrine of waiver, estoppel and/or laches.

Fourth Affirmative Defense

The Plaintiffs' claims are barred because the Plaintiffs failed to follow procedural requirements for bringing claims asserted.

Fifth Affirmative Defense

Defendants deny they have committed any unfair or deceptive acts of practices within the meaning of Massachusetts G.L. c. 93A; insofar as this court may determine otherwise, however, Plaintiffs have not suffered an ascertainable loss of money or property as a result of the use or employment of any unfair or deceptive act or practice within the Commonwealth of Massachusetts and therefore Plaintiffs have no standing to assert a claim under G.L. c. 93A.

Sixth Affirmative Defense

Any acts allegedly performed by Defendants were performed in pursuit of a lawful purpose and by lawful means, and therefore the Complaint is barred by the doctrine of justification.

Seventh Affirmative Defense

Plaintiffs' claims are barred because Plaintiffs failed to mitigate their alleged damages and are therefore barred from recovering any damages which might reasonably have been avoided.

Eighth Affirmative Defense

With respect to any declaratory or equitable relief requested by Plaintiffs, Plaintiffs have adequate remedies at law and are therefore not entitled to any such relief whatsoever.

Ninth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of accord and satisfaction.

Tenth Affirmative Defense

This Court lacks jurisdiction because the Operating Agreement of Great Lines, LLC is a Tennessee contract to be interpreted under the laws of the State of Tennessee and the parties expressly agreed that any litigation in relation to the Operating Agreement of Great Lines, LLC will be brought in the courts located within Davidson County, Tennessee.

Eleventh Affirmative Defense

Plaintiffs' failure to perform their obligations under the Operating Agreement of Great Lines, LLC bars Plaintiffs' enforcement of the agreement.

Twelfth Affirmative Defense

The Operating Agreement of Great Lines, LLC constitutes the entire agreement of the parties and therefore bars Plaintiffs' enforcement of any other alleged agreement among the parties.

Thirteenth Affirmative Defense

Plaintiffs' claims should be dismissed because Plaintiffs' claims are derivative in nature and Plaintiffs have failed to satisfy the requirements of Rule 23.

Fourteenth Affirmative Defense

Plaintiffs' claims fail a as a matter of law because, all decisions and actions taken by Defendants concerning Ms. Conway's career were authorized by Plaintiffs consistent with Section 16 of Operating Agreement of Great Lines, LLC.

Fifteenth Affirmative Defense

Plaintiffs' claims fail a as a matter of law because Defendants consulted Plaintiffs regularly about every decision and action taken concerning Ms. Conway's career, including that Defendants regularly sent Mr. Conway invoices for every expenditure they made on behalf of Ms. Conway's career.

Sixteenth Affirmative Defense

Plaintiffs' claims fail as a matter of law because Defendants did not make any misrepresentations to Plaintiffs at any time.

Seventeenth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of unclean hands.

Eighteenth Affirmative Defense

Plaintiffs' claims should be dismissed because Plaintiffs have suffered no damages.

Nineteenth Affirmative Defense

Defendants reserve the right to add such other and further defenses as become apparent during the course of discovery.

Twentieth Affirmative Defense

Plaintiffs' claims fail as a matter of law because they are not pled with particularity in accordance with Fed. R. Civ. P., Rule 9.

<u>Twenty-First Affirmative Defense</u>

Plaintiffs' Complaint admits that Defendants performed and secured certain services and thus, as a matter of law, Plaintiffs are not entitled to a return of expenses for these services.

## **RELIEF REQUESTED**

Defendants request that the Court award judgment in its favor on all claims, dismissing the Complaint, and awarding Defendants it costs and reasonable attorneys' fees.

## COUNTERCLAIMS

### Parties

1.      Counterclaim Plaintiff Sam Licata aka Phoenix Stone ("Stone") is an individual who currently resides on Overton Lea Road in Nashville, Tennessee.

2.      Counterclaim Plaintiff Sybil Hall ("Hall") is an individual who currently resides on Overton Lea Road in Nashville, Tennessee.

3.      Counterclaim Plaintiff, Stonehall Records, LLC ("Stonehall"), is a California Limited Liability Company with a principal place of business at 909 18th Ave. S. Nashville, TN 37212.  At all times material hereto, Counterclaim Plaintiffs were a party to any agreements, performed all services, and conducted business as Stonehall.  Hereinafter the Counterclaim Plaintiffs Stone, Hall and Stonehall will collectively be referred to as "Counterclaim Plaintiffs."

4.      Counterclaim Defendant Andrew Conway ("Mr. Conway") is an individual who currently resides in Massachusetts.  Mr. Conway is an experienced businessman who owns and runs dozens of Dunkin Donuts franchises and a construction business.

5.      Counterclaim Defendant Liana Conway ("Ms. Conway") is an individual who is the daughter of Mr. Conway, and currently resides in Massachusetts, and at all times material hereto was an adult  Hereinafter, Mr. and Ms. Conway will collectively be referred to herein as "Counterclaim Defendants" and/or "the Conways."

### Jurisdiction

6.      Based upon the allegations above, this Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. §1332, as there is complete diversity between the parties and the amount in controversy is greater than $75,000, exclusive of interest and costs and pursuant to the Copyright Act, 17 U.S.C. §101, et seq.; and 28 U.S.C. § 1338(a) and (b) (jurisdiction over

copyright actions).  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all claims asserted in this counterclaim.

7.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) because the Defendants are residents of the Commonwealth of Massachusetts and this judicial district.

8.     Counterclaim Plaintiffs further allege that venue is proper in Davidson County, Tennessee pursuant to paragraph 30 of the Operating Agreement of Great Lines, LLC, entered into by and between the Conways and Stonehall.

### Facts

9.     Counterclaim Plaintiffs are experienced professionals in the music recording industry.

10.    Stone is an acclaimed singer-songwriter and a founding member of the Backstreet Boys.   As a child, Stone appeared on a television show called "Welcome Freshman" on Nickelodeon.  Stone currently appears as an expert judge in the music industry on the television series, "Next Great Family Band" on Cozi TV, an NBC affiliate.

11.    Hall is experienced in the music industry and is a former manager and founder of the Backstreet Boys

12.    Counterclaim Plaintiffs run Stonehall Entertainment, which includes a record label; a publishing company (a joint venture with Rondor/Universal); a management company that represents record producers and artists; and a television division, which has created shows for MTV, Touchstone and USA Network.

13.    Stone was also president of a joint venture label with Columbia Records. Through this label, he has created and produced the teen rock band the Valli Girls as well as developed

bands for Stonehall Records/EMI's Virgin Records joint venture label and Stonehall Records/Sony Japan joint venture label.

14.     Counterclaim Plaintiffs met Mr. and Ms. Conway on or around April 11, 2010, when a mutual friend introduced them.   The Conways approached Counterclaim Plaintiffs seeking advice on Ms. Conway's musical career and assistance in finding Ms. Conway an internship in Nashville.   Counterclaim Plaintiffs introduced her to a few people in the music industry in Nashville and tried to get her get an internship.

15.     In or around April 2010, Counterclaim Plaintiffs were asked by the Conways to hear some of Ms. Conway's music.  Counterclaim Plaintiffs agreed and called her a week later to invite her to come to Los Angeles and discuss her career and record a demo.  Between April 11, 2010 and May 12, 2010 Ms. Conway told Counterclaim Plaintiffs that she would like to move forward and record songs.

**The Agreement**

16.     In a series of phone calls beginning on May 15, 2010 Mr. and Ms. Conway and Counterclaim Plaintiffs participated in discussions that resulted in the Conways requesting to enter into an agreement concerning Ms. Conway's music career.

17.     Counterclaim Plaintiffs advised Ms. Conway to finish college before embarking on her music career.  Mr. and Ms. Conway, however, decided that she would leave college to pursue a career in music.

18.     Counterclaim Plaintiffs informed Mr. and Ms. Conway that it is very expensive to launch a career in the music industry, sometimes costing up to $5 million to launch a new artist. Counterclaim Plaintiffs also informed Mr. and Ms. Conway that the business is risky, and there are no guarantees that anyone will become a star.  Counterclaim Plaintiffs advised Mr. Conway

that he seek out an agent, a record label company, and an investor to invest in Ms. Conway's career, in order to offset the costs.   After several record labels passed on investing in Ms. Conway's career, Counterclaim Plaintiffs suggested approaching some investors.   Mr. Conway, however, insisted that he was financially successful and that he would be the sole financial investor in Ms. Conway's career.   Mr. Conway then asked Counterclaim Plaintiffs to co-manage Ms. Conway's career and produce and promote Ms. Conway's work.   The parties then developed a close and confidential business relationship treating each other as fiduciaries and partners, and reposing, each to the other, the highest degree of trust.

19.     Because of Mr. Conway's representations that he would fund Ms. Conway's career and advance all costs, including paying Stonehall, they agreed to enter into an agreement with the Conways to form a company in Tennessee to develop a career in music for Ms. Conway.

20.     After discussing alternative ways to start Ms. Conway's career, Counterclaim Plaintiffs and Mr. and Ms. Conway agreed that the four of them should jointly work together to manage, produce, and promote Ms. Conway's music career within a Tennessee limited liability company.   As part of the agreement, Mr. Conway agreed as his contribution to pay all expenses associated with forming and managing the company.   Counterclaim Plaintiffs agreed as their contribution to offer their production, creative direction, branding, song writing, coaching, training, marketing and promotion services to Ms. Conway at a discounted rate for their services in exchange for a one-third (1/3) share in the profits, if any, from Ms. Conway's career.   Under the agreement, Ms. Conway would receive one-third (1/3) share in the profits and Mr. Conway would receive the final one-third (1/3) share in the profits, if any, from Ms. Conway's career.

34

21.     Mr. Conway induced Stonehall to agree to allow Mr. Conway's attorney preparing and filing all of the documents related to the company.

22.     Mr. Conway told Counterclaim Plaintiffs that they would be a team and that they would all be owners in the project as they were like family to Ms. Conway and they reposed trust in each other.

23.     The parties agreed that Mr. Conway would advance funds to Counterclaim Plaintiffs, and Counterclaim Plaintiffs would pay all vendors and outside services for Ms. Conway's career from the Stonehall account until the company was formed and opened its own account.   Mr. Conway also agreed to pay the discounted rate for Counterclaim Plaintiffs' services and to handle all the business matters and accounting.

24.     Mr. and Ms. Conway promised that Ms. Conway would perform exclusively under this agreement and that all proceeds from her career would thus be split between the parties to this agreement.

25.     At the Conway's inducement, and because of their representations that they were forming a company in which Stonehall would share profits, the parties began performing under this agreement right away, in May 2010, and performed for over a year.

26.     In reliance on this agreement and the Conways' representations, Stone wrote eight and produced eighteen songs for Ms. Conway to perform and record.   Counterclaim Plaintiffs also arranged for all photo shoots, produced and arranged shooting of many music videos, marketed Ms. Conway's music to radio stations, arranged interviews with industry news organizations, introduced her to agents, set up live performances for her in shows and radio conventions, created and designed her brand and her website, set up press, all creative direction,

set up a radio tour, and produced, recorded and marketed a full length album for Ms. Conway. They also set Ms. Conway up with an agent for booking performances.

27.     At the insistence of Mr. and Ms. Conway, and contrary to the advice of Counterclaim Plaintiffs that no band was necessary, Counterclaim Plaintiffs arranged for and hired a band to perform with Ms. Conway.

28.     Ms. Conway needed extensive professional development, so, with Mr. Conway's approval, Counterclaim Plaintiffs hired a voice coach and a guitar coach.

29.     Stonehall normally charges $20,000 to $30,000 for Stone to write and produce songs for other artists.  Stone, on behalf of Stonehall, wrote eight and produced eighteen songs for Ms. Conway at a discounted rate of between $1,000 and $15,000 per song.  According to the parties' agreement, Stonehall agreed to defer the $266,000 difference in exchange for a portion of the profits from Ms. Conway's performances.

30.     Ms. Conway promised to use best efforts to continue performing the songs that Stone wrote and produced in an effort to make them profitable to Stonehall.

31.     Pursuant to the parties' agreement, Mr. Conway advanced all funds to Counterclaim Plaintiffs, who then expended all such funds on projects approved by the Conways in furtherance of Ms. Conway's career.  Counterclaim Plaintiffs consistently provided detailed invoices to Plaintiffs of their expenditures on behalf of Ms. Conway.

32.     The Conways did not provide a written agreement as promised and for about a year, the parties performed under the agreement set forth above, mostly working to develop Ms. Conway's music and her performance skills.  When the parties decided she was ready to record an album and begin performing live and touring, in June 2011, the parties conferred via telephone and began to discuss the next steps of the process.

33.     At this time, the parties agreed that Ms. Conway's career needed marketing and promotional services.   Thus, the parties agreed that Mr. Conway would pay Stonehall $25,000 per month for additional services, a portion of which was to be spent on marketing fees Stonehall incurred promoting Ms. Conway, and the remainder was to be retained by Counterclaim Plaintiffs as consulting fees.   In turn, Counterclaim Plaintiffs agreed not to work with any clients other than Ms. Conway and thus to forego any fees from other clients.   In reliance upon the Conways' promises to pay, Counterclaim Plaintiffs passed up joint ventures with major labels creating bands and developing other performers to work exclusively for Ms. Conway.

34.     Throughout the entirety of the parties' relationship, Mr. Conway was extensively involved in every aspect of decision-making related to Ms. Conway's career.   His involvement included, but was not limited to, regular telephone conversations with Counterclaim Plaintiffs, reviewing and approving invoices for payment, and providing marketing and other business-oriented suggestions.

35.     Ms. Conway was also heavily involved in making decisions with regard to her career, especially in connection with the creative aspects as well as and how she was portrayed in the public eye.   For instance, Ms. Conway directed Counterclaim Plaintiffs to schedule extra photo shoots because she did not like certain photos, and insisted upon having the best tour bus (Prevost), hiring tour managers, the best studios, expensive hotels, first class airline seats for herself and her guitar, an onsite computer for photo shoots so that she could review her photos in real-time, re-recording of songs because she did not like the previous recordings, changes to the packaging for albums and singles that cost thousands of dollars, and expensive equipment such as a MAC personal computer and an IN EARS system.   When Counterclaim Plaintiffs would

suggest that these things were too expensive for an artist just starting out in the music industry, Mr. Conway would direct Counterclaim Plaintiffs to comply with Ms. Conway's requests.

36.     Benefitting from Counterclaim Plaintiffs' coaching, marketing and contacts in the industry, Ms. Conway cut a full album, had professional videos on YouTube and all her social media sites, and has three songs that are played on the radio.  Ms. Conway was even named iTunes "artist of the week" during the weeks of August 7, 2012 and August 14, 2012.

37.     Ms. Conway's first single, called "Beautiful Day," was released on August 9, 2011.

38.     Ms. Conway's six-song EP, called "No Turning Back," was released in December 2011.

39.     Ms. Conway's full-length record, called "Sunrise," was released in August of 2012.

40.     Mr. Conway and Ms. Conway repeatedly praised Counterclaim Plaintiffs' services at regular intervals over the years, and expressed excitement about Ms. Conway's career trajectory throughout the entire relationship of the parties.

**The Works**

41.     Stonehall engaged Stone who wrote, produced, recorded, and copyrighted songs (the "*Works*") pursuant to the Operating Agreement for the purpose of promoting Ms. Conway ("Artist"), including the following sound recordings:

      a.   "Beautiful Day" (Copyright Registration No. SR0000734814 / 2013-09-17);

      b.   "Free" (Copyright Registration No. SR0000734812 / 2013-09-17);

      c.   "August Rush" (Copyright Registration No. SR0000734815 / 2013-09-17);

      d.   "Day Dreamin'" (Copyright Registration No. SR0000734813 / 2013-09-17);

e.   "Walk In The Sun" (Copyright Registration No. SR0000734820 / 2013-09-17);

f.   "Naïve" (Copyright Registration No. SR0000734828 / 2013-09-17);

g.   "You Baby" (Copyright Registration No. SR0000734817 / 2013-09-17);

h.   "Callin' You Baby" (Copyright Registration No. SR0000734825 / 2014-01-07);

i.   "I Like You" (Copyright Registration No. SR0000734822 / 2013-09-17);

j.   "No Turning Back" (Copyright Registration No. SR0000734818 / 2013-09-17);

k.   "Cece's Song" (Copyright Registration No. SR0000734827 / 2013-09-17); and

l.   "I Could Have Loved You" (Copyright Registration No. SR0000734821 / 2013-09-17).

42.     Pursuant to the parties' agreement, including the express provisions in the Operating Agreement that Stonehall was assigned "all right, title, and interest in and to all sound recordings" (see Exhibit A at Section 4.03), Stonehall is the copyright claimant to each and every song comprising the *Works*.

**The Great Lines Operating Agreement**

43.     On or about June 10, 2011, Mr. Conway decided that the parties should draft the documents he promised in May 2010 for the company that would run Ms. Conway's career.  Mr. Conway selected and hired Orville Almon, Jr., an entertainment and corporate attorney, in Nashville, Tennessee to draft the Operating Agreement of the parties' joint venture company.

44.     The parties negotiated and agreed upon the terms of the Operating Agreement of Great Lines, LLC.  Mr. Conway suggested the name "Great Lines, LLC." Great Lines, LLC ("Great Lines" or the "Company") was intended to be the company that would engage solely in the business of developing, promoting, marketing, and otherwise exploiting the career of Ms. Conway, and all other related activities.

45.    In June 2011, the Conways continued discussing memorializing the parties' agreement in writing.  Mr. Conway promised to get his lawyer to complete that process.

46.    Finally, Mr. Conway's attorney, Orville Almon, completed the agreement entitled "Operating Agreement of Great Lines, LLC" (a true and correct copy of which is attached hereto as Exhibit A "The Operating Agreement"), a Tennessee limited liability company pursuant to the Tennessee Revised Limited Liability Act, T.C.A. §§ 48-249.101 et seq.

47.    Pursuant to the Operating Agreement, the parties agreed that, among other things,:

a.    The members would be the Conways (33.3% each) and Stonehall (33.3%) (see Section 1.10 and 9.02 of the Operating Agreement);

b.    Ms. Conway would provide her exclusive services to the Company (see Section 4.02);

c.    Ms. Conway and The Company would assign all copyrights and interests in recordings to Stonehall (see Section 4.03);

d.    Mr. Conway would pay "a minimum of $750,000, with additional contributions…" (see Section 4.04);

e.    The Board of Directors would be comprised of the Conways (2/3 vote), and Stone and Hall sharing one vote.  Mr. Conway was named as the Chairman (see Section 15.04);

f.    Management required majority votes of the board (see Section 16.01) and major member decisions by a majority of members (see Section 16.02).

g.    The Operating Agreement is governed by Tennessee law, jurisdiction, and forum (see Section 30).

48.     The Conways' attorney stated that he would file all documents with the Tennessee Secretary of State in or around January 2012.

49.     From July 2011 through August 2012, Mr. Conway made all of the $25,000 per month payments to Counterclaim Plaintiffs.

50.     During this time, the parties were in contact on an almost daily basis, with Mr. Conway and Counterclaim Plaintiffs offering advice on what actions to take in furtherance of Ms. Conway's career.   Under the terms of the parties' agreements, Counterclaim Plaintiffs never made any unilateral decisions concerning Ms. Conway's career.   Stonehall always suggested actions to take and waited for approval from both Ms. Conway and Mr. Conway.   Mr. and Ms. Conway also decided many actions on their own.

51.     The Members of the Company were to be Mr. Conway, Ms. Conway, and Stonehall.

52.     The parties agreed that Stone was to be the President of Great Lines, Hall was to be Secretary, and Mr. Conway was to be the Chairman of the Board of Directors.

53.     Pursuant to the Operating Agreement and consistent with the parties' earlier agreement, Stonehall, would receive one-third (1/3) share in the profits of Great Lines; Ms. Conway would receive one-third (1/3) share in the profits; and Mr. Conway would receive the final one-third (1/3) share in the profits.

54.     Ms. Conway's contribution to the Company was to be her exclusive services.

55.     Stonehall's contribution to the Company was to be Counterclaim Plaintiffs' services to develop, promote, market and otherwise exploit Ms. Conway's career.

56.     Mr. Conway's contribution to the Company was to make a substantial financial capital contribution and to serve as the Chairman of the Board of Directors, responsible for directing all business of the Company.

57.     Stonehall was to own all rights, titles and interests in all sound recordings of Ms. Conway.

58.     The Operating Agreement of Great Lines, LLC reflects the understanding of the parties: that they were jointly operating under the agreement set forth above with the goal of establishing a profitable career in music for Ms. Conway.  The Operating Agreement of Great Lines, LLC is consistent with the behavior of the parties at all relevant times, including before the agreement was drafted.

**The Conways' Breaches**

59.     In 2012, Ms. Conway began a series of acts which were calculated to frustrate the purposes of the agreements between the parties, including her agreement "to render her exclusive services" to the Company whose purpose and right was "exploiting the career of Liana Conway."

60.     On June 24, 2012, Counterclaim Plaintiffs set up and executive-produced a tour for Ms. Conway to promote Ms. Conway's new album.  Mr. Conway attended some of the shows as well.

61.     Counterclaim Plaintiffs set up an interview with MTV executives in New York City for August 9, 2012.  Stone told Ms. Conway not to drink any alcohol or stay out late the night before the interview because she would have to sing for the MTV executive and Stone knew her voice would not be at its best if she engaged in these activities.

62.     Ms. Conway got very angry with Stone for saying this, began yelling and screaming at Stone and throwing a temper tantrum in front of many people.  Ms. Conway said

she was quitting the music business, broke a necklace Stone was wearing and sped off in a limousine insisting she have everything her way.

63.     Ms. Conway then proceeded behave erratically and in breach of her agreement to provide her exclusive services to the Company.  At the MTV interview, Ms. Conway's voice cracked while singing.  After the interview, she again yelled and screamed at Stone in front of many people, including much of the MTV office staff, the MTV press relations contact, and her band members.  She again threatened to quit the music business.

64.     Throughout the parties' business relationship, Mr. Conway and his wife (Ms. Conway's mother) expressed their concern to and repeatedly consulted with Counterclaim Plaintiffs for advice and assistance in working with Ms. Conway to change behaviors that were detrimental to her career.

65.     In one instance, in late August 2012, Ms. Conway's mother noticed some disturbing information on the internet and informed Mr. Conway.  This information caused them to conclude that Ms. Conway's partying lifestyle and use of alcohol was negatively affecting her career and the parties' business relationship.  Mr. Conway informed Counterclaim Plaintiffs of these conclusions, and asked them for help in getting Ms. Conway to change her lifestyle. Counterclaim Plaintiffs complied with Mr. Conway's requests, but Ms. Conway did not make significant changes to her lifestyle.

66.     On other occasions in late August and early September 2012, Ms. Conway was so distracted by drama in her dating relationship that it caused Mr. Conway and Ms. Conway's mother so much concern that they again felt the need to consult with Counterclaim Plaintiffs for advice in handling the matter.   Again, Counterclaim Plaintiffs intervened to no avail: Ms. Conway continued her behavior.

67.     In September, 2012, Mr. and Ms. Conway breached the parties' agreement by: (a) abruptly stopping the $25,000 per month payments to Counterclaim Plaintiffs for their marketing services; (b) cancelling all scheduled performances and promotional tours; (c) wrongfully terminating the services of Counterclaim Plaintiffs; and (d) converting all Stonehall's rights and interests, including copyright in the *Works*.

68.     In fact, Counterclaim Plaintiffs performed services in August 2012 for which Mr. Conway never paid.  Mr. Conway had asked Stone to arrange for and record Ms. Conway singing the National Anthem.  Mr. Conway intended to use the recording to give to a friend, in hopes he would book Ms. Conway to sing at some sporting events.

69.     Ms. Conway has also begun to perform in the entertainment industry again.  Upon information and belief, Ms. Conway is currently recording new music in studios; she performed a live show in or about October 2012, at Showcase Live, an entertainment venue in Foxboro, Mass.; and she is in talks with Kevin Mitchell, a senior entertainment executive and Director of Showcase Live, and Robert Platt, a campaign fundraiser for Mitt Romney with ties to the entertainment industry, about setting up more shows.  In further breach of the parties' agreement, however, Mr. and Ms. Conway have failed to account to Stonehall and have not shared any of the proceeds of her performances with Counterclaim Plaintiffs.

70.     At this point, it became clear that all along Ms. and Mr. Conway had no intention of sharing any profits on Ms. Conway's career with Counterclaim PlaintiffsMs. Conway has engaged in a pattern of not working hard enough to make her career profitable, as evidenced by her frequent temper tantrums, cancelling rehearsals, refusing to take care of her voice and insistence on partying all night, all in an effort to evade her contractual obligations

44

71.     From May 2013 to August 2013, the Conways terminated the agreements and sent threatening letters from their lawyers related to the "Services Engagement."

72.     Then, in further breach, specifically of Section 30 of the Operating Agreement, the Conways sued Stonehall and other improper parties in Massachusetts in flagrant violation of their agreement.

73.     The Conways further breached their agreement, including the Operating Agreement, and have appropriated the *Works* for themselves and have infringed upon Stonehall's copyrights without permission, authorization or payment by: (a) performing the Works; (b) distributing the Works; (c) copying the Works; (d) copyrighting the Works in a compilation entitled "Liana Conway Sunrise" on June 17, 2013 (Registration No. SR0000722855 with "Liana Conway" as the copyright claimant).

74.     These actions are in direct breach of Ms. Conway's express agreement to all rights "connected with the Artist's activities" to the Company.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement, 17 U.S.C. §§ 101 et seq. – Against All Counterclaim Defendants)

75.     Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

76.     Counterclaim Plaintiffs own copyright interests in all elements and copyrights in the *Works,* including original sound recordings and musical arrangements, which are original copyrighted works under the laws of the United States.

77.     Counterclaim Plaintiffs have the exclusive right to prepare derivative works based upon the copyrighted *Works* pursuant to 17 U.S.C. §106 (2), as well as all other rights provided for in §106.

78.     The Counterclaim Defendants' acts in the United States include copying,

downloading, use, modification, reproduction, display, performance, and distribution of elements of the *Works* constitute a violation of the United States Copyright Act, Title 17 U.S.C. §§ 501(a), 106(1), 106(2) and 106(3), and all Counterclaim Defendants were acting as infringers within the meaning of 17 U.S.C. §105(a).

79.     By the Counterclaim Defendants' participation in, and contribution to, the production, distribution, use, and exploitation of the *Works* in the United States, the Counterclaim Defendants knowingly and willfully infringed, authorized others to infringe, and will continue to infringe the Counterclaim Plaintiffs' copyrights in the *Works*.

80.     As a proximate result of the Counterclaim Defendants' copyright infringement, and that of their agents, affiliates, subsidiaries, and distributors in the United States, Counterclaim Plaintiffs have suffered and will continue to suffer irreparable injury, some of which cannot be compensated in money damages if such wrongful conduct continues.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth below:

(a.)     For compensatory and consequential damages as allowed by law according to proof in an amount to be determined at trial;

(b.)     A permanent injunction, pursuant to 17 U.S.C. §502, enjoining all Counterclaim Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

(c.)     A permanent injunction enjoining all Counterclaim Defendants, their officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of the *Works.*

(d.)     Recovery from all Counterclaim Defendants of the damages, including pre-

judgment interest Counterclaim Plaintiffs sustained and will sustain, and any income, gains, profits, and advantages obtained by Counterclaim Defendants and their subsidiaries, affiliates, distributors, and service providers as a result of their wrongful acts alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

(e.)    The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Counterclaim Plaintiffs are further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

(f.)    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

(g.)    For pre-judgment interest as allowed by law;

(h.)    For costs of suit, including reasonable attorneys as proven; and

(i.)    For such other relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Contributory Infringement – Against All Counterclaim Defendants)

81.    Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

82.    Upon information and belief, all Counterclaim Defendants individually, and in concert with the other named Counterclaim Defendants, and with other persons and entities, encouraged, induced, or materially contributed to, the infringement of the *Works* in that:

(a)    all of the Counterclaim Defendants used, distributed, and/or exploited the *Works* in the United States;

(b)    all of the Counterclaim Defendants, and others, copied, performed, produced, distributed, and displayed the *Works* for domestic distribution; and

47

(c)     Counterclaim Defendants' agents, subsidiaries, licensees, and others distributed, promoted, and advertised the *Works* in territories after its production and manufacture in the United States, and, upon information and belief, induced infringement in the United States by providing financing, guarantees, and agreements for distribution of the *Works*.

83.     Upon information and belief, the Counterclaim Defendants' actions were performed with actual and constructive knowledge of Counterclaim Plaintiffs' rights and interests.

84.     The Counterclaim Defendants are jointly and severally liable for contributory copyright infringement.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth below:

(a.)     For compensatory and consequential damages as allowed by law according to proof in an amount to be determined at trial;

(b.)     A permanent injunction, pursuant to 17 U.S.C. §502, enjoining the Counterclaim Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

(c.)     A permanent injunction enjoining the Counterclaim Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, copying, use, distribution, exploitation, advertising, and promotion of the *Works*;

(d.)     Recovery from the Counterclaim Defendants of the damages, including pre-judgment interest Counterclaim Plaintiffs sustained and will sustain, and any income, gains, profits, and advantages obtained by the Counterclaim Defendants, their officers, agents, employees, licensees, assigns, distributors, sub-distributors, and all persons acting in concert with them, as a result of their wrongful acts committed in the United States, and those of their

subsidiaries, affiliates, and distributors, alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

(e.) The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Counterclaim Plaintiffs are further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

(f.) For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper, including punitive damages.

(g.) For pre-judgment interest as allowed by law;

(h.) For costs of suit, including reasonable attorneys as proven;

(i.) For such other relief as the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
**(Vicarious Copyright Infringement - Against All Counterclaim Defendants)**

85. Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

86. All of the Counterclaim Defendants had the right, authority, and the ability to control or supervise the actions, failures, and omissions of their fellow Counterclaim Defendants, and other persons and entities, including their subsidiaries, affiliates, and distributors, which violated Counterclaim Plaintiffs' copyright in the *Works*.

87. The Counterclaim Defendants had knowledge of the Counterclaim Plaintiffs' rights and interests in the *Works*, during the development, production, distribution, copying and exploitation of the *Works*.

88. All named Counterclaim Defendants obtained a direct financial interest, financial advantage, and/or economic consideration from the infringement in the United States as a result

of their infringing actions in the United States.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth below:

(a.)     For compensatory and consequential damages as allowed by law according to proof in an amount to be determined at trial;

(b.)     A permanent injunction, pursuant to 17 U.S.C. §502, enjoining the Counterclaim Defendants, their officers, agents, employees, licensees, assigns, distributors, and all persons acting in concert with them, from engaging in such further violations of the Copyright Act;

(c.)     A permanent injunction enjoining the Counterclaim Defendants, their subsidiaries, affiliates, officers, agents, employees, licensees and assigns, distributors, sub-distributors, and all persons acting in concert with them, from engaging in or authorizing the production, copying, distribution and/or exploitation of the *Works*;

(d.)     Recovery from the Counterclaim Defendants of the damages, including pre-judgment interest Counterclaim Plaintiffs sustained and will sustain, and any income, gains, profits, and advantages obtained by the Counterclaim Defendants, their subsidiaries, affiliates, and distributors as a result of their wrongful acts committed in the United States alleged hereinabove pursuant to 17 U.S.C. §504(b), in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

(e.)     The maximum statutory damages in the amount of $30,000.00 per infringement, and/or $150,000.00 per willful infringement pursuant to 17 U.S.C. §504(c), or for such other amount as may be proper under 17 U.S.C. §504(c). Counterclaim Plaintiffs are further entitled to their attorney's fees and full costs pursuant to 17 U.S.C. §505; and

(f.)     For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§101 et seq., and/or for which the Court may deem just and proper.

(g.)     For pre-judgment interest as allowed by law;

(h.)     For costs of suit, including reasonable attorneys as proven;

(i.)     For such other relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (Breach of the Operating Agreement – Against All Counterclaim Defendants)

89.     Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

90.     On or about January 27, 2012, Counterclaim Plaintiffs ("Stonehall") and the Conways executed the Operating Agreement.

91.     The Operating Agreement is governed by Tennessee law (T.C.A. Sections 1.01, 30).

92.     Pursuant to this agreement, Ms. Conway (the "Artist") and the Company assigned all right, title and interest in the Artist's recordings, reproductions, and duplications of the *Works* to Stonehall and Stonehall is entitled to collect all monies from the exploitation of the *Works*.

93.     In violation of the Operating Agreement, the Conways retained and copyrighted duplications of the Artists' master recordings and the *Works* and continue to collect monies from the exploitation of the *Works*.

94.     Division of Company assets must be in accordance with the provisions of Tenn. Code Ann. §48-249-305(b).

95.     The Tennessee Revised Limited Liability Act, Tenn. Code. Ann. §§ 48-249-101 *et seq.*, contains detailed provisions for the formation, financing, management and dissolution of limited liability companies ("LLC").  An LLC may be created "for the purpose of engaging in

any lawful business." Tenn. Code Ann. § 48-249-104(a). It is formed by filing Articles of Organization with the Tennessee Secretary of State, containing the information required by Tenn. Code Ann. § 48-249-202.

96.     The Act contemplates (but does not require) that the members of the LLC enter into an Operating Agreement to regulate the affairs of the organization, which need not be in writing. Tenn. Code Ann. § 48-249-203(a).

97.     A "capital contribution" is defined as "[c]ash, property, or services contributed by partners to a partnership," or "[f]unds made available by a shareholder, usually without an increase in stock holdings." Black's Law Dictionary (7th ed. 1999). The statutes governing capital contributions to an LLC are found at Tenn. Code Ann. § 48-249-301 and 302.

98.     The Articles of Organization for the Company were filed with the Tennessee Secretary of State.

99.     The Conways accepted the benefit of Stonehall's contribution.

100.     The Conways intended their investment to be a capital contribution and that Stonehall understood it as such.

101.     Counterclaim Plaintiffs demand that the Court terminate the limited liability Company pursuant to Tenn. Code Ann. § 48-249-616.

102.     In the absence of an Operating Agreement containing provisions to the contrary, the governing statutes in the Tennessee Revised Limited Liability Company Act presume that the members of an LLC will share equally in both profits and losses (Tenn. Code Ann. §§ 48-249-602 and 603), by administrative action (Tenn. Code Ann. §§48-249-617 and 618), or by judicial action (Tenn. Code Ann. 48-249-617 and 618). When an LLC is dissolved by judicial action, the relevant statute gives the court broad authority over the ultimate distribution of its assets:

52

> A court may grant any equitable relief it considers just and reasonable under the circumstances, may dissolve an LLC or may direct the dissolved LLC be merged into another or new LLC or other entity, or otherwise be terminated, on the terms and contributions the court deems equitable.

Tenn. Code. Ann. § 48-249-616.

103.    Further, the Conways did not provide Stonehall with the required notice, nor did they take the requisite action in accordance with the buyout and withdrawal provisions in violation of Section 20 of the Operating Agreement.

104.    The Operating Agreement is an enforceable contract between Stonehall and the Conways.  The Conways were both majority members and majority directors and they owed their fellow minority members a duty of loyalty, both under common law, pursuant to the Operating Agreement, and pursuant to Tennessee statutes (T.C.A. §§ 48-249-101 et seq.), and the Conways have breached the Operating Agreement.

105.    The Operating Agreement expressly provides that the Conways were required to obtain the majority vote for major decisions such as any act which makes it impossible to carry on business or the sale or transfer of assets to "be the valid and binding act of the Company" (see Exhibit A, at Sections 15.01 and 16.02).  Failing this consent, the Conways' actions relating to these transactions constitute breaches, are *ultra vires* and void *ab initio*.

106.    The Conways breached the Operating Agreement as the Conways had no authority to unilaterally act in these particular matters.

107.    In addition to the prohibitions in the Operating Agreement, the Operating Agreement expressly stated that the purpose of the Company was to exploit and develop the Artist, Ms. Conway, who agreed to provide her exclusive services (see Exhibit A at Sections 4.01 and 4.02).  The Conways violated these provisions.

108.    The Conways materially breached express provisions of the Operating Agreement

requiring special approval by written vote of a majority required by Sections 15 and 15.05 for member decisions by: (a) transferring and selling the rights and interests in the Artist without Stonehall's consent; (b) Section 18 for transferring all of their membership interest without Stonehall's consent and requiring a majority vote to sell or reorganize the company or to make a general assignment; (c) Section 15.02 requiring written notice of special meetings; (d) Section 16.02(c) regarding the sale of all of the assets of the Company; (e) Section 19.02 by withdrawing from the Company without approval; (f) failing to account to Stonehall; and (g) suing Stonehall in Massachusetts in violation of the jurisdiction provision of the Operating Agreement (Section 30).

109.    The Conways knew or should have known of Stonehall's lack of consent to or approval, express or implied, of the transfers and that such consent and/or approval was expressly required by the Operating Agreement.

110.    As a result, the Conways are liable to Stonehall for all damages resulting from The Conways breach of the Operating Agreement.

111.    Stonehall has been damaged by the Conways' material breaches of the Operating Agreement, including, but not limited to, (a) ownership of all of the assets and opportunities related to the exploitation of the Ms. Conway, (b) the loss of interest in the Artist, (c) lost profits and opportunities, and (d) costs incurred and associated with the Artist.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief that this Court fashion a judgment that allows the return to Stonehall of its capital contribution, all assets of the Company, and that all proceeds be divided equally between the parties in accordance with Tenn. Code Ann. §48-249-305(b).

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing –
### Against All Counterclaim Defendants)

112.     Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

113.     Under Tennessee law, all contracts include an implied covenant to act in good faith.

114.     As parties to the Operating Agreement and Mr. Conway as Chairman and the Conways as managing members of Great Lines, the Conways owed Stonehall a duty to act at all times honestly and in good faith and Stonehall expected that Mr. Conway would comply with the terms of the Operating Agreement.

115.     The Conways breached their duty of good faith to Stonehall  by violating both express and reasonably implied obligations in the Operating Agreement in bad faith to extinguish Stonehall's rights for their own benefit, including (a) transferring and selling the rights and interests in the Artist for no consideration and without Stonehall's consent to a Major Decision.

116.     The Conways knew or should have known of their lack of authority due to Stonehall's lack of consent to or approval, express or implied, of the transfer and sale of Stonehall's rights and interests in the Artist to themselves and the transfer of Stonehall's interest in the Artist to the Conways and that such consent and/or approval was expressly required by the provisions in the Operating Agreement.

117.     Stonehall has been damaged by The Conways' breach of their covenant of good faith and fair dealing, including, but not limited to, (a) rights and interests in the Artist, (b) the loss of Stonehall's interest in the Company and the *Works*, (c) lost profits and opportunities, and (d) legal fees and costs incurred associated with the preservation of Stonehall's rights.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief that this Court fashion a judgment on any basis that the Court deems equitable and that allows termination of the Company, the return to Stonehall of its capital contribution, all assets of the Company, and that all proceeds be divided equally between the parties in accordance with Tenn. Code Ann. §48-249-305(b) and §48-249-620.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty – Against All Counterclaim Defendants)

118.    Counterclaim Plaintiffs re-allege and incorporate by reference, as though fully set forth herein, the allegations contained in the preceding paragraphs of this Counterclaim.

119.    As majority members, board members, and managers, the Conways owed Stonehall the duties of loyalty and care under Tennessee common law and Tenn. Code Ann. §§ 48-249-101 et seq., and this duty cannot be waived by an operating agreement.

120.    The Conways breached their duties of loyalty and care to Stonehall by, among other things: (a) transferring and selling the rights and interests in the Artist without Stonehall's consent; (b) transferring all of Stonehall's interest in the Company, the Artist, and the *Works* to themselves for no consideration and without Stonehall's proper consent; (c) failing to provide notice to, communicate with, meet with, and obtain the vote from Stonehall for major business decisions; (d) conspiring to usurp Stonehall's rights; (e) taking actions adverse to Stonehall in violation of Tennessee C.A. §48-249-403(b); (f) not acting in good faith to share knowledge of related party and adverse transactions in violation of Tennessee law; (g) failing to disclose conflicts of interest in violation of Tennessee law; and (h) making unlawful distributions in violation of Tennessee C.A. §48-249-102; and (i) filing to account in violation of Tennessee C.A. §48-249-403(b).

121.    The Conways knew or should have known of their lack of authority due to

56

Stonehall's lack of consent to or approval, express or implied, of the transfer and sale of Stonehall's rights and interests in the Artist and the *Works*, and the transfer of 100% of Stonehall's membership interest in the Company, and that such consent and/or approval was expressly required by the provisions in the Operating Agreement.   The Conways' actions constitute grossly negligent, reckless conduct and/or intentional misconduct in violation of Tennessee C.A. §48-249-403(c).

122.   The Conways knew or should have known of Stonehall's lack of consent to or approval, express or implied, of the transfer and sale of Stonehall's rights and interests in the Company, the Artist, and the *Works*  to themselves and that such consent and/or approval was required by Tennessee law.

123.   Stonehall has been damaged by the Conways' breach of their duties of loyalty and care including, but not limited to, the devaluation of Stonehall's membership interests in the Company and the loss of its rights and interest in the Artist and in the *Works*.

124.   As majority members, managers, and directors, the Conways owed Stonehall a duty of loyalty and care, which arose from their course of dealing as business partners, a relationship of trust independent of any contractual duties which led Stonehall to believe the Conways were acting on behalf of Stonehall's best interests, from the Conways acting as an agent for them as principals, including Stonehall, in the management and development of the Artist.

125.   Stonehall reposed trust in the Conways, and the Conways agreed to accept Stonehall's trust and protect Stonehall's interests (e.g. refrain from self-dealing and from concealing material facts).

126.   The Conways breached their duties of loyalty and care to Stonehall by, among

57

other things: (a) transferring and selling Stonehall's rights and interests in Great Lines, the Artist, and the *Works* without Stonehall's consent; (b) transferring all of Stonehall's membership interest to themselves without Stonehall's consent; (c) failing to communicate and give Stonehall the opportunity to be involved in major business decisions and activities; (d) conspiring to usurp Stonehall's rights; (e) making misrepresentations to Stonehall regarding the operation; (f) taking actions adverse to Stonehall; (g) not acting in good faith to share knowledge of related party and adverse transactions; (h) failing to disclose conflicts of interest; and (i) failing to abstain from voting on major decisions while occupying a relationship or interest in the transaction.

127.    The Conways knew or should have known of Stonehall's lack of consent to or approval, express or implied, of the transfer and sale of Stonehall's rights and interests in the Company, the Artist, and the *Works* to themselves and that such consent and/or approval was required by Tennessee law.

128.    Stonehall has been damaged by the Conways' breach of their duties of loyalty and care including, but not limited to, the devaluation of Stonehall's membership interests in the Company, the Artist, and the *Works*.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein.

## SEVENTH CLAIM FOR RELIEF
### (Fraud / Intentional Misrepresentation – Against All Counterclaim Defendants)

129.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

130.    Beginning in May 2010, as set forth above, Counterclaim Defendants intentionally misrepresented to Counterclaim Plaintiffs that, if Counterclaim Plaintiffs contributed their services, and gave the Conways a discounted rate on their services, then in

return, Counterclaim Plaintiffs would share in the proceeds of Ms. Conway's career, receiving one-third of all profits on Ms. Conway's career.

131.    In June of 2011, as set forth above, Counterclaim Defendants again intentionally misrepresented to Counterclaim Plaintiffs that, if Counterclaim Plaintiffs gave the Conways a discounted rate on their services, then in return, Counterclaim Plaintiffs would share in the proceeds of Ms. Conway's career, receiving one-third of all profits on Ms. Conway's first two albums.

132.    At the time Counterclaim Defendants made these misrepresentations, they intended to defraud Counterclaim Plaintiffs in order to obtain their services and the benefit of their industry connections at a discounted price.  Ms. Conway had no intention of ensuring that her lifestyle did not impair her career progression while she was working with Counterclaim Plaintiffs, and Mr. Conway had no intention of sharing any future profits on Ms. Conway's career with Counterclaim Plaintiffs.

133.    In reliance on the promises made by the Counterclaim Defendants, Counterclaim Plaintiffs were induced to provide their services to Ms. Conway at a discounted rate.

134.    WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Plaintiffs have suffered damages by foregoing $266,000 in payments from Counterclaim Defendants for the services they performed for Ms. Conway's career.  Moreover, Counterclaim Plaintiffs give up other employment as a result of their commitments to the Conways.

## EIGHTH CLAIM FOR RELIEF
### (Negligent Misrepresentation – Against All Counterclaim Defendants)

135.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

136.    In the course of negotiating an agreement, including specifically the Operating Agreement, with Counterclaim Plaintiffs, Counterclaim Defendants supplied false information for the guidance of Counterclaim Plaintiffs in its business transactions.    Specifically, Counterclaim Defendants informed Counterclaim Plaintiffs that Ms. Conway intended to take her music career seriously and that Counterclaim Plaintiffs would share in the proceeds of Ms. Conway's career.

137.    Counterclaim Defendants, however, never performed the acts they promised to induce Stonehall to provide their services, and the Conways knew that Ms. Conway's lifestyle at the time was calculated to prevent her from having the kind of work ethic necessary to launch a profitable music career.    Further, Counterclaim Defendants termination of Stonehall evidences that they had no intention to share the profits with Counterclaim Plaintiffs.

138.    Counterclaim Defendants failed to exercise reasonable care in communicating that false information to Counterclaim Plaintiffs.

139.    Counterclaim Plaintiffs justifiably relied on that information and suffered damages as a result.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Plaintiffs have suffered damages by foregoing $266,000 in payments from Counterclaim Defendants for the services they performed for Ms. Conway's career. Moreover, Counterclaim Plaintiffs give up other employment as a result of their commitments to the Conways.

## NINTH CLAIM FOR RELIEF
### (Breach of Oral Contract/Implied Covenant of Good Faith and Fair Dealing –
### Against All Counterclaim Defendants)

140.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

141.    Counterclaim Plaintiffs and Mr. and Ms. Conway entered into a contract.

142.    Mr. Conway offered to cover the expenses of Ms. Conway's career.  Ms. Conway promised to perform exclusively under this agreement.  Mr. and Ms. Conway offered to share all the proceeds of Ms. Conway's career with Counterclaim Plaintiffs as follows: Counterclaim Plaintiffs together would receive one-third (1/3) share in the profits; Ms. Conway would receive one-third (1/3) share in the profits; and Mr. Conway would receive the final one-third (1/3) share in the profits from Ms. Conway's career.

143.    In exchange, Counterclaim Plaintiffs promised to provide their extensive services to Ms. Conway at a discounted rate.

144.    Implied in the contract was a promise to act in good faith and deal fairly.

145.    In breach of the parties' agreement, in September of 2012, Mr. Conway refused to continue to pay for the expenses for Ms. Conway's career and Ms. Conway refused to perform exclusively under the agreement.  Then, Mr. Conway terminated the agreement with Stonehall.

146.    In bad faith, Mr. and Ms. Conway have benefitted and will continue to benefit from the valuable advice, professional experience and connections in the industry provided by Counterclaim Plaintiffs without having had to pay full price for those services.

147.    Mr. and Ms. Conway are also now using those benefits to forge ahead with Ms. Conway's career, without having to share the profits with Counterclaim Plaintiffs.

148.    Counterclaim Plaintiffs have suffered damages as a result.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Plaintiffs have suffered damages by foregoing $266,000 in payments from Counterclaim Defendants for the services they performed for Ms. Conway's career. Moreover, Counterclaim Plaintiffs give up other employment as a result of their commitments to the Conways.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment – Against All Counterclaim Defendants)

149.     Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

150.     Counterclaim Plaintiffs have conferred the benefit of their services on Mr. and Ms. Conway at a discounted rate.

151.     Mr. and Ms. Conway appreciate the benefit of these discounted services.

152.     Counterclaim Plaintiffs reasonably expected to receive a benefit in return.

153.     Mr. and Ms. Conway have unjustly retained the benefits of these services without paying full price in violation of the expectations of Counterclaim Plaintiffs.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Plaintiffs are entitled to restitution of the full amount of the value of their services.

## ELEVENTH CLAIM FOR RELIEF
### (Quantum Meruit – Against All Counterclaim Defendants)

154.     Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

155.     Counterclaim Plaintiffs spent significant time and effort in writing songs for, coaching, training, marketing, branding, creative direction and promoting Ms. Conway.

156.    Counterclaim Plaintiffs's services conferred substantial benefit upon Mr. and Ms. Conway.

157.    Counterclaim Plaintiffs reasonably expected to receive a benefit in return.

158.    Mr. and Ms. Conway have unjustly retained the benefits of these services without paying full price in violation of the expectations of Counterclaim Plaintiffs.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Plaintiffs have been unjustly harmed and are entitled to the reasonable value of their services.

### TWELFTH CLAIM FOR RELIEF
### (Promissory Estoppel – Against All Counterclaim Defendants)

159.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

160.    As set forth in more detail above, Mr. Conway promised to cover the expenses of Ms. Conway's career.  Ms. Conway promised to perform exclusively under this agreement.  Mr. and Ms. Conway promised to share all the proceeds of Ms. Conway's career with Counterclaim Plaintiffs as follows: Counterclaim Plaintiffs together would receive one-third (1/3) share in the profits; Ms. Conway would receive one-third (1/3) share in the profits; and Mr. Conway would receive the final one-third (1/3) share in the profits from Ms. Conway's career.

161.    In reliance on the promise, Counterclaim Plaintiffs were induced to provide discounted services to Mr. and Ms. Conway.

162.    Mr. and Ms. Conway have not fulfilled their promises.  Mr. Conway stopped paying Counterclaim Plaintiffs.  Ms. Conway has refused to perform under the agreement.  The Conways have not shared and do not intend to share any profits of Ms. Conway's music career with Counterclaim Plaintiffs.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as injustice can be avoided only by enforcement of the promise.

## THIRTEENTH CLAIM FOR RELIEF
### (Unfair and Deceptive Acts and Practices in Violation of M.G. L. c. 93A - Against All Counterclaims)

163.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

164.    Counterclaim Plaintiffs are engaged in trade or commerce.

165.    Counterclaim Defendants are engaged in trade or commerce.

166.    Counterclaim Defendants' fraudulent inducement of Counterclaim Plaintiffs into providing discounted services to them constitutes an unfair and deceptive act and practice under G.L. c. 93A.

167.    Counterclaim Defendants' refusal to share the profits of Ms. Conway's career with Counterclaim Plaintiffs in accordance with the parties' agreement constitutes an unfair and deceptive act and practice under G.L. c. 93A.

168.    Further, Counterclaim Defendants' refusal to pay Counterclaim Plaintiffs the fair value of their services constitutes an unfair and deceptive act and practice under G.L. c. 93A.

169.    The willful conduct by Counterclaim Defendants described above constitutes materially unfair and deceptive trade practices that proximately caused damages to Counterclaim Plaintiffs.

170.    Counterclaim Defendants' unfair and deceptive acts and practices occurred primarily and substantially within the Commonwealth of Massachusetts.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Counterclaim Defendants are liable for the damages suffered by Counterclaim

Plaintiffs as a result of their unfair and deceptive acts and practices, and Counterclaim Plaintiffs are entitled to treble damages, attorneys' fees, and costs for Counterclaim Defendants' willful violations of M.G.L. c. 93A.

## FOURTEENTH CLAIM FOR RELIEF
### (Fraud in the Inducement – Against All Counterclaim Defendants)

171.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

172.    The Conways made the false representations and omissions of material facts to Stonehall as described above and by the Operating Agreement where the representations were made again, knowing and intending that Stonehall would justifiably rely on the Conways' representations that:

a.    Stonehall would be paid for their services in exploiting and developing the Artist;

b.    Stonehall would be entitled to their proportionate share of the Company by virtue of the Operating Agreement;

c.    Ms. Conway would render her exclusive services as an Artist to the Company;

173.    The Conways further knew that by promising Stonehall fees based on the discounted rate as Stonehall's contribution to the Company, would induce Stonehall to devote all of their time, efforts and services to co-manage, develop, exploit the Artist, and write and produce sound recordings to be performed by the Artist as evidenced by the Counterclaim Defendants' assertion that, notwithstanding all of Stonehall's efforts, the Conways could unilaterally, and for no good cause, terminate the agreements between the parties, including the Operating Agreement.

174.    The Conways made the false representations to Stonehall described above to induce Stonehall to work diligently to develop and exploit the Artist.  At the time the Conways

made these representations to Stonehall, the Conways knew them to be false and intended to appropriate and procure for themselves Stonehall's rights and interests in the master sound recordings, as well as contracts, property, revenues, income, profits and business opportunities generated by the development of Ms. Conway as the Artist.

175.    The Conwaays made these false representations to Stonehall described above to induce Stonehall to devote its full time and efforts to develop and exploit the Artist while intending to divert the copyright interests, business opportunities, property, revenues, income and profits generated by Stonehall's contributions to the Artist for the Conways' own benefit.

176.    The Conways made the false representations to Stonehall described above when they had already commenced negotiations with others for rights granted exclusively to Stonehall, including registering copyright interests on copies of Stonehall's master sound recordings.  This duplicitous conduct diverted the Artists' earnings to other persons, corporations and/or business entities that the Conways created, formed and/or controlled.

177.    The Conways made the false representations to Stonehall described above, knowing and intending that offering Stonehall the Operating Agreement would induce Stonehall to develop marketing concepts for the exploitation of the Artist.

178.    Stonehall acted reasonably in reliance upon the Conways' false representations and was justified in their reliance.

179.    As a result of Stonehall's reasonable and justifiable reliance upon the Conways' false representations, Stonehall has suffered damages, including, but not limited to, Stonehall's fees from lost business opportunities having devoted their services exclusively to the Conways; and the damages of having provided their services at a discount rate in reliance on the Conways' false representations that Stonehall would share equally in the profits of the Company.

180.    Stonehall did not discover, and was prevented by the Conways and others from discovering, the fraud perpetrated on them by the Conways.

WHEREFORE, Counterclaim Plaintiffs demands judgment against the Counterclaim Defendants for damages, which exceed $15,000.00, resulting from the Conways' fraudulent conduct, including the full value of Stonehall's fees for writing and producing sound recordings for the Artist, and Stonehall's share of revenues generated by the Company, including prejudgment interest, costs and such other and further relief that this Court deems appropriate. Counterclaim Plaintiffs demands a jury trial on all issues so triable.

### FIFTEENTH CLAIM FOR RELIEF
### (Constructive Fraud – Against All Counterclaim Defendants)

181.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

182.    Counterclaim Plaintiffs occupied a confidential business relationship with Counterclaim Defendants which arose from: (a) their confidential business enterprise wherein they acted as co-managers and partners in the Company to exploit the Artist; (b) a course of dealing with Stonehall reposing trust in the Conways as the managing members of the Company, and working closely as fiduciaries to each other to co-manage, develop, and exploit the Artist; (c) Stonehall's close business relationship with the Conways including, but not limited to, confidential development and marketing strategies, operating agreements, providing for duties of loyalty and a course of dealing; and (d) the Operating Agreement to protect Stonehall's rights and interests in the master sound recordings and membership interest in the Company.

183.    Stonehall reposed trust in the Conways and the Conways agreed to accept Stonehall's trust and to protect Stonehall's interests, including agreeing to refrain from self-dealing and from concealing material facts from Stonehall.

184.     The Conways induced Stonehall to continue their exclusive services of co-managing, marketing, developing and exploiting the Artist in reliance of the Conways' representations that the parties would share jointly in the profits of their business enterprise and then apportioned for themselves copyright ownership of the master sound recordings so that the Conways would not only own the majority percentage of interest in the Company (33.3% each), but that they would also misappropriate the very rights and interests assigned to Stonehall as agreed upon in the Operating Agreement.

185.     The Conways represented to Stonehall that the Company was a partnership, that their respective ownership would make each of them an owner of the Company, and that ownership would entitle each of them to receive a proportional share based on their percentage of membership, of all income, revenues, profits, distributions, and corporate opportunities generated by the Artist.

186.     The Conways represented to Stonehall that their ownership of a larger share of the Company was intended to compensate Mr. Conway for his financial investment and capital contribution in the Company, but Mr. Conway's purported financial capital contribution was consideration for Stonehall's discounted rates of service in furtherance of the parties' agreements.

187.     In reasonable and justifiable reliance upon the Counterclaim Defendants' representations that they would protect Stonehall's rights and interests in the master sound recordings and interest in the Company, and the Operating Agreement, and that Stonehall would continue to share proportionally in all of the business opportunities, revenues, income and profits generated by the Company and the Artist, the Conways continued to exclusively dedicate their resources, time, and their professional expertise to the marketing and development of the Artist.

68

188.     The Conways made false representations of material fact to Stonehall, concealed their plan to extinguish the rights of Stonehall, and failed to disclose facts relating to transfers and assignments of Stonehall's copyright interests in the master sound recordings to induce Stonehall to refrain from acting to protect its rights and interests.

189.     At the time the Conways made such false statements to Stonehall, they knew that they were false.

190.     Upon information and belief, Counterclaim Defendants participated with others in making the false statements to Stonehall with the full knowledge of Stonehall's reliance and purported to rely upon their false statements in the Operating Agreement.

191.     The Counterclaim Defendants have engaged in fraud, self-dealing and concealment of their conflicts of interests to the detriment and at the expense of Stonehall, to whom an accounting is owed, including, but not limited to, an accounting and the imposition of a constructive trust on all of the Company's assets.

192.     These fiduciary and confidential relationships are evidenced by the Conways' constant reference to Stone, Hall, and Stonehall as part of a family and a partnership to describe their close, trusting relationship, and further evidenced by Stonehall's status as a minority member in the closely held Company.

193.     The Conways received direct benefits from their fiduciary and confidential relationships with Stonehall, namely their ability to enjoy the benefits of Stonehall's exclusive co-management, marketing, and development of the Artist, and the discounted rate of writing and producing sound recordings for the Artist.

194.     Upon information and belief, the Conways, acting for themselves and as agents for the Company, concealed from Stonehall their diversion and misappropriation of the copyright

interests in the master sound recordings, business opportunities, contracts, property rights, revenues, income and profit generated by the Company to which Stonehall is entitled.

195.   Through the fraud, self-dealing and concealment of the Conways' conflicts of interest, the assets, property, contracts, revenues, income, profits and opportunities generated by Company and owned by Stonehall have been misappropriated by and/or diverted to the Conways personally.

196.   As a result of the fraud, self-dealing, conspiracy and concealment of the conflicts of interest by the Conways, Stonehall has been denied the benefits, profits, dividends, rights and other remuneration Stonehall is entitled to as a member in the Company.

197.   As a result the Conways' procuring and inducing false statements and *ultra vires* actions resulting in the misappropriation of Stonehall's copyright interests to the master sound recordings, Stonehall has been damaged, including but not limited to, the loss of its interest in Company due to the improper transfer of Stonehall's membership interest in the Company, and such damages were contemplated by the Conways as a possible consequence of the Conways' actions.

WHEREFORE, Counterclaim Plaintiffs demands judgment against the Counterclaim Defendants for damages, including: (a) imposing a constructive trust on all assets of the Company; (b) ordering an accounting, (c) granting final judgment against the Counterclaim Defendants; and (d) awarding Counterclaim Plaintiffs damages, costs, interest, and any other relief this Court deems just and appropriate, including punitive damages.

**SIXTEENTH CLAIM FOR RELIEF**
**(Unfair and Deceptive Acts and Practices in Violation of the Tennessee Consumer**
**Protection Act, T. C. A. T. 47, Ch. 18 — Against All Counterclaim Defendants)**

198.    Counterclaim Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Counterclaim.

199.    Mr. Conway and Ms. Conway are engaged in trade or commerce.

200.    Counterclaim Plaintiffs are "persons" under the definition contained in T. C. A. § 47-18-103, and thus have standing to bring this claim.

201.    Mr. Conway's and Ms. Conway's fraudulent inducement of Counterclaim Plaintiffs into providing discounted services to them constitutes unfair and deceptive acts and practices under T. C. A. T. 47, Ch. 18.

202.    Mr. Conway's and Ms. Conway's refusals to share the profits of Ms. Conway's career with Counterclaim Plaintiffs in accordance with the parties' agreement constitute willful and/or knowingly unfair and deceptive acts and practices under T. C. A. T. 47, Ch. 18.

203.    Further, Mr. Conway's and Ms. Conway's refusals to pay Counterclaim Plaintiffs the fair value of their services constitute willful and/or knowingly unfair and deceptive acts and practices under T. C. A. T. 47, Ch. 18.

204.    The aforementioned conduct by Mr. Conway and Ms. Conway constitutes willful and/or knowingly unfair and deceptive trade practices that caused damages to Counterclaim Plaintiffs.

205.    Mr. Conway's and Ms. Conway's unfair and deceptive acts and practices occurred within the State of Tennessee and/or while Counterclaim Plaintiffs were present in the State of Tennessee.

206.   Mr. Conway's and Ms. Conway's conduct is governed by Tennessee Law pursuant to the provisions of the parties' agreement.

WHEREFORE, Counterclaim Plaintiffs are entitled to and prays for relief as set forth herein as Mr. Conway and Ms. Conway are liable for the damages suffered by Counterclaim Plaintiffs as a result of their unfair and deceptive acts and practices, and Counterclaim Plaintiffs are entitled to treble damages, attorneys' fees, and costs for their willful and / or knowing violations of T. C. A. T. 47, Ch. 18.

## JURY DEMAND

Counterclaim Plaintiffs demand trial by jury on all claims so triable.

Dated:  February 25, 2014                    Respectfully submitted,

**BERMAN DEVALERIO**

*/s/   Daryl DeValerio Andrews*
Glen DeValerio (BBO #122010)
Daryl DeValerio Andrews (BBO #658523)
Marie Foley Watson (BBO# 642728)
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Fax:  (617) 542-1194
Email:  gdevalerio@bermandevalerio.com
          dandrews@bermandevalerio.com


MORGAN & MORGAN, P.A.
Clay M. Townsend, Esq.
20 N. Orange Avenue, Ste. 1500
Orlando, FL  32801
Phone: (407) 418-2075
Fax:    (407) 245-3346
Email:  CTownsend@forthepeople.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on February 25, 2014.


Dated:  February 25, 2014                          /s/ Daryl DeValerio Andrews
                                                   Daryl DeValerio Andrews