**Statement of compensation.**

As compensation for my study and testimony in this case, including the preparation of this report, I am charging $250 per hour for my services  I have to date charged $5000 for my services.

**Background and qualifications.**

**Career overview.**

George Howard has more than 20 years of experience in the music business. He founded his first label, Slow River Records, while still in graduate school (Brown University). Beginning with an initial investment of $1,000, Mr. Howard turned Slow River into a dominant independent label with a global distribution and marketing reach. Slow River entered into a strategic partnership with Rykodisc in the mid-1990s. At the time, Rykodisc was one of the world's largest independent labels and the world's first CD-only label. The Slow River/Rykodisc partnership was a successful one, and after the acquisition of Rykodisc by Chris Blackwell (founder of Island Records and the person responsible for, among others, Bob Marley, U2, Traffic, The Cranberries, Robert Palmer, Cat Stevens and many more), Mr. Howard was promoted to president of Rykodisc. Mr. Howard oversaw Rykodisc's label, distribution and publishing company until the company was sold to Warner Music Group for approximately $70 million in 2004.

Mr. Howard then co-founded TuneCore. TuneCore's business model was to provide access to the then-nascent online distribution platforms, such as iTunes, for artists who were not signed to labels. Mr. Howard and his partners bootstrapped TuneCore's launch and with a small team, were able to completely disrupt the music business distribution model in short order. Mr. Howard helped TuneCore secure additional funding from Guitar Center and Opus Capital, which allowed for explosive growth leading to TuneCore becoming one of the world's largest distribution companies. Mr. Howard advised TuneCore on its initial strategy, including marketing, finance and business development and later developed TuneCore's social strategy.

Mr. Howard then followed a life-long dream to give back through teaching and became an assistant professor/executive in residence in the business school at Loyola University, New Orleans. While teaching in the business school, Mr. Howard completed a joint JD/MBA program with honors.

Mr. Howard then formed a strategic advising company with a focus on helping firms and individuals navigate and profit from the confluence of technological, legal and marketing opportunities. In this capacity, Mr. Howard has worked with artists such as Grammy and Oscar-winning legend Carly Simon, Emmy and Grammy-winning composer Mark Isham and companies as diverse as CVS/pharmacy, Brown University, Easter Seals, Alticor (parent company of Amway) and Norton, LLC (parent company of Wolfgang's Vault, Concert Vault, Paste Magazine and Daytrotter).

George Howard has acted as personal manager to Carly Simon. Howard is currently in the process of negotiating a personal management agreement with Melissa Ferrick.

Mr. Howard is an in-demand advisor to a range of companies at various stages of development (from start up to maturity) and is considered an authority on copyright. Mr. Howard is a frequent speaker and moderator at industry events such as SXSW, CMJ, MIDEM and more. Mr. Howard has written countless articles on business strategy for academic publications as well as outlets such as Forbes, Huffington Post and many others. Mr. Howard has authored two books on the music business, both published by Berklee Press.

In addition to advising companies, Mr. Howard is an associate professor of management at Berklee College of Music, where he teaches courses on copyright law, emerging business models and creative promotion in new media.

I have attached my curriculum vitae as an Appendix

**Prior testimony.**

In the previous four years, I have not testified at trial or deposition as an expert witness.

**Prior publications.**

In the previous ten years, I have authored the following publications[1]:

- Howard, George. 2014 "Music Festivals Are Good for Fans, a Necessity for Artists." *The New York Times*

- Howard, George. 2014 "Why Music Services Are Wasting Time Recommending New Music." *Forbes*

- Howard, George. 2013 "The Latest Tectonic Shift in Music." *Huffington Post*

- Howard, George. 2013 "More Thoughts on Why Artists Should Stop Chasing Spotify's Pennies And Focus On Top Fans" *Forbe*s

- Howard, George. 2013 "Why Artists Should Stop Chasing Spotify's Pennies And Focus On Top Fans" *Forbes*

- Howard, George, and Jeff Price. 2012. *The New Rules For the Music Industry.* New York. TuneCore

- Howard, George. 2012. "Start Up Call." *The Music Business Journal*.

- Howard, George, and Jeff Price. 2011. *Music Industry Survival Guide.* New York. TuneCore

---

[1] I have authored numerous articles that have appeared on music-related blogs and websites that may be provided upon request.

- Howard, George. 2011. "Beyond Social Media." *The Music Business Journal*.

- Howard, George and Bruce Warren. 2011. "The Relevance of Radio." Paste Magazine

- Howard, George. 2011. "Assessing Amazon's New Cloud Player." Paste Magazine

- Howard, George. 2010. "Psychographics and Fan Retention." *The Music Business Journal*.

- Howard, George and Gary Myers. 2009. "The Future of Music: Reconfiguring Public Performance Rights." *The Journal of Intellectual Property Law*.

- Howard, George. 2009. "Social Media and the Marketing Mix." *The Music Business Journal*.

- Howard, George. *Music Publishing 101*. Boston: Berkee Press 2005. Book

- Howard, George. 2005 "Royalty Streams." *The Music Business Journal*.

- Howard, George. Getting Signed: An Insider's Guide to the Record Industry. Boston: Berkee Press, 2004. Book

**Facts forming the basis of my opinions.**

In forming my opinions, I have reviewed relevant portions of the following documents and materials:

- The deposition transcript of Andrew Conway;

- The deposition transcript of Liana Conway;

- The deposition transcript of Sybil Hall;

- The deposition transcript of Phoenix Stone;

- The deposition transcript of Joe Skatell;

- The deposition transcript of the designees most knowledgeable of Stonehall Entertainment, LLC; Stonehall Merchandise, LLC; Stonehall Music Publishing, LLC; Stonehall Records, LLC; Stonehall Television, LLC; and Stonehall Touring, LLC (referred to collectively as "Stonehall");

- ███████████████████████████

140815                                3

- Exhibit 82 to the Defendants' Motion for Summary Judgment;

- The subpoena response of Ed Gertler;

- The subpoena response of Apple, Inc.;

- The subpoena response of Wells Fargo, N.A.;

- The subpoena response of Bank of America, N.A.;

- The redacted bank statements produced by the Defendants (Stonehall167 through Stonehall697);

- The receipts and bills produced by the Defendants (Stonehall7668 through Stonehall8028);

- The invoices from Stonehall;

- The Plaintiffs' Complaint;

- The Defendants' First Amended Answer and Counterclaims;

- The Defendants' Second Amended Answer and Counterclaims;

- The Defendants' Responses to Interrogatories;

- The Defendants' Responses to Requests for Production;

- The Operating Agreement of Great Lines, LLC;

- The expert report of Jim DiBiase;

- The expert report of Judith Finell;

- Various E-mails to, from, and among the parties;

- The timeline by Andrew Conway;

- Interview of Liana Conway and Andrew Conway;

- Copyright registrations;

- Recordings featuring the performances of Liana Conway.

**<u>An overview of the modern music industry.</u>**

      I have been retained to offer my professional opinions as a music industry expert concerning a number of factors in the music industry and in particular concerning the quality of

the personal management, business management, and other services provided to Liana Conway and by the Defendants in this case. In order to adequately express my opinions, I need to give an overview of how the modern music industry works, and specifically the relationship between and among the artist and the members of his or her management team. I will also describe the various conflicts of interest between those various capacities.

**The artist's team.**

An artist's team of managers and professionals is integral to the artist's success. While most new artists will not have every individual described below, the personal manager and business manager are the most important elements of the team and should be acquired at the beginning of the artist's career. It is the case oftentimes that there does not exist each of these separate individuals or entities to perform their respective tasks as part of the team; however, where there is a combination of roles, the member on the team is still required to provide the essential services that each such member would otherwise independently provide.

(a) The personal manager.

The personal manager of a musical artist is that person or management entity that gives guidance and advice to the artist in many if not all aspects of such artist's career. When one hears the term "manager" in the music business it is typically assumed that what is being referred to is the so-called "personal manager." Artists have a strong and compelling desire for personal management.

This desire is somewhat residual in nature. It harkens back to the era of the industry in which managers had direct relationships with labels, and thus believed that a manager was an essential conduit to a record deal.

***In that era, and perhaps even more so in today's record industry, where the manager often must function in a wide array of rules,*** the manager is perhaps the most important member of the artist team.

***Unfortunately, due to a frequent mis-alignment of either values or expectations (or both) between the manager and the artist, these relationships can be perilous.***

For a manager-artist relationship to work, there must be clearly defined goals, roles, and expectations.

<u>Beginning-Level Managers</u>

At a certain point—after an artist has made a demo, played some gigs, and started to develop a following—the artist may be approached by someone with interest in managing the artist. Most likely, the people approaching the artist at this early stage of their career will be friends, family, fans, or people who work at the venues where they perform.

Some of the most successful managers in the business originally came from this pool. Bertis Downs, for example, began working with REM when he and members of the band were college students together in Athens, GA. Brian Epstein worked in his family's furniture store

when he was asked to go see a band. That band was the Beatles, and he became their manager. Rusty Harmon was a college student and an intern at a management firm, who showed a young band around when they came through town. This band, eventually sold millions of records and won two Grammys under Mr. Harmon's management: Hootie and the Blowfish. Similarly, Coran Capshaw, who became the manager to the Dave Mathews Band, originally developed his relationship with the band by giving them a weekly gig at the bar which he owned.

StoneHall was acting as Liana Conway's manager and they should have entered into a personal management agreement with Liana Conway containing terms typical of such agreements, including but not limited to the manager's compensation, which consists of a commission between 15-20% of Artist's income, disclosure of conflicts of interest; artist retention of intellectual properties; limitations on expenditures that can be charged back to the artist; the right to a complete and accurate accounting and standard audit rights to inspect financial books and records.

Typical services are frequently kept intentionally broad in agreements. For instance, here is the relevant clause from the sample agreement. To avoid confusion, the "We" in the paragraph is the artist; the "you" is the manager:

> During the Term, as and when we reasonably request, you agree to advise, counsel and assist us with regard to the selection of artistic material to be performed; our contractual relationships with record companies, booking agencies, promoters and other parties with whom we have contractual relationships (other than you or your Affiliates); our services to be rendered in the Entertainment Industry; marketing, promotion and publicity; and with regard such other matters as personal managers generally counsel and assist their clients in the Entertainment Industry.

With respect to how the monies are handled both during and after the term, below is an excerpt from a standard agreement. Again, to avoid confusion, "We" is the artist, "You" is the manager:

> Commissions. We agree to pay you the following commissions:
> (a) 15% of all Gross Income received during the Term.
> (b) The following percentages of Gross Income received after the expiration or termination of the Term:
> (i) 15% of all Gross Income, in perpetuity, received In connection with our personal appearance engagements that are booked or substantially negotiated during the Term (regardless of when the engagement Is actually performed) and any Artist Merchandise that is sold at or in connection with such engagements.
> (ii) Percentage of Gross Income as set forth below with regard to Masters, Compositions, and Other Works created or acquired in whole or in part prior to or during the Term.
> (A)   Six months following termination: 15%
> (B)   The following two (2) calendar years: 10%
> (C)   The following two (2) calendar years: 5%
> (D)   Thereafter: 0%

Here is how expenses are handled:

> Expenses. We will reimburse you for your reasonable, out-of-pocket expenses (excluding general overhead and other fixed costs) incurred in rendering your services to me, provided that (a) any single expense or group of related expenses in excess of Five Hundred Dollars ($500) or aggregate expenses in excess of One Thousand Dollars ($1,000) was incurred with my consent (not to be withheld unreasonably); (b) any expenses pertaining both to us and any one or more of your other clients will be prorated in a mutually acceptable manner; and (c) you will provide us with documentation adequately evidencing the expense item Incurred. You shall have no obligation to advance monies to us or to others for our benefit during the Term, but if you do so with our prior consent, we agree to reimburse you for them on your request.

Here is how Accounting are handled:

> Accountings. We will account to you for your commissions and reimburse you for those expenses that are reimbursable pursuant to paragraph 4 above within fifteen (15) days after the end of each calendar month. Each accounting will be in detail sufficient to allow you to determine the source and amount of each payment of Gross Income and any reductions therefrom permissible pursuant to this Agreement. As soon as it is practically feasible for me to do so, we will engage the services of a business manager experienced In the Entertainment Industry to collect all Gross Income and to account to you on our behalf. You will have the right to inspect our books and records relating to your commissions hereunder on reasonable advance notice to us in order to verify the accuracy of my accountings.  Accountings will be binding on you except to the extent you object to them by notice to me within three (3) years after the date rendered.

Typically a manager will receive a commission—usually 15 to 20 percent—of all of the income that you generate (the gross). This includes money from gigs, money paid to you from a record label as a personal advance against royalties (typically, not from money advanced by a label for you to record your record), money from merchandise, income from your music being used in movies or commercials, and any other source of income you generate as an artist. It is therefore in the best interest of the manager to leverage all of those connections I mentioned above to help you generate as much money as you can, which of course, generates more money for them. This is capitalism at its finest, and when it works, it works great for everybody. The problem is that young or unestablished artists typically take quite a while to generate any revenue. Also, these artists typically don't have any money of their own, so the management is left to spend their own money in order to develop the band before any money comes in. Because of this, you will occasionally see management securing other pieces of the artists' potential income as a kind of collateral against the money and time they are putting up. Sometimes, for example, management will acquire some part of the artist's publishing—in other words, a piece of the equity in the copyrights of the songs.

This means that when these songs begin generating royalties, the manager will be paid a percentage of the money. Managers do this because they often defer their commission while spending their own money. They have no guarantee that they will ever recover their investment.

This practice has largely been frowned upon (by both artists and managers), and was seen only occasionally in the past. However, I'm seeing it happen more and more, and I believe it will become even more of a common practice in the future.

As an artist, you must seriously debate whether parting with your publishing, in order to provide a sort of insurance to a manager, is the right thing to do. My opinion is that it is usually the wrong thing to do. As we will see in the publishing chapter, I do not believe that you should hold on to your publishing at all costs. Rather, I feel that giving up some part of your publishing is frequently essential to building a successful career. With one caveat: Whoever you assign any part of your publishing to must be able to do something with it. By this, I mean they must be able to "work" your publishing to generate awareness about you and money for you. If they cannot do this, do not assign any part of your publishing to them. Therefore, if a manager is requiring you to assign some portion of your publishing to them, you should only do this if you feel the manager is going to actively engage in working your songs.

Of course, it may not be this simple for you, especially if you don't have a lot of options. You may feel that the prospective manager can help your career in many ways, and that it would be foolish to miss the opportunity to have him or her represent you by clinging too tightly to your publishing. You may be right.

There are as many types of managers and styles of management as there are types of bands and styles of music.  However, there are certain constants.

There are three characteristics that a manager must have in order to facilitate the growth goals of the artist: Passion, Connections, Capital.

If a manager has passion, he may be able to succeed without the others. However, if a manager is without passion for the artist's music, the chances of long-term success will be reduced. The best-case scenario is, of course, having all three.

With respect to connections, the record business is one where you live and die by how connected you are. Simply put, at all stages of an artist's career—from getting an A&R person to listen to your demo, to getting your video played on MTV, to getting a gig to perform at the Super Bowl Halftime Extravaganza—it is often connections that make the difference. The reality is that the strength of the connection is frequently as powerful as the strength of the music.

A fundamental role of the manager is to expose his artist to more people. Therefore, managers spend much of their time casting a wide web around all the corners of the industry. In so doing, they develop relationships with booking agents, record labels, radio stations, press, and so on.

Ideally, when an artist partners with a manager, they are not only getting this person's individual expertise, energy, and hopefully, passion. They are also gaining access to their connections and relationships. These connections help in many similar ways, from having your music heard by music supervisors at advertising agencies to introducing you to a music publisher to securing you an opening slot on a coveted tour.

Throughout, the manager must represent the artist's vision in a way that aligns with the artist's expectations and values.

(b) The business manager.

In the music business, the term "business manager" refers to the party who handles the money on behalf of the artist. They frequently are accountants, and perform the function of distributing funds on behalf of the artist, and to the artist.

Beyond the necessary functions related to day-to-day pragmatism, the bottom line is that the sooner the personal manager and artist divorce themselves from a direct financial relationship — one in which either the artist or manager is collecting and distributing the money to the other party — and instead outsources this to a third-party business manager, the better.

The manager's role is to increase the brand equity of the artist. In so doing, revenue opportunities and revenue itself should increase. The artist and manager both should be completely aware of the financial state of the artist, from a current (balance sheet) perspective, a historical (income statement) perspective, and forward looking (pro forma).

However, the actual cash managements — whether day-to-day cash flow or longer-term expenses and income — should be managed by a qualified third party; be that a business manager or an accountant.

The reason for this is, absent this third-party management of the finances, there are no checks in place with respect to who is paying what to whom, and when. This axiomatically leads to non-productive questioning and suspicions, that takes time and energy away from the prime role of the manager: raising the artist's brand equity.

The bottom line is that the vast majority of personal managers have neither the training nor understanding of finances necessary to handle anything beyond the most rudimentary financial transactions. While the risks may be small at the early days of an artist career in which there is little money flowing, it quickly becomes an issue when money does beginning flowing.

Beyond the obvious issues related to taxes, liability, etc., there are issues having to do with transparency and trust that additionally make the business manager such a crucial component of an artist-personal manager relationship.

The business manager's function is also to render periodic accountings, usually on a monthly basis to the artist and any other interested person. Such other interested persons could include an the investor, whether it be an individual or an entity. The role of business manager is necessary to ensure that the money is fully accounted for to the interested parties as described herein.

The personal manager generally receives a commission of the artist's revenue (typically, 15% of the gross revenue received), however the flow of this money can be contentious. For instance, should the money come into the artist, and then the artist pay out the commission to the manager? Or vice versa?

As stated, most managers do not have the requisite training in finance/accounting to understand how to set up the appropriate accounts, let alone render accurate statements. Artists, of course, are typically even less able to manage such details. Moreover, the interests of the personal manager and the business manager are often not entirely aligned with each other. It is thus necessary that the business manager watch over the funds as such money is made available to fund the career of the artist, on the one hand, or as revenue through live performance receipts, merchandise receipts, and other revenue streams are generated and start to increase.

The net effect therefore is that there are frequently questions and concerns with respect to money — from both sides. Therefore, it is essential that a certified accountant or some other trained professional handle the financial affairs of the artist, including making the requisite commission payments to the artist's manager.

(c)  The investor

Increasingly, in today's disentermediated music business, where no longer does one strictly need a record label to achieve success, there are parties who invest in artists. Typically, this approach occurs when an individual has a great degree of passion for an artist as well as business experience and financial means. The investor will frequently view the artist as a form of start up business, in which the investor will contribute the funds needed to grow the artist's profile, with the hopes that, over time, the artist will generate revenue, which the investor will then reap his return from.

There are as many types of investor/artist relationships as there are investor/business relationships, but typically the resultant intellectual properties created by the artist (e.g., music publishing rights, sound recordings, trademark rights) will vest in the entity or entities through which the artist will provide his or her services, and these entities are in turn, are jointly-owned by the investor and the artist. In most cases, the investor takes an equity stake in the artist's future earnings, from whichever source they may emerge (record sales, publishing, merchandise, etc.).

(d)  The booking agent

Booking agents work on commissions generated from the income the artist makes; typically ten percent of the money from the gig. The role of the booking agent is to secure live performances for the artist. These live performances can range from entry-level "gigs" as opening acts to headlining stadium shows. Booking agents do wield influence with respect to frequently being able to "leverage" their roster to provide live appearance opportunities for other artists signed to their roster. However, this so-called leverage is often more perception than reality, as the final decision with respect to opening slots rests with the headlining artist.

Touring for most emerging artists is the single most important activity they can engage in. While the proliferation of the internet has given rise to the belief that all one must do to succeed is put some videos up on YouTube, and wait for the record deals to come streaming in, nothing, in fact, could be further from the truth.

Touring, of course, is difficult for the emerging artist, and, as described above, booking agents are virtually impossible to secure at the beginning stages.

Thus, "touring" is an overly-grand descriptor of what an emerging artist should engage in.

The savvy emerging artist will, for instance, work vigilantly to hone their performance via a series of so-called "non-professional" gigs at venues such as house parties and other non-traditional venues. Doing so enables them to both hone their performance ability with little risk of damaging their credibility amongst professional-venue bookers, and, of course, begin to build a following.

In fact, artists should not perform in so-called professional venues until they have built a following who will attend these performances if and when the artist undertakes them.

Once the artist has established a beachhead of sorts in their local market where they are consistently able to draw 150 people or so to their events (150 is significant, as it is "Dunbar's Number[2]) they thn should begin looking to other major metropolitan areas *within driving distance* from their hometown to identify other artists who have a similar aesthetic/sound to their own, and who can also draw ~150 people in their hometown.

The artist should then offer a trade in which they open for the artist in the artist's hometown, and allow the other artist to open for them in their howetown.

This swapping of opening slots will greatly increase the odds of putting each artist in front of a new crowd who is predisposed to like them.

The emerging artist should seek to do this in four or five towns, all within driving distance of their hometown, and alternate between each of these markets every weekend or so, while playing their own hometown once a month or so.

Done correctly, an artist can create a geographic region of dedicated fans, which can then be expanded outward, in a highly cost-effective (and, typically, profitable) manner.

The alternative is not good. An artist who attempts to conquer the entire United States through a series of somewhat random stops along the map will almost necessarily hemorrhage money, and lose confidence. This approach is the very definition of a random act of improvement.

(e) The record producer.

In all genres of music except for hip-hop, the producer has a very specific and defined role: The producer's job is to extract the best possible performance from the artist. To do so, the producer may play a role in everything from studio selection, to song selection, to which musicians perform on the recordings. Producers will frequently work with artists for some time

---

[2] http://en.wikipedia.org/wiki/Dunbar's_number

prior to a single note of music being recorded to determine not only the songs that will be recorded, but also the general feel and tone of the recording.

Some producers will take an active role in actually capturing the sound — placing microphones, controlling faders on the mixing board, etc. — but many rely on audio engineers (typically chosen by the producer). The producer's role, therefore, has less to do with the technical elements of creating the recording and more to do with attempting to elicit the very best performance by the artist.

Certain producers are hired by artists (or the artist's label) based on the producer's specific sound (a producer like Daniel Lanois, for instance is known for his atmospheric, reverb-drenched productions). Dominantly, however, producers are selected either because an artist admires the work that the producer did for another artist the band has affinity for, or because the producer has a track record of creating songs/albums that sell. Rick Rubin, for instance, falls into this camp.

With very limited exception, the producer in these contexts is hired by the artist/label, and receives some form of up-front payment (the range of this payment is all over the map; for an emerging artist with little-to-no budget, the producer may take as little as a few hundred dollars for the session(s); Rick Rubin, and other producers who have produced records that have sold millions of copies, obviously take a higher fee – though, again, they will work for far below rate for artists whom they believe in), and back-end "points." Points are defined as a percentage of the artist royalty. Artists who are signed to labels typically receive a royalty of between 11 and 20% of the suggested retail list price (SRLP) of an album or single sale.  Typically, these so-called "artist royalties" are not paid until the artist has recouped any and all advances and other costs the label has paid on behalf of the artist. Importantly, the artist recoups at the royalty rate. This means that if the artist has a 15% royalty rate and the list price of a download of an album is $10, the artist is credited $1.50 (less any contractual deductions) for the sale of the download. If the artist was advanced $150,000 by the label, the artist would have to sell 100,000 records to recoup the advance.

The producer is often granted points out of the artist's share. In other words, if a producer receives two points (which is typical; producers are most-often granted between one and four points), it means that if the artist had a 12% royalty, the artist is assigning two of these points to the producer, and is thus left with 10%. Like the artist, the producer will not receive any payment in the form of a back-end percentage unless and until the artist recoups any advances, etc. (some of the advance to be recouped, of course, may be the up-front payment to the producer).

At the beginning of this section I mentioned that hip-hop producers fall outside of the normal course of producer-artist relationships in all other (non hip-hop) genres. This is because many hip-hop producers create the tracks that the hip-hop vocalists then perform over. In this manner, the hip-hop producer is not only performing the functions described above that non-hip-hop producers perform, but also are acting as co-writers as well.

Producers, while they may very well make musical contributions to the songs, typically do not receive any co-writing credit, and thus do not have a claim to the copyright of the

composition(s), nor receive any royalties (mechanical, synch, performance, etc.). For example, arguably the greatest producer of all time, Sir George Martin, did not receive any co-writing credits for the masterful work and material contributions as a producer to the recordings of the Beatles. It was a violation by Phoenix Stone to claim co-authorship of Liana Conway's song, August Rush. Phoenix Stone did not contribute copyrightable subject matter to the song and any such claim of co-authorship should have been set forth in a written agreement signed by the parties.

(e)  The attorney.

The role of the attorney in the music industry can be multi-faceted. Certainly, at one level the attorney is there to prepare and review transactional documents on behalf of their client (artist, label, manager, or publisher). Lawyers in the entertainment industry, however, often act as bridges between their clients and prospective parties interested in deals. For instance, an attorney might take on an artist prior to the artist having a record deal or even management, and then endeavor to facilitate introductions that lead to deals. Of course, the lawyer would then represent the artist with respect to any transactions with these parties, and receive compensation for these services.

(f)  The songwriting collaborator.

A copyright for a musical work is created when an original work of authorship is fixed in a tangible form. A songwriter who creates an original work, and then either writes down or records the work is automatically granted the copyright to the composition. With this grant comes a bundle of exclusive rights, which, in sum, drive the entire music industry with respect to revenue opportunities.

The copyright of the composition of the song is the single most valuable asset a songwriter has. Even as the music business morphs and changes from a business concerned with the sale of recorded music to a business dominated by streams, the most crucial asset will remain the copyright to the composition. This is because, in the absence of a license, the copyright holder to the compositions, and only the copyright holder to the composition may reproduce, distribute, publicly perform, or create derivatives of the composition.

Anyone desiring to do any of those things — for instance, a record label, radio station, website, etc. — must secure the appropriate license for the holder of the copyright of the compositions, and failing doing so will be liable for infringing upon the copyright holder's rights.

Given the valuable nature of the copyright to the composition, so-called collaborations must be taken very seriously. Once a copyright has been divided, due to it being classified as a joint work, it is near-impossible for it to be re-assembled. The copyright runs with the party who has a claim to it, irrespective of whether or not the party is still in the band they were in when the song was written.

For instance, if a band determines that they will divide the copyright to all of their songs amongst the members of the band, each member will receive a percentage of the copyright to

140815                                    13

each song, and that member will maintain that percentage for the life of the copyright, whether or not they remain in the band.

There appears to be a good deal of confusion as to what threshold must be met in order for a person or persons to be deemed a co-writer. In point of fact: one must make a material contribution to the melody or lyric of a song to be deemed a co-writer. The easiest and best way, however, to resolve any potential dispute is for an agreement to be established between or among respective contributing writers. This is especially important when the existence of a record producer is added to the mix. That is, quite often a record producer will make a contribution to a particular song. The line is often blurred between the contribution of the record producer as a producer and as a contributing writer. It is thus very important that the rights and distributions be established and agreed upon in advance.

What this means, in point of fact, is that while a musician may contribute a very effective bass line, drum beat, or guitar lead, none of these elements will likely be deemed material, and thus will not give rise to the creation of a joint-work.

A joint work is defined by the Copyright Act as:

A work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

The key element is intent. Both parties must intend to create a joint work for the parts to become inseparable. As such, once the parts have been joined, either party can exploit the composition, but must account to the other party.

It is absolutely crucial to emphasize that the vast majority of non-hip-hop related productions are not joint works between artist and producer.  Similarly, the vast majority of so-called session performers, non-writing band mates, background vocalists,  engineers, and basically anyone who is not a material contributor to either the melody or the lyric, do not take a percentage of the copyright of the composition.

In order to avoid potential issues around parties claiming authorship, and thus ownership in some or all of the copyright to the composition, it is standard that these participants sign work made for hire agreements (see appendix X for a sample work made for hire agreement).

**A Note on the Comparison between the Copyright in Musical Works and Sound Recordings**

A song, sometimes referred to as the underlying composition, is typically deemed to include lyrics, melody, and harmony (chords).

Sound Recordings are  "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." Title 17 USC. Thus, two distinct copyrights of the related works, the song and the sound recording, co-exist in most musical sound recordings

(a) The session artist.

As above, session players are not typically authors, and thus do not receive any part of the ownership in the copyright to the composition. These parties, instead, are paid a fee for their service, and in-exchange sign a work made for hire agreement which stipulates that they have no ongoing ownership in the copyright to the composition.

(b) The tour manager.

The tour manager plays a very important role in the artist's career, but it is also very specific. The tour manager's principal duties are two-fold: 1. Make sure that the artist shows up for whatever activity is scheduled for the day; this could be the gig, an on-air radio interview, a live performance at a retailer, etc. 2. Make sure that the artist is compensated for their performance. This act of "settling up," is obviously a massively important job, and for artists who not yet reached a level of success where all of the money from live performances is flowing into the booking agent to the business manager, and then to the artist, it is the job of the tour manager to ensure that the artist is paid.

The tour manager travels with the band, allocates the per diems to the artists, coordinates itinerary, etc.

**OTHER SERVICE PROVIDERS ENGAGED BY PERSONAL MANAGER**

(c) The videographer

Most artists do not have a dedicated videographer as part of their team until they have reached a very high level of success (if then).

Typically, artists, labels, or managers will hire a videographer/producer to create a specific output. This could be an Electronic Press Kit (EPK), or fodder for social media, or a full-fledged video.

Of course, in the era of YouTube, video is perceived as increasingly important. It is, however, difficult to determine, given the fact that a vast number of videos that are either created with a small to non-existent budget, or are entirely user-generated content have massive numbers of hits, is the correlation between video quality and video quality.

(d) The publicist.

Consistent with a risk of correlation without causation, the efficacy of a publicist with respect to a positive impact on an artist's career is suspect. Certainly, positive press in a widely-read (or listened to) outlet such as the New York Times or on NPR will have an impact, but, like everything else in the artist's career, both the possibility of this type of meaningful press and its associated impact (or lack thereof) are cumulative in nature.

That is, press typically does not occur in a vacuum, and it almost never has any impact in a vacuum.

That said, artists crave publicity almost as much as they crave record sales or any other metric of success. My belief is that this is because reading about the artist's work offers some type of tangible validation for the artist that is otherwise hard to attain.

In any case, publicists know this, and present the possibility of press (however real or not) as a massively tempting carrot. The sad reality for the emerging artist is that they will spend thousands of dollars on an independent publicist who will attempt to generate interest in the artist/the artist's work, and will likely receive very little results for this effort.

The cause of this is two-fold: First, as above, press does not occur in a vacuum; it is part of a larger mosaic of interest. Writers need far more than "good" music to justify editorial space. They need a story, and, by definition, an emerging artist typically does not have much if any "story."  Second, those who write about music fit the classic definition of what Malcolm Gladwell describes as a "Maven" in his seminal book The Tipping Point.  In summary, a maven is an "information specialist"; one who delights in discovering things (music, food, technology, etc.) prior to the mainstream discovering these things.

As their joy comes from discovery, if you deprive them of this, they will react negatively. That is, those who write about/report on music must discover the music themselves. A publicist who deprives them of this joy virtually guarantees that whatever music the publicist has foisted upon them will be ignored.

This is not to say that — at a certain point — publicists can not supply value. That point, however, is after the artist has begun building an organic firmament of interest. At this point, the publicist can leverage his connections to accelerate the interest that has authentically emerged. They cannot, however, manufacture interest, and paying them to attempt to do so is a fool's errand

**(e)** Graphic Designer

A graphic designer is only relevant to an artist if and when that artist is releasing some form of tangible product: a CD, vinyl, poster, etc.

There are myriad freelance graphic designers as well as very affordable graphic design collectives — such as 99design.com — where those seeking graphic design can receive countless bids, comps, etc.

The internet, as it has done with so many things, has democratized this process, and supply far outstrips demand, and thus for someone seeking graphic design it is a buyer's market.

Of course, there are still true artists in this space, and their work has only taken on a brighter distinction amidst the sea of competitors. These designers remain in-demand and expensive. There is, however, no reason for an emergent artist to consider them.

f)   Social Media Coordinator

The importance of social media to an emergent artist cannot be emphasized enough. For all of its inherent flaws (and there are many), social media, when part of a comprehensive plan, provides the single best way for an artist to begin building authentic connections with their fans.

Social media includes sites/services such as Facebook, Twitter, Instagram, YouTube, Reddit, and others.

The challenge with social media is a metaphor for the challenge of the emergent artist, generally: as the barriers of entry have come down, the difficulty in emerging from the crowd has gone up. That is, because social media allows anyone the possibility of connecting with a constituent group who is disposed to appreciate their work, without intermediaries such as press, labels, etc., every artist who has ever written a song is attempting to do so.

This constant competition for the attention of potential customers of course makes it difficult for artists to stand out.

The bottom line with respect to social media, and the music business generally, therefore is: when everyone has access to the same tools, she who uses the tools most creatively and authentically, prevails.

There are certainly any number of less-than-savory services (and service providers) that will exploit the desire and ignorance of an artist and convince them that achieving a high number of, for instance, "Likes" on Facebook — achieved by any means possible, including buying likes — is necessary to present the appropriate optics with respect to an artist's status. These services are, of course, at best focusing on the short-term rather than the long-term, and, at worst, doing harm to the artist by stigmatizing them as un-authentic in a space (the internet) that shines a bright light on falsity.

As described in various sections above, a social presence must be part of a holistic approach. The irony of social media is that it works best when these online activities are connected to offline activities. That is, an artist who is consistently playing live, will have a far better chance of creating a beneficial social media strategy than the artist who focuses entirely on their online presence.

The other fallacy of social media is that it diminishes the importance of two things: 1. The artists' own/owned website, and 2. Email. Regarding the first, artists must view social media as planets orbiting the sun that is their own/owned website. These social media "planets" should have one dominant objective: to drive potential customers to the artist's site, where email (the second point above) can be captured. Email is still the dominant driver with respect to conversion; far outpacing social sites like Twitter, Facebook, et al.

Any social media coordinator who does not follow this approach will fail.

(g) E-commerce supervisor

Electronic commerce is obviously an important component of an artist's revenue strategy. Like all of the above, e-commerce — whether the product be a download, vinyl, tickets or merchandise — only becomes relevant once an artist has a material fanbase.

Second, ecommerce should not occur prior to there being shown a demonstrable demand for the artist's product(s) via sales at live shows.

Ignoring this sequence (that is, attempting to generate revenue via online sales prior to showing demand via sales from the stage) will result in unnecessary expenditures, and frustration.

f) Data Analytics Supervisor

Certainly, understanding an artist's customer base via analytics is crucial.  The dominant tool for this is Google Analytics, and artists and managers should be fluent with this tool.  A separate party to maintain this is unnecessary

## RESPONSIBILITIES OF THE PERSONAL MANAGER

**Licensing requirements for management professionals.**

In California, managers must be licensed. "If a person is acting as a "talent agent" in California, they must obtain a license from the State Labor Commissioner and are subject to state regulation."[3]

**The fiduciary duties owed by the personal and business managers.**

The parties produced approximately 29 documents that the Defendants characterize as "budgets" or "proposals" and that the Plaintiffs state are invoices. These documents are as follows:

(e)                              Fiduciary duties generally.

A fiduciary duty is an obligation to act in the best interest of another party. A fiduciary duty may arise in one of the following manners: (i) by operation of law; (ii) by agreement; or (iii) by a relationship that involves a special trust, confidence, and reliance on the fiduciary to exercise his discretion or expertise in acting for the client. .

A party that owes a fiduciary duty owes the duty of utmost loyalty and care and is required to place the interests of the person to whom such duty is owed ahead of their own and to refrain from self dealing in any way with respect to the party to whom the duty is owed. In financial matters, the party who owes a fiduciary duty must provide an honest and accurate accounting as to any assets belonging to the party to whom the duty is owed. The party owing

---

[3] California Talent Agencies Act, Labor Code §§ 1700 - 1700.47

the fiduciary duty must not co-mingle his or her assets with those assets belonging to the party to whom the duty is owed.

> (f)  The personal manager's fiduciary duties.

Generally, a personal manager, as a matter of law, owes a fiduciary duty of loyalty and care to the artist he or she represents. In addition, where the personal manager is involved in handling investment funds on behalf of the artist from a third party, such behavior does give rise to a fiduciary duty as a matter of law and fact.

The personal manager is a trusted advisor who is responsible for supervising the members of the artist's "team" (e.g., business manager, record label, music publisher, producer, songwriting collaborator, agent, lawyer, tour manager, publicist, social media coordinator, etc.), each of whom provides distinct services, and between whom can arise fundamental conflicts of interest. Therefore, there should be different parties to assume and provide these different "team" roles. Where the personal manager is the only entity acting on behalf of the artist—in this case the team is comprised of a one person--the personal manager takes on numerous roles and is there therefore responsible for fulfilling all such roles with the same competence, care and loyalty as the different professionals themselves. The dominant conflict of interests in the music industry are those that occur when parties who are intended to be adverse become not so. For instance, one of the key roles of the manager is to, on behalf of the artist they represent, demand high performance and fair dealings from parties like labels, publishers, publicists, consultants, etc. If the manager thus is performing those roles — acting as a publisher, label, etc, — there is no one to represent the artist and demand accountability, thus the decision making process is no longer based upon what is purely best for the artist.

C. Duties and Obligations of StoneHall as Personal Managers.

With respect to the relationship between the defendants on the one hand and Liana Conway and Andrew Conway (the "Conways"), the Defendants owed the Conways a fiduciary duty. This relationship arose as a matter of law and pursuant to the conduct of the parties. Sybill Hall, Phoenix Stone and the related companies (hereinafter, individually and collectively "StoneHall") gained the confidence and trust of the Conways. StoneHall acknowledged that when they met the Conways, the Conways did not understand the intricacies of the music industry—Liana was "a blank page" and Andrew Conway was, "a loving father who wanted to support his daughter".

StoneHall quickly gained the Conways' complete confidence and trust, especially in light of the fact that they were total newcomers to the music industry. The Defendants were instantly aware of this fact. As a consequence, the Defendants saw an opportunity to take complete control over both the career of Liana Conway and the finances of Andrew Conway with respect to financing Liana's career.  StoneHall never informed the Conways about any potential conflicts of interest in their assuming all of the reins of Liana's career. The defendants quickly gained their trust and rendered guidance, advice and supervision on virtually every aspect of developing Liana's career, including as follows: (i) A&R-evaluated her repertoire, song selection; (ii) production services--selected recording studios, engineers, musicians, navigated the style of music, chose production techniques, orchestration, arrangement; (iii) record label services,

including CD manufacturing & production, producing liner notes & packaging; (iv) marketing; (v) promotion, including videos & photo shoots; (vi) publicity; (vii) art direction; (viii) brand creation--her look, her sound, advised on how to interview, how to speak, what to wear, hair style--in short the entire creative aspect; (ix) website, and social media; (x) producing live performances, supervising live radio performances, touring/assembling the band; (xi) business management, providing financial services to the artist, including management of the artist's money, collecting all revenues, deposited same into the StoneHall account, taking control of the entire investment budget, amounting to $1,738,000 and supervising all expenditures relating to Liana's career. Sybill Hall said, "what we did was more than personal management".  StoneHall did not obtain a license as required under California law. In short, with respect to Liana Conway, the Defendnats gained her trust and assumed total control over her music and career; with respect to Andrew Conway, the Defendants gained control over the funds he invested in Liana's career and they failed to account and spend prudently such funds.

The Conways relied to their detriment on the avowed expertise, superior knowledge, skill and experience that StoneHall purported to render to them and supposedly  in their best interests.

<u>The Independence Between The Personal Manager And Business Manager</u>

        The most important "separation of powers, "check and balance relationship" on the artist's team is that of the independent business manager and the personal manager. Again, it is the Business Manager who lends fiscal restraint, control, regular accountings and complete openness in the financial relationship between the parties. It was a breach of StoneHall's fiduciary duty to the Conways not to insist that the Conways retain an independent business manager to supervise all financial aspects of Liana's career. A separate business manager would have prevented the financial abuse that occurred. Moreover, where StoneHall took complete control of the financial aspects of the professional relationship, StoneHall is nonetheless charged with the same fiduciary duties with respect to handling and accounting for the funds, exercising fiscal restraint and acting in the best interests of the Conways.

        StoneHall was aware of the trust the Conways reposed in them and abused it to an extreme level. StoneHall abused the fiduciary relationship by inducing Andrew Conway to commit $1,738,000.00 to their control and care and thereafter misleading him as to the actual use of the funds. StoneHall deceived the Conways into the false belief that the funds were being used for direct third party costs and expenses except in the few instances where specifically noted. Moreover, the fees that the Defendants and in particular Phoenix Stone charged for certain musical production services were exorbitant and completely unreasonable. Assuming further that the Artist was completely untested, new to the music industry and with no experience, sales history or other established marketabilty whatsoever, the breach of trust for charging these fees is even more pronounced. Consistent with this analysis, and as will be more particularly explained below, the amount of expenditure for simple matters such as video and photo shoots which any Artist can do at her own modest expense given today's technology, the wrongfulness of the conduct with respect to the unreasonable and exorbitant expenditures taken by StoneHall from the Conways is even more obvious and heightened. On review, the lavish and expensive production of all aspects of Liana Conway's career was calculated to achieve one objective: to line the pockets of StoneHall. This scheme to bilk money for the investor is a failure to place the

interests of the Artist and Investor ahead of the personal interests of StoneHall of the highest magnitude.

By assuming the responsibilities of as business manager, StoneHall was obligated to render periodic, accurate accountings and failed to do so. Such accountings should have been rendered on at least a monthly basis. Sybill Hall acknowledged to not even knowing what an accounting is at the relevant time period. Phoenix Stone acknowledged that he didn't handle accounting matters. At a minimum, the accounting should have consisted of Quickbooks reports, profit & loss statements, or other formats generally and widely accepted in contemporary business environment. Accountings should have referenced account, payee, date and purpose or all expenditures, together with any supporting documentation the Conways might have requested. None of this accounting information was ever rendered. In November 2011 and January 2012, StoneHall intentionally misled the Conways with falsified accountings and fabricated invoices.

(1) Build the artist's brand (social media, merchandising, releasing music, etc.)

An artist's brand is a symbolic embodiment of all the information connected to artist and serves to create associations and expectations around it. Developing the artist's brand involves generating a consistent proposition for the artist that when conveyed in marketing and advertising campaigns, will provide an attractive, unique, and relevant message to current and potential fans and customers--It is the duty of the Personal manager to develop the brand equity of the artist.

Specifically, this entails assessing the current position of the artist within the industry, and – in concert with the artist – devising a strategy to advance the artist's career in a manner that brand equity is raised.

The reason it is so important for a manager to think in terms of increasing the artist's brand equity is because only through this thought process can the manager increase the likelihood of a long-term, sustainable career. Artists who have high levels of brand equity maintain durable relationships with their fans, which can be monetized in a variety of ways, irrespective of market trends.

To do so effectively, this requires a multi-pronged approach which focuses on strategically creating awareness of the artist and connections with constituents via social media and other online marketing, as well as developing live performances, recordings, and merchandise.

The Defendants engaged in the unethical practice of buying fake social media views and likes without telling the Plaintiffs, which was a breach of the duties of care and loyalty, thereby tarnishing the artist's brand, rather than burnishing it.

Sybill Hall acknowledged that Stone Hall paid for artificial social media traffic on behalf of Liana Conway, such as purchasing likes on Facebook, views on youTube, and Twitter traffic.

140815                                                  21

Joe Skatell, a web site and social media manager, specifically cautioned Sybill Hall against the purchase of buying artificial likes and other social media traffic that bore no real relationship to the popularity of the artist. Furthermore, Mr. Skatell informed Sybill Hall that social traffic from foreign destinations like Vilnius would have a highly detrimental impact on Liana Conway's career, if discovered. Against such admonition, StoneHall continued such practice. Moreover, StoneHall would then use the false impression of purchased social media traffic to suggest false momentum—suggesting that Liana's career was on the rise in order to induce further investment from Andrew Conway. The discovery of the purchase of false social media traffic did have a detrimental, catastrophic affect upon Liana's career.

(2) The personal manager is duty-bound to allocate investment funds prudently

To do this effectively, and to honor the fiduciary duty between artist and manager, the manager must only spend money that has a high degree of likelihood to achieve measurable impact with respect to the attraction and retention of fans for the artist. *MVP stuff*

Additionally, the manager should not be spending any money without the artist's knowledge and agreement.

Instead of providing forthright budgets, accountings, and substantiating invoices, StoneHall chose a method of reconciliation that was calculated to deceive the Conways. Under the circumstances of this relationship, StoneHall should have provided advance budgets for any upcoming expenditure and subsequent accounting of how the budget was actually spent. Instead StoneHall, "invoiced in advance" for the "services to be rendered". This is an example of the improper accounting practices.

As a consequence, the Conways were unaware of exactly how the investment monies were actually dissipated in numerous instances StoneHall received and retained investment monies from the Conways for their own use instead of directly paying 3rd party vendors and service providers for services rendered.

In numerous instances, StoneHall would render bogus invoices for services, and would convince the Conways that a large budget was required for items on such invoices. StoneHall would obscure the actual amount of the fees that StoneHall converted to its own use, without identifying the amount of such payments. StoneHall would also systematically add superfluous roles to projects and pad budgets to increase personal payments to themselves and to justify these self-payments.



Moreover, StoneHall convinced Andrew Conway to pay $115,000.00 and $77,000.00 for "radio promotion" budgets for which they have no evidence were ever undertaken. These

monies were diverted to their own use and for which no tangible evidence of radio play was achieved. In fact, the only evidence of radio play was a document subpoenaed that showed the number of plays or spins from Oct 1, 2012 through Dec 1, 2012 was 51 (i.e., roughly $4,300/spin).

Overall, the expenditures were completely unjustified. There was no predicable or resultant ROI for Liana Conway.

(3) The Personal Manager is duty-bound to render sound advice to the artist

The manager should be advising the artist with respect to both strategic and tactical matters. However, the best artist/manager relationships are ones in which the artist's and manager's values and expectations are aligned. In these cases, while certainly the manager may continue to advise, the role is more one of trusted ally who should have some level of experience or insight that the artist lacks. StoneHall had no discernible long-term strategies or plans for Liana Conway. No plan, no end game, no metrics. It was all a subterfuge for extracting more money from Andrew Conway. The overall campaign for Liana Conway was absolutely rudderless. It was flawed from beginning to completion. There was no overall strategy or plan on how to develop the artist into a sufficient artist developing revenue for growth. There was no care of how to develop her brand, as evidenced by the total mishandling of social media and promotion efforts.

(4) The personal Manager must place the interests of the artist ahead of their own.

A fundamental tenet of the obligation of the fiduciary duty is to place interests of the artist ahead of the fiduciary. In all cases, the manager is working on behalf of the artist, and thus the artist's interests must always supersede those of the manager.

(5) Transparency in all aspects

Manager/artist relationships always break down for the same reason: lack of transparency. While this frequently has to do with lack of transparency related to financial matters, lack of transparency related to decisions made by the manager without the artist's knowledge, etc. are also unacceptable and inevitably lead to breakdowns in the artist/manager relationship.

(6) Access and Credibility

The influence of the Personal Manager in the music industry is another key component to the successful management of the Artist. The Manager must be able to gain access to important other facets of the marketplace such as record label executives. The ultimate objective is to create a stable, income producing Artist who is both known by music industry insiders as well as fans. It cannot be stated strongly enough that part of the process of creating an effective brand is the creation of recognition of an Artist within the industry itself before that Artist becomes well known to the general public. The Personal Manager must have sufficient resources, credibility, success and reputation within the music industry to have access to perhaps one of the most

140815                                            23

important elements of that marketplace, namely record label executives.  Signing on with an established, well funded and solvent label is still, even today, the best way to gain widespread awareness and popularity among the fans whose support is essential to the Artist. Under the circumstances of the Defendants' representation of Liana Conway, it is evident that StoneHall misled the Conways with their inflated statements of access, false statements concerning accomplishments and credentials, overblown past history and experience and causal name dropping. These misleading statements moreover are not minor transgressions; rather, they constitute in many ways the essence what the Personal Manager has to offer. The Defendants again breached their fiduciary duty to the Conways by misleading them as to their place and influence in the music industry.

(g) The business manager's fiduciary duties.

(1) Manage the finances for the artists

Given the extraordinary amount of money being invested into the career of the Artist, the Defendants should have made arrangements to retain the services of a business manager to handle all finances. The facts of this particular case did not simply require the independence and guidance of a Business Manager; it demanded it. The Defendants, moreover, as industry insiders, were well aware of this fact and intentionally avoided the retention of a business manager's services. It is clear, based on a review of the spending habits and financial reporting controls of the Defendants, that StoneHall did not want an experienced, prudent Business Manager reviewing their activities at the expense of both Liana Conway and more particular Andrew Conway. The business manager has one very specific purpose: manage the finances of the artist with the best interest of the artist as the sole decision-making driver.

(2) Don't commingle

Given the manager's fiduciary duty, any comingling of funds is a fiduciary and ethical breach of duty. Double dipping could occur if, for instance, a manager commissioned payment to an artist for tour support. Tour support is an advance from a record label to an artist to cover the shortfall from live performances. This should never be commissioned because the artist does not actually receive this money as profit, but rather as an additional debit (advance) against their account. The manager should only be commissioning income from live performances, but not the tour support.

(3) Clear accountings

Accountings must be rendered regularly, and must be in a format that an average lay person can understand. The burden of ensuring that the accountings are understood by the artist falls upon the business manager.

Phoenix Stone, Sybill Hall and the StoneHall companies should have entered into a personal management agreement with Liana Conway containing terms typical of such agreements, including but not limited to the manager's compensation, which consists of a commission between 15-20% of Artist's income, disclosure of conflicts of interest; artist retention of intellectual properties; limitations on expenditures that can be charged back to the

artist; the right to a complete and accurate accounting and standard audit rights to inspect financial books and records.

## Analysis and conclusions.

Based upon my years of experience, training, expertise and educational background, as a professional in the music industry, and based upon my understanding of the facts and circumstances of the professional relationship between Phoenix Stone, Sybill Hall and the StoneHall companies on the one hand and Liana Conway and Andrew Conway on the other, it is my professional opinion as follows:

     a. Phoenix Stone, Sybill Hall and the StoneHall companies have entered into a fiduciary relationship with Liana Conway and Andrew Conway;

     b. Phoenix Stone, Sybill Hall and the StoneHall companies have breached that duty;

     c. Phoenix Stone, Sybill Hall and the StoneHall companies have violated their duty of loyalty to Liana Conway and Andrew Conway;

     d. Phoenix Stone, Sybill Hall and the StoneHall companies become almost in the role of parents and misused this relationship to bilk her and her father out of unconscionable sums of money;

     e. Phoenix Stone, Sybill Hall and the StoneHall companies have violated the duty of utmost good faith and fair dealing toward Liana Conway and Andrew Conway;

     f. Phoenix Stone, Sybill Hall and the StoneHall companies have violated the duty of care, and specifically their conduct, acts and omissions have fallen below the standard of care of a reasonably prudent personal manager in the music industry; their breach of that duty and their conduct below such standard of care has caused direct harm, including financial damages to Liana Conway and Andrew Conway harm has resulted in financial harm in the amount of $1,737,948.00 and significant damage to the career of Liana Conway;

     g. Phoenix Stone, Sybill Hall and the StoneHall companies have placed their own personal interests above those of Liana Conway and Andrew Conway;

     h. Phoenix Stone, Sybill Hall and the StoneHall companies have failed and intentionally omitted to render complete, accurate, truthful and periodic accountings to Liana Conway and Andrew Conway of the dissipation of investor funds delivered to them in trust by Andrew Conway;

     h. Phoenix Stone, Sybill Hall and the StoneHall companies were acting in numerous capacities on Liana Conway and Andrew Conway's behalf. The Defendants had numerous conflicts of interest that they failed to disclose to the Plaintiffs and failed to properly handle. These various capacities include the following:

**i.** Phoenix Stone, Sybill Hall and the StoneHall companies were personal managers because they actively engaged in the proffering of advice and guidance to the artist with respect to her career goals. Phoenix Stone, Sybill Hall and the StoneHall companies also failed to explain to Liana that they were simultaneously managing Phoenix Stone's career as they were rendering services to her. Phoenix Stone, Sybill Hall and the StoneHall companies engaged in self-dealing and breached their duty of loyalty to the Plaintiffs. Phoenix Stone, Sybill Hall and the StoneHall companies management services were overpriced, poorly planned, poorly executed, and in violation of their fiduciary duties of care and loyalty.

ii. Phoenix Stone, Sybill Hall and the StoneHall companies were business managers because they managed all the funds and paid for services on behalf of the artist and they commingled funds in violation of their fiduciary duty of loyalty.

iii.  Phoenix Stone, Sybill Hall and the StoneHall companies were acting as record producers for Liana Conway. Phoenix Stone, Sybill Hall and the StoneHall companies overcharged for their own service and failed to look for alternatives. Moreover, Phoenix Stone, Sybill Hall and the StoneHall companies failed to properly disclose and explain their ownership interests in Liana's sound recordings. Moreover, it was a violation of fiduciary duty for Phoenix Stone to claim co-authorship of Liana Conway's song, August Rush for two reasons: 1) He did not contribute copyrightable subject matter to the song; 2) any such claim of co-authorship should have been set forth in a written agreement signed by the parties.

iv Phoenix Stone, Sybill Hall and the StoneHall companies were a record label because, a record label is defined as an entity that engages in the promotion and distribution of recorded materials, and has some equity stake in the recordings. They satisfy all of these requirements. Moreover, Phoenix Stone, Sybill Hall and the StoneHall companies also failed to explain to Liana that they were also managing Phoenix Stone's career at the same time that they were rendering these record label services to her.

v. Phoenix Stone, Sybill Hall and the StoneHall companies were a tour manager because they traveled with the artist, arranged and coordinated live events and itineraries, and "settled up" with respect to the money. Liana's summer camp tour was too expensive and elaborate for an artist of her caliber.

vi. Phoenix Stone, Sybill Hall and the StoneHall companies were the e-commerce manager because they engaged in the planning, promoting, and selling of the artist's merchandise online.

vii. Phoenix Stone, Sybill Hall and the StoneHall companies were the social media manager because they devised online marketing strategies utilizing social media tools such as Facebook, Twitter, YouTube, etc. Phoenix Stone, Sybill Hall and the StoneHall companies engaged in the unethical practice of buying fake social media views and likes without telling the Plaintiffs in breach of the duties of care and loyalty

j. The conduct, acts and omissions of Phoenix Stone, Sybill Hall and the StoneHall companies have resulted in significant damages to Liana Conway. In my expert opinion, StoneHall's services have resulted in a three year financial and emotional fiasco--there has been no measurable impact or advance in Liana Conway's career or the fulfillment of her career goals. Liana Conway has stated that she has felt manipulated as a result of the conduct of StoneHall. She is justifiably disillusioned, feels as if she has lost three year's of her life and that her career has been stalled and run into the ground.  Despite the fact that she travelled all over the country at the behest of StoneHall, and while the tour was enjoyable--from a business perspective the tour was a complete folly, a complete waste of time and money.  StoneHall actually instigated the utmost travesty—Liana has almost given up on her career.

k. It is incumbent upon the personal manager, as fiduciary, to act prudently and in the best interests of the artist and the investor. One of the ways in which to violate a fiduciary duty is for the manager to breach the standard of care or to fall below the standard of care of a reasonably prudent manager would conform to. A personal manager must render best efforts to:
- Build the artist brand
- Spend funds prudently
- Provide sound advice to artist
- Place the artist's needs ahead of their own
- Engage in openness and transparency in all material aspect of the relationship including accountings that can be understood by a laypersons
- Be honest and candid about access and relationships in the music industry and to retain credibility in the music industry
- Do all things reasonable and necessary to build the career or artist
- Make decisions and to advise the artist in a manner that is fiscally responsible
- Advise concerning tours that recognize the costs involved and to avoid unnecessary deficit spending
- Provide fiscally sound, prudent and cost-effective advice.
- Take no steps that would jeopardize the brand, public image and career of artist
- Invest funds in a prudent reasonable manner consistent with the objectives of the investor
- Initiate marketing photo shoots videos and to invest amounts that are commensurate with the relative position in the marketplace.

It is clear after an analysis of the conduct of Phoenix Stone, Sybill Hall and the StoneHall companies that their management of Liana Conway fell below the standard of care.

_

140815                                  27

**Analysis and conclusions.**

Based upon my years of experience, training, expertise and educational background, as a professional in the music industry, and based upon my understanding of the facts and circumstances of the professional relationship between Phoenix Stone, Sybill Hall and the StoneHall companies on the one hand and Liana Conway and Andrew Conway on the other, it is my professional opinion as follows:

a. Phoenix Stone, Sybill Hall and the StoneHall companies have entered into a fiduciary relationship with Liana Conway and Andrew Conway;

b. Phoenix Stone, Sybill Hall and the StoneHall companies have breached that duty. As a result of such breach, the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

c. Phoenix Stone, Sybill Hall and the StoneHall companies have violated their duty of loyalty to Liana Conway and Andrew Conway; the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

d. Phoenix Stone, Sybill Hall and the StoneHall companies become almost in the role of parents and misused this relationship to bilk her and her father out of unconscionable sums of money; the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

e. Phoenix Stone, Sybill Hall and the StoneHall companies have violated the duty of utmost good faith and fair dealing toward Liana Conway and Andrew Conway; the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

f. Phoenix Stone, Sybill Hall and the StoneHall companies have violated the duty of care, and specifically their conduct, acts and omissions have fallen below the standard of care of a reasonably prudent personal manager in the music industry; their breach of that duty and their conduct below such standard of care has caused direct harm, including financial damages to Liana Conway and Andrew Conway harm has resulted in financial harm in the amount of $1,737,948.00 and significant damage to the career of Liana Conway;

g. Phoenix Stone, Sybill Hall and the StoneHall companies have placed their own personal interests above those of Liana Conway and Andrew Conway; the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

h. Phoenix Stone, Sybill Hall and the StoneHall companies have failed and intentionally omitted to render complete, accurate, truthful and periodic accountings to Liana Conway and Andrew Conway of the dissipation of investor funds delivered to them in trust by Andrew Conway; the acts and omissions of Sybil Hall, Phoenix Stone and the StoneHall companies have caused direct harm including financial damages to Andrew Conway in the amount of $1,737,948, and significant damage to the career of Liana Conway;

I reserve the right to supplement this report and testimony for purposes of rebuttal of any opinions, summaries, testimony, anticipated testimony, expert disclosures, or expert opinions presented by the opposing parties. At trial I intend to testify as to all matters contained in this report; the quality, level and sufficiency of the personal management. I will also testify as to the methods, and industry practices and standards, as well as acceptable conduct, in the music industry with respect to personal management of Artists. I will testify about the general practices concerning the treatment of artists by certain professional persons who are involved with advising and supervising the Artist, including business practices, accounting matters and financial matters relating to the Artists' development and career. I will render my expert opinions about the various duties of trust and fiduciary duties that all such professional persons owe to the Artist. I will identify the conflicts of interest and the Defendants' failure to disclose such conflicts.  I intend to testify that the Defendants failed to fulfill their obligations to the artist, Liana Conway, and the investor, Andrew Conway, as well as identifying numerous instances where the Defendants have actually deceived the Artist Liana Conway and the investor, Andrew Conway. I intend to render such opinions based on a reasonable degree of certainty in accordance with my knowledge of the customs, practices, duties and obligations of personal managers, including within the music industry and in accordance with acceptable practices. I am also prepared to testify to my education, training and experience and to respond to hypothetical questions that may be posed at trial and to the expert witnesses, if any, retained by the defendants.

Acknowledged as to the accuracy of the
foregoing and respectfully submitted,


George A. Howard

# Appendices

Howard CV

# George A. Howard

23 Oak St.
Beverly Farms, MA 01915
(617) 899-6721 • gah650@gmail.com • @gah650

_____

## PROFESSIONAL OVERVIEW

Accomplished senior level operations, marketing, strategy, and legal executive; consultant; educator; author; and expert witness with extensive experience with both large and emerging companies, and a proven track record of successful corporate and startup leadership.

Direct experience in the following:

-complex negotiations                            -strategic planning and implementation
-mergers, acquisitions, and turnarounds          -marketing strategy and implementation
-social media                                    -copyright
-information technology                          -product development
-licensing                                       -manufacturing                    -
branding                                         -start ups
-all aspects of the music industry
-artist management                               -music publishing
-innovation

Selected Professional Accomplishments:

- COO of Norton (Parent company of Wolfgang's Vault, Concert Vault, Daytrotter, and Paste), oversaw a staff of over 50 employees, and in the span of two years, turned-around to profitability Daytrotter and Concert Vault, and acquired and made profitable Paste Magazine.

- President of Rykodisc, oversaw the growth of one of the world's largest independent record labels, which was sold to Warner Music Group for $67 million.

- Original founder of TuneCore, which grew from a team of four people to now be one of the world's largest distributors of music.

- In a management/advisor capacity, has guided the careers of Grammy, Emmy, and Oscar-award winning artists such as Carly Simon and Mark Isham.

- Advised companies from the Fortune 500 (CVS/pharmacy), to the Ivy League (Brown University), as well as non-profits (Easter Seals), and startups (Troy & Sons Moonshine) on an array of business strategy and legal issues.

**George A. Howard**
-2-
_____

Selected Professional Accomplishments (continued):

- As an educator, have taught classes in Copyright Law, Emerging Business Models, Ethics, Leadership, Creative Promotion in New Media, Record Industry Operations, authored numerous scholarly articles, and was the 2014 recipient of the Dean's Award for Excellence in Teaching from Berklee College of Music.

- As an author, have published two books on the music industry (Berklee Press), regularly contribute to Forbes, and have authored hundreds of widely-read articles on marketing and strategy that have appeared in publications such as The Huffington Post, Time, The Music Business Journal, and others.

## BUSINESS EXPERIENCE

**2004-Present:**   **Founder: The Howard Agency**
Boutique strategic, technology, marketing and legal firm.  Selected Accomplishments include:

- ***CVS/pharmacy***
Advised this Fortune 500 company on their marketing/branding strategy. In particular, Mr. Howard devised strategic initiatives for the company in the new media/social media sphere.  Specifically, Mr. Howard launched the company's successful social media initiative.

- ***Wolfgang's Vault***
Advised on strategic, technological, and legal concerns for this online music and merchandise venture controlling one of the largest collection of rock and roll music and memorabilia in the world, as well as its subsidiary sites, Daytrotter, Concert Vault, and Paste Magazine

  Mr. Howard developed and implemented strategic and marketing plans, as well as negotiated complicated acquisition and licensing deals with content holders, including artists and other firms.

  Additionally, Mr. Howard developed the technological initiatives that led to, among other things, revolutionary new direct to consumer purchasing programs and award-winning mobile (iPhone/iPad) applications.

- ***Brown University***
Advised this Ivy League University on branding, marketing, and strategic development. Specifically, Mr. Howard developed new markets for their Choices Program, and launched their Summer at Brown Social Media Campaign.

**George A. Howard**

-3-

_____

- **Alticor/Amway**
  Advised on complex copyright issues, as well as marketing strategy. Authored and created numerous instructional videos.

- **Easter Seals**
  Advised this large non-profit organization on strategy related to its entrée into the drug rehabilitation sector. Additionally, Mr. Howard devised and implemented the social media and online marketing for their initial rehab units.

- **Carly Simon**
  Managed and advised the world-renowned songwriter and vocalist on all facets of her career, including developing the strategic plan for the Carly Simon Foundation for Musical Therapy. Developed Ms. Simon's product and apparel launch, including a revolutionary deluxe box package. Negotiated numerous complex deals, including deals involving the online exploitation of Ms. Simon's videos, as well as licensing of Ms. Simon's music to company's engaged in synchronizing audio to online video.

- **Mark Isham Music**
  Advisor to Grammy Award winning composer Mark Isham.  Developed and implemented all processes related to the marketing and distribution of Mr. Isham's work. Advised on all facets of Mr. Isham's technology and branding strategy. Negotiated numerous complex deals, including licensing of Mr. Isham's music to company's engaged in synchronizing audio to online video.

- **The Estate of the Platters**
  Provided expert reports on a variety of complex legal and music-related issues, and developed the strategic plan for the ongoing exploitation of masters and intellectual property of the legendary vocal group.

- **Troy and Sons Distillery**
  Developed the strategic, branding, and marketing plans for this boutique distillery. Advised on legal and financial strategy. Instrumental in raising funding, and in the eventual sale of a percentage of the company

- **Berklee College of Music**
  Social Media Marketing advisor for Berklee Media, the online school and publisher for Berklee College of Music.  Working directly with the head of Berklee Media, developed a comprehensive social media marketing strategy designed to increase awareness and enrollment for this multi-million dollar institution.

**George A. Howard**
-4-

_____

**2011-2014:**          **COO: Wolfgang's Vault, Concert Vault, Paste Magazine, Daytrotter**

Mr. Howard oversaw all aspects of this Media, Culture, and Apparel company, and the staff of Norton, LLC, which controls one of the world's largest collections of music-related products; the world's largest collection of live music audio and video concerts; Paste Magazine, an online culture web site that received 70 million page views in 2012; and Daytrotter, a fast-growing independent music site.

Responsible for all facets of the various companies' strategy, marketing, finance, as well as business affairs, including managing all elements related to the exploitation of the company's video assets both on its own Sites and via third-party sites such as YouTube.

Oversaw the acquisition and turn-around of Paste Magazine; taking the company out of bankruptcy to over a million dollars in profit in one year; the turn-around of Daytrotter, which had lost money for five years running, but, under Mr. Howard's auspices became profitable; the launch of Concert Vault (August of 2012), which included a redesign of the website and business model (including the development and exploitation of the company's vast collection of videos), that has led to profitability.

**2006-2008:**          **Vice President and Executive Editor, Artists House Music Foundation**

Drafted the grant proposal, which resulted in the Herb Alpert Foundation funding a $2 million web site designed to provide educational resources for musicians.

Created and implemented the social-media and marketings campaign for the Site, which resulted in dramatic increases in brand awareness and traffic.

Authored hundreds of articles for the Site.

**George A. Howard**
-5-
_____

**2004-2007:**  **Co-founder: TuneCore**
Co-Founder of TuneCore, an online company which enables artists to make their music available on iTunes and other digital retailers without a label.

Instrumental in the creation of the business, marketing, and financial strategy for the Company.

Advised on the strategic partnership between TuneCore and Guitar Center, resulting in a multi-million dollar investment from Guitar Center.  More recently, Mr. Howard advised on the $7 million dollar investment in TuneCore from Opus Capital.

**2000-2004:**  **President: Rykodisc**
Oversaw all aspects of this company — one of the world's largest and most respected independent record labels with offices in Boston, New York, Philadelphia, England (London) and Canada — which grew to $40 million in annual revenues and a staff of 50.

Areas of focus included signing of artists, contracts and legal affairs.  Worked closely with board of directors, bankers, attorneys, distribution company, publishing companies, media, artist managers, art directors, promoters, and booking agents. Oversaw daily business operations including financials and staffing.

**1992-2000:**  **Founder: Slow River Records**
Started an independent label in a dorm room, and built it to a multi-million dollar company representing numerous significant artists.

**1988-Present:**  **Independent Music Producer/Musician**
Produced and performed on numerous albums. Proficient in guitar, mandolin, electric bass, banjo, and dulcimer.

**George A. Howard**
-6-
_____

## SUMMARY OF ACADEMIC EXPERIENCE

Mr. Howard is an Associate Professor or Management at Berklee College of Music. Prior to this, Mr. Howard was an assistant professor of Management and Executive in Residence at Loyola University's Joseph Butt College of Business Administration, an AACSB accredited institution. Mr. Howard teaches courses in management, entrepreneurship, business ethics, copyright law, and marketing.  Mr. Howard's principal research activities involve copyright law and policy.

Mr. Howard has lectured at numerous universities including: Brown University, Tulane University, Loyola College of Law, Boston College, and Northeastern University.

Mr. Howard has developed a number of online courses including Music Business Management and Music Business Entrepreneurship.

## EDUCATION

JD, Loyola University, New Orleans, La, 2009
MBA, Loyola University, New Orleans, La, 2009
MA, Literature, University of New Hampshire, Durham, NH, 2004
BA, Literature, Boston University, Boston, MA, 1992

## SPEAKING

Mr. Howard is a sought after speaker.  He has presented Keynote speeches, lectures, moderated panels, and been a panelist at numerous events including:

MIDEM
Brown University
CVS
Snowbird Ski and Summer Resort
Future of Music Policy Summit
Grantmakers in the Arts Conference
MEISA Convention
SxSW

## ACADEMIC EXPERIENCE

2011-Present:     Associate Professor, Berklee College of Music. Teaching Assignments: Emergent Business Models, Leadership and Ethics, Copyright Law, Creative Promotion in New Media

2004-2011:     Assistant Professor/Executive in Residence, College of Business Administration, Loyola University, New Orleans. Teaching Assignments: Entrepreneurship, Management, Marketing, Introduction to Business

**George A. Howard**
-7-

_____

2004-2005          Assistant Professor, Berklee College of Music, Boston, MA,
                   Teaching Assignments: Music Management and Music Business
                   Entrepreneurship.

2003-2004          Adjunct Faculty, Northeastern University and University of
                   Massachusetts, Teaching Assignments: Music Management,
                   Copyright, Arts Administration, Music Publishing.


**<u>PUBLICATIONS</u>**

<u>Books</u>:          *An Insider's Guide to the Record Industry*  (Berklee, 2003)
                   *Music Publishing 101* (Berklee, 2004)
                   *The Artist's Dilemma…And the Way Forward* (in contract negotiations)

<u>Articles</u>:        •Howard, George and Gary Myers. 2009. "The Future of Music:
                   Reconfiguring Public Performance Rights." *The Journal of Intellectual
                   Property Law.*
                   •Howard, George. 2009. "Social Media and the Marketing Mix." *The Music
                   Business Journal.*
                   •Howard, George. 2005 "Royalty Streams." *The Music Business Journal.*

                   <u>Please review the complete list by clicking this link.</u>