UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDREW CONWAY, LILIANA CONWAY
d/b/a ZEKE THE ZEBRA,

              Plaintiffs

v.

SAM LICATA a/k/a PHOENIX STONE;
SYBIL HALL a/k/a SBYILL LICATA;
STONEHALL ENTERTAINMENT, LLC, a California
Limited Liability Company;
STONEHALL MERCHANDISE, LLC, a California
Limited Liability Company;
STONEHALL MUSIC PUBLISHING, LLC, a California
Limited Liability Company;
STONEHALL RECORDS, LLC, a California
Limited Liability Company;
STONEHALL TELEVISION, LLC, a California
Limited Liability Company; and
STONEHALL TOURING, LLC, a California
Limited Liability Company,

              Defendants

Docket No.:
1:13-cv-12193-LTS

**Leave to file excess
pages granted
on 2/17/2015 (Dkt. 175)**

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ ii

I.      SUMMARY OF FACTS ................................................................................. 1

II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        ALL REMAINING COUNTS ......................................................................... 4

III.    TENNESSEE LAW APPLIES TO ALL OF PLAINITFFS' CLAIMS ............... 4

IV.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
        THE BREACH OF CONTRACT COUNT ....................................................... 7

        A.    Plaintiffs' version of the parties' agreement is unenforceable
              as a matter of law. ............................................................................. 9

        B.    Defendants were never required to provide detailed, itemized invoices ................. 10

        C.    There is no evidence that Defendants did not use the funds on Liana's career. ...... 12

V.      MASSACHUSETTS' CONSUMER PROTECTION STATUTE
        DOES NOT APPLY ...................................................................................... 14

VI.     PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM FAILS .................. 17

VII.    DEFENDANTS HAVE NOT BREACHED ANY FIDUCIARY DUTIES ....... 20

VIII.   PLAINTIFFS CANNOT PROVE THEIR FRAUD AND NEGLIGENT
        MISREPRESENTATION CLAIMS ............................................................... 24

        A.    Defendants have not misrepresented their credentials.. ........................... 25

        B.    Plaintiffs' allegations that Defendants' services were too costly
              do not constitute fraud. ..................................................................... 26

        C.    Plaintiffs have shown no fraudulent marketing or promotion charges. ............... 28

        D.    Plaintiffs' damages claim strains the boundaries of common sense. ................. 28

IX.     CONCLUSION ............................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*108 Degrees, LLC v. Merrimack Golf Club, Inc.*,
    2010 WL 1254920 (D.N.H. Mar. 25, 2010) ................................................................18

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
    374 F.3d 23 (1st Cir. 2004)........................................................................................25

*ARC LifeMed, Inc. v. AMC-Tenn., Inc.*,
    183 S.W.3d 1 (Tenn. Ct. App. 2005)............................................................................9

*Aspect Software, Inc. v. Barnett*,
    787 F. Supp. 2d 118 (D. Mass. 2011).........................................................................4

*Backman v. Smirnov*,
    751 F. Supp. 2d 304 (D. Mass. 2010).........................................................................12

*BancorpSouth Bank v. Herter*,
    643 F. Supp. 2d 1041 (W.D. Tenn. 2009) ..................................................................12

*Blasberg v. Oxbow Power Corp.*,
    934 F. Supp. 21 (D. Mass. 1996).................................................................................21

*Boland v. George S. May Int'l Co.*,
    969 N.E.2d 166 (Mass. App. Ct. 2012) ......................................................................5

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir. 1998)..........................................................................................26

*Broomfield v. Kosow*,
    212 N.E.2d 556 (Mass. 1965).....................................................................................23

*Brown v. Brown*,
    863 S.W.2d 432 (Tenn. Ct. App. 1993).......................................................................26

*Bushkin Assoc., Inc. v. Raytheon Co.*,
    473 N.E.2d 662 (Mass. 1985)......................................................................................6

*Cagle v. Hybner*,
    2008 WL 2649643 (Tenn. Ct. App. July 3, 2008)......................................................24

*Calabro v. Calabro*,
    15 S.W.3d 873 (Tenn. Ct. App. 1999).........................................................................10

**Cases**                                                                      **Page(s)**

*Calipari v. Powertel, Inc.*,
  231 F.Supp.2d 734 (W.D. Tenn. 2002) ...................................................................................23

*Cambridge Plating Co., Inc. v. Napco, Inc.*,
  85 F.3d 752 (1st Cir. 1996)......................................................................................... 14-15

*Cecil v. Hardin*,
  575 S.W.2d 268 (Tenn. 1978) ..............................................................................................24

*Clark v. Small*,
  14 Tenn. 418 (Tenn. Err. & App. Ct. 1834) ...............................................................10

*Clark v. State St. Trust Co.*,
  169 N.E. 897 (Mass. 1930)..............................................................................................5

*Cmty. Builders, Inc. v. Indian Motocycle Assoc., Inc.*,
  692 N.E.2d 964 (Mass. App. Ct. 1998) ......................................................................9

*Cosme v. Whitin Mach. Works, Inc.*,
  632 N.E.2d 832 (Mass. 1994)........................................................................................6

*Cowan v. Buyers*,
  3 Tenn. 53 (Tenn. Err. & App. Ct. 1812) ..................................................................17

*Cummings v. HPG Int'l, Inc.*,
  244 F.3d 16 (1st Cir. 2001)............................................................................. 16-17, 24, 26

*Dead Kennedys v. Biafra*,
  37 F. Supp. 2d 1151 (N.D. Cal. 1999)........................................................................18

*Dialogo, LLC v. Bauza*,
  456 F. Supp. 2d 219 (D. Mass. 2006).........................................................................12

*Duclersaint v. Fed. Nat'l Mortgage Ass'n*,
  696 N.E.2d 536 (Mass. 1998).........................................................................................15

*Eisenstein v. David G. Conlin, P.C.*,
  827 N.E.2d 686 (Mass. 2005).........................................................................................22

*Engenius Entm't, Inc. v. Herenton*,
  971 S.W.2d 12 (Tenn. Ct. App. 1997).........................................................................10

*Evans v. Boggs*,
  245 S.W.2d 641 (Tenn. Ct. App. 1951).......................................................................21

**Cases**                                                                                   **Page(s)**

*Fichera v. City of Lawrence*,
　44 N.E.2d 779 (Mass. 1942) ........................................................................8

*Fin. Res. Network, Inc. v. Brown & Brown, Inc.*,
　930 F. Supp. 2d 287 (D. Mass. 2013) ...........................................................8

*Fogerty v. Fantasy, Inc.*,
　510 U.S. 517 (1994) ....................................................................................20

*Frullo v. Landenberger*,
　814 N.E.2d 1105 (Mass. Ct. App. 2004) .....................................................16

*Geo. W. Wilcox, Inc. v. Shell E. Petroleum Prod., Inc.*,
　186 N.E. 562 (Mass. 1933) ...........................................................................9

*German v. Ford*,
　300 S.W.3d 692 (Tenn. Ct. App. 2009) .......................................................10

*Griffin v. J-Records*,
　398 F. Supp. 2d 1137 (E.D. Wash. 2005) ....................................................17

*Hayduk v. Lanna*,
　775 F.2d 441 (1st Cir. 1985) ........................................................................25

*Jamestowne on Signal, Inc. v. First Federal Savings and Loan Association*,
　807 S.W.2d 559 (Tenn. Ct. App. 1990) .......................................................13

*Jarvis v. A & M Records*,
　827 F. Supp. 282 (D.N.J. 1993) .............................................................. 19-20

*JCW Invs., Inc. v. Novelty, Inc.*,
　289 F. Supp. 2d 1023 (N.D. Ill. 2003) ........................................................18

*Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*,
　470 F.3d 14 (1st Cir. 2006) ..........................................................................12

*Johnson v. Suntrust Bank*,
　2013 WL 6147698 (E.D. Tenn. Nov. 22, 2013) ..........................................17

*Kattar v. Demoulas*,
　739 N.E.2d 246 (Mass. 2000) ......................................................................15

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
　313 U.S. 487 (1941) ......................................................................................4

**Cases**                                                                 **Page(s)**

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
   781 N.E.2d 787 (Mass. 2003) ................................................................................................ 14

*Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*,
   21 F. Supp. 2d 785 (W.D. Tenn. 1998) ................................................................................ 12

*Levin v. Dalva Bros., Inc.*,
   459 F.3d 68 (1st Cir. 2006) ............................................................................................... 4, 5

*Lightfoot v. Hardaway,*
   751 S.W.2d 844 (Tenn. Ct. App.1988) ............................................................................ 20, 21

*LinkCo, Inc. v. Fujitsu Ltd.*,
   2002 WL 1585551 (S.D.N.Y. July 16, 2002) ..................................................................... 27

*Lyons v. Jones*,
   121 S.W.2d 125 (Tenn. Ct. App. 1938) .............................................................................. 10

*Madan v. Royal Indem. Co.*,
   532 N.E.2d 1214 (Mass. App. Ct. 1989) ............................................................................ 15

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
   412 F.3d 215 (1st Cir. 2005) ............................................................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................................. 4

*McElroy v. Boise Cascade Corp.*,
   632 S.W.2d 127 (Tenn. Ct. App. 1982) .............................................................................. 26

*Medina-Muñoz v. R.J. Reynolds Tobacco Co.*,
   896 F.2d 5 (1st Cir. 1990) ..................................................................................................... 4

*Menuskin v. Williams*,
   145 F.3d 755 (6th Cir. 1998) .............................................................................................. 24

*Morris v. Watsco, Inc.*,
   433 N.E.2d 886 (Mass. 1982) .............................................................................................. 5

*Morrison v. Allen*,
   338 S.W.3d 417 (Tenn. 2011) ............................................................................................ 20

*Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*,
   986 F.2d 607 (1st Cir. 1993) ................................................................................................ 5

**Cases**                                               **Page(s)**

*Newton v. Diamond*,
   388 F.3d 1189 (9th Cir. 2004) ...............................................................17

*Newton v. Moffie*,
   434 N.E.2d 656 (Mass. App. Ct. 1982) ..................................................16

*Oddo v. Ries*,
   743 F.2d 630 (9th Cir. 1984) ...................................................................18

*Overstreet v. TRW Commercial Steering Div.*,
   256 S.W.3d 626 (Tenn.2008) ..................................................................23

*Peoples Bank of Elk Valley v. ConAgra Poultry Co.*,
   832 S.W.2d 550 (Tenn. Ct. App. 1991) ..............................................10, 13

*Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.*,
   40 F. Supp. 2d 49 (D. Mass. 1999),
   *aff'd*, 214 F.3d 216 (1st Cir. 2000) ....................................................16, 21

*Pfahler v. Nat'l Latex Prods. Co.*,
   517 F.3d 816 (6th Cir. 2007) ...............................................................21-22

*Pimental v. Wachovia Mortg. Corp.*,
   411 F. Supp. 2d 32 (D. Mass. 2006) .......................................................17

*Pinson & Assocs. Ins. Agency, Inc. v. Kreal*,
   800 S.W.2d 486 (Tenn. Ct. App. 1990) ...................................................11

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
   321 N.E.2d 915 (Mass. 1975) ..................................................................14

*Portfolioscope, Inc. v. I-Flex Solutions Ltd.*,
   473 F. Supp. 2d 252 (D. Mass. 2007) ......................................................17

*Qestec, Inc. v. Krummenacker*,
   367 F. Supp. 2d 89 (D. Mass. 2005) ........................................................20

*Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*,
   988 F. Supp. 2d 395 (S.D.N.Y. 2013) .....................................................27

*Reznor v. J. Artist Mgmt., Inc.*,
   365 F. Supp. 2d 565 (S.D.N.Y. 2005) .....................................................24

**Cases**                                                          **Page(s)**

*Rodi v. S. New England School of Law,*
    389 F.3d 5 (1st Cir. 2004)....................................................................................................25

*Samia v. Cent. Oil Co. of Worcester,*
    158 N.E.2d 469 (Mass. 1959)............................................................................................21

*Santiago v. Sherwin Williams Co.,*
    3 F.3d 546 (1st Cir. 1993).................................................................................................24

*Santiago v. Sherwin-Williams Co.,*
    794 F. Supp. 29 (D. Mass. 1992).......................................................................................24

*Se. Tex. Inns, Inc. v. Prime Hospitality Corp.,*
    462 F.3d 666 (6th Cir. 2006).............................................................................................24

*Sears v. Gregory,*
    146 S.W.3d 610 (Tenn. Ct. App. 2004)............................................................................24

*Sebastian Music Grp., Inc. v. Ayala-Rodriguez,*
    594 F. Supp. 2d 176 (D.P.R. 2008) ..................................................................................18

*Sever Records, LLC v. Rich,*
    658 F.3d 571 (6th Cir. 2011) ............................................................................................18

*Singarella v. City of Boston,*
    173 N.E.2d 290 (1961) .......................................................................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) .........................................................................................................19

*Spinner v. Nutt,*
    631 N.E.2d 542 (Mass. 1994)...........................................................................................24

*Stacks v. Saunders,*
    812 S.W.2d 587 (Tenn. Ct. App. 1990)............................................................................24

*Stagecoach Transp., Inc. v. Shuttle, Inc.,*
    741 N.E.2d 862 (2001) .......................................................................................................5

*Staggers v. Real  Authentic Sound,*
    77 F. Supp. 2d 57 (D.D.C. 1999)......................................................................................18

*Starnes Family Office, LLC v. McCullar,*
    765 F. Supp. 2d 1036 (W.D. Tenn. 2011) ........................................................................20

**Cases**                                                                                          **Page(s)**

*Stonyfield Farm, Inc. v. Agro-Farma, Inc.*,
   2009 WL 3255218 (D.N.H. Oct. 7, 2009) ...................................................................5

*Superior Glass Co. v. First Bristol County Nat'l Bank*,
   406 N.E.2d 672 (Mass. 1980) ......................................................................................23

*Systems XIX, Inc. v. Parker*,
   30 F. Supp. 2d 1225 (N.D. Cal. 1998),
   *aff'd*, 482 F.3d 910 (7th Cir. 2007)............................................................................18

*Szalla v. Locke*,
   657 N.E.2d 1267 (Mass. 1995)....................................................................................16

*TechTarget, Inc. v. Spark Design, LLC*,
   746 F. Supp. 2d 353 (D. Mass. 2010)..........................................................................24

*Tetra Tech, Inc. v. Performa Entm't Real Estate, Inc.*,
   2008 WL 4457061 (Tenn. Ct. App. Oct. 3, 2008)........................................................9

*T-Peg, Inc. v. Vt. Timber Works, Inc.*,
   669 F.3d 59 (1st Cir. 2012)..........................................................................................20

*Value Partners S.A. v. Bain & Co.*,
   245 F. Supp. 2d 269 (D. Mass. 2003)............................................................................7

*Wasserman v. Agnastopoulos*,
   2497 N.E.2d 19 (Mass. App. Ct. 1986) ......................................................................15

*Weber v. Sanborn*,
   502 F. Supp. 2d 197 (D. Mass. 2007) .........................................................................14

*Wells v. Chattanooga Bakery, Inc.*,
   448 S.W.3d 381 (Tenn. Ct. App. 2014)......................................................................17

*Whitinsville Plaza, Inc. v. Kotseas*,
   390 N.E.2d 243 (Mass. 1979) .....................................................................................15

*Zimmerman v. Bogoff*,
   524 N.E.2d 849 (Mass. 1988) .....................................................................................21

*Zimmerman v. Kent*,
   575 N.E.2d 70 (Mass. Ct. App. 1991) ........................................................................24

| Rules | Page(s) |
|---|---|

Fed R. Civ P. 9(b)......................................................................................................25

Fed. R. Civ. P. 56(a)....................................................................................................4

**Statutes**

17 U.S.C. § 101 ..........................................................................................................18

17 U.S.C. §§ 106(1), (2) & (3) ...................................................................................19

Massachusetts General Laws Chapter 93A ...........................................................5, 14

Tenn. Code Ann. § 29-2-101(a)(5).............................................................................8

Tenn. Code. Ann. § 29-30-101 ..................................................................................17

**Other Authorities**

52 Mass. Prac., Law of Chapter 93A § 12.9 ..............................................................6

90 C.J.S. *Trover and Conversion* § 16 (2015) ........................................................17

117 Cong. Rec. 34748-34749 (1971)
    (colloquy of Reps. Kazen & Kastenmeier).........................................................19

*Cause of Action for Infringement of Copyrights in Sound Recordings*
    *Under Federal Copyright Act of 1976,*
    58 Causes of Action 2d 663 (2013) (Dvorske, John J.)......................................19

*Construction & application of provision of Rule 9(b), Fed. R. Civ. P.,*
    *that circumstances constituting fraud or mistake be stated with particularity,*
    27 A.L.R. Fed. 407 (Finberg, Barney J.) ...........................................................26

H.R. Rep. No. 94-1476, 94th Cong. (2nd Sess. 1976) .............................................18

*Mass. Gen. Laws Chapter 93A, Section 11: The Evolution of the "Raised Eyebrow" Standard,*
    36 Suffolk U. L. Rev. 139, 154-56 (2002) (Callahan, Katerina S.)...................15

Restatement (Second) of Conflict of Laws § 6 (1971)...............................................5

Restatement (Second) of Conflict of Laws § 145(2) (1971).......................................7

Restatement (Second) of Conflict of Laws § 188(2) (1971).......................................6

Restatement (Second) of Torts § 552(1) ...................................................................24

Defendants respectfully submit this memorandum in support of their motion for summary judgment and ask that the Court dismiss this case with prejudice.[1]

## I.    SUMMARY OF FACTS[2]

This action arises in connection with the music career of Plaintiff Liana Conway ("Ms. Conway").[3]  Ms. Conway, Plaintiff Andrew Conway ("Mr. Conway") and Defendant Stonehall Records LLC ("Stonehall"), run by Phoenix Stone ("Stone") and Sybil Hall ("Hall"), entered into an agreement as members of a record label company that provided artistic and music development, marketing, production and many other services in furtherance of Ms. Conway's career in the entertainment industry.  Under the agreement, which was memorialized as the Great Lines Agreement, Mr. Conway provided investment funding, Ms. Conway provided her talent, and Defendants provided their development, promotion and marketing services.  All members had decision making powers, with Plaintiffs holding 2/3 interest and Defendants holding 1/3 interest, with the members to receive the same percentage of net profits.  Once the parties' attorney had committed the agreement to writing, Mr. Conway reached out to Defendants and induced them to sign it "as soon as possible."  After receiving Defendants' executed version of the agreement, Plaintiffs did not sign the agreement and admit they never informed Defendants they did not sign the agreement, allowing Defendants to perform under the terms of what Defendants thought was a fully executed agreement, but secretly disavowing the terms that were not to their benefit.  Now, Plaintiffs bring breach of contract claims alleging an entirely different contract from the one

---

[1] Count XIX was dismissed on October 17, 2014.  ECF No. 144.  Plaintiffs have moved to withdraw Counts VIII and XIV and Defendants have assented thereto.  This motion seeks a grant of summary judgment on all remaining claims against Defendants.

[2] Defendants file herewith a more detailed Local Rule 56.1 Statement of Undisputed Facts (hereinafter "Facts").

[3] Plaintiffs inexplicably misspelled Ms. Conway's name as Liliana Conway in the caption and never corrected it.  Facts at 12.

negotiated and memorialized by the parties, unsurprisingly with terms that benefit only Plaintiffs and lack consideration to Defendants.

For over two years, the parties worked together to produce professional quality videos available via a quick YouTube search, a full length music album, hundreds of professional photos, and dozens of articles written about Ms. Conway in various media outlets. Ms. Conway's songs were played by radio stations, nightclubs, restaurants, gyms and stores, and were available on iTunes and other outlets. In fact, Ms. Conway was named to iTunes' "New & Noteworthy" and "New Artists" lists two weeks in a row. The parties toured various states on Ms. Conway's summer camp tour, visited multiple radio stations to promote Ms. Conway's music, hired agents to set up a performance at a radio conference in Colorado with many music executives and set up multiple performances on the local Nashville music scene. Stone produced all the songs on Ms. Conway's album, and wrote or co-wrote many of them as well. The parties discussed weekly, and sometimes daily, the development and marketing plans for Ms Conway's career, the budget, which services were being provided, and by whom, and the overall direction of the project.

Mr. Conway, as the investor, received monthly invoices from Stonehall; and he unfailingly paid them all for over two years. About one year into the parties' relationship, in mid-2011, Plaintiffs asked Defendants to focus their time exclusively on Ms. Conway's career; the result was an agreement that Mr. Conway would pay Defendants $25,000 per month for their exclusive marketing services. Plaintiffs allege that Defendants misappropriated the funds invested by Mr. Conway and did not provide the bargained-for services. Plaintiffs, however, have adduced absolutely no evidence that Defendants did not provide any promised services. In fact, Defendants provided a 26-page accounting detailing each expenditure and linking it to the services listed in the

Stonehall invoices and produced hundreds of pages of bank records, receipts and invoices backing up the accounting.

Plaintiffs claim that many of the services Defendants provided or arranged were overcharged, yet they have adduced no evidence of this allegation. Rather, the evidence shows that it was Plaintiffs' expensive taste and costly decisions that caused increases in the charges. Plaintiffs praised Defendants' work throughout the relationship, leaving flattering voicemails, and even testified that, to this day, they are still happy with Defendants' work. In short, Plaintiffs received all of the services at the level of quality that they demanded. For these reasons, Plaintiffs' tort claims of breach of fiduciary duty, fraud and negligent misrepresentation all fail.

Plaintiffs also bring frivolous copyright violation claims based on the faulty premise that Defendants' distribution of sound recordings (for which they hold copyrights) somehow violates the underlying composition copyright of those songs. These claims fail because there is no legal basis for them.

This case boils down to an experienced businessman who mismanaged his daughter's fledgling music career, and a spoiled daughter who allowed the expensive and wild lifestyle of her own choosing to distract her from the serious work it takes to become successful in the music industry. Plaintiffs walked away from Ms. Conway's career just after her album party in New York City and an audition with Nickelodeon, during which her voice cracked after ignoring Defendants' advice not to party late the night before. Then Ms. Conway had a nervous breakdown because she could not handle the pressures of the career that was taking flight. Plaintiffs have only themselves to blame for the failure of Ms. Conway's career. That Mr. Conway chose to invest a great deal of his personal time and money into his daughter who failed him is sad, but does not constitute grounds for a federal multimillion dollar lawsuit. Since no amount of revisionist history and rank

speculation can change the record of evidence in this case, Defendants respectfully ask this Court to grant summary judgment on each of Plaintiffs' remaining Counts.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL REMAINING COUNTS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once a party seeking summary judgment informs the district court of the basis for its motion, and identifies the evidence that it believes demonstrate the absence of a genuine issue of material fact, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). For the following reasons, the Court should grant summary judgment in favor of Defendants on all remaining counts.

## III.   TENNESSEE LAW APPLIES TO ALL OF PLAINTIFFS' CLAIMS

To determine which state's substantive law will apply in an action, the federal courts apply the choice-of-law principles of the forum state.  *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  As a general rule, Massachusetts courts give effect to a choice-of-law clause negotiated between the parties.  *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 125-26 (D. Mass. 2011).  There is no question that had the Plaintiffs signed the Great Lines Agreement, the Tennessee choice of law clause would

control and apply to Plaintiffs' contract claims.[4]  *See Morris v. Watsco, Inc.*, 433 N.E.2d 886, 888

(Mass. 1982) ("Massachusetts law has recognized, within reason, the right of the parties to a

transaction to select the law governing their relationship.").  Further, the remainder of Plaintiffs'

claims should be governed by Tennessee law as well since they all stem from the contractual

relationship of the parties.  *See Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986

F.2d 607, 610 (1st Cir.1993) ("[W]hen parties agree that 'contract related' claims will be tried

under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach

of contract will be tried under ... Massachusetts [General Laws Chapter 93A].");  *Stonyfield Farm,*

*Inc. v. Agro-Farma, Inc.*, 2009 WL 3255218, at *6 (D.N.H. Oct. 7, 2009) (applying contractual

choice-of-law provision to tort claims predicated on breach of contract).

Even assuming, as Plaintiffs claim, that they did not sign the Great Lines Agreement, the

choice of law provision in the Agreement should still control since it is the only memorialization of

the parties' understanding and since Plaintiffs induced Defendants to sign it.[5]  *See Boland v. George*

*S. May Int'l Co.*, 969 N.E.2d 166, 174 (Mass. App. Ct. 2012) ("The aim of all interpretation of

writings is to ascertain the meaning intended to be attached to the words by the parties who used

them, and to effectuate the true purpose of the parties as thus ascertained." (quoting *Clark v. State*

*St. Trust Co.*, 169 N.E. 897, 903 (Mass. 1930));  *Stagecoach Transp., Inc. v. Shuttle, Inc.*, 741

N.E.2d 862, 867 (2001) (honoring choice of law clause in unsigned contract where parties agreed to

the essential terms of the contract and acted according to such terms).

---

[4] The forum selection clause in the Great Lines Agreement further reflects the parties' intention that Tennessee law also apply to any disputes concerning *the Company* that the parties were forming, and not just the Agreement.  Thus Tennessee law should also apply to all claims arising from the parties' relationship.

[5] Plaintiffs should not be rewarded for their trickery by being allowed to disavow the choice of law clause that Defendants justifiably expected to apply.  Mr. Conway induced Hall to sign the Agreement on behalf of Stonehall, knew she signed it and never told Defendants that Plaintiffs did not sign it.  Facts at 52-3, 55, 61.  *See also Levin*, 459 F.3d at 75 (the governing law should reflect the parties' justified expectations and that a party's act concealing information forfeits their right to expect Massachusetts law to govern) (citing Restatement (Second) of Conflict of Laws § 6 (1971));  Moreover, Plaintiffs have never expressed any opposition to Tennessee as the choice of law term in the Great Lines Agreement.  Facts at 63.

Moreover, even if the parties had not agreed that Tennessee law would govern their disputes, Tennessee law should apply to all the contract and contract-related claims because Massachusetts conflicts law requires the Court to consider "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assoc., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 668 (Mass. 1985); *see also Cosme v. Whitin Mach. Works, Inc.*, 632 N.E.2d 832, 834 (Mass. 1994). The test under *Bushkin* to determine which jurisdiction has the most significant relationship to the transaction and the parties assesses the various contacts of the parties:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Bushkin*, 473 N.E.2d at 669 (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)).[6]

Most of the contacts between the parties occurred in Tennessee. Facts at 31-42. Shortly after the parties' first meeting in California, Liana and Defendants all moved to Tennessee. Facts at 14-6, 25. Tennessee is where Liana and Defendants reside to this day. Facts at 33, 40-2. In fact, in his deposition, Andrew Conway referred to the parties' relationship as "the project in Nashville." Facts at 31. Additionally, the parties hired a Tennessee lawyer to draft the Great Lines Agreement and, at the very least, verbally agreed that Tennessee law would govern their agreement. Facts at 47, 56. Only one of the Plaintiffs, Andrew Conway, lived in Massachusetts during the parties' working relationship, and yet, even he travelled to Tennessee frequently to participate in events and to discuss the project. Facts at 32, 117.

Moreover, even if Plaintiffs' tort claims did not arise from the contractual relationship, Tennessee law would govern those as well. The factors to be considered in tort cases include: "(1) the place of injury, (2) the place of conduct, (3) the domicile of the parties, and (4) the place where

---

[6] If the contacts of the parties do not strongly indicate a more significant relationship with one jurisdiction versus another, then the court is to go to a second step and consider choice-influencing, or policy, factors set forth in the Restatement. 52 Mass. Prac., Law of Chapter 93A § 12.9. Such factors do not point toward applying Massachusetts law here.

the relationship, if any, between the parties is centered." *Value Partners S.A. v. Bain & Co.*, 245 F.

Supp. 2d 269, 276 (D. Mass. 2003) (quoting Restatement (Second) of Conflict of Laws § 145(2)

(1971)).  Plaintiffs' tort claims are centered in Tennessee since the majority of the parties' conduct

took place there.  Many of the video shoots took place in Tennessee.  Facts at 35.  Liana and her

band members all lived in, rehearsed, and performed in Nashville, Tennessee.  Facts at 36.  Three of

the four parties were domiciled in Tennessee for most of the parties' relationship.  Facts at 39.

Thus, any tort claim arising from the Defendants' alleged conduct should be governed by Tennessee

law.

## IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT COUNT

Plaintiffs recently supplemented their answers to interrogatories to clarify (for the first time

in this litigation) the terms of the agreement that serves as the basis of their breach of contract

claim:

> Stone and Hall proposed I pay them lump sums in response to line item invoices for such lump sum payments that they would hold and use to pay the vendors and service providers working on Liana's career.  They agreed that they would come up with ideas for promoting Liana and her music and managing and developing her career, use the funds that I sent them to pay the expenses directly, and provide detailed, itemized invoices of the expenses that they incurred explaining their spending in detail.  Every dollar that I advanced was to be spent on Liana's career.  In exchange for the opportunity to be involved, they also agreed that they would not take or retain any income (with some exceptions) until Liana's career became profitable and she was a recognized commercial artist.  After Liana became profitable and the funds that I had advanced were repaid, Stone and Hall would be paid a percentage of or a commission on the revenues that Liana generated.  Based on my discussions with the Defendants, the commission was to be fair and reasonable based on music industry standards.

Facts at 65.  This statement of the parties' alleged agreement ignores the fact that the parties

negotiated a written contract to govern their relationship and hired a lawyer to memorialize that

agreement.  Facts at 43-51.  Once the written contract, the Great Lines Agreement, was finalized,

Plaintiffs induced Defendants to sign it.  Facts at 52.  Plaintiffs then failed to inform Defendants that

they did not sign the agreement, thereby causing Defendants to believe that the parties were operating under a written agreement.  Facts at 60-2.  Moreover, as sophisticated businesspeople, Mr. Conway and the Defendants both knew that a written agreement was necessary given the scope of the parties' relationship.  Facts at 46.  Yet Plaintiffs will have this Court believe that there was a separate oral agreement that supersedes the written agreement negotiated by the parties.  Such a claim defies logic and violates the statute of frauds.

In Tennessee, no action shall be brought "upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith."  Tenn. Code Ann. § 29-2-101(a)(5).  "When a party seeks to enforce an alleged oral contract that is within the statute of frauds, he must not only prove the existence of the oral contract itself but he must go one step further and prove a memorandum in writing containing the terms of that same oral contract in so far as he seeks to enforce them."  *Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 930 F. Supp. 2d 287, 308 (D. Mass. 2013) (quoting *Fichera v. City of Lawrence*, 44 N.E.2d 779, 780 (Mass. 1942)). Plaintiffs have adduced no evidence of any writings that support the oral contract they allege. Further, the only writings that exist – the Great Lines Agreement and the Stonehall invoices – belie Plaintiffs' version of the agreement.  Facts at 56, 64-89.

Even if Plaintiffs did not face a statute of fraud problem with their version of the agreement, their breach of contract claim fails because Plaintiffs cannot prove the required elements.  To survive, Plaintiffs must show: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract; and (3) damages caused by the breach of that contract.  *See*

*ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005); *Singarella v. City of Boston*, 173 N.E.2d 290, 291 (1961).  Plaintiffs' claim fails on each of these elements.

**A.  <u>Plaintiffs' version of the parties' agreement is unenforceable as a matter of law</u>.**

The Plaintiffs' version of the parties' agreement is unenforceable because it is missing an essential element.  As a matter of law, "[a] contract may not be enforceable where an essential element, such as price or compensation terms, is determined to be indefinite."  *Tetra Tech, Inc. v. Performa Entm't Real Estate, Inc.*, 2008 WL 4457061, at *5 (Tenn. Ct. App. Oct. 3, 2008).[7] Specifically, the Plaintiffs' contract fails because the payment terms are uncertain.  *See id.* at *5-6 (contract version submitted by Defendant failed because it did not contain a definite payment amount or payment terms).  Plaintiffs admit that the payment terms of their alleged oral agreement were never established, claiming in their interrogatory answer that "Stone and Hall would be paid a percentage of or a commission on the revenues Liana generated … [that was to be] fair and reasonable based on music industry standards."  Mr. Conway testified that there was no agreement as to the "division of profits" if Liana ever broke and began making a profit: "With the euphoria of her popping and becoming somebody, I'm sure we would have had a collective well spring of good vibes and common interests and something would have been worked out."  Facts at 66.  The percentage amount was never established; it was never decided whether the percentage would be from the gross or net revenue; nor was it determined for how long Defendants would collect this percentage of Ms. Conway's revenues.  At best, Plaintiffs' alleged agreement amounts to "an agreement between the parties to negotiate in good faith to reach a final [] agreement" and thus fails

---

[7] *See also Cmty. Builders, Inc. v. Indian Motocycle Assoc., Inc.*, 692 N.E.2d 964, 976-77 (Mass. App. Ct.1998) ("It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking...." (alteration in original) (quoting *Geo. W. Wilcox, Inc. v. Shell E. Petroleum Prod., Inc.*, 186 N.E. 562, 565 (Mass. 1933)).

to establish that a contract exists.  *Engenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 17-18 (Tenn. Ct. App. 1997).

Moreover, it defies logic to believe that Defendants agreed to provide their services free of charge for over two years based on the promise of an undefined amount of future payment with a date uncertain.  *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 554 (Tenn. Ct. App. 1991) (finding that an alleged contract was unenforceable because it was "so unusual and unbusinesslike as to raise a doubt of the seriousness of the contention" (quoting *Lyons v. Jones*, 121 S.W.2d 125, 129 (Tenn. Ct. App. 1938)).

Additionally, Plaintiff's alleged oral contract is unenforceable because Plaintiffs' promise to pay Defendants something in the future was illusory – it failed to bind the Plaintiffs to do anything to ensure that Defendants were paid for their services[8] – and thus Plaintiffs' version of the contract also fails for lack of consideration.  *German v. Ford*, 300 S.W.3d 692, 704-05 (Tenn. Ct. App. 2009) ("A promise is illusory when it fails to bind the promisor, who retains the option of not performing; an illusory promise is not consideration for a return promise, and so cannot be the basis for finding a contract."); *Calabro v. Calabro*, 15 S.W.3d 873, 876-77 (Tenn. Ct. App. 1999) (finding that a party attempting to prove the existence of a contract "is required to show that the agreement on which he relies was supported by adequate consideration ...") (alteration in original) (citation omitted);  *Clark v. Small,* 14 Tenn. 418, 421 (Tenn. Err. & App. Ct. 1834) ("[I]n all simple contracts ... whether written or verbal, the consideration must be averred and proved.").

**B.  Defendants were never required to provide detailed, itemized invoices.**

Even if Plaintiffs' agreement were enforceable on its face, Plaintiffs have adduced no evidence that Defendants promised to provide "detailed, itemized invoices of the expenses that they

---

[8] For instance, there is no requirement in Plaintiffs' alleged contract that Ms. Conway continue working on her career in entertainment or that she even use her best efforts to generate revenue.  Even if this is an implied covenant in Plaintiffs' contract, then it is clear that by quitting the project, Ms. Conway herself is the one who breached the Plaintiffs' contract.

incurred explaining their spending in detail," as Plaintiffs' interrogatory answer claims.  There is no evidence that Plaintiffs ever asked for such a detailed accounting from Defendants.[9]  In fact, the evidence shows that Mr. Conway often repeated that he was not a "bean counter."  Facts at 122-3. For over two years, Defendants invariably provided invoices to Mr. Conway that laid out the types of services they believed Ms. Conway needed and how much each service would cost.  Facts at 118-9.  The parties discussed the particulars on a regular basis, in person, over the telephone, and via texts and e-mails.  Facts at 77, 115-8.  For example, on January 31, 2011, Stonehall invoiced Mr. Conway $2,860.00 for "TRAVEL (AIRFARE, HOTEL AND RENTAL CAR) 4 days." Facts at 75. Mr. Conway never asked and Stonehall never sent the invoices for the flights or the hotel and rental car because that was not how the invoice system worked among the parties; the detail of the services was provided in person[10] and over the telephone and not in written invoices.  Facts at 67-89, 115, 118.

Neither have Plaintiffs adduced any evidence that Defendants promised to provide after-the-fact breakdowns or accountings of how the money was spent.  Tellingly, Plaintiffs have adduced no evidence explaining why they did not demand the accountings, why they continued to work with Defendants, or why they continued to wire funds *for over two years* when Defendants did not provide the detailed invoices that they had allegedly agreed to produce.  Quite simply, this is because a detailed accounting was never a term of the parties' understanding.  *See Pinson & Assocs. Ins. Agency, Inc. v. Kreal,* 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990) (finding that the course of conduct of the parties is the strongest evidence of their original intent in the terms of a contract).

---

[9] Although never requested during the parties' relationship and not required by any duties or law, during this litigation and in the spirit of cooperation in fulsome discovery, Defendants provided a spreadsheet detailing where all of the money wired by Mr. Conway was spent.  Facts at 183.  For this reason, Count XVI seeking an accounting is now moot.

[10] The evidence shows and Mr. Conway testified that he was present at many of the video and photo shoots, recording sessions, and other events.  Facts at 32, 117.  And, certainly, Ms. Conway was present for and the recipient of all services provided by Defendants.

C.  **There is no evidence that Defendants did not use the funds on Liana's career**.

Plaintiffs' breach of contract claim also fails because the evidence shows that Defendants provided every service that was promised and invoiced.[11]  In terms of the promise that Defendants "use the funds that I sent them to pay the expenses directly," Plaintiffs have adduced no evidence that the funds were spent on anything other than Ms. Conway's career.  In fact, since the discovery process confirmed that Defendants had indeed paid all the vendors who worked on Ms. Conway's career and were not siphoning funds, Plaintiffs now complain that Defendants promised not to retain any income for the services *they themselves* provided.  Yet, Plaintiffs admit, as they must, that Defendants did not agree to forego payment from the project and that there were "some exceptions" to this alleged agreement. Facts at 68-9, 71.

While Plaintiffs have never been clear about what types of services were such exceptions, one theory advanced by Mr. Conway in his deposition is that the exceptions had to be apparent on the face of the invoice.  Facts at 72-3.  The exceptions, according to Mr. Conway, were never discussed but rather had to be listed on the invoice:

> I never had discussions about compensation.  The deal was that I would – if they wouldn't let me pay the bills [directly], I would pay against the invoices.  But if any of the invoice money was to inure to them [Stonehall] that it had to be shown on the invoice.  And I was fine with that.  Otherwise, it was 100 percent to cost retirement.

Facts at 72.  If this were so, then one would expect to see invoices in which it is apparent on their face that Stonehall was being paid for its services.  The evidence does not, however, bear this out.

*Not one single invoice* shows that Stonehall was being compensated directly for a service.  Facts at 74-6, 79-80.  Even on the invoices for the services that Plaintiffs admit Defendants were to be paid

---

[11] For this reason, Plaintiffs' claims for quantum meruit, money had and received  and unjust enrichment (Counts III, IV, and V) also fail.  *See BancorpSouth Bank v. Herter*, 643 F. Supp. 2d 1041, 1056-57 (W.D. Tenn. 2009) (quantum meruit elements requiring an inequitable retention of a benefit); *Backman v. Smirnov*, 751 F. Supp. 2d 304, 314 (D. Mass. 2010) (same); *Lawyers Title Ins. Corp. v. United Am. Bank of Memphis*, 21 F. Supp. 2d 785, 805-06 (W.D. Tenn. 1998) (unjust enrichment elements requiring an inequitable retention of a benefit); *Dialogo, LLC v. Bauza*, 456 F. Supp. 2d 219, 227-28 (D. Mass. 2006) (same); *Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.,* 470 F.3d 14, 17 (1st Cir. 2006) (describing money had and received claim as unjust enrichment claim limited to money or its equivalent).

– e.g., for their production services[12] – there is no indication who was performing the services or retaining the funds; the invoices listed only a description of the service performed.  Facts at 74.[13]  In fact, the invoices never listed who was performing the services, even where it was a third party.  Facts at 74-6, 79-80.  This was a detail that the parties discussed in person or over the phone.  For example, the tour that Liana performed was listed as "12 to 20 School Tour" on the invoice.  Facts at 76.  This clearly included multiple vendors and costs, and yet more detail on the invoice was not provided and was not necessary because the parties had discussed every detail of the tour.  Facts at 77, 115-8.  The generally worded invoice reflects the greater understanding that, at bottom, the parties were in constant contact, discussing and deciding together every step of the way each service necessary for Ms. Conway's career.  Further, since Plaintiffs have adduced no evidence that any of the services listed on the invoices were not performed, or even that they were not performed to their satisfaction, *see* Section VIII, Plaintiffs have no claim for damages under this alleged contract.

In sum, Plaintiffs' version of the contract fails because there is no writing, no evidence of breach and it is much too vague to be enforceable.  *See Peoples Bank*, 832 S.W.2d at 554 (finding that an alleged contract was too vague and indefinite for enforcement as a matter of law).[14]  Defendants, on the other hand, have been crystal clear that the parties agreed that if Defendants

---

[12] Curiously, Mr. Conway testified Stone's production services were part of the "exception" because they were "stated right in the invoice."  Facts at 73.  Yet this is patently untrue.  Facts at 74.

[13] Plaintiffs still seek the return of the entire amount, approximately $1.7 million dollars that Mr. Conway wired to Stonehall, which would include these payments.

[14] *Jamestowne on Signal, Inc. v. First Federal Savings and Loan Association* is also instructive here.  The Court of Appeals of Tennessee found an oral agreement failed to contain the necessary elements to make it an enforceable contract, ruling that the "contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences ... might reasonably be drawn."  807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).  The alleged agreement in *Jamestowne* was intended to cover a loan, but there was no showing of any of the essential elements of a loan agreement, such as the amount, the duration of the loan, how and when it was to be repaid, the rate of interest, and what, if any, security was to be given.  *Id.*  Similarly, Plaintiffs here have not identified which of Defendants' services were part of the "exception" for which Defendants would receive payment, on what revenues Defendants would later receive a commission, how much of a commission and for how long Defendants would collect, and whether Plaintiffs were obligated to compensate Defendants if they stopped using their best efforts to generate revenue.

performed any services – marketing, production, promotion – or incurred any travel or out of pocket

costs, they would be compensated.  This version of the agreement is supported by Mr. Conway's

own testimony that payments to Stonehall would occur "should they [Stonehall] see the need for it

if they did certain functions."  Facts at 81.   Assuredly, it is undisputed that Plaintiffs received the

services for which they paid.  Facts at 90-110.  Thus, *any* claim for breach of contract should fail.

## V.      MASSACHUSETTS' CONSUMER PROTECTION STATUTE DOES NOT APPLY

As set forth above, Plaintiffs' Mass. Gen. Laws ch. 93A ("93A") claim fails as a matter of

law because the claim arises from a Tennessee contract and Massachusetts law does not apply.

Even if Massachusetts law applied, Plaintiffs must still prove that the unfair acts occurred

primarily and substantially within Massachusetts.  *Kuwaiti Danish Computer Co. v. Digital Equip.*

*Corp.*, 781 N.E.2d 787, 797 (Mass. 2003).  "Citizenship of the parties [] is irrelevant to the

applicability of M.G.L., c. 93A, § 11. Chapter 93A does not require Massachusetts citizenship, but

that 'the center of gravity of the circumstances that give rise to the claim is primarily and

substantially within the Commonwealth." *Weber v. Sanborn*, 502 F. Supp. 2d 197, 199 (D. Mass.

2007) (quoting *Kuwaiti*, 781 N.E.2d at 799).  As shown above in Section III, the actions complained

of here occurred primarily and substantially in California and Tennessee, not in Massachusetts.  In

fact, in his deposition, Andrew Conway referred to the parties' relationship as "the project in

Nashville."  Facts at 30-42.

Additionally, Plaintiffs' 93A claim fails for the important reason that Defendants' alleged

conduct does not fall within "the penumbra of some common-law, statutory, or other established

concept of unfairness" or "immoral, unethical, oppressive, or unscrupulous" acts.  *PMP Assocs.,*

*Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975), *quoted in Cambridge Plating Co.,*

*Inc. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996).  "[O]rdinary ... dispute[s] without conduct that

was unethical, immoral, oppressive, or unscrupulous" do not indicate unfairness. *Duclersaint v. Fed. Nat'l Mortgage Ass'n*, 696 N.E.2d 536, 814 (Mass. 1998) (ellipse in original) (a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a 93A claim is made). The courts have also determined that certain business-to-business conduct does not violate 93A. Indeed, not every deal that "goes sour" gives rise to a 93A claim. Katerina S. Callahan, *Mass. Gen. Laws Chapter 93A, Section 11: The Evolution of the "Raised Eyebrow" Standard*, 36 Suffolk U. L. Rev. 139, 154-56 (2002); *Madan v. Royal Indem. Co*., 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (stating breach of oral agreement to lease office space not unfair or deceptive). For example, breaching a contract does not automatically violate section 11. *Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243, 251 (Mass. 1979) (holding mere contract breach not 93A violation). Therefore, the context in which the alleged unfair act took place is of great import. *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000).

Here, the parties were working together toward a common goal in a business venture for over two years and then, suddenly, on the precipice of success, Plaintiffs unilaterally halted the project. Facts at 164-8. Plaintiffs now irrationally seek to retrieve every single dollar expended on the career of Liana Conway, despite their own involvement at every step, and in the face of demonstrable achievements and tangible results from the services Defendants provided. Facts at 90-117. The evidence adduced by Plaintiffs does not show fraud or any other conduct that rises to the level of callousness or meretriciousness that would justify multiple damages. *Cambridge Plating*, 85 F.3d at 771 (setting aside award of multiple damages because facts as found by the trial court did not rise to the "purposeful level of culpability" contemplated by the statute (citing *Wasserman v. Agnastopoulos*, 2497 N.E.2d 19, 24-25 (Mass. App. Ct. 1986)).

Further, the 93A claim fails because the parties are partners in an enterprise and thus 93A does not apply.  "[A] private transaction between individual members of the same partnership is not actionable under [section] 11 where the transaction affects only the partners themselves and does not affect, either directly or indirectly, the interests of the public, other businessmen, or competitors."  *Newton v. Moffie*, 434 N.E.2d 656, 660 (Mass. App. Ct. 1982); *see also Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.*, 214 F.3d 216, 223 (1st Cir. 2000) (Chapter 93A generally is applicable only to business dealings "between discrete, independent business entities," not to "disputes between parties in the same … venture," as the latter are not regarded as having arisen in "trade or commerce") (citation omitted); *Szalla v. Locke*, 657 N.E.2d 1267, 1269 (Mass. 1995) (citing cases).  The only writing in existence that elucidates the relationship among the parties, the Great Lines Agreement, shows that the parties were acting together as a record label, with Defendants providing production and marketing services, Ms. Conway acting as the artist, and Mr. Conway as the financial investor and decision-maker.  Facts at 56, 58, 62.  The parties' conduct in line with the Great Lines Agreement further shows that the parties intended to create a record label business together.  Facts at 57-9, 62.  In addition, Plaintiffs admit that the parties' relationship was like a "triangle" consisting of Ms. Conway, Mr. Conway, and the Defendants.  Facts at 48, 59.  Thus, as partners in a joint enterprise, Plaintiffs cannot bring 93A claims against Defendants.

Finally, Plaintiffs' 93A claim fails because they have adduced no evidence of the underlying claims,[15] which Plaintiffs proffer as the basis for their allegations of unfair acts or practices.  *See Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) ("There can be no claim of unfairness based on a misrepresentation where, [Plaintiffs have] failed to show [Defendant] made *any* deceitful

---

[15] Additionally, Plaintiffs have suffered no losses as a result of any of Defendants' acts as set forth in Section VIII. *Frullo v. Landenberger*, 814 N.E.2d 1105, 1113 (Mass. Ct. App. 2004) (rejecting §11 claim where "there has been no showing that the plaintiffs lost anything as a result of the defendant's actions, deceptive or otherwise … [and t]he absence of evidence on this essential element is fatal").

or even negligently false statements.); *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 40

(D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence

claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for

finding [defendant] liable under Chapter 93A.").

## VI.    PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM FAILS

Plaintiffs fundamentally misapprehend the nature of copyrights by claiming that

Defendants' distribution of a <u>sound recording</u> (to which Defendants hold a copyright) somehow

violates a <u>composition</u> copyright held by Plaintiffs.[16]  On this point, they are simply wrong and have

provided no legal support for such a position.[17]  Defendants cannot be said to have violated a

composition copyright by distributing a sound recording, *in which Defendants own a copyright*.

Indeed, Plaintiffs are conflating the two types of copyrights.  The rights of a copyright in a

composition do not extend to sound recordings.  *Griffin v. J-Records*, 398 F. Supp. 2d 1137, 1142

(E.D. Wash. 2005) ("The rights of a copyright in a sound recording do not extend to the song itself,

and *vice versa.*").  "Sound recordings and their underlying compositions are separate works with

their own distinct copyrights."  *Newton v. Diamond*, 388 F.3d 1189, 1191 (9th Cir. 2004).

It is undisputed that Defendant Phoenix Stone, working on behalf of Defendant Stonehall,

produced all of the songs on Plaintiffs' album entitled "Sunrise."  Facts at 141.  Thus, as a matter of

---

[16] For the same reasons set forth herein, Plaintiffs' Counts XV and XX seeking declaratory judgment and Count XVIII for injunctive relief fail as a matter of law. Defendants are also entitled to summary judgment on the conversion and replevin claims because those claims may not be brought with respect to intangible property such as money or copyright, especially where the Defendant is a co-owner of the copyright.  *Portfolioscope, Inc. v. I-Flex Solutions Ltd.*, 473 F. Supp. 2d 252, 256 (D. Mass. 2007) (Tauro, J.) (conversion and replevin claims "require an allegation of wrongful possession of tangible property"); *see also Wells v. Chattanooga Bakery, Inc.*, 448 S.W.3d 381, 392 (Tenn. Ct. App. 2014); *Johnson v. Suntrust Bank*, 2013 WL 6147698, at *4 (E.D. Tenn. Nov. 22, 2013); *Cowan v. Buyers*, 3 Tenn. 53 (Tenn. Err. & App. Ct. 1812) (one co-owner cannot maintain an action for conversion against the other); *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005) (same); Tenn. Code. Ann. § 29-30-101 (person bringing replevin action must be "entitled to possession"); 90 C.J.S. *Trover and Conversion* § 16 (2015) (the general rule is that money is an intangible and therefore not subject to a claim for conversion). Plaintiffs have adduced no evidence of wrongful possession of any tangible objects and thus these counts fail.

[17] Even Plaintiffs' copyright expert, Judith Greenberg Finell, does not offer an opinion that Defendants' distribution of the sound recording of *August Rush* would violate a composition copyright in the song. Facts at 146.

law, Defendants have a copyright in the sound recordings of all the songs on "Sunrise." The author of a sound recording is the performer or record producer or both.[18] *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 63 (D.D.C. 1999) (noting that if record producer's "creative contributions to the sound recording were substantial, he and [performer] may be joint authors of the work"). A record producer may be an author when he or she is "responsible for setting up the session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording." *Systems XIX, Inc. v. Parker*, 30 F. Supp. 2d 1225, 1228 (N.D. Cal. 1998) (quoting H.R. Rep. No. 94-1476, 94th Cong. (2nd Sess. 1976)). *See also JCW Invs., Inc. v. Novelty, Inc.*, 289 F. Supp. 2d 1023, 1032 (N.D. Ill. 2003) (citing *Systems XIX, Inc.* for the proposition that a producer contributes artistically to a sound recording and is, therefore, a co-author for copyright purposes), *aff'd*, 482 F.3d 910 (7th Cir. 2007). Moreover, there was no work-for-hire writing giving sole copyright to the Plaintiffs, as can sometimes be the case when an artist hires a producer. *See 108 Degrees, LLC v. Merrimack Golf Club, Inc.*, 2010 WL 1254920, at *2 (D.N.H. Mar. 25, 2010) (recognizing that, under the Copyright Act of 1976, the work-for-hire exception to rule that authors are the presumed copyright owners of works is only triggered when the work falls within one of nine enumerated categories in the Act or was created pursuant to a **written** work-for-hire agreement).

It is further undisputed that Defendant Stone wrote or co-wrote all of the songs on the album, with the exception of five (5) songs, which Ms. Conway claims she wrote alone: *August*

---

[18] Joint or "co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright." *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir.1984). *See also Sebastian Music Grp., Inc. v. Ayala-Rodriguez*, 594 F. Supp. 2d 176, 179-80 (D.P.R. 2008) ("the Copyright Act defines a joint work as 'a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.'" (quoting 17 U.S.C. § 101)); *Sever Records, LLC v. Rich*, 658 F.3d 571, 582 (6th Cir. 2011) (no claim of infringement against assignee of co-copyright holder); *Dead Kennedys v. Biafra*, 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999) (whether co-owners are a partnership or separate entities, no action for copyright infringement can arise between them).

*Rush,* [19] *Walk in the Sun, Naïve, I Like You,* and *CeCe's Song*.  Facts at 144.   It is these five songs, to which Ms. Conway has a musical composition copyright <u>and</u> Stone has a sound recording copyright, that are at issue.[20]

As the copyright owner in the sound recordings, Stonehall is entitled to distribute the sound recordings without Plaintiffs' consent.  The scope of a copyright in a sound recording is specifically delineated in 17 U.S.C. § 114, to include: (i) the right to reproduce or copy the sound recording; (ii) the right to distribute the sound recording for sale; and (iii) the right to prepare derivatives of the sound recording.  *Id.* (citing 17 U.S.C. §§ 106(1), (2) & (3)); *see also* John J. Dvorske, *Cause of Action for Infringement of Copyrights in Sound Recordings Under Federal Copyright Act of 1976*, 58 Causes of Action 2d 663 (2013).  This includes the right of commercial distribution.  *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 472-73 (1984) ("the bill protects copyrighted material that is duplicated for commercial purposes only" (citing 117 Cong. Rec. 34748-34749 (1971) (colloquy of Reps. Kazen & Kastenmeier)).  Thus, Plaintiffs' allegation that Defendants' distribution of the sound recordings at issue violates copyright law is wholly unsupported by the facts and the law.

Plaintiffs have not alleged or adduced any evidence whatsoever that Defendants have infringed Ms. Conway's copyright in the <u>compositions</u> of the songs at issue.  Examples of such violations include recording a new version of the musical composition or "sampling" portions of the composition in a new song without a license.  In other words, one has to ***copy*** the work.  *Jarvis v. A*

---

[19] Plaintiffs allege that Ms. Conway is the sole author of *August Rush.*  Defendants disagree; Stone, in fact, co-wrote *August Rush*, as the liner notes to the album indicate.  Facts at 145.  This factual dispute, however is immaterial on summary judgment because, as explained in more detail *infra*, Stone has a sound recording copyright in *August Rush* as the producer of the sound recording.  Thus, the expert report of Finell on behalf of Plaintiffs, opining that Stone did not co-author *August Rush* and thus does not have a composition copyright in the song, is unhelpful and irrelevant to Plaintiffs' claims.  Facts at 146.

[20]  It is undisputed that Defendants have a composition and sound recording copyright in the remaining songs on the album and thus cannot be said to have violated copyright laws by distributing those songs.

*& M Records*, 827 F. Supp. 282, 288 (D.N.J. 1993).  Plaintiffs have neither alleged nor adduced

evidence that Defendants copied, prepared any kind of derivative work, sold or gave away the

composition – as opposed to the sound recording – or performed in public a work based on a Liana

Conway composition.

Even if Plaintiffs could somehow prove that they have sole copyright ownership in the

composition and sound recordings, the record is clear the parties intended that the Great Lines

Agreement grants Stonehall a copyright license to reproduce and distribute Ms. Conway's

recordings and videos.  Facts at 147-8.  Plaintiffs even attempted to rescind that license, thereby

admitting its existence.  Facts at 179; Complaint at ¶183 .  In sum, Plaintiffs have adduced nothing

more than evidence that Stonehall has commercially distributed sound recordings for which it holds

copyrights.  As a result, Defendants cannot be said to have committed copyright infringement.[21]

## VII.   DEFENDANTS HAVE NOT BREACHED ANY FIDUCIARY DUTIES

Defendants are entitled to summary judgment on the Plaintiffs' claims of breach of fiduciary

duty.  *See Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011) (elements claim are: (1) existence

of fiduciary duty; (2) breach; and (3) damages); *Qestec, Inc. v. Krummenacker*, 367 F. Supp. 2d 89,

97 (D. Mass. 2005) (same).  "[T]he relationship of partners is fiduciary and imposes on them the

obligation of the utmost good faith and integrity in their dealings with one another with respect to

partnership affairs." *Starnes Family Office, LLC v. McCullar,* 765 F. Supp. 2d 1036, 1051 (W.D.

Tenn. 2011) (citation omitted); *see also Lightfoot v. Hardaway,* 751 S.W.2d 844, 849

(Tenn. Ct. App.1988) (holding that partner breached <u>no</u> fiduciary duty by acquiring partnership

---

[21] Prevailing parties in copyright infringement actions may, in the discretion of the Court, be awarded attorneys fees and costs.  *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 534 n.19 (1994); *T-Peg, Inc. v. Vt. Timber Works, Inc.*, 669 F.3d 59, 61 (1st Cir. 2012).  If Defendants prevail on summary judgment, they intend to seek an order for attorneys fees and costs since Plaintiffs' claims embody "frivolousness, [bad] motivation, objective unreasonableness (both in the factual and in the legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence."  *T-Peg*, 669 F.3d at 61 (citing *Fogerty*, 510 U.S. at 534 n.19).

property without offering other partners opportunity to participate in construction of hotel on land); *Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.,* 40 F. Supp. 2d 49, 52 (D. Mass. 1999), *aff'd*, 214 F.3d 216 (1st Cir. 2000) (same).  Plaintiffs have adduced no evidence of a breach of the fiduciary duty of partners.

Plaintiffs allege that Defendants have breached their fiduciary duty by failing to provide an accounting of all funds expended.  Complaint ¶205.  There is no legal support for Plaintiffs' assertion that there is a duty to provide the type of accounting that Plaintiffs claim Defendants were required to provide.  The duty to account is to the partnership, not to the Plaintiffs directly, and should have been brought as a derivative claim.  *Lightfoot*, 751 S.W.2d at 849; *Blasberg v. Oxbow Power Corp.,* 934 F. Supp. 21, 28 (D. Mass. 1996) (finding potential recovery on fiduciary duty claim against partner would appropriately be ordered payable to *the Partnership,* not to plaintiff individually).  Additionally, the courts are clear that the duty to account does not impose an unconditional duty to inform the partnership of every penny spent.  *Samia v. Cent. Oil Co. of Worcester*, 158 N.E.2d 469, 484 & n.11 (Mass. 1959). *Evans v. Boggs*, 245 S.W.2d 641 (Tenn. Ct. App. 1951).  Rather, when applied to a non-trustee,[22] a duty to account may be satisfied by any number of expediencies, such as periodic accountings (perhaps amounting to an account stated); that the expenditures were agreed to in advance, or ratified; that the expenditures were beneficial to the [other party]; or that they were approximately in a stated amount.  *Samia*, 158 N.E.2d at 484 n.11.[23]

---

[22] Mr. Conway also claims that Defendants held his funds in trust for the benefit of Ms. Conway and thus some sort of trustee duty arises.  Complaint at ¶202.  The *Lightfoot*  Court rejected that same argument, however. 751 S.W.2d at 849 (finding fiduciary relationship is that of partners not trustees).  Indeed, fiduciary duties of partners are "not intended to place a strait jacket on legitimate corporate activity."  *Zimmerman v. Bogoff*, 524 N.E.2d 849, 853 (Mass. 1988).

[23] Plaintiffs also claim that Defendants breached their fiduciary duties by not obtaining competitive pricing for services.  Complaint at ¶208.  This claim fails as a matter of law because there is no legal support for the notion that this behavior violates any fiduciary duties.  *See Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 832 (6th Cir. 2007) (affirming summary judgment on breach of fiduciary duty claim where defendant was not obligated by any duty to perform the act

The evidence shows that Defendants satisfied this duty to account.  Mr. Conway admits that he insisted upon *and received* business and marketing plans from the Defendants that he either approved or modified.  Facts at 115; Complaint ¶96.  Mr. Conway admits that he was apprised of and personally approved every step of the project before Defendants began the work – even going so far as to testify that he was the decision-maker for the entire project.  Facts at 58, 77, 115-8.  The evidence shows that the parties discussed the project in person and over the telephone, weekly, and sometimes daily, and occasionally via e-mail and text messages, with Defendants accounting for how all the money for each project would be spent.  Facts at 118.  In fact, Hall testified that Mr. Conway actually instructed her <u>not</u> to provide him with too much financial detail, telling her repeatedly, "I'm not a bean counter."  Facts at 123.  Thus, Defendants met their duty to account to Mr. Conway.

Moreover, in this litigation, Defendants provided Plaintiffs with a detailed accounting, which was a massive endeavor that took Defendants weeks to prepare and showed beyond question that Defendants did not misuse any funds or harm Plaintiffs in any way.  Facts at 184.  Indeed, Plaintiffs have yet to identify a single specific instance in which Stonehall misappropriated any funds or that they were harmed in any way.  *See Eisenstein v. David G. Conlin, P.C.*, 827 N.E.2d 686, 693-94 (Mass. 2005) (dismissing breach of fiduciary claim for failure to present evidence of damages at summary judgment stage).  Indeed, Ms. Conway's deposition testimony shows that this case is about disappointed expectations rather than any inappropriate behavior on Defendants' part.  Ms. Conway's complaint here is "the lack of things that w[ere] happening in my career." and

---

that it failed to perform).  Further, as set forth in detail below in Section VIII, there is no evidence that Defendants did not obtain competitive pricing.

that "nothing ever came to fruition… [f]or all of the work that they said they put in, for all of the

money that we put forward, we were getting pebbles back." Facts at 181.

Even if the parties were not partners in a common enterprise, a claim of any other fiduciary

relationship must fail.  One party may not impose a fiduciary status on the other simply by reciting

that there was a placing of confidence and trust in the other party.  Instead, both parties must

understand that such trust is reposed and accept the duties that go along with fiduciary status.

*Overstreet v. TRW Commercial Steering Div.,* 256 S.W.3d 626, 641-42 (Tenn.2008), *abrogated by*

*statute on other grounds*; *Superior Glass Co. v. First Bristol County Nat'l Bank*, 406 N.E.2d 672,

674 (Mass. 1980) (noting that "the plaintiff alone, by reposing trust and confidence in the

defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.")

(citation omitted).  Plaintiffs have adduced no evidence that Defendants believed Mr. Conway

reposed any particular trust in them.  Mr. Conway's purported evidence of a fiduciary relationship

*consists solely of his statement that he put trust in Defendants* and is insufficient as a matter of law

to establish such a relationship.  Yet, Mr. Conway was clear during his testimony that he was an

experienced business man and was the decision-maker for the project. Facts at 8-10, 58, 116.  *See*

*Calipari v. Powertel, Inc.*, 231 F.Supp.2d 734, 736 (W.D. Tenn. 2002) (holding that by law dealings

between sophisticated entities, negotiated at arm's length, do not create fiduciary duties between the

parties); *Broomfield v. Kosow*, 212 N.E.2d 556, 560 (Mass. 1965) (same).

Additionally, it is clear that Plaintiffs' breach allegations – Defendants' alleged spending of

Mr. Conway's funds without adequate disclosure and failure to account for such expenditures on a

monthly basis – do not concern the alleged management relationship between Defendants and Ms.

Conway. It is only the relationship between Defendants and Mr. Conway, as the investor, that is the

subject of this count.  Therefore, any duty that arises from the alleged management relationship

between Defendants and Ms. Conway, a relationship that Defendants refute, is not relevant to Plaintiffs' breach of fiduciary duty claims. *Cf. Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565, 574-75 (S.D.N.Y. 2005) (finding fiduciary relationship between musician and personal/business manager).[24]

In sum, the undisputed material facts show that Defendants did not breach any fiduciary duties and are entitled to summary judgment on Count IX. In fact, if any fiduciary duties were breached, it was Plaintiffs who breached their duties to Defendants by refusing to act in good faith in furtherance of the goals of the partnership.

## VIII.  PLAINTIFFS CANNOT PROVE THEIR FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS

Plaintiffs have adduced no evidence of fraud or negligent misrepresentation. Both claims require Plaintiffs to prove Defendants made at least one misrepresentation. *See Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990) (listing elements of fraud claim in Tennessee); *Sears v. Gregory*, 146 S.W.3d 610, 621 (Tenn. Ct. App. 2004) (listing elements of a negligent misrepresentation claim under Tennessee law).[25] Plaintiffs have adduced no evidence that Defendants[26] have made any misrepresentations at all, whether intentionally or negligently. It is

---

[24] The fiduciary relationship between an artist and a manager is one that imposes the duties of good faith and fair dealing. *Cagle v. Hybner*, 2008 WL 2649643, at *7 (Tenn. Ct. App. July 3, 2008). Plaintiffs have failed to allege any violation of those duties or evidence of actual damages. Moreover, Mr. Conway's constant presence and oversight in his role as manager and decision-maker removes this case from the classic Svengali-like music manager cases.

[25] *See also Zimmerman v. Kent*, 575 N.E.2d 70, 74 (Mass. Ct. App. 1991); *Cummings*, 244 F.3d at 23 (Massachusetts follows Restatement (Second) of Torts § 552(1)).

[26] Plaintiffs have adduced no evidence in this case that the Defendants used the Stonehall LLCs to promote any sort of fraud; therefore, this Court has no reason to pierce the corporate veil (Count XII). Facts at 24; *see also Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674 (6th Cir. 2006) (Tennessee law requires an element of fraud to pierce the corporate veil); *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356 (D. Mass. 2010) (same). Plaintiffs' counts of concert of action and aiding and abetting (Counts X and XI) also fail because there is no evidence of an agreement to perform a tortious act. *See Menuskin v. Williams*, 145 F.3d 755, 770 (6th Cir. 1998) (explaining that concert of action is an element of civil conspiracy); *Santiago v. Sherwin-Williams Co.*, 794 F. Supp. 29, 31 (D. Mass. 1992) (same), *aff'd sub nom.*, *Santiago v. Sherwin Williams Co.*, 3 F.3d 546 (1st Cir. 1993); *Cecil v. Hardin*, 575 S.W.2d 268, 272 (Tenn. 1978) (tort theory of aiding and abetting imposes liability for harm to a third party from the tortious act of another); *Spinner v. Nutt*, 631 N.E.2d 542, 546 (Mass. 1994) (same).

undisputed that Plaintiffs received all the goods and services that Defendants promised and that the services were performed at the level of quality the Plaintiffs demanded.  Indeed, Plaintiffs' Complaint admits that Defendants performed all bargained-for services.  Complaint ¶¶ 19 – 143.[27] As explained below, Plaintiffs cannot show any evidence supporting their allegations of misrepresentation.

### A.   <u>Defendants have not misrepresented their credentials.</u>

Plaintiffs have adduced no evidence to support their claim that Defendants misrepresented their backgrounds, experience and contacts in the music industry.  Specifically, Plaintiffs allege that Defendants falsely represented that they knew and have worked with pop stars Ke$ha, Britney Spears and Miley Cyrus.  Complaint at ¶¶41-44.  A simple internet search reveals that Defendant Stone toured with and performed as the opening act for Britney Spears.  Facts at 20.  Moreover, Ms. Conway admitted in her deposition that Defendants do know Kesha (f/k/a Ke$ha).  Facts at 26. Plaintiffs also complain that Defendants misrepresented that they did not have relationships with music executives, Complaint at ¶46-53, yet documents produced in this action show that Defendants received substantive responses from several music industry executives concerning Ms. Conway's music.  Facts at 27.  Indeed, Mr. Conway admitted in his deposition that Phoenix Stone is "experienced," "talented," and "did some very nice things in the studio."  Facts at 138.  Other than their own self-serving conclusory testimony, Plaintiffs have adduced no evidence that Defendants misrepresented their experience and credentials.

---

[27] Plaintiffs' allegations of fraud do not even meet the heightened particularity requirements of Fed R. Civ P. 9(b). *See e.g., Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985). "This heightened pleading standard is satisfied by an averment 'of the who, what, where, and when of the allegedly false or fraudulent representation.'" *Rodi v. S. New England School of Law*, 389 F.3d 5, 15 (1st Cir. 2004) (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004) (other citations omitted)). Here, Plaintiffs have failed, not only to plead their fraud allegations with the requisite particularity, but also to adduce any particular evidence of fraud beyond their conclusory assertions of fraud.

Plaintiffs further complain that Defendants misrepresented that Liana Conway "will be the biggest" and that her songs "will be hits." Complaint at ¶¶ 55, 85. These statements of opinion do not give rise to actionable fraud or negligent misrepresentation claims. *See Brown v. Brown*, 863 S.W.2d 432, 434 (Tenn. Ct. App. 1993) ("Mere expressions of opinion do not give rise to an action of fraud."); *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) ("statements of opinion or intention are not actionable" in a negligent misrepresentation case); *Cummings*, 244 F.3d at 21 (same).

Further, Plaintiffs both testified that they were happy with Defendants' services over the more-than-two-year relationship. Mr. Conway stated that he had no issue with Defendants' work ethic and that Stone is "to this day, [] very talented in the recording studio." Facts at 138. Ms. Conway testified repeatedly that she was happy with Defendants' work on her music, her videos, her radio tours, and her overall experience. Facts at 139. And, Plaintiffs left dozens of voicemails for Defendants praising their work throughout the course of the parties' relationship. Facts at 137. Since Plaintiffs have adduced no evidence that Defendants misrepresented their background or connections in the industry, a claim of deceit based on these allegations must fail.

## B.  Plaintiffs' allegations that Defendants' services were too costly do not constitute fraud.

Plaintiffs have adduced no evidence to support their allegations that Defendants overcharged Plaintiffs for the services. Complaint at ¶¶67-118. Moreover, even if Plaintiffs had such evidence of overcharging, such conduct is not considered fraudulent, as a matter of law. *See Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 71 (1st Cir. 1998) ("price disparity is not itself fraud … absent a deception"); Barney J. Finberg, *Construction & application of provision of Rule 9(b), Fed. R. Civ. P., that circumstances constituting fraud or mistake be stated with particularity*, 27 A.L.R. Fed. 407 (same).

Plaintiffs' expert, George Howard, claims that many of Defendants' services were overcharged.  The report is not backed up, however, by any support for the "reasonable prices" that Defendants should have been charging.  Mr. Howard does not cite any examples of industry providers who have charged these prices. In federal courts, experts "must provide some explanation for their conclusions, rather than referring generally to their experience [because] [w]ithout good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience." *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see also Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013) (expert may not "give an unsupported opinion merely because the expert has experience in a particular field").  Moreover, Mr. Howard does not even have experience charging or receiving such services.  Facts at 135.  In fact, Mr. Howard has not been a music executive since 2004 when he left Rykodisc.  Facts at 136. Therefore, Mr. Howard's concept of "reasonable prices" is at least ten years out of date.  On the other hand, Defendants' expert, who is *currently* a music executive active in the industry, gives concrete examples to support his opinion that Defendants' charges are in line with the industry standard, in which one video can cost as much as $6 million dollars.  Facts at 134.

Indeed, the evidence shows that it was Plaintiffs themselves who made many of the costly decisions in the project.  Facts at 125-31.  Mr. Conway happily provided whatever Liana wanted even when Defendants suggested more frugal expenditures.  Facts at 125.  For instance, Ms. Conway insisted on purchasing a seat on the plane for her guitar, picked the "coolest" bus for her tour, lived in the same apartment building as Taylor Swift, stayed in luxury hotels, insisted on photo shoot retakes and an expensive computer at the photo shoot so that she could view the pictures immediately.  Facts at 127.  Ms. Conway even insisted on a costly frame-by-frame edit to

her videos in order to make Ms. Conway – an already slim woman – appear slimmer.  Facts at 128.

Frankly, Ms. Conway insisted on living like a profitable artist before she became one.

**C.   Plaintiffs have shown no fraudulent marketing or promotion charges.**

Plaintiffs have adduced no evidence that the $25,000 per month, which was earmarked for

marketing and promoting, was not actually spent for that purpose. Complaint ¶¶ 88-118.

Defendants have accounted for all the pass-through costs for marketing and promotion in their

massive accounting and the evidence shows that they provided a myriad of marketing and

promotional services themselves.  Facts at 115, 118, 122, 124, 182, 184.  Plaintiffs admit that

Defendants were to be paid for their marketing services from this $25,000 monthly fee.[28]  For

instance, Ms. Conway testified that the parties agreed that Hall would be paid for her services when

she would travel for radio tours.  Facts at 79.  Mr. Conway testified that Defendants were entitled to

remuneration for their services.  Facts at 81.   There is no factual dispute in this regard and

Plaintiffs' claims must fail.

**D.   Plaintiffs' damages claim strains the boundaries of common sense.**

Despite Defendants' production of hundreds of pages of receipts and invoices showing

funds spent on Ms. Conway's career, Defendants' creation of a 26-page accounting detailing each

expenditure and linking it to Stonehall invoices, bank records and receipts, and Plaintiffs' discovery

obtained from every third party imaginable, Plaintiffs have adduced no evidence of nefarious

behavior concerning the Defendants' charges.  Further evidence of the outlandishness of Plaintiffs'

claims is found in their claim for damages.  Plaintiffs seek the entire $1.7 million expended on Ms.

---

[28] To the extent that Plaintiffs argue that they did not agree Defendants were to be paid for their marketing services from
this $25,000 fee, it defies logic that Plaintiffs would have believed the marketing fee was entirely a pass-through cost
each month that *invariably* amounted to exactly $25,000 per month for over a year – and would have continued to pay
that fee without clarifying the agreement.  Moreover, if the marketing fee represented only pass-through expenses,
which were lumped together each month, as Plaintiffs claim, Plaintiffs do not explain why Stonehall invoiced additional
and unique high cost marketing expenses as separate line items on numerous invoices. Facts at 87.

Conway's career, which by definition includes amounts demonstratively paid to third parties, despite the litany of services that Plaintiffs admit Defendants provided at the level of quality they demanded.[29]

Indeed, the evidence shows that it was not Defendants' services that were the cause of the parties' rift but rather that Ms. Conway was having personal problems that affected her work and scared her parents. Facts at 150-64. Plaintiffs chose to stop working with the Defendants in the fall of 2012 on the heels of her album release party and an interview at Nickelodeon, prior to embarking on a radio tour geared towards promoting the album she had just released. Facts at 156-9, 165-8. In other words, Ms. Conway could not handle the pressures of her career. Mr. Conway then manufactured a financial dispute with the help of a third party, Kevin Mitchell. Facts at 171-6. Together, Mitchell and Mr. Conway combed through the parties' agreement and discussed possible ways to extricate the Conways from the project. Facts at 173. In contrast, Defendants continued promoting Ms. Conway's album through the end of 2012, thinking that Ms. Conway would quickly recover from her problems and return to the project, as she had done in the past. Facts at 150, 169-70. The simple fact alone that Defendants continued to perform their services as promised belies Plaintiffs' fraud claim. Yet, Plaintiffs insist that Defendants owe them the full $1.7 million dollars that Mr. Conway expended on Ms. Conway's career, shedding doubt on the authenticity of

---

[29] The Complaint admits that Defendants guided and advised Ms. Conway's career; spent years developing her abilities as a professional musician; "supervised the process" of recording and releasing 12 different songs, some with multiple versions; hired a band that performed live shows with Ms. Conway; introduced Ms. Conway to a talent agent; set up and produced multiple photo shoots, a radio tour, a summer camp tour and multiple videos for Ms. Conway; and arranged for and paid the invoices of various vendors who provided services in furtherance of Ms. Conway's career. *See* Complaint at ¶¶ 49-52, 60, 69, 74, 76-82, 86-87, 103-5, 107, and 110-112. Moreover, Plaintiffs admit that Stone produced all of the songs recorded by Ms. Conway, provided vocal coaching, and performed a myriad of other services geared towards developing Ms. Conway as a professional musician and that he was properly paid for those services. Facts at 90, 93, 103, 108, 110, 141. Additionally, Plaintiffs admit that the quality of services provided by Defendants was exemplary, praising the quality of Defendants' work both at the time the services were rendered and to this day. Facts at 137-140.

Plaintiffs' claims and indicating the overly litigious strategy Plaintiffs have employed in asserting frivolous claims with no reasonable basis in law or fact.

**IX.** **CONCLUSION**

For the reasons set forth herein, the Court should grant summary judgment in favor of Defendants and dismiss this action in its entirety.


Dated:  February 27, 2015                    The Defendants,
                                             By their Attorneys,

                                             **BERMAN DEVALERIO**

                                             */s/ Glen DeValerio*
                                             Glen DeValerio (BBO #122010)
                                             Daryl DeValerio Andrews (BBO #658523)
                                             John Sutter (BBO #630917)
                                             Marie Foley Watson (BBO# 642728)
                                             One Liberty Square
                                             Boston, MA 02109
                                             Telephone:  (617) 542-8300
                                             Fax:  (617) 542-1194
                                             Email:    gdevalerio@bermandevalerio.com
                                                       dandrews@bermandevalerio.com
                                                       jsutter@bermandevalerio.com
                                                       mfoleywatson@bermandevalerio.com


CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on February 27, 2015.

                                             */s/ Glen DeValerio*
Dated:  February 27, 2015                    Glen DeValerio