UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ANDREW CONWAY, et al.,                  )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      )         Civil Action No. 13-12193-LTS
                                        )
SAM LICATA, et al.,                     )
                                        )
            Defendants.                 )
_____)


<u>ORDER ON PENDING MOTIONS</u>

May 8, 2015

SOROKIN, J.

      This case arises from a soured business relationship between an aspiring recording artist and her father who was investing in her music career on one side, and a husband-wife team acting as the artist's producer and marketing agents on the other.  Before the Court is Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.  Defendants have moved for summary judgment on all the counts remaining in Plaintiffs' Complaint, while Plaintiffs have moved for summary judgment on Plaintiffs' claim of copyright infringement.  As described below, both Motions are ALLOWED IN PART and DENIED IN PART.  Separately, Defendants have moved to compel production of certain documents and exclude evidence, Doc. No. 189, and to stay a related action filed in California state court and enjoin the filing of further actions by Plaintiffs, Doc. No. 220.  The Motion to Compel and Exclude is ALLOWED IN PART and DENIED IN PART, and the Motion to Stay and Enjoin is DENIED.

I.      <u>STATEMENT OF FACTS</u>[1]

Plaintiff Andrew Conway ("Mr. Conway") is a businessman who resides in Massachusetts.  SOMF ¶¶ 8, 188.[2]  Mr. Conway's daughter, Plaintiff Liana Conway ("Ms. Conway") was a college student, amateur songwriter, and aspiring recording artist in 2010, when the interactions between the parties first occurred.  Id. ¶ 11, 13.  Defendant Sam Licata, who performs under the name Phoenix Stone ("Stone"), is a recording artist, actor, and music producer.  Id. ¶ 19.  Stone's wife, Defendant Sybil Hall ("Hall") has worked in the entertainment and music industries for a number of years.  Id. ¶ 18.  Together, Stone and Hall own or operate the remaining business entity defendants, all entities containing "Stonehall" in the title, which they use to facilitate their music and entertainment business.  Id. ¶¶ 23, 185-87.

Plaintiffs and Defendants first came into contact in 2010 through a mutual friend.  Id. ¶¶ 28-29.  Plaintiffs knew Defendants were in the music industry and were interested in establishing a connection with them because of Ms. Conway's interest in a music career.  Ex. 1 at 16:5-16.[3]  After some initial conversations, Plaintiffs eventually sent Hall an amateur recording of Ms. Conway singing.  Ex. 1 at 17:2-22.  Defendants, impressed by the recording, suggested that Ms. Conway record some songs with them in California.  Ex. 2 at 13:14-20.  In June of 2010, Ms. Conway went to California to record four songs with Stone.  Id. at 13:23-14:22.  Defendants

---

[1] The facts which follow are not disputed by the parties unless explicitly noted otherwise.  The Court reserves discussion of certain undisputed facts and factual allegations for the analysis of the specific legal issue to which they are relevant.

[2] Citations in this form refer to the parties' combined statement of material facts, found on the docket in this action at number 216.  The Court notes that both parties seemingly misunderstand the requirement of filing a "concise statement of material facts" as called for by Local Rule 56.1.  The parties' combined statement stretches more than 600 numbered paragraphs across more than 180 pages.  Plaintiffs, in particular, include numerous paragraphs in the statement similar to paragraph 233, which reads, in its entirety, "On January 7, 2011, Andrew received a call from Hall."  These sorts of facts, if indeed material to the present motions (which the Court doubts) are best presented in summary form, if at all.  The parties should note that such voluminous filings hinder, rather than assist, the Court's resolution of their dispute.

[3] Citations in this form refer to the parties' combined sequentially numbered exhibits to their motions for summary judgment, appearing on the docket in this action at numbers 186, 196, 217, and 234.

arranged for musicians to prerecord the music and Ms. Conway provided vocals over the music. Id. at 18:3-16.  Stone acted as producer and worked with an engineer to produce the master recordings of the songs.  Id. at 19:3-9.  Some of the compositions sung by Ms. Conway were songs she composed herself, others were songs composed by Stone.  Id. at 14:20-15:2.  Ms. Conway returned to California in September of that year for a photo shoot organized by Defendants intended to support the songs she recorded.  SOMF ¶ 34(a).

The parties remained in contact after that initial recording session and photo shoot.  Over the fall of 2010, the parties discussed recording more songs to complete an album and engaging in a marketing campaign with the object of transforming Ms. Conway into a successful commercial recording artist.  Ex. 1 at 26:5-28:19.  Thereafter, in February 2011, Ms. Conway recorded an additional six songs with Stone and Hall.  Ex. 2 at 27:1-28:21.  These songs were recorded in the same manner as the previous four, with Ms. Conway providing vocals over prerecorded music and Stone producing.  Id. at 29:2-6.  The songs recorded in this session included compositions written by Ms. Conway, compositions written by Stone, and joint works where both Stone and Ms. Conway contributed to the music and lyrics.  Id. at 28:9-21.

Up to this point, Mr. Conway had been discussing individual projects to promote Ms. Conway's career with Stone and Hall as they arose and agreeing to pay for them on a project-by-project basis.  See, e.g., ex. 1 at 24:24-25:10, 37:13-38:10.  In June 2011, however, the parties discussed Mr. Conway paying $25,000 monthly for marketing to promote Ms. Conway's career, an arrangement to which Mr. Conway eventually agreed.  SOMF ¶ 259.  The purposes for which that money was intended and the limitations on its use are the key disputes of this case. Plaintiffs argue that the amounts transferred monthly were to be applied solely to pass-through expenses from third parties and that Defendants were permitted to pay themselves from those

amounts only when specifically authorized by Mr. Conway.  Defendants contend that the parties'

agreement was the $25,000 payments was intended to pay for their services at a discounted rate

in addition to paying for the services of third parties.  It is undisputed, however, that Defendants

invoiced Mr. Conway $25,000 every month beginning in July 2011 and continuing through

August 2012[4] and that Mr. Conway paid those invoices.  SOMF ¶ 85.  In addition to the monthly

payments, Mr. Conway would pay separately for certain other expenses; for example, Mr.

Conway made separate transfers of funds earmarked for radio promotion of two of Ms.

Conway's songs.  Id. ¶¶ 580, 583.

        In 2011, around the same time the parties began discussing the $25,000 monthly

payments, Mr. Conway broached the idea of drafting a written agreement with Hall and Stone

that would govern the parties' business relationship.  Id. ¶¶ 43-44.  In June 2011, Defendants

contacted an attorney in Nashville to draft the agreement that the parties had contemplated,

which the parties refer to as the Great Lines Agreement.  Id. ¶ 195.  Mr. Conway's notes

regarding the project reveal that he reviewed drafts of the agreement and communicated with

Defendants and the lawyer drafting the agreement about its content.  Id. ¶ 50; Ex. 19 at

CON0440-52.  In January 2012, the lawyer drafting the agreement emailed a copy of the

agreement for the parties to execute.  Ex. 27.  The draft of the agreement contemplated the

formation of a limited liability company to promote Ms. Conway's career.  Id.  It also regulated

the ownership of intellectual property born of the relationship, Mr. Conway's capital

contributions, and the distribution of profits from Ms. Conway's career.  Id.  On February 4,

2012, Hall signed the agreement on behalf of Defendants and forwarded the signed copies to Mr.

Conway.  SOMF ¶ 55.  It is undisputed that neither Mr. Conway nor Ms. Conway ever signed

---

[4] The parties note that Defendants did not bill for February 2012.  SOMF ¶ 85.

the agreement, id. ¶¶ 199, 202, and that the paperwork was never filed to bring the business

entity into existence.  Id. ¶ 211.  Stone and Hall stated they did not know that the agreement was

unsigned until after the parties' relationship dissolved in 2013.  Id. ¶ 50.  Conway did not

specifically advise them he had not signed it.  Id. ¶ 61.

Defendants argue that the Great Lines Agreement, as manifested in the January draft,

governs even though it is unsigned because the written agreement simply memorialized the

parties' agreement as to their relationship.  Plaintiffs argue that they never intended that

agreement to govern the parties' relationship.  Plaintiffs contend that the parties had a separate

oral agreement under which Mr. Conway would provide funding and Defendants would provide

marketing and production services and would pay third-party vendors from the money Mr.

Conway advanced.  Id. ¶ 65.  Under the purported oral contract, Defendants would only pay

themselves from those funds for certain specified services that were "exceptions" to the general

rule and would receive a percentage or commission on the revenues Ms. Conway generated once

she became a successful recording artist.  Id. ¶ 65.

Although the scope, propriety, and necessity of Defendants' services is in dispute, it is

undisputed that throughout 2011 and much of 2012, the parties worked together to promote Ms.

Conway's career.  The record shows Mr. Conway and Defendants to have been in near weekly

contact over this period.  The parties recorded additional songs, id. ¶ 37, completed photo shoots,

id. ¶ 34, and produced videos for at least six of the songs that had been recorded, id. ¶ 35.  The

parties also worked together to expand Ms. Conway's visibility by arranging performances at a

conference of music executives, id. ¶ 102, on a summer camp tour during the summer of 2012,

id. ¶ 100, and on various live shows, interviews, and other promotional events.  Id. ¶¶ 94, 95,

103-05.  To facilitate these events and to promote Ms. Conway generally, Defendants worked

with numerous third parties, including promoters, publicists, and marketing firms.  Id. ¶¶ 100, 588, 604.  One of the services Defendants procured was purchasing "likes" for Ms. Conway's Facebook account.  Id. ¶ 422.  The parties' activities culminated in an album release party, held in August 2012 for Ms. Conway's album, which all of the parties attended and were involved in bringing to fruition.  Id. ¶¶ 106-107.

The parties' relationship was, however, marked at times by conflict in the business and creative aspects of their endeavor.  In November 2011, Mr. Conway "[e]xpressed dissatisfaction with diverging efforts and lack of cohesiveness to define Liana's brand and accelerate its appeal."  Id. ¶ 298.  Around this time, Mr. Conway requested a breakdown of marketing expenditures and Hall obliged with a document that purported to explain how marketing monies were being spent.  Ex. 134.  Later, in February 2012, Mr. Conway "shut[] down" the project, telling Defendants he would not be making future payments, apparently due to conflict between Ms. Conway and Stone and concerns about financial transparency.  SOMF ¶¶ 311, 312.  In response, Hall sent an email to Mr. Conway providing "a breakdown of where the marketing budget went in January" and stating that "we are continuing to see increases on Twitter, Facebook, You Tube [sic] and sales . . . indicating that the project is moving in a positive direction."  Ex. 130.  In late February, Mr. Conway restarted the project.  SOMF ¶ 346.  Concerns persisted, however, regarding "maintaining transparency, providing financial documentation & allowing [Ms. Conway]'s input on aspect[s] of the project."  Id. ¶ 347.  Issues were coming to a head through the summer of 2012, with Mr. Conway eventually speaking to other individuals in the entertainment industry about the propriety and effectiveness of Defendants' services.  Id. ¶ 172.  On September 11, 2012, after the album release party, Mr. Conway sent a text message to Hall requesting documentation related to all of the invoices paid

as of that date and informing her that no additional funding would be forthcoming except for live performances.  Ex. 101.  Plaintiffs contend that they never received the documentation requested. The parties did not work together again after that point.

After the parties' active relationship ended, both parties sought to secure the intellectual property that resulted from the relationship.  On June 6, 2013, Ms. Conway, through her attorney, registered copyrights to the compositions of the songs she contends that she wrote.  Ex. 119.  Plaintiffs' counsel also sent letters to Defendants, demanding the return of master recordings and audiovisual works embodying Ms. Conway's performances.  Exs. 109, 110.  A later letter, dated August 9, 2013, informed Defendants that "any license which may have existed" between Plaintiffs and Defendants regarding musical compositions or recordings was "rescinded, revoked[,] and terminated."  Ex. 111.  On September 17, 2013, Defendants registered copyrights, in the name of Stonehall Records, in the sound recordings and compositions of nine of the songs recorded by Ms. Conway, including compositions Ms. Conway had registered months earlier.  Ex. 98.  Around the same time, on September 4, 2013, Plaintiffs filed this action, making numerous allegations of malfeasance against Defendants.  Defendants, for their part, have counterclaimed alleging similar wrongdoing by Plaintiffs.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)).  The Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When cross-motions for summary judgment are presented, the Court "must consider each motion separately" and draw all inferences against each moving party in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

III.   DISCUSSION

Defendants have moved for summary judgment on all counts of Plaintiffs' Complaint.[5] In resolving this motion, all reasonable inferences are drawn in Plaintiffs' favor.  Plaintiffs, in turn, have moved for summary judgment on their copyright infringement count.[6]  The Court will address this claim separately and draw all reasonable interferences in Defendants' favor when resolving that motion.  After resolving the parties' motions for summary judgment, the Court will address Defendants' other motions.

---

[5] Plaintiffs' Complaint, as supplemented, originally brought twenty counts.  Doc. Nos. 1, 37.  The Court dismissed Count XIX of the Complaint, alleging violation of the Racketeer Influenced and Corrupt Organizations Act, on an earlier summary judgment motion.  Doc. No. 144.  Plaintiffs voluntarily dismissed Count VIII, alleging defamation, and Count XIV, alleging violation of Mass. Gen. Laws ch. 214, § 3A.  Doc. Nos. 172, 182.  Accordingly, Defendants are moving for summary judgment on the remaining seventeen claims.
[6] Neither party has moved for summary judgment on Defendants' counterclaims and thus those claims will proceed to trial along with the claims which survive the instant motions.

A.    Choice of Law

Defendants argue that Tennessee law applies to all of Plaintiffs' claims because the unexecuted Great Lines Agreement contained a choice of law provision in favor of Tennessee and that, even though unsigned, the agreement represented a memorialization of an enforceable agreement.  Alternatively, Defendants argue, Tennessee law should apply as the jurisdiction with the most significant relationship to the parties and the transaction.  Plaintiffs counter, correctly, that the Court need not decide the choice of law issue unless a conflict arises between the laws of the applicable jurisdictions.  At the hearing on these motions, Defendants conceded that there are no material differences between Massachusetts and Tennessee law for the purposes of resolving the claims at issue here.[7]  Given this concession and because the Court discerns no conflict between Massachusetts and Tennessee law on the determinative issues, the Court does not decide the choice of law question.

B.    Breach of Contract

Defendants move for summary judgment on Plaintiffs' breach of contract claim.  Plaintiffs' contract claim arises not from the Great Lines Agreement but from an oral contract or, alternatively, contracts arising from invoices sent by Defendants to Plaintiffs.  Plaintiffs identify no other contract nor advance any other contract theory in opposition to Defendants' Motion for Summary Judgment on this claim.  Thus, to resolve summary judgment on this claim, the Court need only address the contracts Plaintiffs seek to enforce.

First, the oral contract.  The substance of the oral contract is set forth in Mr. Conway's response to an interrogatory, in which he states:

> Stone and Hall proposed I pay them lump sums in response to line item invoices for such lump sum payments that they would hold and use to pay the vendors and service

_____

[7] At the hearing, Defendants did argue that there were subtle differences in the laws of the jurisdictions, but specifically identified no such differences at the hearing or in their motion papers.

providers working on Liana's career.  They agreed that they would come up with ideas for promoting Liana and her music and managing and developing her career, use the funds that I sent them to pay the expenses directly, and provide detailed, itemized invoices of the expenses that they incurred explaining their spending in detail.  Every dollar that I advanced was to be spent on Liana's career.  In exchange for the opportunity to be involved, they also agreed that they would not take or retain any income (with some exceptions) until Liana's career became profitable and she was a recognized commercial artist.  After Liana became profitable and the funds that I had advanced were repaid, Stone and Hall would be paid a percentage of or a commission on the revenues that Liana generated.  Based on my discussions with the Defendants, the commission was to be fair and reasonable based on music industry standards.

Ex. 33 at 7.

In order to succeed on their breach of contract claim under either Massachusetts or Tennessee law, Plaintiffs "must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007); accord Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co., 410 S.W.3d 810, 816-17 (Tenn. Ct. App. 2011).  Defendants argue that the text of the alleged contract demonstrates that Plaintiffs cannot prove the first element of their claim, the existence of an enforceable contract, because the purported oral contract is indefinite as to essential terms of the contract and violates the statute of frauds.

Defendants' primary contention is that the contract is unenforceable as indefinite because Defendants' compensation was neither set forth in the agreement nor ascertainable from the terms of the agreement.  "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000).  "[W]hile '[i]t is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily

preclude the formation of a binding contract[,]' in order for an enforceable contract to exist, the

parties must have reached an agreement on all of the essential terms." D'Agostino v. Fed. Ins.

Co., 969 F. Supp. 2d 116, 127 (D. Mass. 2013) (quoting Situation Mgmt. Sys., 724 N.E.2d at

703); see Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3-677, 811 S.W.2d

875, 880 (Tenn. 1991) ("for a contract to be enforceable, it must be of sufficient explicitness so

that a court can perceive what are the respective obligations of the parties") (quoting Soar v.

Nat'l Football League Players' Ass'n, 550 F.2d 1287, 1290 (1st Cir. 1977)).  Whether the terms

of a purported contract are sufficiently definite to be enforceable is a question of law for the

Court.  Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004); Doe v. HCA

Health Servs. of Tenn., Inc., 46 S.W.3d 191, 196 (Tenn. 2001).

      Here, the purported contract did not include a specific rate or procedure for determining

the compensation for Defendants' services other than providing that Defendants would be paid a

"percentage of or a commission on the revenues that Liana generated" that would "be fair and

reasonable based on music industry standards."  The contract does not specify the revenues that

would be considered in calculating compensation or any amounts that might be excluded from

the calculation.  The contract does not specify the degree of effort Defendants must invest during

the life of the contract, for example, full-time effort, part-time effort, or some different measure.

Similarly, the contract does not specify whether Ms. Conway must work exclusively pursuant to

the contract.  The contract, as recited, also is silent as to the duration of the agreement, the

duration of any period for which Defendants would be entitled to a commission, the ability of the

parties to terminate the agreement, and the terms, if any, that would regulate any such

termination.  While the absence of any one of these terms may not have rendered the contract

unenforceable, in aggregate these omissions render the purported contract too indefinite to be

enforced by this Court.  See Cooper v. Kenexa Tech., Inc., Civ. A. No. 10-12189-DJC, 2012 WL

2946012, at *6 (D. Mass. July 19, 2012) (finding contract unenforceable for indefiniteness "in

the absence of agreement on material terms including but not limited to how the bonus would be

determined and the duration of the alleged agreement"); Held v. Zamparelli, 431 N.E.2d 961,

962 (Mass. App. Ct. 1982) (declining to enforce contract where "described agreement is silent on

essential terms of the contract, such as, but scarcely limited to: when the plaintiff's share of the

profits was to be computed and to be paid to her; the duration of the agreement under which she

claims the right to a share of the profits; what was to occur if the property were sold; or what

would be the plaintiff's responsibility should there be a claim against the owners of the

property"); HCA Health Servs. of Tenn., 46 S.W.3d at 197 (holding contract to be unenforceable

because an essential term—the price—was indefinite).

      The limited guidance that the alleged contract provides—that Defendants would be paid

"a percentage . . . or a commission" that would be "fair and reasonable based on music industry

standards"—leaves more questions than it answers.  What revenues would be considered for

determining the compensation, over what period, and what rights, if any, would Defendants have

to compensation if the agreement was terminated?  The contract also provides no measure for the

degree of effort either Defendants or Ms. Conway were required to devote to the project.  These

questions highlight the inability of the Court to determine the rights and obligations of the parties

supposedly bound by the alleged contract.

      What Plaintiffs present in the purported oral contract, rather, is an agreement to agree in

the future to the essential terms of a contract, including, but not limited to, terms sufficiently

detailing how Defendants would be compensated.  This conclusion is aptly illustrated by Mr.

Conway who, in regard to the future division of profits, stated during his deposition that "[w]ith

the euphoria of [Ms. Conway] popping and becoming somebody, I'm sure we would have had a collective well spring of good vibes and common interests and something would have been worked out." Ex. 1 at 70:17-21.  This statement shows that the parties had not "progressed beyond the stage of 'imperfect negotiation,'" Situation Mgmt. Sys, 724 N.E.2d at 703 (quoting Lafayette Place Assocs. v. Bos. Redevelopment Auth., 694 N.E.2d 820, 826 (Mass. 1998)), leaving no contract for the Court to enforce.[8]  See Conner v. Hardee's Food Sys., Inc., 65 F. App'x 19, 23 (6th Cir. 2003).

As a fallback position, Plaintiffs argue that, even if the oral agreement is unenforceable, each of the individual monthly invoices issued by Defendants constitutes a separate, individually enforceable contract breached by Defendants.  Defendants respond that the evidence shows Defendants to have provided the services described in the contract, implicitly arguing that, if the invoices are contracts, Plaintiffs cannot show evidence of breach of those agreements.  Assuming that each invoice constitutes a separate contract, the terms are limited to the provision of the described services for the stated fees; the invoices contain no other language.

In order to demonstrate a breach of those contracts on the part of Defendants, Plaintiffs would need to point to services set out in an invoice that were not performed as described on the face of the invoice.  Plaintiffs, while citing record evidence that Defendants issued the invoices, SOMF ¶ 605 (citing ex. 34), and that Mr. Conway paid the invoices, id. ¶ 224, do not point to

---

[8] The Court notes that the described contract is problematic for other reasons.  Insofar as the Court assumes that the contract, lacking any term regarding termination, could be terminated by either party with reasonable notice, Plaintiffs could have terminated Defendants at any time before Mr. Conway's capital contributions were repaid and Defendants would be entitled to nothing for their efforts.  This raises the issue of whether such a one-sided contract would be unenforceable on the basis of unconscionability or lacking consideration, doctrines that are recognized in both jurisdictions. See Drakopoulos v. U.S. Bank Nat. Ass'n, 991 N.E.2d 1086, 1095-96 (Mass. 2013) (unconscionability); Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth., 255 N.E.2d 793, 796 (Mass. 1970) (illusory promise); Taylor v. Butler, 142 S.W.3d 277, 284-85 (Tenn. 2004) (unconscionability); Stinger Indus., LLC v. Hill-Rom Co., 23 F. App'x 472, 474 (6th Cir. 2001) (illusory promise).

any evidence that any of the services set out in the invoices were not performed.  Plaintiffs also

fail to point to any evidence that the services were not performed as described.[9]  Plaintiffs argue

that Defendants inflated the price of the services described in the invoice, that is, they charged

Mr. Conway substantially more for a service than the cost of the service as billed by the third

party providing that service.  Assuming, as the Court does, that whether the individual invoices

permitted Defendants to mark up the cost of third party services presents a jury question,

Plaintiffs have nonetheless failed to identify any invoice item for which the listed charge

exceeded the actual cost of the service or item.  In short, Plaintiffs offer no evidence in support

of the breach of any individual invoice.

Plaintiffs advance one more argument in support of the invoices as contracts.  At the

hearing, they suggested that the Court should fill in or supplement the individual invoices' terms

with the parties' course of dealing and industry custom with the understanding that each invoice

prohibited Defendants from using any portion of the $25,000 monthly marketing fee to pay

themselves, absent specific permission from Mr. Conway.  Of course, no express language in the

invoice prohibited Defendants from paying themselves in this manner.  This theory suffers from

a number of legal defects, not least of which is, if the Court so interpreted the invoices, the

invoices would no longer constitute a binding contract due to lack of consideration.  Under this

version of the contract, Defendants would merely be acting as agents to procure and pay third

parties without any contractual right to any compensation for any services they provided.

Presumably, Plaintiffs answer this problem by pointing to the terms of their proposed oral

contract (providing for a royalty payment after Liana became profitable) and arguing for

---

[9] The Court notes that, as part of their misrepresentation claims, Plaintiffs point to evidence that services described in third-party invoices issued to Defendants may not have been provided as described in the invoice.  Plaintiffs, however, do not argue that invoices issued by third parties to Defendants constitute enforceable contracts between Plaintiffs and Defendants.

wholesale incorporation, but then the invoices (lacking any contractual language) fail as enforceable contracts for all the reasons that the oral contract failed. Accordingly, Defendants are correct that Plaintiffs have not put before the Court evidence of breach of the invoices.

Finally, to be clear, the Court has not ruled that no contract existed between the parties, either express or arising from the parties' course of conduct, see Popponesset Beach Ass'n, Inc. v. Marchillo, 658 N.E.2d 983, 987 (Mass. App. Ct. 1996); Jones v. LeMoyne-Owen Coll., 308 S.W.3d 894, 905 (Tenn. Ct. App. 2009), but only that Plaintiffs have failed to identify an enforceable contract or evidence of breach. The Court is not obligated to ferret through the record for evidence of a viable theory of recovery. See Fed. R. Civ. P. 56(c)(3).

For these reasons, Defendants have demonstrated that the oral agreement described by Mr. Conway is not enforceable due to indefiniteness of material terms[10] and have pointed to an absence of evidence as to breach of the invoices if they are considered contracts. Thus, the Motion for Summary Judgment is ALLOWED as to Plaintiffs' breach of contract claim.

C.    Breach of Fiduciary Duty, Fraud, and Chapter 93A

1.    **Breach of Fiduciary Duties**

Plaintiffs bring a claim that Defendants breached fiduciary duties owed to Plaintiffs. To establish a breach of fiduciary duties, Plaintiffs need to show "1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005); accord Morrison v. Allen, 338 S.W.3d 417, 437-38 (Tenn. 2011). "A fiduciary duty exists 'when one reposes faith, confidence, and trust in another's judgment and advice.'" Doe v. Harbor Sch., Inc., 843 N.E.2d 1058, 1064 (Mass. 2006) (quoting Van Brode

---

[10] As the Court has found the alleged oral contract unenforceable due to indefiniteness, it need not address Defendants' alternate argument against enforceability that the agreement violated the statute of frauds.

Grp., Inc. v. Bowditch & Dewey, 633 N.E.2d 424, 428 (Mass. App. Ct. 1994)); see Morrison, 338 S.W.3d at 437-38 (quoting Overstreet v. TRW Commercial Steering Div., 256 S.W.3d 626, 641-42 (Tenn. 2008)).

The record before the Court reveals a close relationship between Plaintiffs and Defendants in Defendants' management and promotion of Ms. Conway's career and Mr. Conway's investment in that career.  It is not disputed that Defendants advised Plaintiffs on marketing and business decisions related to Ms. Conway's career, SOMF ¶¶ 440-59, and on all aspects of her musical development, id. ¶¶ 460-71.  Defendants were entrusted as well with large amounts of money with which they were to procure and pay for services to further Ms. Conway's career.  Id. ¶¶ 82, 85.  A jury could draw the reasonable inference from those facts that Ms. Conway as a client and Mr. Conway as an investor reposed significant trust in Defendants' to distribute those funds prudently and in accordance with Plaintiffs' instructions.  Whether the interactions between the parties actually created fiduciary duties on the part of Defendants is a question of fact for the jury.

Plaintiffs allege, and the evidence is sufficient to support, that Defendants failed to adequately report on expenditures, paid money to themselves and people known to them without properly notifying Plaintiffs, and failed to obtain competitive pricing for the services they acquired on Plaintiffs' behalf.  While these actions could, in theory, constitute a breach of a fiduciary relationship, whether these actions in fact breached fiduciary duties Defendants owed to Plaintiffs turns, in part, on the scope of the fiduciary relationship, which itself is a question of fact for the jury to resolve.  See Korper v. Weinstein, 783 N.E.2d 877, 881 (Mass. App. Ct. 2003); Morrison, 338 S.W.3d at 449-50.  Accordingly, Defendants' Motion for Summary Judgment on this count is DENIED.

2.      **Fraud**

Plaintiffs bring a count of fraud and negligent misrepresentation.  Fraud, or deceit under

Massachusetts law, requires proof that "(1) the defendant made a misrepresentation of fact; (2) it

was made with the intention to induce another to act upon it; (3) it was made with the knowledge

of its untruth; (4) it was intended that it be acted upon, and that it was in fact acted upon; and (5)

damage directly resulted therefrom."  Equip. & Sys. For Indus., Inc. v. Northmeadows Const.

Co., 798 N.E.2d 571, 574 (Mass. App. Ct. 2003); accord Walker v. Sunrise Pontiac-GMC Truck,

Inc., 249 S.W.3d 301, 311 (Tenn. 2008) (elements of fraudulent or intentional representation are

that "1) the defendant made a representation of an existing or past fact; 2) the representation was

false when made; 3) the representation was in regard to a material fact; 4) the false representation

was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably

relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the

misrepresentation.") (quoting Metro. Gov't of Nashville & Davidson Cnty. v. McKinney, 852

S.W.2d 233, 237 (Tenn. Ct. App. 1992)).  Similarly, a claim for negligent misrepresentation

requires establishing that (1) "the defendant falsely represented a past or existing material fact

without any reasonable basis for thinking it to be true"; (2) "that he intended to euchre the

plaintiff into relying on the representation"; (3) "that the plaintiff, unaware of the

representation's falsity, justifiably relied on it"; and (4) "that the plaintiff suffered harm due to

his reliance."  Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 41 (1st Cir.

1998); Walker, 249 S.W.3d at 311 ("a plaintiff must establish 'that the defendant supplied

information to the plaintiff; the information was false; the defendant did not exercise reasonable

care in obtaining or communicating the information and the plaintiffs justifiably relied on the

information.'") (quoting <u>Williams v. Berube & Assocs.</u>, 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)).

Although Plaintiffs allege numerous misstatements in their Complaint, they argue in their motion papers that there is sufficient evidence for five misrepresentations to proceed to trial.

First, Plaintiffs argue that it was fraud for Defendants to fail to disclose that they paid themselves fees from the amounts advanced by Mr. Conway. Plaintiffs have cited to entries in invoices that constituted payments to Defendants that were not clearly indicated as such. SOMF ¶¶ 552-63. In order for an omission or failure to disclose to rise to the level of fraud, Plaintiffs must show a duty on the part of Defendants to disclose the information. <u>Sahin v. Sahin</u>, 758 N.E.2d 132, 138 n.9 (Mass. 2001); <u>PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.</u>, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012). The fiduciary duty alleged by Plaintiffs, depending on its scope, could encompass an obligation to disclose payments made to themselves. Accordingly, summary judgment is DENIED as to the invoice entries indicated in paragraphs 552 to 563 of the parties' Statement of Material Facts.

Second, Plaintiffs claim that fraud arose from Defendants' transmission to Mr. Conway of invoices and itemizations of expenses incurred that were false or forged. Plaintiffs point to two emails, one in November 2011, ex. 134, and the other in February 2012, ex. 130, containing breakdowns of expenditures that Plaintiffs allege were false in that the listed amounts were not paid as described. Plaintiffs also point to three invoices that Plaintiffs allege were not legitimate, but were forged by Defendants. Doc. No. 194 at 32. Plaintiffs have adduced sufficient evidence that, if believed by the jury, could support fraud or negligent misrepresentation as to the two itemizations and the invoice purportedly from JAS Marketing, ex. 126. Thus, Defendants' Motion for Summary Judgment is DENIED as to those documents. Defendants' Motion for

Summary Judgment is ALLOWED as to the invoice from Artist Brand and Management and Tommy Johnson.  As to the invoice from Artist Brand and Management, ex. 127, Defendants have provided an affidavit from an employee of that company, SOMF ¶ 322, who states that he sent the invoice to Defendants in February 2012, ex. 163, negating any inference that the invoice was forged by Defendants.  As to the invoice from Tommy Johnson, Plaintiffs have not shown that Mr. Conway received the invoice or otherwise relied on upon it.  See SOMF ¶¶ 326-28.

Third, Plaintiffs argue that fraud or negligent misrepresentation occurred when Defendants stated that the $25,000 monthly transfers would be used only for "cost retirement." Plaintiffs cite to Mr. Conway's deposition in which he stated that Plaintiffs were asked if the money was "100 percent going to cost reduction from bills from third vendors" and they responded affirmatively.[11]  Ex. 1 at 193:14-17.  There is sufficient evidence to support the claim for fraudulent or negligent misrepresentation and the Motion for Summary Judgment is DENIED.

Fourth, Plaintiffs contend that Defendants' statement that only third parties would be engaging in radio promotion for two of Ms. Conway's songs (and thus that only third parties would be paid for the promotion) was not true and Plaintiffs, in fact, paid themselves out of funds earmarked for radio promotion of the two songs.  Plaintiffs, however can point to no statements made by Defendants to that effect.  They cite to a paragraph in the statement of material facts which avers only that Mr. Conway "believed that the Defendants would not be doing the radio promotion themselves."  SOMF ¶ 628.  Mr. Conway's deposition testimony, which is the authority for that paragraph, similarly contains no support for a specific statement

---

[11] While it could be argued that this statement could constitute a term in an oral contract or a contract implied in fact for the purposes of Plaintiffs' breach of contract claim, the resulting contract would suffer the same flaw—lack of consideration—that the Court addressed above.  For this reason, even if Plaintiffs had referred to this statement in support of their contract claim, it would not help them.

made by a Defendant that they would not be involved in the radio promotion.[12]  See Ex. 1 at

136:16-140:23.  Accordingly, Defendants' Motion for Summary Judgment is ALLOWED as to

this claim.

Finally, Plaintiffs argue that Defendants misrepresented Ms. Conway's success by

purchasing fake social media traffic.  Plaintiffs point to a February 9, 2012 email in which Ms.

Hall states that they are "continuing to see increases on Twitter, Facebook, You Tube [sic] . . .

[a]ll indicating that the project is moving in a positive direction."  Ex. 130.  They also cite to

evidence that Ms. Hall was purchasing "likes" and other social media traffic.  Ex. 129.  If the

jury were to believe that Ms. Hall made that representation knowing that the "increases" were

coming from purchasing social media traffic, the jury could conclude that the statement in the

February 9th email was fraudulent or negligent misrepresentation.  Accordingly, Defendants'

Motion for Summary Judgment is DENIED as to this claim.

In sum, summary judgment is DENIED as to the four statements described above and

otherwise ALLOWED.[13]

3.      **Chapter 93A Claim**

Plaintiffs bring a claim pursuant to Massachusetts General Laws chapter 93A, section 11.

Defendants move for summary judgment on this claim for several reasons.  First, they argue that

Massachusetts is not the "center of gravity of the circumstances that give rise to the claim[s]" as

---

[12] Similarly, Plaintiffs appear to argue that Defendants told Mr. Conway that the radio promotion would "saturate 93% of the national market," Doc. No. 194 at 33, but in fact did not.  Putting aside whether such a statement of a future event is actionable as a misstatement, the deposition testimony does not support that one of the Defendants made such a statement or that they promised to "saturate" that portion of the market.  Ex. 1 at 76:18-77:3.

[13] Plaintiffs' Complaint alleges numerous other statements which Plaintiffs contend constitute fraudulent or negligent misrepresentations.  As Plaintiffs have not shown any evidence to support their claims as to those misstatements, Plaintiffs' claims for fraud or negligent misrepresentation are limited to the statements specified in this section for which the Court has denied summary judgment.

required to succeed on such a claim.  Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 781 N.E.2d 787, 799 (Mass. 2003).  Mr. Conway, however, resides in Massachusetts, SOMF ¶ 188, allowing the reasonable inference that Massachusetts was the location where he received and relied upon many of the communications alleged to be fraudulent.  Plaintiffs also point to evidence that Mr. Conway arranged the wire transfers to Defendants from banks in Massachusetts, ex. 144, and thus the losses were experienced in Massachusetts.  For purposes of the motion for summary judgment, drawing all reasonable inferences in Plaintiffs' favor, that is sufficient to permit a finder of fact to reasonably conclude that any unfair and deceptive practices occurred primarily and substantially in Massachusetts, an analysis that is "necessarily . . . fact intensive and unique to each case."  Kuwaiti Danish Computer Co., 781 N.E.2d at 798.

The remaining issues raised by Defendants, including the contentions that all parties were members of the same partnership and that Defendants' conduct was not unfair or otherwise violative of the statute, involve issues of fact that cannot be resolved on summary judgment. Accordingly, Defendants' Motion is DENIED as to the Chapter 93A claim.

D.      Copyright Infringement

1.      **Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on Plaintiffs' claim for copyright infringement. In order to establish copyright infringement, Plaintiffs must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  Holding a license from the owner of the copyright is an affirmative defense to a claim of copyright infringement.  I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).

Defendants argue that Plaintiffs' theory of copyright infringement is not viable as a matter of law.  They assert that Stone, by virtue of producing those songs, was a co-owner of the copyrighted sound recordings along with Ms. Conway.  This, they contend, grants them the right to distribute those sound recordings without infringing the copyright in the compositions of those songs, which are held by Ms. Conway.

The copyright in a sound recording is distinct from the copyright of the underlying musical composition played on the sound recording.[14]  Griffin v. J-Records, 398 F. Supp. 2d 1137, 1142 (E.D. Wash. 2005); see 17 U.S.C. § 102(a)(2), (7) (defining musical works and sound recordings as separate "works of authorship" entitled to copyright protection).  Thus, "[t]he rights of a copyright in a sound recording do not extend to the song itself, and vice versa." Newton v. Diamond, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), aff'd, 349 F.3d 591 (9th Cir. 2003), opinion amended and superseded on denial of reh'g, 388 F.3d 1189 (9th Cir. 2004), and aff'd, 388 F.3d 1189 (9th Cir. 2004); see T.B. Harms Co. v. Jem Records, Inc., 655 F. Supp. 1575, 1577 (D.N.J. 1987).  Mechanical licenses are the vehicle used to bridge the gap between

---

[14] The Copyright Act distinguishes between musical compositions, sound recordings, and phonorecords.  Sound recordings are "works of authorship" "that result from the fixation of a series of musical, spoken, or other sounds, . . . regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied."  17 U.S.C. §§ 101, 102.  Phonorecords are the "material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.  Musical compositions are the music and lyrics that are capable of representation in notation, for instance, on sheet music.  See Circular 56A, United States Copyright Office.  Thus, in this case the compositions are the music and lyrics written, presumably, by Ms. Conway, the sound recordings are the fixation of a specific performance of those compositions in a way that allows the specific performances to be repeated, and the phonorecords are objects, such as CDs or an electronic file stored on a hard drive, which would allow a person to hear that performance.  See BTE v. Bonnecaze, 43 F. Supp. 2d 619, 627 (E.D. La. 1999); see also London-Sire Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) (noting that a hard disk containing an electronic file of a sound recording constitutes a phonorecord).

these distinct copyrights.  A mechanical license is issued by the owner of the copyright in the

composition (or her agent) and allows the holder of the license to reproduce phonorecords of the

copyrighted composition, generally on a fee-per-reproduction basis.  2 Melville B. Nimmer &

David Nimmer, Nimmer on Copyright § 8.04[A], [B] (Rev. Ed. 2015).

      Distributing a phonorecord that contains a copyrighted composition without a mechanical

license infringes on the copyright in the composition.  Blagman v. Apple, Inc., No. 12 Civ. 5453

(ALC) (JCF), 2014 WL 1285496, at *7 (S.D.N.Y. Mar. 31, 2014) ("In order to lawfully

duplicate a sound recording, the duplicator must obtain authorization from the copyright holder

of the sound recording, who must in turn have acquired either a mechanical or negotiated license

for the underlying composition."); see Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th

Cir. 1984).  This is so regardless of whether the distribution is being made by a person holding

the copyright to or a license for the sound recording being distributed.  This point is illustrated by

the case of Stumm v. Drive Entertainment, Inc., No. 00 Civ. 4676 (DC), 2002 WL 5589

(S.D.N.Y. Jan. 2, 2002).  In that case, a record label sought to use a copyrighted sound recording

in an album the label was releasing.  Id. at *1.  The plaintiff in that case held the copyright to the

composition, and a corporation, of which the plaintiff was president, held the copyright to the

sound recording.  Id.  The record label sought and received a license to use the sound recording

on their album.  Id. at 2.  When the record label released the album containing the song in

question, the plaintiff owning the copyright to the composition sued, arguing that the defendant

had committed copyright infringement by not obtaining a license to distribute the composition.

Id. at 1-2, 5.  Although the court did not grant summary judgment due to the existence of issues

of material fact, the court rejected the defendants' claim that the plaintiffs could not maintain an

action for copyright infringement of the <u>composition</u> because the plaintiff licensed the <u>sound</u> <u>recording</u>.  <u>Id.</u> at 5.

Here, there is evidence that Ms. Conway holds the copyright to the compositions of the three songs in question and that Defendants distributed phonorecords embodying those compositions.  Further, it is not clear from the record that Defendants were distributing the recordings with a license from Ms. Conway, which would insulate them from copyright liability.  Accordingly, Plaintiffs' copyright infringement claim does not fail as a matter of law, and Defendants' Motion for Summary Judgment is DENIED.  Because Plaintiffs' claims for declaratory relief and injunctive relief are derivative of the copyright claim, Defendants' Motion for Summary Judgment on those claims is DENIED as well.

2.  **Plaintiffs' Motion for Summary Judgment**

Plaintiffs move for summary judgment on their count of copyright infringement of three compositions: "August Rush," "Naïve," and "I Like You," arising from the distribution of those songs.  Doc. No. 194 at 16.  At the hearing on these motions, Plaintiffs represented for the first time that they were in fact claiming infringement in five compositions, not three.  Plaintiffs also requested leave to file a supplemental memorandum on the issues raised by their copyright claim.  The Court, citing the expedited basis for resolving these motions, neither allowed nor denied the request, stating that it would resolve the motions notwithstanding the request, but that it would read a submission made before its resolution issued.  Plaintiffs filed their supplemental memorandum on May 6, 2015, Doc. No. 234, and Defendants filed a reply the following day, Doc. No. 235.  The Court has read both submissions.

In their supplemental filing, Plaintiffs again assert that there are five musical works at issue (although they do not name the two additional songs in their memorandum).  Doc. No. 234

at 3.  They also attach a spreadsheet detailing downloads of the five songs (and making clear for

the first time the identity of the two additional songs: "CeCe's Song" and "Walk in the Sun").

Doc. No. 234-6 at 1.  As to these recently raised claims of infringement beyond the three works

set out in their principal brief, the Court denies Plaintiffs' Motion for Summary Judgment.  At no

time before the hearing did Plaintiffs indicate that they intended to seek summary judgment or

present evidence on infringement of additional works not cited in their memorandum.  Nor have

Plaintiffs offered any explanation as to why they could not have raised the infringement of those

other compositions at an earlier time.  Further, Plaintiffs have not supplemented their statement

of material facts to set forth those facts which entitle them to summary judgment on their

infringement claim on those songs.  Accordingly, because Plaintiffs were obligated to set forth

the claims on which they sought summary judgment in their principal brief, see Graham v. Sabol,

734 F. Supp. 2d 194, 199 n.4 (D. Mass. 2010) ("A reply brief is not an opportunity to raise new

arguments"), and because they have not put the issue squarely before Defendants and the Court,

Plaintiffs' Motion is DENIED as to these claims of infringement.

As to the three compositions raised in Plaintiffs' principal brief, Defendants have

opposed Plaintiffs' Motion, arguing that Stone's co-ownership of the sound recording entitles

Defendants to distribute that recording, that distributing a sound recording without paying

mechanical royalties is not infringement, and that, in any event, Ms. Conway transferred

ownership of the copyright or, alternatively, granted a license to Defendants in the Great Lines

Agreement.

As stated above, in order to prove copyright infringement a plaintiff must show "(1)

ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original," Feist Publ'ns, 499 U.S. at 361, and holding a license from the copyright owner is an

affirmative defense to an infringement claim, I.A.E., 74 F.3d at 775.  A nonexclusive license

need not be in writing and may be granted orally or be implied from the conduct of the parties,

but, however created, the alleged infringers have the burden of proving the existence of a license.

Atkins v. Fischer, 331 F.3d 988, 991-92 (D.C. Cir. 2003).

    Defendants do not dispute that Ms. Conway wrote the three songs in question and thus

was the original copyright owner.[15]  Although Defendants argue that they were not copying or

distributing the songs, Defendants "do not deny" that the songs are "available for download and

being distributed by the third party vendors set up during the parties' relationship."  SOMF ¶

589.  Defendants' objections miss the mark.  There is testimony that Hall called a sales

representative to list Ms. Conway's album for sale on iTunes and other outlets, received checks

when sales of the songs or album were made, and deposited those checks into an account

controlled by Defendants.  Ex. 14 at 74:13-77:8.  Electronic file transfers of copyrighted works

constitute distribution within the meaning of the Copyright Act, which can violate the exclusive

rights of a copyright owner.  London-Sire Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 174 (D.

Mass. 2008); see 17 U.S.C. § 106.  Accordingly, the only question raised by Plaintiffs'

affirmative case for copyright infringement is whether Ms. Conway transferred her interest in the

copyrights.

---

[15] Defendants note in a footnote that they "disagree" with Plaintiffs' contention that Ms. Conway authored
the song "August Rush" and point to the liner notes of the album, which indicate that the song was
written by both Stone and Ms. Conway, ex. 97.  This labeling is less than probative on the issue of
whether Stone actually was a joint author of that song, and he points to no evidence of how his
contributions to the song constitute joint authorship.  Plaintiffs point to Ms. Conway's testimony that she
was the sole author of the song, ex. 2 at 29:23-30:4, and offer the report of an expert, Judith Finell, who
opines that Stone "did not provide musical material or services that exceeding that of a standard studio
musician/producer/arranger, and his contributions did not rise to the level of a co-author."  Ex. 99 at 13.
Given this, Defendants' argument for co-authorship, without any development or evidence of the process
by which he obtained joint author status is the sort of "merely colorable" or "not significantly probative"
evidence that does not create an issue of material fact to defeat summary judgment.  See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Defendants argue that Ms. Conway does not own the copyright to the songs because the Great Lines Agreement transferred all of her rights in the songs to Great Lines LLC, of which Defendants claim to be members.  It is undisputed, however, that neither Ms. Conway nor Mr. Conway ever signed the Great Lines Agreement.  SOMF ¶ 60.  The Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204.  Thus, the unsigned Great Lines Agreement could not have served to transfer ownership of the copyrights.  Accordingly, Plaintiffs have established both the ownership and copying to prove their case of copyright infringement.

Defendants may still prevail on Plaintiffs' copyright claims if the affirmative defense of license is established.  Plaintiffs argue that there is no evidence of a license granted to Defendants.  The Court disagrees.  There is evidence that Ms. Conway recorded the songs with Stone as producer and participated in promoting those songs across various media.  Ex. 2 at 28:9-29:20; see, e.g., id. at 95:7-98:8.  Drawing reasonable inferences favoring Defendants, the jury could find from the parties' working relationship that Ms. Conway intended to grant an implied license to distribute her compositions.  See John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (noting the copyright owner's intent as the key to determining the existence of an implied license).  Questions of the parties' intent and the scope of any license involving the songs at issue requires resolving issues of fact not amenable to summary judgment.

As Plaintiffs note, however, any distribution occurring after any implied license was revoked would constitute infringement.  Plaintiffs point to a letter sent by their attorney on

August 9, 2013, clearly and unequivocally stating that "any license which may have existed . . . is hereby rescinded, revoked and terminated," Ex. 117, establishing a revocation of any implied license that may have existed.

Defendants do not dispute the content of the August 9th letter.  Rather, Defendants argue that Ms. Conway is registered with the American Society of Composers, Authors, and Publishers ("ASCAP") and suggests that the license may exist through ASCAP and any royalties due to her would be processed through that organization.  Defendants are mistaken about the role of ASCAP.  "ASCAP licenses only the public performance right in musical works established in 17 U.S.C. § 106(4)."  In re Cellco P'ship, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009).  Plaintiffs' claim is that Defendants infringed on Plaintiffs' distribution rights under 17 U.S.C. § 106(3), a license not provided by ASCAP.  Defendants have not referred the Court to any evidence which could support the existence of an implied, negotiated, or compulsory license existing after the August 9, 2013 revocation letter.  Accordingly, Plaintiffs' Motion for Summary Judgment is DENIED as to the distribution of songs occurring before August 9, 2013 and ALLOWED as to Defendants' liability for the distribution of the three compositions occurring after that date, although the issue of damages remains for the jury to resolve.[16]

---

[16] Plaintiffs have understandably asserted that they elect statutory damages for their claims of copyright infringement.  Plaintiffs state that Ms. Conway would owed slightly less than sixteen dollars in actual damages, assuming 175 distributions, had Defendants obtained compulsory mechanical licenses.  Doc. No. 234 at 3.  The Court understands statutory damages to allow a plaintiff to recover an amount between $750 and $30,000 (with the ceiling rising to $150,000 if there is a finding of willfulness) per work infringed upon, not per infringement.  17 U.S.C. § 504(c).  The amount of statutory damages within the applicable range is a question for the jury to decide.  Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 62-63 (1st Cir. 2000).

E.     Other Counts

1.     **Replevin and Piercing the Corporate Veil**

Defendants move for summary judgment on Plaintiffs' counts of Replevin and Piercing

the Corporate Veil.  Plaintiffs have not offered any opposition to summary judgment entering on

those counts and, accordingly, the Motion for Summary Judgment is ALLOWED as to those

claims.

2.     **Remaining Claims**

The remaining claims are not plainly meritless, as Defendants claim, and present

questions of fact to be resolved at trial.  Accordingly, Defendants' Motion for Summary

Judgment on those claims is DENIED.

F.     Motion to Compel and Exclude Evidence

Defendants move to compel or exclude evidence related to Kevin Mitchell, who worked

with Plaintiffs around the time that the relationship between Plaintiffs and Defendants was

dissolving and thereafter.  Insofar as Defendants seek to exclude Mitchell's testimony on the

ground that he is an undisclosed expert, the Motion is DENIED AS MOOT WITHOUT

PREJUDICE in light of Plaintiffs' express representation that they do not seek to elicit opinion

testimony from him.  Doc. No. 197 at 3.

Insofar as Defendants seek to exclude Mitchell's testimony regarding what he told

Andrew Conway regarding Defendants' activities on behalf of Plaintiffs, the Motion is DENIED

WITHOUT PREJUDICE to renewal during the course of the trial in response to specific

questions or lines of questions.  However, the Court cautions Plaintiffs that Mitchell's views

regarding Defendants' performance, to the extent they were communicated to Mr. Conway, are

not automatically admissible as relevant evidence bearing on Mr. Conway's state of mind at the

time he ended his relationship with Defendants.  In the ordinary course, Mr. Conway would

testify to the reasons he ended his relationship, and Mitchell's testimony appears potentially

duplicative, cumulative, and unnecessary regarding Mr. Conway's state of mind.  The Court,

however, will rule on such issues at trial.

Defendants also move to compel production of documents related to Mitchell which were

withheld on the basis of an asserted attorney-client privilege.  Plaintiffs assert that Mitchell was

an agent of Plaintiffs in procuring a lawyer and, later, acted as a "conduit of information from the

Plaintiffs" to their attorney.  Doc. No. 197 at 7.  As such, Plaintiffs argue, Mitchell's

involvement in these conversations does not destroy the attorney-client privilege, citing the

"intermediary doctrine."

The burden to prove that the attorney-client privilege applies lies with the party asserting

the privilege.  United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 28

(1st Cir. 1989).[17]  "Generally, disclosing attorney-client communications to a third party

undermines the privilege."  Cavallaro v. United States, 284 F.3d 236, 246-47 (1st Cir. 2002).

Courts, however, have recognized an exception where "third parties [are] employed to assist a

lawyer in rendering legal advice."  Id. at 247.  In order for privilege to attach in this

circumstance, the presence of the third party in the communications between lawyer and client

must be "necessary, or at least highly useful, for the effective consultation between the client and

the lawyer which the privilege is designed to permit."  Id. at 240 (quoting United States v. Kovel,

296 F.2d 918, 922 (2d Cir. 1961)).  Necessary means "more than just useful and convenient";

rather, the "involvement of the third party must be nearly indispensable or serve some

---

[17] The parties have not addressed whether federal or state law applies to this claim of privilege.  See Fed.
R. Evid. 501 ("in a civil case, state law governs privilege regarding a claim or defense for which state law
supplies the rule of decision.").  The parties, however, have cited federal caselaw almost exclusively in
their papers regarding privilege, and thus, the Court assumes, without deciding, that federal law applies.

specialized purpose in facilitating the attorney-client communications." Id. at 250 (quoting E.S. Epstein, The Attorney–Client Privilege and the Work–Product Doctrine 168–69, 189 (4th ed. 2001)).

Here, Plaintiff has not shown Mitchell's involvement to be "nearly indispensable" to communicating with counsel.  The only evidence regarding Mitchell's utility in conversing with counsel is Mr. Conway's affidavit in which he states that Mitchell "introduce[ed]" Plaintiffs to legal counsel, "assisted" in conversations with counsel, and "assisted" with negotiating a separate agreement.  Doc. No. 197-3 ¶¶ 3, 5, 6.  There is no evidence showing Mitchell to be necessary or highly useful to the consultation between Plaintiffs and their counsel.  In fact, there is no evidence at all detailing how Mitchell served to facilitate attorney-client communications. Plaintiffs' claim that Mitchell was acting as their agent in their dealings with their attorney is not sufficient, by itself, to bring Mitchell within the privilege.  See Cavallaro, 284 F.3d at 247. Accordingly, Mitchell's involvement in any communications constituted a waiver of any attorney-client privilege, and thus Plaintiffs have not met their burden to establish the existence of privilege in those communications.  To the extent they have not already, Plaintiffs shall produce the documents involving Mitchell within seven days of this Order.

G.      Motion to Enjoin the California Action and Filing of Further Actions

Defendants have moved the Court to enjoin a related action filed in California state court by Plaintiffs and to enjoin Plaintiffs from filing further related actions.  As Defendants have represented that they intend to file no further actions, the motion to enjoin Plaintiffs from filing further actions is DENIED AS MOOT.  Given Defendants' representation, there is no evidence before the Court that the filing of the California action was vexatious or harassing, the only

argument underpinning Defendants' motion to enjoin the action in California.  Accordingly,

Defendants' Motion, Doc. No. 220, is DENIED.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court ALLOWS IN PART and DENIES IN PART

both Defendants' Motion for Summary Judgment, Doc. No. 183, and Plaintiffs' Motion for

Summary Judgment, Doc. No. 193.  Given the profusion of claims alleged in this action, the

Court summarizes its rulings.  Defendants' Motion for Summary Judgment is DENIED as to

Plaintiffs' claims of quantum meruit (Count III), money had and received (Count IV), unjust

enrichment (Count V), conversion (Count VI), copyright infringement (Count VII), breach of

fiduciary duties (Count IX), concert of action (Count X), aiding and abetting (Count XI), Chapter

93A violations (Count XIII), declaratory judgment (Count XV), equitable accounting (XVI),

injunctive relief (Count XVII), and declaratory judgment (Count XX).  Defendants' Motion for

Summary Judgment is DENIED regarding Plaintiffs' claim for fraud or negligent

misrepresentation (Count I) as to the specific statements set forth herein and otherwise

ALLOWED regarding this claim.  Otherwise, Defendants' Motion for Summary Judgment is

ALLOWED.  Plaintiffs' Motion for Summary Judgment on their claim of copyright infringement

is ALLOWED IN PART and DENIED IN PART as set forth herein.

Defendants' Motion to Compel and Exclude Evidence, Doc. No. 189, is ALLOWED IN

PART and DENIED IN PART.  Defendants' Motion to Enjoin the California Action and Filing

of Further Actions is DENIED.

Trial in this matter is set to commence with jury empanelment on May 18, 2015.  In

accordance with the Court's prior Order, Doc. No. 169, the parties shall file a succinct and

neutral statement summarizing principal claims and defenses, a list of potential witnesses, and

proposed voir dire questions no later than May 14, 2015.  The Court will hold a final pretrial

conference with the parties on May 21, 2015 at 3:00 p.m.  The Court will address the

implications of Defendants' tender of payment and related activities described in their

supplemental memorandum at the conference.

SO ORDERED.

    /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge