UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANDREW CONWAY, LILIANA CONWAY d/b/a ZEKE THE ZEBRA,<br><br>        Plaintiffs<br><br>v.<br><br>SAM LICATA a/k/a PHOENIX STONE; SYBIL HALL a/k/a SBYILL LICATA; STONEHALL ENTERTAINMENT, LLC, a California Limited Liability Company; STONEHALL MERCHANDISE, LLC, a California Limited Liability Company; STONEHALL MUSIC PUBLISHING, LLC, a California Limited Liability Company; STONEHALL RECORDS, LLC, a California Limited Liability Company; STONEHALL TELEVISION, LLC, a California Limited Liability Company; and STONEHALL TOURING, LLC, a California Limited Liability Company,<br><br>        Defendants | Docket No.:<br>1:13-cv-12193-LTS |

## **DEFENDANTS' MOTION FOR DIRECTED VERDICT**

Defendants respectfully submit this motion for directed verdict.  Rule 50(a)(1)(A) provides in pertinent part:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may… resolve the issue against the party; …

As shown below, based on the evidence presented at trial, no reasonable jury could find that:

(1) Defendants have breached any fiduciary duties to Ms. Conway;

(2) Defendants owe any fiduciary duties to Mr. Conway;

(3) Defendants overcharged Plaintiffs for any goods or services;

(4) Sybil Hall and/or Phoenix Stone were acting in any capacity other than on behalf of Stonehall Records when they recorded and distributed the sound recordings at issue here; and

(5) Defendants have not committed copyright infringement.

**1. *No duties to Ms. Conway have been breached.***

Regardless of what capacity Defendants were acting in, i.e. whether as a personal manager or a record label, Plaintiffs have offered no evidence that Defendants breached any duties to Ms. Conway.   The record clearly establishes that Plaintiffs' complaint centers around the financial aspects of this case.  Moreover, Defendants have not established any damages flowing from an alleged breach.

**2. *Defendants do not owe Mr. Conway any fiduciary duties.***

No reasonable jury could decide that Plaintiffs have met their burden of proving that there is a fiduciary relationship between Mr. Conway and Stonehall.  The Conways both testified that they never received the transparency they were looking for; they didn't like how Defendants treated Liana, that Stonehall never satisfied Mr. Conway, that no funds were being retained by Stonehall, and that Stonehall never established to Mr. Conway's satisfaction that the $25,000 per month was, in fact, being used only for third party vendors.  5/27/15 at 73-4, 93, 124, 127-8, 135-42, 144-49, 151; 6/2/15 Tr. at 173-4.  Mr. Conway has described what is an arms' length business transaction, one in which he did not trust Stonehall.  He admitted that even though he felt there was a lack of transparency, he continued to make payments to Stonehall month after month on the invoices. 5/29/15 Tr. at 11.

Mr. Conway very clearly testified that he did not enter into the Great Lines Agreement with Stonehall, despite his assurances to them that he intended to and that Stonehall thought he did. 5/28/15 Tr. at 114-43.   Mr. Conway could have executed the Great Lines agreement; he could have proposed an alternative agreement; he could have asked Stonehall to open a Great Lines bank account; as CEO of Great Lines, he could have hired an accountant to maintain the books of the company (or even asked Ms. Hall to do that).   He did none of these things.   In fact, Hall testified that Mr. Conway even told her not to open a Great Lines bank account.   6/3/15 Tr. at 185.   He chose to continue working with Stonehall on a monthly invoice basis.   5/29/15 Tr. at 11.

Typically, trust relationships are created by contractual agreement between two parties.   *In re Columbia Gas Sys. Inc.,* 997 F.2d 1039, 1060 (3d Cir. 1993).   Where there is no agreement, the court must look to the actions of the parties.   Here, Mr. Conway's payment of the monthly invoices month after month does not establish that Stonehall held any money in trust and therefore does not raise fiduciary duties.   *Restatement (Second) of Trusts* § 404 (2003).   A conventional business relationship, without more, is insufficient to create a fiduciary relationship required to support a breach of fiduciary duty claim; rather, a plaintiff must show special circumstances that transformed the parties' business relationship to a fiduciary one.   121 Am. Jur. Trials 129 (Originally published in 2011).   Neither does an arm's length business relationship establish the sort of confidential or fiduciary relationship that would support a cause of action for negligent misrepresentation. *Id.*   A mere debt does not constitute a trust or create a fiduciary relationship. *Wolf v. Superior Court,* 106 Cal. App. 4th 625, 33-34, 130 Cal. Rptr. 2d 860, 866 (2003).

Moreover, the evidence of Stonehall exercising dominion over the funds in question, commingling the funds in one bank account with funds from other sources, and spending the funds from the account on other clients and other general business matters, is evidence that the funds were

not held in trust. *In re UDI Corp.,* 301 B.R. 104, 114 (Bankr. D. Mass. 2003) (finding no implied

trust where the party holding the money exercised dominion over, commingled the funds in

question, deducted a commission and used the funds for its own general corporate purposes); *In re*

*Fin. Res. Mortgage, Inc.,* 468 B.R. 487, 507 (Bankr. D.N.H. 2012) ("Another factor in

distinguishing between a trust relationship and an ordinary debt is whether or not the recipient of

the fund was entitled to use the funds as his own or commingle them with his own funds.").  There

is no doubt that Stonehall commingled the funds paid by Mr. Conway in its general business bank

account. 6/3/15 Tr. at 57-58.   It has been very clearly established that Stonehall decided which

vendors to pay and when, evidencing dominion over the funds. 6/3/15 Tr. at 53-4; 178-9.  And, in

fact, Stonehall continued to spend the radio budget at the end of the parties' relationship consistent

with the fact that they were not, in fact, holding Mr. Conway's funds in trust. 6/3/15 Tr. at 195.

Stonehall also used the funds paid to them to pay for other business matters having nothing to do

with the Conways' project. 6/3/15 Tr. at 168-171.

### 3. *Plaintiffs' Overcharging Claims Should Be Dismissed.*

To the extent that Plaintiffs' breach of fiduciary duties claims survive and Plaintiffs are still

claiming that Defendants breached any fiduciary duties by overcharging for services, Defendants

submit that no reasonable jury could find that Defendants overcharged Plaintiffs for any services.

Plaintiffs' expert, George Howard, testified that:

> I did. I mean, at the end of the day, there's
> no justifiable expenditure, right? Because where is she?
> I mean, the poor girl is left with no career and
> there's -- so the total cost should have been zero.

Mr. Howard did not testify that the costs were out of range for the industry, only that the Conways

could have received the services for less. 6/1/15 Tr. at 70, 119.  Mr. Howard did not cite any

examples of industry providers who have charged these prices.  In federal courts, experts "must

provide some explanation for their conclusions, rather than referring generally to their experience [because] [w]ithout good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience." *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see also Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013) (expert may not "give an unsupported opinion merely because the expert has experience in a particular field").

### 4.   *The Copyright Claims against the Individual Defendants Should Be Dismissed.*

A reasonable jury can only conclude that Sybil Hall and Phoenix Stone were acting at all relevant times on behalf of Stonehall Records.  Ms. Conway herself admitted that Stonehall Records produced all her songs and is the label on her album, 6/1 Tr. at 12:49.  There has been no testimony establishing that Sybil Hall or Phoenix Stone were acting in their individual capacity at any relevant time when recording and distributing the sound recordings that contain the underlying musical compositions written by Ms. Conway.  In contrast, Hall testified on June 4, 2015 as follows:

Okay. Now, let me ask you some questions with
regard to the copyright issue. Who produced each one of the
songs that Liana Conway recorded?
A. Phoenix Stone for Stonehall Records.
Q. Okay. And does a producer, in your understanding,
have a copyright interest in the resulting sound recording?
A. Yes, they do.
Q. And did you understand that Stonehall were the
owners of the copyrights on the sound recordings of the
Liana's songs?
A. Yes, Stonehall was the producer. Right.
Q. And that's because why?
A. Well, Phoenix Stone produced them, so a producer
has a copyright.
Q. And Stonehall was the producer?
A. Yeah, Stonehall was the producer. That's right.
Q. Did you understand that Stonehall had a right to
distribute those sound recordings?
A. That's right. Stonehall had a copyright.
Q. All right. And what's your understanding as to
who owns the musical composition of a song?

A.  The songwriters.

...

Q. Okay. So then you received -- we had a discussion
yesterday, Mr. Baker showed you the letter that Mr. Herlihy
wrote, on August 9, 2013, Exhibit 12. Do you have that in
front of you?
A. I don't. But I do remember.
Q. We'll put it up. Hold on.
A. I do remember him showing me.
Q. We'll put it up. And this was addressed to your
attorney, right? Mr. Burry?
A. Yes, Ken Burry.
Q. All right. And what was your understanding, I
think yesterday you testified that it was an attempt to
revoke the license to distribute the music, right?
A. That's right.
Q. And whose license was it attempting to revoke?
A. Stonehall's license.
Q. Stonehall Records?
A. Stonehall Records. That's right.

6/4/15 Tr. At 117-19.

Plaintiffs have presented no evidence suggesting that Hall and Stone were acting in an

individual capacity, and thus the copyright claims against Hall and Stone individually should be

dismissed.

   5.  *Defendants have not committed copyright infringement.*

Defendants have clearly established that they held, at the very least, an implied license to

create and distribute a sound recording from the underlying musical compositions that Ms. Conway

authored. 6/4/15 Tr. At 117-19 (quoted above).  Plaintiffs testified that the parties were in

agreement when they recorded music, packaged it and distributed it.  6/2 Tr. at 140-41, 147, 154,

171.

Plaintiffs attempt to revoke the license is barred by the Derivative Works Exception, which

allows Defendants to "continue to utilize" the derivative work pursuant to the pre-termination

license granted to them. *See Architettura*, 652 F. Supp. 2d at 783 (applying Derivative Works Exception and *Mills* decision to "determine which party is entitled to post-termination distributive rights" by "examin[ing] what rights each party was entitled to before termination").

Section 203 of the Copyright Act of 1976 deals with termination of transfers and licenses granted by an author. 17 U.S.C. § 203. The plain language of Section 203 covers *all* grants of a license executed after January 1, 1978, including implied, oral licenses that are revocable at will. Section 203(b) applies to "all rights under this title that were covered by the terminated grants." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1294 (11th Cir. 1999) (applying Section 203 to an oral, implied license of indefinite duration); *Architettura, Inc. v. DBSI Cumberland at Granbury LP*, 652 F. Supp. 2d 775, 782-83 (N.D. Tex. 2009) (rejecting plaintiff's argument that the Derivative Works Exception applies only to statutory terminations of licenses); *see also* 3–11 Nimmer on Copyright § 11.02 n. 2.

Under Section 203, an author, or an author's statutory heirs, may, under certain conditions, terminate an exclusive grant of a license "by serving an advance notice in writing, ... upon the grantee or the grantee's successor in title." 17 U.S.C. § 203(a)(4). *See also Latin Am. Music Co. v. Am. Soc'y of Composers Authors & Publishers*, 593 F.3d 95, 101 (1st Cir. 2010). But there is one notable caveat—the Derivative Works Exception:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 203(b)(1).

The Derivative Works Exception reflects Congress's judgment that the owner of a derivative work should be allowed to continue to use the derivative work after termination, "both to encourage investment by derivative work proprietors and to assure that the public retain[s] access to the

derivative work." Note, *The Errant Evolution of Termination of Transfer Rights and the Derivative Works Exception*, 48 Ohio St. L.J. 897, 912 (1987). "Without the Exception, the creator of a derivative work (and, indeed, the public at large) could be held hostage to the potentially exorbitant demands of the owner of the copyright in the underlying work." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,* 155 F.3d 17, 21-22 (2d Cir. 1998) (construing § 304).[1] "The purpose of the Exception was 'to preserve *the right of the owner of a derivative work to exploit it,* notwithstanding reversion.'" *Mills Music*, 469 U.S. at 173 (quoting statement of Barbara Ringer in Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law 39, 88th Cong., 2d Sess., Copyright Law Revision, Part 4 (H.Judiciary Comm.Print 1964); *see also Woods v. Bourne Co.*, 60 F.3d 978, 988 (2d Cir. 1995) (same). "The author may not, at the end of the renewal term, terminate the right to use a derivative work for which the owner of the derivative work has held valid rights in the original and renewal terms." *Stewart v. Abend*, 495 U.S. 207, 225 (1990).

The seminal Supreme Court decision in *Mills Music* involved somewhat similar facts to those of the instant case. *Mills Music*, 469 U.S. 153 (construing § 304).[2] Snyder, the sole author of the song "Who's Sorry Now," had assigned renewal rights in the song to a publisher, Mills, in 1940 in exchange for, among other things, a 50% share in mechanical royalties from sales of copies of sound recordings. Mills in turn licensed record companies to produce copies of sound recordings of the song. Upon termination of the grant from Snyder to Mills, Snyder's heirs claimed the right to

---

[1] The Supreme Court, in *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-76 (1985), described § 203 and § 304 as "comparable," stated that the two Sections were "counterparts" of each other, and cited to the legislative histories of both in analyzing the purposes of § 304. In construing § 203, courts are informed by decisions construing § 304. *Architettura*, 652 F. Supp. 2d at 783.

[2] *See supra* note 1.

100%, rather than just 50%, of future mechanical royalties.  Mills claimed that the sound recordings at issue were derivative works created under the terms of the grant from Snyder to Mills and that, therefore, Mills should continue to share in mechanical royalties according to the terms of that grant.  Because the combination of the two license grants directed record companies to pay royalties to Mills, and Mills in turn to pay 50% of the amount collected to Snyder, and the Derivative Works Exception applied to both grants, the Court held that Mills was entitled to retain its 50% share of mechanical royalties on sales of records produced before termination but sold during the extended renewal term.  *Id.* at 178.

Additionally, to the extent that the court finds that state contract law, not copyright law, governs the question of termination of licenses of indefinite duration, Defendants have proven that Plaintiffs are estopped from revoking the license.  Under Massachusetts law, the essential elements of estoppel are: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) detriment to such person as a consequence of the act or omission. *Cellucci v. Sun Oil Co.*, 320 N.E.2d 919, 923 (Mass. App. Ct. 1974), *aff'd* 331 N.E.2d 813 (Mass. 1975); *Hoppe v. Baxter Healthcare Corp.*, 878 F. Supp. 303, 312-13 (D. Mass. 1995).  Defendants will be able to show that the Plaintiffs' conduct in hiring them to produce an album with Ms. Conway's recordings induced Defendants into producing the album at a discounted price, to their determent.

The question thus is whether Plaintiffs had the right to rescind the licensing agreement. Without showing a material breach of the license agreement, Plaintiffs had no right to rescind the license agreement.  "A breach will justify rescission of a licensing agreement only when it is 'of so

material and substantial a nature that [it] affect[s] the very essence of the contract and serve[s] to defeat the object of the parties.... [The breach must constitute] a total failure in the performance of the contract.'" *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) (alteration in original) (quoting *Affiliated Hosp. Prods., Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1186 (2d Cir. 1975)); *see also Nolan v. Williamson Music, Inc.*, 300 F. Supp. 1311, 1317 (S.D.N.Y. 1969), *aff'd sub nom., Nolan v. Sam Fox Publ'g Co.*, 499 F.2d 1394 (2d Cir. 1974); 3 Melville B. Nimmer & David  Nimmer, *Nimmer on Copyright* § 10.15[A] at 116-18.  Plaintiffs have not presented any evidence of breach of the license agreement as justification for rescission of it.  Nor have they offered *any* reason for the rescission in their written termination of the grant.  Plaintiffs have not established that Defendants were required under the license agreement to pay mechanical royalties.

It has been very clearly established at trial that the parties worked together for over two years and the exchange of mechanical royalties in the amount of approximately $50 could hardly be considered a material breach of any agreement.  *See Rano*, 987 F.2d at 586 (finding that after a harmonious eight-year relationship and considerable performance, a slight breach which does not go to the root of the contract will not justify termination).  Indeed, many agencies do not even send checks out to authors until the royalties reach a certain threshhold.  *See* Am. Soc'y of Composers, Authors & Publishers ("ASCAP"), Direct Deposit and Royalty Thresholds, *http://www.ascap.com/members/payment/payment.aspx* (ASCAP website indication that "bank fees and the costs of check processing and manual handling make it uneconomical to issue checks for less than $100.  If you choose to receive physical checks and earn under the $100 threshold in a given distribution, ASCAP will apply the amount you earned to a future distribution, and will issue a check once at least $100 in royalties have accumulated.  At the end of a calendar year, if the

cumulative $100 threshold has not been reached, outstanding amounts will be rolled over into the

following year.").

**BERMAN DEVALERIO**

*/s/ Glen DeValerio*
Glen DeValerio (BBO #122010)
Daryl DeValerio Andrews (BBO #658523)
John Sutter (BBO #630917)
Marie Foley Watson (BBO# 642728)
One Liberty Square
Boston, MA 02109
Telephone:  (617) 542-8300
Fax:  (617) 542-1194
Email:    gdevalerio@bermandevalerio.com
          dandrews@bermandevalerio.com
          jsutter@bermandevalerio.com
          mfoleywatson@bermandevalerio.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on June 5, 2015.

*/s/ Glen DeValerio*
Dated:  June 5, 2015                          Glen DeValerio