UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDREW CONWAY, LILIANA CONWAY
d/b/a ZEKE THE ZEBRA,

                    Plaintiffs

v.                                                          Docket No.:
                                                            1:13-cv-12193-LTS
SAM LICATA a/k/a PHOENIX STONE;
et.al.

                    Defendants


**<u>DEFENDANTS' RESPONSE TO PLAINTIFFS' TRIAL BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ........................................................................................... ii

I.      Chapter 93A Does Not Apply to this Action. ................................................... 1

     A.      The Center of Gravity of the Circumstances Giving Rise to this Action is
        Not within the Commonwealth of Massachusetts. ................................. 1

     B.      The Parties Were Engaged in a Partnership. ......................................... 3

II.     The Jury's Finding of Negligence Does Not Support a Violation of  Chapter 93A. .......... 5

III.    Defendants' Alleged Conduct Did Not Violate 93A ........................................ 7

     A.      Marketing and Production Services ...................................................... 9

     B.      The November 2011 and February 2012 E-mails and Supporting Invoices ......... 10

     C.      Failure to Disclose Fees ....................................................................... 13

     D.      Social Media Marketing ........................................................................ 14

     E.      Camp Tour and Merchandise ............................................................... 16

IV.     Defendants' conduct was not willful. ............................................................. 16

V.      Plaintiffs' Unclean Hands Prevent Their Recovery Under 93A. ..................... 17

VI.     Stone Was Not Involved In Any of the Acts of Which Plaintiffs Complain. .................. 21

VII.    Damages ........................................................................................................... 22

VIII.   Unjust Enrichment .......................................................................................... 24

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Baena v. KPMG LLP*,
   453 F.3d 1 (1st Cir. 2006) ..................................................... 17

*Baker v. Goldman Sachs & Co.*,
   No. 09-10053-PBS, 2013 WL 4780962 (D. Mass. Sept. 4, 2013) ............................ 8

*Baker v. Goldman, Sachs & Co.*,
   771 F.3d 37 (1st Cir. 2014) ..................................................... 5

*Branch Ave Capital, LLC v. U.S. Bank Nat. Ass'n*,
   No. 12-40140-TSH, 2013 WL 5242121 (D. Mass. Sept. 16, 2013) .......................... 9

*Bryan Corp. v. Chemwerth, Inc.*,
   No. 12-10446-MLW, 2013 WL 6489785 (D. Mass. Dec. 9, 2013) ..................... 5, 17

*Cahill v. TIG Premier Ins. Co.*,
   20 F. Supp. 2d 141 (D.Mass.1998) ..................................................... 7

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
   284 F.3d 302 (1st Cir. 2002) ............................................... 7, 15

*Certified Sales, Inc. v. Standard Fire Ins. Co.*,
   No. 09-11769-DJC, 2012 WL 4498894 (D. Mass. Sept. 30, 2012) .......................... 9

*Cummings v. HPG Int'l, Inc.*,
   244 F.3d 16 (1st Cir. 2001) .................................................... 22

*Damon v. Sun Co., Inc.*,
   87 F.3d 1467 (1st Cir. 1996) ..................................................... 6

*Empire Today, LLC v. Nat'l Floors Direct, Inc.*,
   788 F. Supp. 2d 7 (D. Mass. 2011) ......................................... 7, 15

*Fed. Ins. Co. v. HPSC, Inc.*,
   No. 02-CV-11822RG, 2005 WL 2206071 (D. Mass. Sept. 12, 2005) ....................... 16

*Fidelity Mgmt. & Research Co. v. Ostrander*,
   662 N.E.2d 699 (Mass. App. Ct.1996) ............................................. 17

*First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*,
   839 F. Supp. 2d 407 (D. Mass. 2012) ............................................. 7

*Fisher v. Fisher,*
   212 N.E.2d 222 (Mass. 1965) ................................................................................ 17

*Frullo v. Landenberger,*
   814 N.E.2d 1105 (Mass. Ct. App. 2004) ............................................................... 10

*Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.,*
   No. 12-40098-TSH, 2015 WL 1815632 (D. Mass. Apr. 22, 2015) .......................... 7

*Giuffrida v. High Country Investor, Inc.,*
   897 N.E.2d 82 (Mass. App. Ct. 2008) ...................................................................... 8

*Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.,*
   788 N.E.2d 522 (Mass. 2003) ................................................................................... 5

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   582 F.3d 156 (1st Cir.2009) ...................................................................................... 8

*In re TJX Cos. Retail Sec. Breach Litig.,*
   564 F.3d 489 (1st Cir.2009) ...................................................................................... 8

*Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.,*
   329 F.3d 216 (1st Cir. 2003) ..................................................................................... 2

*Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,*
   72 F.3d 190 (1st Cir. 1995) ....................................................................................... 5

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,*
   781 N.E.2d 787 (Mass. 2003) ............................................................................... 1, 2

*Marram v. Kobrick Offshore Fund, Ltd.,*
   809 N.E.2d 1017 (Mass. 2004) ................................................................................. 5

*McCann v. Davis, Malm & D'Agostine,*
   669 N.E.2d 1077 (Mass. 1996) ................................................................................. 7

*Metro. Life Ins. Co. v. Cotter,*
   984 N.E. 835 (Mass. 2013) ..................................................................................... 24

*Nadherny v. Roseland Prop. Co., Inc.,*
   390 F.3d 44 (1st Cir. 2004) ..................................................................................... 13

*Newton v. Moffie,*
   434 N.E.2d 656 (Mass. App. Ct. 1982) .................................................................... 4

*Parker v. D'Avolio,*
   664 N.E.2d 858 (Mass. App. Ct. 1996) .................................................................. 17

iii

*Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.*,
   214 F.3d 216 (1st Cir. 2000) .................................................................. 4

*Pimental v. Wachovia Mortg. Corp.*,
   411 F. Supp. 2d 32 (D. Mass. 2006) ...................................................... 22

*Pizzo v. Gambee*,
   754 F. Supp. 2d 234 (D. Mass. 2010) ................................................ 6, 15

*Play Time, Inc. v. LDDS Metromedia Commc'ns, Inc.*,
   123 F.3d 23 (1st Cir.1997) ...................................................................... 2

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*,
   387 S.W.3d 525 (Tenn. Ct. App. 2012) ................................................ 13

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 ........................................................................................... 17

*Prof'l Servs. Grp., Inc. v. Town of Rockland*,
   515 F. Supp. 2d 179 (D. Mass. 2007) ...................................................... 7

*Roberts v. Sears, Roebuck & Co.*,
   573 F.2d 976 (7th Cir. 1978) ................................................................. 24

*Sahin v. Sahin*,
   758 N.E.2d 132 n.9 (Mass. 2001) .......................................................... 13

Salamon v. Terra,
   477 N.E.2d 1029 (Mass. 1985) .............................................................. 25

*Santagate v. Tower* ,
   64 Mass. App. Ct. 324 (2005) ............................................................... 24

*Small Justice v. Xcentric Ventures*,
   No. 13-cv-11701, 2014 WL 1214828 (D. Mass. Mar. 24, 2014) ............ 18

*Specialty Mktg. Grp., Inc. v. Katz*,
   No. 13-12636-LTS, 2014 WL 2453105 (D. Mass. May 30, 2014) .......... 21

*Spiegel v. Beacon Participations, Inc.*,
   8 N.E.2d 895 (Mass. 1937) .................................................................... 17

*Spiniello Cos. v. Brico Indus., Inc.*,
   511 F. Supp. 2d 199 (D. Mass. 2007) ...................................................... 5

*Szalla v. Locke*,
   657 N.E.2d 1267 (Mass. 1995) ................................................................ 5

*Tanner v. Whiteco, L.P.,*
    337 S.W.3d 792 (Tenn. Ct. App. 2010) .................................................... 4

*Trenwick Am. Reinsurance Corp. v. IRC, Inc.,*
    764 F. Supp. 2d 274 (D. Mass. 2011) .................................................... 19

*Utica Nat'l Ins. Grp. v. BMW of N. Am., LLC*,
    45 F. Supp. 3d 157 (D. Mass. 2014) .................................................... 5, 9

*VMark Software v. EMC Corp.,*
    642 N.E.2d 587 (Mass. 1994) .................................................... 8, 17

*Weber v. Sanborn*,
    502 F. Supp. 2d 197 (D. Mass. 2007) .................................................... 1

*Wells v. Lynch*,
    2007 Iowa App. LEXIS 2 (Iowa Ct. App. Jan. 18, 2007) .................................................... 24

*Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*,
    246 F. Supp. 2d 102 (D. Mass. 2003) .................................................... 2

*Zurich Am. Ins. Co. v. Watts Regulator Co.,*
    796 F. Supp. 2d 240 (D. Mass. 2011) .................................................... 8

**Statutes**

14A Mass. Prac., Summary of Basic Law § 9.48 (4th ed.) .................................................... 17

Chapter 93A Rights & Remedies  (Mass. Cont. Legal Educ. 2d ed. 2007) .................................................... passim

Fed. R. Civ. P. 8(d)(2) .................................................... 3

Tenn. Code Ann. § 61–1–101(6) .................................................... 4

**Other Authorities**

Black's Law Dictionary at 791 (6th ed.1990) .................................................... 17

McHugh, Business Remedies Under Chapter 93A app. A.14, Chapter 93A Rights and
    Remedies (Mass. Continuing Legal Educ. 2010) .................................................... 8

As set forth in more detail below, the Court should enter judgment in favor of Defendants on Plaintiffs' claims under Mass. Gen. Laws c. 93A ("Chapter 93A") and for Unjust Enrichment. As an initial matter, Chapter 93A does not apply here because the center of gravity of the circumstances giving rise to this action is not within the Commonwealth of Massachusetts. Moreover, Plaintiffs' claims against Defendants, who were their partners in a joint venture, are not actionable under Chapter 93A.  Even if Chapter 93A were applicable here, Plaintiffs' claims fail because the jury determined that Defendants' conduct was not intentional and there is no factual support for the Court to contradict the jury with a finding that Defendants acted intentionally or willfully.  Additionally, Plaintiffs' own bad faith and improper behavior has been sufficiently established to prevent them from recovering under Chapter 93A.

Finally, Defendants have not been unjustly enriched by Plaintiffs since Defendants provided all bargained-for services.  Plaintiffs had an adequate remedy at law and presented their claims to a jury; they should not be able to recover on the same claims on which the jury has already decided.

## I.      Chapter 93A Does Not Apply to this Action.

### A.      The Center of Gravity of the Circumstances Giving Rise to this Action is Not within the Commonwealth of Massachusetts.

Plaintiffs' Chapter 93A claim fails as a matter of law because the alleged unfair acts did not occur "primarily and substantially" within Massachusetts.  *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 797-98 (Mass. 2003).  Chapter 93A requires that "'the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.'"  *Weber v. Sanborn*, 502 F. Supp. 2d 197, 199 (D. Mass. 2007) (quoting *Kuwaiti*, 781 N.E.2d at 799).

The actions complained of here occurred primarily and substantially in California and Tennessee, not in Massachusetts.  The center of gravity of the acts complained of cannot be Massachusetts, where the only link to Massachusetts is that <u>one</u> of the Plaintiffs lives here.  The place of receipt of the alleged deception does not outweigh any other factual inquiry, as Plaintiffs claim.  Plaintiffs' analysis of the center of gravity test under 93A is wrong.  Brief at 29.  Plaintiffs' reliance on *Play Time, Inc. v. LDDS Metromedia Commc'ns, Inc.*, 123 F.3d 23 (1st Cir.1997), and other federal cases that predate *Kuwaiti,* 781 N.E.2d 787, and that utilize a formula of factors is misplaced.  *See Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 117 (D. Mass. 2003) ("*Play Time* may no longer be good law.").

Importantly, it is Plaintiffs' face-to-face contacts, which occurred in California, that convinced Plaintiffs to work with Defendants and to transfer money to them, that are the determining facts here.  *See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.,* 329 F.3d 216, 234-35 (1st Cir. 2003) (finding center of gravity of transactions giving rise to claims was not in Mass. even where "the transfer of funds" was from a Mass. corporation and "the fraudulent misrepresentations" were made to party in Mass. but "it was not until Perry traveled to Michigan that he was convinced by the defendants' misrepresentations to transfer money out of the Kenda account and abandon his position as owner of Kenda").

Plaintiffs testified repeatedly at trial about the events that took place in Tennessee and California, including recording of songs, videos, face-to-face meetings and conversations.  5/27/15 Tr. at 38, 49, 56, 58, 70, 72-73, 92, 93, 178; 5/28/15 Tr. at 37, 78, 92, 94, 101.[1]  5/29/15 Tr. at 37, 143, 155. 6/2/15 Tr. at 144-47, 154.   Additionally, the parties hired a Tennessee lawyer to draft a Tennessee agreement, in part because Mr. Conway was in Nashville often and

---

[1] Defendants' transcript citations are to the rough transcripts since the final transcripts are not yet available.

because that is where Liana was living <u>at all relevant times</u>.  5/28/15 Tr. at 94, 110.  Mr.

Conway's self-serving affidavit aside, the evidence does not show that he was in Massachusetts

when any of the misrepresentations were made.  Further, there are no text messages, letters or

emails (or anything in writing) containing the misrepresentations Plaintiffs' claim.  Brief at 31.

*But see* 5/28/15 Tr. at 99-100, 110-11, 118-19, 159; 5/29/15 Tr. at 23.  In fact, Mr. Conway

specifically testified that he had no writing outlining the alleged terms of the parties' agreement

and that it "fell to discussions with Phoenix and Sybil."  5/29/15 Tr. at 24.  Indeed, there are not

even any entries in the Contact Record containing the misrepresentations Plaintiffs' claim.  *See*

Trial Ex. 509.  The only logical explanation for this is that Mr. Conway, the self-described

"prolific writer and recorder," took notes of these alleged misrepresentations while he was in

face-to-face meetings with Stonehall in either Tennessee or California, and lost or discarded

those notes before they could be entered into the Contact Record.  *See* 5/26/15 at 167.  In any

event, Plaintiffs have no evidence that the misrepresentations took place, and if they did, they

certainly did not take place in Massachusetts; thus Massachusetts is clearly not the center of

gravity of the alleged complained of acts.[2]

## B.    The Parties Were Engaged in a Partnership.[3]

The only writing in existence that elucidates the relationship among the parties, the Great

Lines Agreement, shows that the parties were acting together as a record label, with Defendants

---

[2] Plaintiffs' argument that Defendants' 93A claims are somehow an admission that their own alleged acts took place in Massachusetts is getting tired.  Pleading in the alternative is a proper litigation tactic, *see* Fed. R. Civ. P. 8(d)(2), and theories of liability are not factual concessions. In any event, Defendants are not pressing any 93A claims.  Dkt. No. 304 at 3.

[3] The jury's decision that Defendants did not owe Plaintiffs any fiduciary duties is not controlling since they were likely focused on the arguments Plaintiffs made *ad naseum* throughout the trial that Defendants were managers and thus owed duties as managers.  The Great Lines Agreement, which Defendants most assuredly were working under, provides that Stonehall will receive an income for services provided, albeit at a discounted rate, and will also share in future profits.  Trial Ex. 491 at §§ 10, 14.

providing production and marketing services, Ms. Conway acting as the artist, and Mr. Conway as the financial investor and decision-maker. Trial Ex 491. Further, Mr. Conway admitted that his Contact Record was kept in the ordinary course of the business he ran with Stonehall for the benefit of Liana Conway's career. 5/26/15 Tr. at 164-69, 175-76, 180-81.

Ms. Conway testified that the parties' relationship was a "triangle" consisting of herself, Mr. Conway, and the Defendants. *See* 6/2/15 Tr. at 171. Mr. Conway referred to it as a "triumvirate." 5/28/15 Tr. at 29. Mr. Conway also admits that each of the parties was to receive either "income, return on investment, or profit depending on which member of the triumvirate is considered." *Id.* Since Plaintiffs spent most of the trial denying that Stonehall was entitled to income from the project and since Stonehall did not make a monetary investment, he could only mean that he and Liana intended to share the profits from her career with Stonehall.

The parties entered into an agreement as profit-sharing members of Great Lines, and are thus partners and thus cannot recover against each other pursuant to Chapter 93A. *See Tanner v. Whiteco, L.P.,* 337 S.W.3d 792, 799 (Tenn. Ct. App. 2010) (Tenn. Code Ann. § 61–1–101(6) defines a "partnership" as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit . . . ."). "[A] private transaction between individual members of the same partnership is not actionable under [section] 11 where the transaction affects only the partners themselves and does not affect, either directly or indirectly, the interests of the public, other businessmen, or competitors." *Newton v. Moffie*, 434 N.E.2d 656, 660 (Mass. App. Ct. 1982); *see also Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co.*, 214 F.3d 216, 223 (1st Cir. 2000) ("Chapter 93A generally is applicable only to business dealings 'between discrete, independent business entities,' not to 'disputes between parties in the same … venture,' as the latter are not regarded as having arisen in 'trade or commerce.'") (citation omitted); *Szalla*

4

*v. Locke*, 657 N.E.2d 1267, 1269-70 (Mass. 1995).  Thus, as partners in a joint enterprise, Plaintiffs' 93A claims against Defendants cannot survive.

## II.   The Jury's Finding of Negligence[4] Does Not Support a Violation of Chapter 93A.

The jury's finding of negligence against Defendants Stonehall and Sybil Hall will not support a finding of a Chapter 93A violation.  Without more, "'mere negligence'" does not support a finding of a violation of 93A § 11.  *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014); *Bryan Corp. v. Chemwerth, Inc.*, No. 12-10446-MLW, 2013 WL 6489785, at *4 (D. Mass. Dec. 9, 2013).  "In the commercial context, neither negligence nor breach of contract/warranty, standing alone, establishes liability under Chapter 93A."  *Spiniello Cos. v. Brico Indus., Inc.*, 511 F. Supp. 2d 199, 203 (D. Mass. 2007) (citing *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522 (Mass. 2003)).  Rather, the plaintiff must show negligence "plus," where that "plus" is conduct which, if true, would render the acts "repugnant to the milieu of the commercial marketplace."  *Utica Nat'l Ins. Grp. v. BMW of N. Am., LLC*, 45 F. Supp. 3d 157, 161 (D. Mass. 2014).  In *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1032 (Mass. 2004), the court described the "something more" that is needed for 93A liability as "extreme or egregious" negligence.  This showing "is especially difficult where the case involves arm's-length transactions between sophisticated business entities."  *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 200 (1st Cir. 1995).  That is precisely the case here: the parties were sophisticated and engaged in arm's-length transactions.  Indeed, that is why the jury found no fiduciary duties were owed to <u>either</u> party.

In response to this argument,[5] Plaintiffs argue that the Stonehall Accounting, which was created during this litigation, was somehow a misrepresentation of facts that gave rise to their

---

[4] The case law cited by Plaintiffs concerning fraud and willful misrepresentation is inapposite since the jury did not find that Hall or Stonehall committed anything other than mere negligence.

5

misrepresentation claims.  Plaintiffs failed at trial to convince the jury that Defendants owed

them a duty to account; therefore no misrepresentation claim can be premised on the failure to

account.  Moreover, no misrepresentation claim can be fashioned from an accounting that was

created over two years after the parties' relationship ended.  Therefore, Mr. DeBiasi's opinion

that bank and credit card statements are insufficient evidence of expenses is completely

irrelevant, as are any other references to Mr. DeBiasi's opinion.[6]

Additionally, Plaintiffs' argument that the accounting indicated that Stonehall was often

under budget on its invoices and should have credited back funds to Mr. Conway is belied by the

fact that the accounting actually shows that more often Stonehall was *over budget* and by an

amount that exceeded the times it was under budget.  In fact, the accounting shows that Stonehall

was over budget by approximately $57,564.15.  *See infra* section VII for explanation of this

amount.  Therefore, any finding of damages against Stonehall should be reduced by this amount.

Moreover, the First Circuit has also held that "[l]iability under Chapter 93A for conduct

amounting to ***intentional*** misrepresentation does not automatically trigger punitive damages.

There must be something more."  *Damon v. Sun Co.*, *Inc.,* 87 F.3d 1467, 1485 (1st Cir. 1996)

(emphasis added) (quotation marks and citation omitted); *see also Pizzo v. Gambee*, 754 F. Supp.

2d 234, 238 (D. Mass. 2010) (refusing to award multiple damages in § 9 case – which has lower

standard for plaintiffs than in § 11 cases – involving a "he-said-he-said" argument between

---

[5] Plaintiffs had over 5 hours to respond to this argument since they belatedly filed their trial brief after Defendants filed their submission.

[6] In fact, any reference at all to the accounting is irrelevant given the jury's decision that Plaintiffs were not entitled to an accounting.  Plaintiffs' Exhibit A to Appendix C is also irrelevant as it is an attempt to pick apart Defendants' accounting.  Moreover, Defendants renew their objections to the document being used as evidence since it contains inaccuracies and the admissibility of it has not been established.  If the Court finds the document persuasive, Defendants request a chance to put Mr. Groulx on the witness stand to cross-examine him on the documents' accuracy.

former friends with very little substantive evidence from either party other than affidavits, each

contradicting the other on almost all points).  Given that the jury did not find any intentional

misrepresentations (or fraud), but only negligent misrepresentation, the case law does not support

an award of multiple damages under 93A.

**III.**     **Defendants' Alleged Conduct Did Not Violate 93A**

The jury's finding of nothing more than negligence on the part of Hall and Stonehall

should not be disturbed.  While the Court has "the right to decide a jury was 'dead wrong' . . . [it

also] has discretion to consider a jury's findings in making an independent determination of a

Chapter 93A claim." *Prof'l Servs. Grp., Inc. v. Town of Rockland*, 515 F. Supp. 2d 179, 196 (D.

Mass. 2007) citing *W. Oliver Tripp Co. v. Am. Hoechst Corp.,* 616 N.E.2d 118, 125 (Mass.

1993).  To be sure, "whether an act or practice is 'immoral, unethical, oppressive or

unscrupulous' is the kind of fact-specific determination best left for a jury." *Full Spectrum*

*Software, Inc. v. Forte Automation Sys., Inc.,* No. 12-40098-TSH, 2015 WL 1815632, at *7 (D.

Mass. Apr. 22, 2015), quoting *First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.,* 839 F.

Supp. 2d 407, 415 (D. Mass. 2012).  Courts have trended toward upholding a jury's findings of

fact when making the independent 93A determinations.  *See, e. g., Empire Today, LLC v. Nat'l*

*Floors Direct, Inc.,* 788 F. Supp. 2d 7, 27 (D. Mass. 2011) (noting jury finding alone may be

enough to deny 93A claims and choosing not to disturb jury's verdict); *Cahill v. TIG Premier*

*Ins. Co.,* 20 F. Supp. 2d 141, 143 (D.Mass.1998) (denying a Chapter 93A claim where the jury

denied all but the plaintiff's breach of contract claim, which did not rise to the level of a Chapter

93A violation on its own); *McCann v. Davis, Malm & D'Agostine,* 669 N.E.2d 1077, 1079

(Mass. 1996) (upholding Chapter 93A decision that incorporated jury's finding of facts).  *See*

*also Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 320 (1st Cir. 2002)

(finding that conflicting evidence and inconsistent positions among the parties are best resolved by the jury).

Moreover, to find a 93A violation here, however, the Court would have to find that Defendant's conduct was "egregious." *See In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d 156, 185 (1st Cir.2009) ("'[T]he defendant's conduct must be not only wrong, but also egregiously wrong.'") (citation omitted); *Baker v. Goldman Sachs & Co.,* No. 09-10053-PBS, 2013 WL 4780962, at *1 (D. Mass. Sept. 4, 2013). The First Circuit has held: "[C]hapter 93A is intended exclusively for egregious conduct." *In re TJX Cos. Retail Sec. Breach Litig.,* 564 F.3d 489, 497 (1st Cir.2009). This egregiousness standard is rooted in Massachusetts case law. *See, e.g., VMark Software v. EMC Corp.,* 642 N.E.2d 587, 597 (Mass. 1994) ("[Defendant's conduct] is insufficiently egregious to bring the offending party within [the scope of ch. 93A liability]"); *see also* McHugh, Business Remedies Under Chapter 93A app. A.14, Chapter 93A Rights and Remedies (Mass. Continuing Legal Educ. 2010) ("Chapter 93A claims generally need as a base some egregious breach of contract or a ***serious*** misrepresentation of a key element in a transaction.") (emphasis added).

Further, "businesses seeking relief under Section 11 are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct." Chapter 93A Rights & Remedies § 2.5, at 2–67 (Mass. Cont. Legal Educ. 2d ed. 2007); *Giuffrida v. High Country Investor, Inc.,* 897 N.E.2d 82, 95 (Mass. App. Ct. 2008). "In the context of disputes among businesses, where both parties are sophisticated commercial players, the objectionable conduct must attain a level of rascality that would raise an eyebrow to the rough and tumble of the world of commerce." *Zurich Am. Ins. Co. v. Watts Regulator Co.,* 796 F. Supp. 2d 240, 244 (D. Mass. 2011) (citations omitted); *see also Branch Ave Capital, LLC v. U.S. Bank Nat. Ass'n,* No. 12-

40140-TSH, 2013 WL 5242121, at *7 (D. Mass. Sept. 16, 2013) (same).  When "supplying the relevant § 11 standard and determining whether [Defendants] plausibly exceeded that level of unfair or deceptive conduct based on the facts of the complaint" the Court should "keep in mind" Mr. Conway's status as a multi-millionaire businessman.[7]  *Utica Nat. Ins. Grp.,* 45 F. Supp. 3d at 160  (taking BMW's status as a multi-billion dollar car company into account when determining Chapter 93A §11 claims).

Here, the parties were working together toward a common goal in a business venture for over two years and then, suddenly, on the precipice of success, Plaintiffs unilaterally halted the project.  Plaintiffs now irrationally seek to retrieve every single dollar expended on the career of Liana Conway, despite their own involvement at every step, and in the face of demonstrable achievements and tangible results from the services Defendants provided.  *See* Trial Exs. 494, 496, 514, 527, 587.

### A.    Marketing and Production Services

Indeed, many of the complained of acts (even if true), did not cause any damage to Plaintiffs.  *See Certified Sales, Inc. v. Standard Fire Ins. Co.,* No. 09-11769-DJC, 2012 WL 4498894, at **8-9 (D. Mass. Sept. 30, 2012) ("a business entity bringing a c. 93A violation must show a 'loss of money or property' due to the 'unfair or deceptive act.'") (quoting Mass. Gen. L.

---

[7] Plaintiffs have repeatedly argued that the Conways were naïve and inexperienced in the music industry.  Of importance in assessing this "babes in the woods" argument is that this was a two and a half year business relationship in which a highly successful, college educated businessman managed and financed his daughter's career and was directly involved in all decisions.  5/26/15 Tr. at 154.  To whatever extent Mr. Conway was naïve and inexperienced at the outset of the Conway/Stonehall relationship, he became experienced through the regular management of Ms. Conway's career.  Further, Mr. Conway admitted that he had access to whatever professional guidance he needed to make informed decisions about his daughter's career.  5/28/15 Tr. at 74.  Moreover, Plaintiffs also went to great pains to elicit testimony from Ms. Conway that she was a dean's list student at Boston College and now at Belmont College. 6/1/15 Tr. at 160.  This is surely not the stuff of a naïve "babe in the woods" strategy.

c. 93A § 11); *Frullo v. Landenberger*, 814 N.E.2d 1105, 1113 (Mass. Ct. App. 2004) (rejecting §11 claim where "there has been no showing that the plaintiffs lost anything as a result of the defendant's actions, deceptive or otherwise … [and] [t]he absence of evidence on this essential element is fatal").  For instance, that Defendants were performing the marketing and production[8] services rather than hiring third parties and paying them to perform the marketing services did not harm Plaintiffs, since they received all the services for which they paid.  *Compare* Brief at 3-6 *with* 5/29/15 Tr. at 17-18; 6/1/15 Tr. at 172-82.   Indeed, Mr. Conway only continued to pay the Stonehall invoices each month because he received all the services for which he had contracted. 5/28/15 Tr. at 161-63.  Plaintiffs have no evidence that Mr. Conway was harmed in any way by Stonehall performing the marketing and production services rather than passing the funds through to a third party.  For this reason, Plaintiffs' 93A claims based on Stonehall's compensation for these services should be disregarded.

### B.    The November 2011 and February 2012 E-mails and Supporting Invoices

Moreover, Plaintiffs have not shown that any representation in the November 2011[9] or February 2012 email caused Mr. Conway to continue to transfer funds to the Defendants.  To the contrary, Mr. Conway testified at trial that he did not trust Defendants, that he was not receiving

---

[8] Stone testified at trial that he usually receives $20,000 per song for his production services; he was not charging Conways $20,000 per song, as Plaintiffs claim, but was charging a discounted fee.  *See* Brief at 5; Trial Ex. 1009.  The double billing argument made by Plaintiffs is a red herring.  The second set of studio, rental and engineering costs were because Liana insisted on recording new acoustic versions of "August Rush" and "I Like You," against Stone's recommendation.  6/4/15 Tr. at 141.  Liana admitted to this.  6/2/15 Tr. at 182-84.

[9] The November 9, 2011 contains nothing even approximating a misrepresentation.  *See* Trial Ex. 52.  The document is a "an idea of how [Stonehall was] exposing the Liana Conway brand to the mainstream."  The generic breakdown of categories such as "International $2,550.00" and "Traditional marketing $5,000" are not linked to specific months nor do they indicate that they were pass-through expenditures.  Plaintiffs' contrived theory that this was in response to a request from Mr. Conway to *account* for where the $25,000 was being passed-through is nonsensical.

10

the transparency that he needed from them.  5/28/15 Tr. at 103-5, 133-34, 162.  Neither does his

"contemporaneous" Contact Record support the claim that he relied on these emails in deciding

to continue transferring funds to Defendants, since the entry on February 11, 2012, two days

after the February 9, 2012 email indicates that he finished the conversation to suspend with

Stonehall.  *See* Trial Ex. 509 at 2/11/12 entry.  Moreover, there is another notation in

Mr. Conway's Contact Record that within one week of resuming the project, he had another

confrontation with Stonehall over transparency and financial documentation.  *See id.* at 2/24/12

entry.  Finally, when Mr. Conway had reviewed the invoices Stonehall sent him that supported

the February 9, 2012 email, he noted *contemporaneously* his distrust of the documents since they

were so "generic."  *See id.* at 2/25/12 entry.  Despite this distrust, three days later he wired

money to Stonehall.  *See id.* at 2/28/12 entry.

 In any event, the "he said/ she said" dispute about the context of the February 9, 2012

email is not enough to support a 93A claim.  Plaintiffs claim the email was meant as a

breakdown of the January, 2012 $25,000 marketing payment.  Brief at 13.  Yet, they concede

that the amounts on the email total *over* $25,000.  5/27/15 Tr. at 135.  Moreover, Hall testified at

trial that the email was not a breakdown of the Stonehall marketing fee and how it was spent in

January but rather a breakdown of the overall budget in January.  6/3/15 Tr. at 83-5.  The email

itself supports this, indicating that it is an "overview" of the "budget" and not a breakdown of the

Stonehall fee and then it proceeds to lay out the work to be done over the next few months in

2012. Trial Ex. 53.  And indeed, the breakdown included publicity and radio charges as well, not

just marketing charges.  *See id.*

Plaintiffs' claim that Hall provided Mr. Conway with fake invoices is disingenuous at

best.  First, this Court has already ruled that the Artist & Brand Management and Tommy

11

Johnson invoices were not fraudulent.  Dkt. No. 238, at 18-19.  The testimony concerning the

JAS Marketing invoices clearly established that Ted Gibson created the invoice that Plaintiffs

claim Hall "manipulated."  Brief at 15.  Mr. Skatell, however, testified that JAS Marketing did

not normally invoice outside Paypal and so if a client needed an invoice or a pre-invoice, there

were multiple versions that JAS would use. 6/4/15 Tr. at 50.  He also testified that it appeared to

him that the invoice at issue here *was* created by JAS Marketing.  6/4/15 Tr. at 30.  Mr. Skatell's

testimony at trial that he suddenly remembered that Hall asked him in February to create an

invoice that was dated for January services is highly problematic and should be discredited since

Mr. Skatell incredibly suddenly remembered *after* his deposition that Hall asked him to create

this invoice, despite that Mr. Skatell spent hours in deposition discussing the $10,000 invoice

and never once remembered the conversation with Hall.[10]  6/4/15 Tr. at 49.  In short, there is no

evidence whatsoever that Hall altered, manipulated, or created any invoices.  Neither is there

evidence that she requested fake invoices.

　　　The only real complaint concerning these invoices is that they were not paid.  And,

whether they were paid is a red herring since Defendants were not required to pass through any

funds to third parties.  In any event, the Johnson invoice *was* paid in January, and this Court has

ruled as a matter of law that "Plaintiffs have not shown that Mr. Conway received the invoice or

otherwise relied upon it." Dkt. No. 238 at 19.  Moreover, the only reason the JAS Marketing and

Artist & Brand invoices were not paid was that Plaintiffs suspended the project and cancelled the

---

[10] Mr. Skatell also attempted multiple times to improperly testify to hearsay, 6/4/15 Tr. at 27-29, 32-3.  Mr. Skatell was also hired as part of the Conways' legal team for this action.  *See* Trial Ex. 521.  Moreover, Mr. Skatell had a personal vendetta against Stonehall and even threatened Defendants, through their counsel, that he would testify against them if they did not pay him. 6/4/15 Tr. at 43-48.  Therefore, he should not be considered a credible witness.

school tour in early 2012.  The costs were then spread out over the remainder of 2012 leading up to, what became, the summer camp tour.  6/3/15 Tr. at 102.

### C.      Failure to Disclose Fees

Plaintiffs' claims concerning Defendants' alleged failure to disclose the fees they received for their services, including radio promotion, Brief at 17-20, survived summary judgment solely on the theory that they are premised on Plaintiffs' claim that there was a duty to disclose such fees, as this Court ruled.  *See* Dkt No. 238 at 18 ("In order for an omission or failure to disclose to rise to the level of fraud, Plaintiffs must show a duty on the part of Defendants to disclose the information.") citing *Sahin v. Sahin*, 758 N.E.2d 132, 138 n.9 (Mass. 2001); *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012).  At the summary judgment stage, Plaintiffs failed to establish that their version of the agreement was a valid contract.  Further, at trial, Plaintiffs failed to offer any evidence, other than their own testimony, supporting their version of the agreement; they offered no witnesses, no third party corroboration, no direct written evidence, nor any circumstantial evidence of the alleged terms.  Nor did Plaintiffs offer sufficient evidence supporting any relationship giving rise to a duty on the part of Defendants to disclose their fees.  Rather, the jury found that Defendants did not owe Plaintiffs any duties, including any duty to disclose their fees.

Just as ambiguous terms are to be construed against the drafter of the terms, *Nadherny v. Roseland Prop. Co., Inc.,* 390 F.3d 44, 49 (1st Cir. 2004), the fact that Mr. Conway did not strike provisions of the Great Lines Agreement that were inconsistent with his (at least current) position that Stonehall was not to earn any compensation until Liana broke should be construed against him.  Mr. Conway admits to receiving multiple draft versions of the Great Lines

Agreement during the time when he was paying Stonehall for, among other things, their services. Trial Ex. 539 (multiple Great Lines drafts produced by Conway); 5/28/15 Tr. at 113-21. Mr. Conway also admits that he never made edits to the Great Lines Agreement drafts that would strike section 14 which allowed Stonehall to receive compensation. *Id.* This provision was specifically added by the attorney working for the parties to memorialize the parties' agreement that Stonehall was to receive $25,000 per month in salary for their services. 6/4/15 Tr. at 93-4.

     As this Court ruled at summary judgment, the fraud and misrepresentation claims are premised solely on Plaintiffs' claim that there was a duty to disclose such fees. Since the jury found no duty to disclose their fees, it necessarily follows that Defendants could not have committed fraud or misrepresentation by failing to disclose their fees.

### D.     Social Media Marketing

     Plaintiffs' are misguided in their argument on Defendants' practice of social media marketing. At the summary judgment stage, the only issue left open was whether Hall misrepresented the project was moving in a positive direction because of increases on social media while "knowing that the 'increases' were coming from purchasing social media traffic." Dkt. No. 238 at 20. Whether the practice of buying fake likes was "scorned" in the music industry is irrelevant here and thus the experts' opinions on that point are moot.[11] Brief at 8. The only question is whether Hall knew that *all* the increases were the result of direct purchases

---

[11] Mr. Benson in fact testified that the practice of hiring media companies to drive traffic to social media sites is not unsavory. 6/2/15 Tr. at 61. He further testified that these companies have thousands of email addresses at their disposal and will send out e-mail blasts encouraging people to visit the artist's social media sites. *Id.*

of fake social media or whether she thought she was hiring legitimate social media marketing companies to market Liana's social media pages properly.[12]

In this regard, the social media marketing issue also falls squarely into the "he said/ she said" category.  Hall testified that she did not engage in the purchasing of "fake" social media. 6/3/15 Tr. at 149.  She testified that the Conways knew that Stonehall had hired an online marketing company to increase Liana's social media presence, including increasing Facebook "likes," YouTube "views" and Twitter "followers."  *Id.*  Hall testified that there were admittedly two occasions where someone raised an issue with her that a company Stonehall hired may have in fact been purchasing fake or international likes, and that she immediately fired them.  6/3/15 Tr. at 157; 6/4/15 Tr. at 81-2.  Other than those two isolated occasions (which she immediately rectified), there is no evidence that Hall was knowingly purchasing fake likes.

Where "there is evidence presenting 'inconsistent positions on a crucial issue of fact,' it is appropriate to agree with the jury, which is 'best suited to resolve' such a dispute."  *Empire Today, LLC*, 788 F. Supp. 2d at 30, citing *Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d at 320 (1st Cir. 2002) ("In the end, the parties present witnesses who hold inconsistent positions on a crucial issue of fact. Rather than weighing in on the matter, we conclude that this dispute is one which a jury is best suited to resolve."); *see also Pizzo*, 754 F. Supp. 2d at 238 (refusing 93A damages in "he-said-he-said" argument between former friends with very little substantive evidence from either party other than affidavits, each contradicting the other on almost all points).

---

[12] Indeed, Liana Conway testified that she knew Stonehall hired marketing companies to increase her social media.  In fact, Liana Conway was in control of her own social media and was often the one requesting that her social media numbers be increased.  *See* 6/2/15 Tr. at 180; Trial Ex. 502 at Stonehall00008051.  She also testified that she understood that increased social media did not correspond directly to increased sales, but that the ultimate goal was to drive people to your sites and eventually get them to buy your music.  6/2/15 Tr. at 179.

### E.    Camp Tour and Merchandise

Plaintiffs' claims with regard to the camp tour and merchandise, Brief at 6-7, are perplexing.  Plaintiffs appear to be complaining that the tour was not successful and that this is somehow a 93A violation.  Yet, Plaintiffs both testified that the tour was a success and was the most fun Liana had during the entire project.[13]  5/27/15 Tr. at 150; 6/2/15 Tr. at 151-2. Concerning the failure to account for any merchandise sales during the summer camp tour, Plaintiffs have failed to show how it was the duty of Stonehall, who was not present during the tour, and not the duty of Liana Conway or Mr. Conway, the only Great Lines representatives present on the tour, to collect and account for the profits from the merchandise sold.  6/1/15 Tr. at 177; 5/29/15 Tr. at 13.  In fact, Hall testified that it was Liana who was selling the merchandise and the CDs on the summer camp tour, and is probably the one who should be accounting to Defendants for the profits. 6/3/15 Tr. at 114.[14]

### IV.    Defendants' conduct was not willful.

Plaintiffs have no evidence that any of Defendants' conduct was willful, so multiple damages are not warranted.  "Chapter 93A does not mandate the automatic imposition of multiple damages for any misrepresentation; '[r]ather, it is only when the acts of misrepresentation amount to intentional fraud that the severe sanction is appropriate.'" *Fed. Ins. Co. v. HPSC, Inc.,* No. 02-CV-11822RG, 2005 WL 2206071, at *3 (D. Mass. Sept. 12, 2005)

---

[13] Moreover, one of the biggest expenses of the summer camp tour was a $25,800 bus that Liana Conway chose. 5/29/15 Tr. at 26; 6/1/15 Tr. at 178.

[14] They also appear to complain that Defendant's contemporaneous accounting practices failed to account for their fees earned for creating the tour, yet they cite absolutely nothing to support this or to even suggest that Defendants' internal accounting practices have anything to do with Plaintiffs.  Their complaint is also premised on the failed argument that Defendants had a duty to disclose what portion of each invoice payments was their fee and what portion was passed-through to third parties.  As set forth in Section III C, the jury did not find that Defendants had any such duty, and thus any argument premised on this fact should be disregarded.

quoting *VMark Software,* 642 N.E.2d at 5967.  "[I]t is only in the rare and exceptionally

egregious case that such a finding [of bad faith] should be made . . . bad faith is not simply bad

judgment." *Parker v. D'Avolio,* 664 N.E.2d 858 (Mass. App. Ct. 1996) (internal quotations and

citations omitted). "[Bad faith] is not merely negligence. It imports a dishonest purpose or some

moral obliquity. It implies conscious doing of wrong. It means a breach of a known duty through

some motive of interest or ill will." *Spiegel v. Beacon Participations, Inc.,* 8 N.E.2d 895, 907

(Mass. 1937).  The jury's finding of mere negligent misrepresentation on the part of Hall and

Stonehall will not support a finding of willfulness to justify multiple damages under Chapter

93A.

## V.      Plaintiffs' Unclean Hands Prevent Their Recovery Under 93A.

*In pari delicto*, sometimes known as unclean hands, applies in tort cases and cases

seeking equitable remedies, including claims under Chapter 93A. *Baena v. KPMG LLP*, 453 F.3d

1, 6 (1st Cir. 2006).  "The full maxim is *in pari delicto potior est conditio defendentis,* meaning

'[i]n a case of equal or mutual fault, the position of the [defending party] is the better one.'" *Id.,*

n.5 citing Black's Law Dictionary at 791 (6th ed.1990).  The doctrine applies to prevent aid to

"one tainted with inequitableness or bad faith relative to the matter in which he seeks relief,

however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co.*

*v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (1945); *Bryan Corp.*, 2013 WL 6489785, at *2

(same).  The doctrine's "purpose is to prevent a party from benefiting by his dishonesty," *Fisher*

*v. Fisher,* 212 N.E.2d 222, 224 (Mass. 1965), and "require that they shall have acted fairly and

without fraud or deceit as to the controversy in issue." *Fidelity Mgmt. & Research Co. v.*

*Ostrander,* 662 N.E.2d 699, 704 (Mass. App. Ct.1996).  *See also* 14A Mass. Prac., Summary of

Basic Law § 9.48 (4th ed.).

Mr. Conway induced Defendants into signing the Great Lines Agreement.  He drafted a

letter to Stonehall expressing that the Great Lines Agreement "should be signed as soon as

possible." *See* Trial Ex. 493A.  Mr. Conway admitted at trial that, while he did not send that

letter, the sentiments of it were discussed on a phone call, as supported by Trial Ex. 509

(Conway Contact Record) at 1/5/12 entry.  *See* 5/28/15 Tr. at 131-32.   Mr. Conway very clearly

testified that he did not sign the Great Lines Agreement with Stonehall, despite his assurances to

them that he intended to and that Stonehall thought he did.  5/28/15 Tr. at 114-43.  After Hall

signed the agreement at his behest and sent it to Mr. Conway in February 2012, Mr. Conway

then *never* raised the issue with Stonehall.  He never asked them why they signed and sent an

agreement he did not agree with.  He never informed them that he did not agree to the terms of

the agreement and therefore would not sign.  He never told them he did not consider that they

were working under the same premise.  He never raised the question of another written

agreement, despite the fact that he admitted a written agreement was vital to any business

relationship. 5/28/15 Tr. at 90.

Had Mr. Conway actually signed the Great Lines Agreement, it would be very clear at

this stage that the parties were engaged in a joint venture and his Chapter 93A claims would be

barred.  *See infra* section IB.  Mr. Conway should not be allowed to now benefit from his

deceitful behavior.  Mr. Conway's unclean hands, in this regard, should bar his recovery under

Chapter 93A.

Moreover, Plaintiffs' improper litigation tactics should be considered in the unclean

hands context, just as they are considered in deciding affirmative Chapter 93A violations against

a party.  *See Small Justice v. Xcentric Ventures*, No. 13-cv-11701, 2014 WL 1214828, at *9 (D.

Mass. Mar. 24, 2014) ("While there may be debate concerning whether litigation tactics alone

can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct."); *Trenwick Am. Reinsurance Corp. v. IRC, Inc.,* 764 F. Supp. 2d 274, 307 (D. Mass. 2011) (same where defendants "used many of the same tactics in defense that it had used pre-litigation" including "shifting litigation positions and discovery abuses").

Here, Plaintiffs have engaged in countless dishonest litigation tactics, beginning as soon as the case was filed.  Feigning that they did not know how to reach Defendants, despite their relationship being so close that Liana considered them her "second parents," 6/1/15 Tr. at 147, Plaintiffs moved this Court to allow alternate service by publishing notice of the case in the Los Angeles Times for three consecutive days and in Billboard Magazine.  Dkt. No. 6.  They even sought to have Defendants pay their fees for this notice campaign that was aimed at simply disparaging Defendants in public.  *Id.*

Plaintiffs have also shifted their litigation strategy multiple times throughout the case, including when Mr. Conway suddenly declared that his Contact Record was a business record, despite the fact that the affidavit he filed with the Court stated it was kept because he intended to write a book.   5/26/15 Tr. at 177-78.

Moreover, Plaintiffs hid highly relevant documents from Defendants under the guise of privilege, withheld relevant discovery and even altered evidence when ordered to produce it (because it supported Defendants' claim that Mr. Conway induced them to sign the Great Lines Agreement).  *See* Dkt. 189, 256; 5/29/15 Tr. at 136-38.   More specifically, Defendants hid from Plaintiffs an agreement with Kevin Mitchell that casts serious doubt on Plaintiffs' claims that they did not agree to pay Stonehall a $25,000 monthly fee, when the agreement was drafted just after the parties stopped working together and contains nearly identical terms but for the

19

discounted rate of $23,000 per month (and the essential missing term of profit-sharing).  *See*

Trial Ex. 521.  The contract also identified JAS Marketing, a key witness in Plaintiffs' case, as

part of the litigation team that would aid in an investigation of Stonehall.  Yet, Mr. Skatell

testified at his deposition that he had no prior contact with the Conways or their counsel and

Defendants were unable to cross examine him on this point because the existence of the Mitchell

contract had been hidden from them.  Mr. Conway testified that he had the agreement from

November 2012 when it was first proposed and never produced it to Defendants and hid the fact

of it from Defendants' Counsel during his deposition.  5/29/15Tr. at 93-96.  There was no reason

why Defendants should have been forced to compel this document after spotting it on the

privilege log of a third party; the agreement should have been produced in the ordinary course of

litigation by Plaintiffs.  *See* Dkt. 189.

Additionally, Mr. Conway's highly suspect act of withholding pages from his diary based

on the claim that they were irrelevant when they contained entries such as "Sign S-H agreement"

which clearly referred to his intent to sign the Great Lines Agreement in early 2012 is a travesty

of justice.  And to then produce a blank diary in an attempt to pass it off as if he had no diary

entries that week is a clear indication of Mr. Conway's belief that he is beyond the reach of this

Court.  5/28/15 Tr. at 138.  Conway's testimony that he somehow mismanaged the copying

process is inherently not credible and especially egregious since Defendants' Counsel had been

shown the original and specifically marked the page for copying.  His behavior should not be

rewarded by this Court.

Mr. Conway also discarded handwritten notes during the course of this litigation.  The

handwritten notes are specifically identified in an exchange of emails between Mr. Conway,

Mitchell and Conway's attorney, and yet Mr. Conway's testimony that no such handwritten notes existed is patently not credible. *See* Trial Ex. 1010; 5/29/15 Tr. at 59-64.

For all these reasons, Plaintiffs should not be rewarded for their deceptive pre-litigation tactics that continued into this litigation, from the discovery period right through trial.

**VI.      Stone Was Not Involved In Any of the Acts of Which Plaintiffs Complain.**

Plaintiffs want the Court to impose a damage award jointly and severally against Stone. In support of this claim, Plaintiffs point to two propositions.  First, Plaintiffs state that Hall testified that she and Stone made all decisions jointly.  Second, they point out that that Hall and Stone were both present on telephone calls with Mr. Conway discussing the Liana Conway project and its financing.  Neither of these points supports their claim that Stone should be held jointly and severally liable, or that he engaged in an unfair or deceptive act or practice.

Absent from Plaintiffs' argument is any allegation or evidence supporting the proposition that Stone was aware of or present when any unfair or deceptive act, practice or statement occurred.[15]   In fact, Plaintiffs fail to even allege that Stone committed any unfair and deceptive acts.  Plaintiffs ask the Court to draw the inference that because Stone performed music production services and Hall performed "financial and back-end promotional activities" that were both invoiced together, Stone should be held jointly and severally liable with Hall.  This is not enough - "[a] 93A claim . . . may not be based on conclusory or threadbare assertions." *Specialty Mktg. Grp., Inc. v. Katz*, No. 13-12636-LTS, 2014 WL 2453105, at *6 (D. Mass. May 30, 2014).

---

[15] Rather, Plaintiffs have been unable to point to one entry in Andrew Conway's purportedly contemporaneous Contact Record in which he recorded any of the statements alleged to be unfair or deceptive.

Absent proof of some unfair or deceptive act or practice by Stone, the Court cannot find him jointly and severally liable with Hall and Stonehall. *See Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) ("There can be no claim of unfairness based on a misrepresentation where, . . . [plaintiffs have] failed to show [defendant] made *any* deceitful or even negligently false statements.); *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [defendant] liable under Chapter 93A.").

## VII.   **Damages**

Plaintiffs' request for 93A damages in the amount of $1,164,511.71 plus multiple damages is beyond comprehension.  They have already been awarded $393,248.00 by the jury, adding another $1.16 million plus multiple damages would give them a windfall profit on a project that they walked away from, causing financial harm to all the parties.  Plaintiffs are not entitled to any further recovery from Defendants for all the reasons set forth above.  Moreover, the jury has more than adequately compensated them in the amount of $393,248.00.

Defendants also take issue with the numbers that Plaintiffs have negligently thrown around during this trial.  That Plaintiffs argued *anything* in their closing does not make that argument a fact.  Brief at  23.  Plaintiffs have completely conflated which party has the burden here.  Defendants are not required to prove that their expenditures were justified.  Since the jury found that Defendants did not owe Plaintiffs a duty, then Defendants have no duty to account to Plaintiffs for any expenditure.  *See infra* section II.  That Defendants provided Plaintiffs with a detailed accounting during this litigation shows that they have gone above their duty to show

Plaintiffs that they have always been truthful with them.  In any event, Plaintiffs' analysis of the Revised Stonehall Accounting is highly flawed and should not be relied upon.

As described above in section II, Stonehall's actual expenses on a given project occasionally came in under budget, but more often the final expenditures exceeded the budget. The Revised Stonehall Accounting, Trial Ex. 3, totals the over and under each month and is easily identified in the total Invoice entry for each invoice.  For instance, entry no. 20 on page 2 of the accounting indicates that for the September 11, 2010 invoice, Stonehall's expenses exceeded the budget by $916.83.  Stonehall never sought payment for this budget overrun from Mr. Conway because the parties operated on an invoice basis, much like a general contractor.  If it cost Stonehall a little more to provide the service, they funded the deficit; and it if cost them a little less, then they benefitted.  The total delta on this amount favors Stonehall by $57,564.15. *See* Trial Ex. 3.

Contrary to Plaintiffs' arguments, Brief at 23, the Revised Stonehall Accounting shows that Stonehall earned $702,334.71 in compensation *before* taking into account the $57,564.15 in total expenses that went over budget.  Therefore, Stonehall actually earned about $644,770.56[16] during the parties' two and a half year relationship, which averages to approximately $128,954 per person in annual compensation.  This amount hardly supports Plaintiffs' claim that Defendants made windfall profits from their relationship with their rich, naïve clients.

This means that the pass-through expenses totaled approximately $1,093,187.44 and not $847,369.20, as Plaintiffs claims.  Brief at 23.  Plaintiffs' analysis that they agree with $487,454.37 of the actual pass-through expenses and contend that $359,914.83 are unsupported and have no back-up appears to be made from whole cloth.  Every single pass-through expense

---

[16] This amount includes over $300,000 in production and studio charges that Plaintiffs initially did not contend with when this case began.  *See* Dkt 216 at 42-3.

in the Revised Stonehall Accounting is supported by a reference to a bank record, credit card statement, or receipt.  That Plaintiffs' argument that these expenses were not in furtherance of Liana's career is completely unsupported and should be disregarded since Plaintiffs have not met their burden of proof.

## VIII.   <u>Unjust Enrichment</u>

As an initial matter, in their most recent submission, Plaintiffs argued that:

> unjust enrichment is unavailable to the Defendants because they had a remedy at law
>
>                ***
>
> Negligent misrepresentation is a claim at law.  *See Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 984 n. 7 (7th Cir. 1978); *Wells v. Lynch*, 2007 Iowa App. LEXIS 2, 4 (Iowa Ct. App. Jan. 18, 2007). The Defendants therefore cannot claim unjust enrichment. *See Santagate v. Tower* , 64 Mass. App. Ct. 324, 329 (2005) (stating that the "equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law").

*See* Dkt. No. 318 at 5.  By propounding this argument, Plaintiffs admit that their own claim for unjust enrichment should fail.  As opposed to Defendants, who are submitting a claim for *different* damages from what they sought from the jury, Plaintiffs' unjust enrichment claims seek the *exact same* damages they sought from the jury.  For this reason alone, Plaintiffs' unjust enrichment claim should be denied.

Further, contrary to Plaintiffs' claim that Defendants have not shown they were entitled to the fees they earned for services on behalf of Liana Conway, it is <u>Plaintiffs' burden</u> to establish that it would be unjust for Defendants to retain those fees.  *See e.g. Metro. Life Ins. Co. v. Cotter*, 984 N.E. 835, 850-51 (Mass. 2013) ("The party seeking restitution has the burden of proving its entitlement thereto").  Because the jury found that Defendants did not owe Plaintiffs a duty to disclose their fees, it is Plaintiffs who must show that Defendants were not entitled to their fees.

Plaintiffs testified that they received all the services on the invoices.  5/29/15 Tr. at 17-18; 6/1/15 Tr. at 172-82.  Therefore, their only complaint here must be that Stonehall promised not to be paid for its services.  *Salamon v. Terra,* 477 N.E.2d 1029, 1031 (Mass. 1985) (whether a benefit is unjust is "a quality that turns on the reasonable expectations of the parties."). Plaintiffs have not proven that promise.  In fact, their brief is devoid of any factual allegations on this point at all.  Even if Plaintiffs had argued that there was an oral agreement that Stonehall would not be paid for its services, Mr. Conway's testimony on that point was not credible, considering that he also testified that he did not agree that Stonehall would receive any percentage of future profits, leaving the fact finder to guess at why Stonehall would ever agree to work for no compensation <u>and</u> no share of future profits.  *See* 5/29/15 Tr. at 49-50. Indeed, even though Mr. Conway claims that his Contact Record was a contemporaneous record of discussions and events that were material to the relationship with Stonehall, the Contact Record contains no mention of this key term of the agreement between the parties.

In contrast, Hall testified that Stonehall and Mr. Conway operated on a month-to-month basis where she would send invoices for services and Mr. Conway would pay under the invoices. 6/3/15 Tr. at 72.  Stonehall provided Plaintiffs with all the services listed on the invoice and thus there can be no question that there was no unjust enrichment of Defendants at the expense of Plaintiffs. *See infra* section IIIA for more discussion of the invoice to invoice business relationship.

In short, the Court should not upset the jury's factual findings by awarding Plaintiffs anything under their unjust enrichment claims.

WHEREFORE, Defendants request that the Court:

1.      Enter Judgment in Favor of Defendants on Plaintiffs' 93A and Unjust Enrichment Claims; and

2.      Order that Plaintiffs produce the person who created Plaintiffs' Exhibit A to Appendix C for cross-examination.

Dated:  June 26, 2015                The Defendants,

                                     By their Attorneys,

                                     **BERMAN DEVALERIO**

                                     */s/ Glen DeValerio*
                                     Glen DeValerio (BBO #122010)
                                     Daryl DeValerio Andrews (BBO #658523)
                                     One Liberty Square
                                     Boston, MA 02109
                                     Telephone:  (617) 542-8300
                                     Fax:  (617) 542-1194
                                     Email:      gdevalerio@bermandevalerio.com
                                                 dandrews@bermandevalerio.com


                          <u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on June 26, 2015.


                                     */s/Glen DeValerio*
Dated:  June 26, 2015                Glen DeValerio