UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| ANDREW CONWAY, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| SAM LICATA, et al., | ) |
|  | ) |
| Defendants. | ) |

Civil Action No. 13-12193-LTS

_____

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW ON BENCH CLAIMS</u>

August 31, 2015

SOROKIN, J.

Before the Court are claims of both parties that have been reserved for the Court's decision after a jury trial.  Plaintiffs Andrew Conway and Liana Conway (collectively, "the Conways") bring claims for violation of Massachusetts General Laws chapter 93A, § 11 and unjust enrichment.  Defendants Sam Licata—who performs under the name Phoenix Stone ("Stone")—Sybil Hall ("Hall"), and associated business entities (collectively, with Stone and Hall, "the Defendants") bring a claim for unjust enrichment.  The Court makes the following findings of facts and conclusions of law resolving these claims.

I.      <u>PROCEDURAL HISTORY</u>

This action was commenced by the Conways' lengthy complaint, which was met by numerous counterclaims in the Defendants' answer.  Doc. Nos. 1, 28.  The case was trimmed for a trial by jury such that the Conways presented claims for breach of fiduciary duties, fraud, negligent misrepresentation, and copyright infringement and the Defendants presented claims for

fraud and negligent misrepresentation.  The Conways reserved claims for equitable accounting, violation of chapter 93A, declaratory judgment as to copyright issues, and unjust enrichment for resolution by the Court.  Similarly, the Defendants reserved claims of violation of chapter 93A and unjust enrichment to be resolved by the Court.  All other claims and counterclaims in this action either have been voluntarily dismissed or dismissed pursuant to the Court's two summary judgment decisions.

At trial, Andrew and Liana Conway each claimed the Defendants breached fiduciary duties allegedly owed by the Defendants to them (as investor and musician, respectively).  The jury rejected the Conways' fiduciary duty claims.  Doc. No. 297 at 1-2.  Next, Andrew and Liana Conway each claimed the Defendants committed fraudulent misrepresentation.  The jury similarly rejected the fraudulent misrepresentation claim in its entirety.  Id. at 2-3.  The Conways additionally claimed the Defendants committed negligent misrepresentation.  The jury rejected Liana Conway's claim in its entirety.  Id. at 4-5.  As to Andrew Conway, the jury found Hall and the defendant-entities liable for negligent misrepresentation and awarded Andrew Conway $393,248 in damages.  Id.  The jury, however, rejected Andrew Conway's claim of negligent misrepresentation as to Stone.  Id. at 4.

Defendant Stonehall Records presented its own claims for fraud and negligent misrepresentation.  The jury rejected the fraudulent misrepresentation claim in its entirety.  The jury, however, found that Andrew Conway committed negligent misrepresentation against Stonehall Records and that Stonehall Records proved the negligent misrepresentation proximately caused harm to it.  Id. at 8.  The jury, however, awarded no damages to Stonehall Records for the negligent misrepresentation.  Id. at 9.

In addition, Liana Conway pursued a copyright claim against the Defendants.  Her copyright claim relates to five songs she authored and for which she holds the copyright in the musical composition.  During the parties' relationship, Liana Conway and the Defendants recorded these songs, resulting in sound recordings—and separate copyrights in those sound recordings jointly held by the parties.  After the parties' relationship ended in September 2012 and until the Court's ruling on summary judgment, the Defendants distributed the sound recordings without a compulsory license or a negotiated license from Liana Conway for use of the compositions contained within those sound recordings.  The Defendants had maintained such a license was unnecessary, a position rejected by the Court on summary judgment, Doc. No. 238 at 24-28.  The distributions made by the Defendants during this period were de minimis.  The Conway's expert calculated the amount of Liana Conway's unpaid royalties over the period of August 2013 to March 2014 as $1.18, using the compulsory license rate.  Ex. 38.  The Conways later reported to the Court that approximately 175 downloads (one download representing the purchase of one copy of one song) had occurred as of the time of the hearing on summary judgment in 2015.  Doc. No. 252 at 7:12-7:15.  In response to the Court's Order on summary judgment, the Defendants tendered payment of $51.78 to the Conways, an amount representing the most the Defendants could possibly owe in unpaid compulsory royalties, Doc. No. 236 ¶¶ 2-3, and represented that they ceased distribution of the recordings.  While the Court had resolved the liability of Stonehall Records on summary judgment, it did not determine the liability of the individual defendants, the willfulness or innocence of the infringement, or damages.  Doc. No. 278.  At trial, Liana Conway sought statutory damages for each infringed work, urged the jury to find willful infringement, and suggested the maximum statutory award of $150,000 per song was appropriate.  The jury rejected these positions.  Doc. No. 297 at 6-7.  While the jury found the

individual Defendants liable, it found the Defendants to have met their burden to establish

innocent infringement and awarded $1,000 in statutory damages for each song.  Id. at 7.

    After the verdict, the Defendants, in light of the jury's verdict, elected to dismiss their

chapter 93A claim as well as all of their other claims except for a claim of unjust enrichment

arising from Andrew Conway's alleged failure to pay for two discrete services: a $25,000

marketing charge from the last month of the parties' relationship and the value of the production

services Stonehall Records provided to Liana Conway in her recording of the National Anthem.[1]

Doc. No. 304.  The Conways similarly trimmed their claims, but took a different tack on their

chapter 93A claim, proceeding on their claim for unfair and deceptive practices for more than $1

million of the money transferred to the Defendants.  Doc. No. 306 at 23.  The Conways also

decided to press a narrower theory of recovery, on the basis of unjust enrichment, for the

amounts retained as fees by the Defendants over the course of their relationship.  Id. at 32-33.

    In support of the claims reserved for the Court's resolution, the parties have now

submitted briefing as well as additional evidence to supplement the evidence offered at trial.

See, e.g., Doc. Nos. 304, 305, 306, 308.  The Court held hearings on these claims on July 15,

2015 and August 24, 2015.  Neither party has sought a further evidentiary hearing as to any of

the matters that now remain for decision.[2]

---

[1] The Defendants originally presented to the Court, but later withdrew, an unjust enrichment claim
seeking recovery of a $4,500 payment to vendor Shore Fire Media that was not reimbursed.  Doc. No.
337.
[2] The Court considers all claims reserved for resolution by the Court but not briefed by the parties post-
trial to have been waived.  Accordingly, judgment will enter in favor of the party against whom the claim
had been asserted.

II.   <u>FINDINGS OF FACT</u>[3]

In 2010, Andrew Conway was a successful businessman.  After graduating from college and working for several years in real estate, he went into the business of owning and operating Dunkin' Donuts franchises with his future in-laws.  Over the next thirty years, the business grew to more than thirty franchises, overseen by an 8,000 square foot management office populated by numerous administrative personnel who manage the franchises.  Apart from his franchise business, Andrew Conway is, in addition, a successful commercial real estate developer.  In the course of his career, he has negotiated at least hundreds, if not thousands, of business transactions and managed numerous business relationships with partners, landlords, tenants, buyers, sellers, outside professionals, employees, consultants, and government regulatory bodies, among others.  He is also familiar with and conversant in accounting standards and has the ability to review, intelligently, the "cost side" of the ventures in which he is involved.

In 2010, Liana Conway, Andrew Conway's daughter, was a sophomore at Boston College with an interest in music and a desire to try her hand at becoming a professional recording artist or songwriter.  In the course of a conversation between Andrew Conway and his realtor (also a family friend), the realtor mentioned his acquaintance with a husband and wife in the music industry, Phoenix Stone and Sybil Hall.  Thereafter, Andrew Conway contacted Stone and Hall.

Stone and Hall have significant experience in the music and entertainment industries and have had some role working with or developing other recording artists, including the Backstreet Boys, NSYNC, Britney Spears, and others.  This experience has generated relationships with music industry professionals and resulted in at least one "joint venture" project with a major

---

[3] The Court reserves certain findings of fact for the discussion of the specific claims to which they are relevant in the Conclusions of Law section.

music label.  Stone and Hall were generally receptive to working with Liana Conway after hearing an amateur recording of her singing and seeing a photograph of her.  At least from the point when Liana Conway initially recorded songs with them in June 2010, Stone and Hall believed that she had the talent to "break"—that is, to achieve widespread popular exposure and commercial success as a recording artist.

Stone and Hall's strategy to "break" Liana Conway was similar to the plan utilized by other talent with whom they had worked.  It involved creating polished content—both songs and music videos—augmented by exposure on social media and online outlets so as to generate a critical mass of public interest or a contract with a major record label.  This was a viable path, but certainly not the only viable path, either to "break" her or to otherwise develop her commercial musical career.

The Conways initial interest was for Liana Conway to record professionally several songs she had written and to test the commercial opportunities available to her.  In addition, the Conways were interested in Liana Conway having a "rock star" type experience and being presented like a successful rock star.  For example, the Conways paid more than $50,000 to record and produce four songs in June of 2010—Liana Conway's first professional recording— not including the cost of travel to or accommodations in California.  Ex. 514 at 579-80, 599-600, 611-12.[4]  Upon moving to Nashville in the summer of 2010, Liana Conway moved into an apartment building in which one of the other units was owned or rented by Taylor Swift.  In addition, when arranging for a summer camp tour in the summer of 2012, the Conways decided to rent a bus costing more than $25,000, including the fee for the driver, to take Liana Conway

---

[4] Citations in this form refer to trial exhibits.  Citations to specific page numbers refer to the last three digits of the Bates number of the document, if available, or if not, to other pagination internal to the document.

and her band on the three-week tour.  Ex. 514 at 603.  The bus, which had a bedroom, a full bath, and a kitchen, was an upgrade the Conways choose in lieu of a bus costing $7,500, not to mention the conceivable option to travel by car and stay in motels.

Eventually, the Conways became focused on Liana Conway achieving commercial success in music and proceeding directly toward the goal of turning her into a commercially recognized artist.  Although the Conways were generally aware that there were other viable methods to develop a musical career, including playing at local venues and exploiting free or inexpensive online distribution channels such as YouTube and SoundCloud, they did not pursue these avenues.  Throughout the process, Andrew Conway believed that his daughter had the talent to succeed as a commercial recording artist.

In the spring of 2010, Andrew Conway agreed to hire the Defendants to produce and record four songs written and performed by Liana Conway in a professional studio—the same studio in which Michael Jackson recorded his album Thriller—for a total cost of more than $50,000, not including the cost to the Conways of traveling to Los Angeles.  The Conways made no effort to seek out or compare other producers or record labels and did not otherwise investigate the reasonableness of the prices the Defendants charged.  The evidence shows that the cost of recording, producing, and mixing sound recordings can vary widely, with prices as low as several hundred dollars and prices as high, and higher, than the Defendants' stated fee of $20,000 per song.  The difference in cost depends, in part, upon the sophistication of the recording equipment, the experience of the producer and engineer, and the price that a person can command on the market.  The evidence shows that Stone, as a producer, was talented at his work and expensive.  The Defendants presented evidence that Stone was contracted to produce

songs for Virgin Records America for $20,000 per song, the same rate he argued was his standard rate for the purposes of this litigation.  Ex. 578 at 114.

The initial recording sessions occurred in June, 2010.  This marked the beginning of a more than two-year long working relationship between the parties.  Over that period, the parties worked together to develop Liana Conway as a professional recording artist and to promote her career.  The Conways, Stone, and Hall were in contact frequently, at times, daily.  Liana Conway worked closely with Stone and Hall, considering them to be her second parents.  As a result of working together, the parties produced professional-quality songs, music videos, photoshoots, media appearances, performances, and a summer camp tour.  This included, as relevant to the Defendants' unjust enrichment claim, Liana Conway's recording of the National Anthem, which was produced by the Defendants and recorded on or about August 22, 2012.  Ex. 502 at 090; ex. 508 (entry for August 23, 2012).

Beginning with the initial recording session, the Defendants would issue an "invoice" for a discrete project or discrete portions of projects for which the Defendants provided services. These invoices generally covered expenses before they were incurred.  Andrew Conway would then approve those charges and pay on those invoices.  By June of 2011, Andrew Conway had been invoiced and paid the Defendants more than $200,000 (more than $50,000 of which was for the initial recording of four songs).  Ex. 514 (invoice transmittal emails dated between May 17, 2010 and May 3, 2011).  At that time, Andrew Conway and the Defendants came to the agreement that he would pay the Defendants $25,000 per month for "marketing."  Accordingly, each month, the Defendants would issue an invoice that included a $25,000 line item for "marketing" and, typically, other charges.  See generally ex. 514.  Occasionally, the Defendants issued more than one invoice in a month.  Rarely, a line item referenced an expense related to a

specific defendant.  Ex. 514 at 582.  More often, the line items would be phrased in generic terms that did not specifically reference who performed the service or would receive the payment. Many line items, from the course of dealing between the parties and as a matter of common sense, strongly imply that they were compensation to the Defendants for services they were providing.  See ex. 514 at 575-76 (transmittal email from Hall stating that Stone would be "working with Liana" and enclosed invoice including line item for "Musical Director/Vocal Coaching").

Stone and Hall arranged and participated in virtually all of the activities described above. Andrew Conway also attended most of the events and production activities.  As described above, prior to the transmitting the monthly bill, Hall reviewed with Andrew Conway the upcoming potential activities and associated costs for his input and approval.  He also frequently discussed the future of the "project" as well as past expenditures with Hall.  Liana Conway did not participate in these discussions nor in the related email communication between Andrew Conway and Hall regarding finances.  Andrew Conway paid every invoice issued to him, amounting to approximately $1.7 million over the course of the entire relationship.

This was an expensive project.  The high cost is attributable to several factors.  The Conways sought out and pursued an expensive strategy to reach commercial success, which included high-end, professional-grade recordings and music videos.  At times, the Conways added expenses that went beyond what was necessary for such a strategy.  In addition, the Defendants recommended such a strategy, charged handsomely for their services, and expended a lot of time and effort related to the project.  These aspects of the project were part and parcel of the "rock star" experience the Conways sought for Liana Conway.

The evidence shows that, beginning around the time that the parties began discussing the $25,000 monthly payment in 2011 and continuing into 2012, the parties negotiated an agreement intended to govern the working relationship between them.  The Defendants retained a lawyer to draft the agreement, and Andrew Conway paid his legal fees.  Ex. 514 at 574.  At several points Andrew Conway provided input and otherwise discussed drafts of the agreement with Stone, Hall, and the attorney.  These negotiations resulted in a draft agreement, which was referred to by the parties as the Great Lines Agreement.  This draft agreement contemplated the formation of a business entity, Great Lines, LLC, in which Andrew Conway, Liana Conway, and Stonehall Records would each hold one-third ownership interests.  Ex. 491 at 366, 368.  The agreement further contemplated that the officers and employees of the entity could receive salaries, as approved by the board of the entity, and that Stonehall would receive an interest in some of the intellectual property born of the relationship.  Id. at 366-67, 369-70, see note 5, infra.

At least in January of 2012, and possibly at other times, Andrew Conway encouraged the Defendants to execute the Great Lines Agreement.  See ex. 493A; ex. 513A.  The counsel drafting the agreement circulated a draft to the parties by email dated, January 27, 2012.  Ex. 542 at 129.  Hall executed the draft agreement in the early days of February, 2012 and mailed it to Andrew Conway for his signature.  Neither he nor Liana Conway ever signed the document or informed the Defendants that they had not and would not sign it.[5]

---

[5] Andrew Conway testified that he did not sign the Great Lines Agreement in part because he did not want his daughter to relinquish her intellectual property rights to the Defendants.  At the hearing on the bench claims on August 24, 2015, the Conways' counsel cited the Great Lines Agreement and stated that it provided for Liana Conway to surrender her intellectual property to the Defendants.  In fact, the Great Lines Agreement provided that Liana Conway would assign her interest in any intellectual property arising out of the parties' relationship for a period of two album cycles only to Great Lines, LLC, an entity over which the Conways maintained two-thirds control.  Ex. 491 §§ 4.02, 9.01, 9.02.  Separately, the Great Lines Agreement contemplated that Liana Conway would assign her interest in any sound recordings—a separate copyright from the composition of the works, see Doc. No. 238 at 22-23, and one in which the Defendants already had an interest as producers of those recordings—created over the course

Andrew Conway's testimony regarding the parties' relationship was that, presumably around the time he began paying the monthly marketing fee in the summer of 2011, the parties entered into an oral agreement under which the Defendants would perform marketing and production services, but could only bill for third-party expenses incurred in the course of providing those services.  Under this version of the parties' agreement, the Defendants could not retain <u>any</u> of the transferred funds as compensation for their services, except as specifically authorized by Andrew Conway, that is, unless payment to Stone, Hall, or one of the defendant-entities was identified expressly on an invoice.  In addition, the Defendants were not guaranteed any deferred compensation should Liana Conway eventually become commercially successful; rather, the Defendants' present compensation was the "opportunity to be involved" with her. Doc. No. 216 ¶ 65.  There was some prospect of compensation after she became successful in the form of a "fair and reasonable" commission, calculated from revenues after Andrew Conway's capital contributions had been repaid, in an amount to be determined, presumably, by Andrew Conway.  <u>Id.</u>  The Court previously decided that, even if those facts were credited, the described agreement did not constitute a legally binding contract.  Doc. No. 238 at 9-13.

At trial, Andrew Conway testified to these facts and emphasized that his focus was on his daughter's development and the protections for him as an investor.  He testified that he was not focused on commissions, profits, or what would happen upon commercial success.  I reject this testimony as incredible.  There is no documentary evidence which shows or suggests the

---

of the two album cycles to Defendant Stonehall Records.  Ex. 491 § 4.03.  The Great Lines Agreement also provided, however, that net profits resulting from the exploitation of those sound recordings had to be paid to Great Lines, LLC and used to repay Andrew Conway's capital contributions.  <u>Id.</u> §§ 4.03, 10.03, 10.05.  The Court also notes that there is no documentary evidence showing that Andrew Conway ever proposed amending any of the provisions of the agreement touching on intellectual property despite commenting on other provisions of the draft agreement and encouraging the Defendants to sign the agreement, ex. 493A; ex. 513A.  In sum, the evidence undermines Andrew Conway's explanation for not signing the Great Lines Agreement, and I find it incredible.

Defendants' agreement to work for free in the hopes of an uncertain future commission, as Andrew Conway describes.  The Defendants are not generally in the business of working in exchange for the possibility of a future undisclosed and undiscussed commission.  Contrary to Andrew Conway's testimony, the parties agreed, at least in principle, to a profit-sharing relationship set out in detail in the Great Lines Agreement.  This topic was discussed extensively over a six-month period of time and memorialized by counsel in the draft agreement, just as one would normally expect.  It strains credulity that someone in the Defendants' shoes would tirelessly labor to develop a musician's career without pay, without promise of payment, without any right to exclusive representation, without any right to a share of the intellectual property, without any right to a share of the profits, and without any other right to be paid.

The proposed reward in the form of the "opportunity to be involved" with Liana Conway's career was just not that great.  Indeed, the Conways' own expert stated in his report that it is typical for managers[6] to earn a commission on the income generated by the artist or, frequently in the case of an unestablished artist, an equity stake in the intellectual property of the artist as compensation for the manager's investment of time and energy in the artist's career.  Ex. 37 at 7-8.[7]  Further, the expert quoted from what he termed to be a "standard agreement" between a manager and an artist which included a fixed term for the contract, a commission on gross receipts received during the contractual term, and a commission on receipts received after the contractual term but which stemmed from appearances or content negotiated, arranged, or

---

[6] The Court here is assuming, as was the Conway's position at trial, that the Defendants were acting as personal managers.  The Court is not, however, finding that the Defendants were acting as personal managers as a matter of fact.

[7] The Court notes that the expert report of George Howard, the Conway's expert, was not admitted as a trial exhibit.  The Conways, however, provided the report as a proposed trial exhibit and the report was included in the record on summary judgment, Doc. No. 186-32.  The Court considers it here only as it further illuminates the credibility of Andrew Conway's testimony and notes that the Court would have reached the same conclusion regarding his credibility without regard to the report.

created during the term.  Id. at 6-7.  These guaranteed features were all conspicuously absent

from Andrew Conway's articulation of the agreement between the parties.  In other words, far

from supporting his version of the parties' agreement, the report of the Conway's expert further

discredits Andrew Conway's description of the parties' working relationship.

Andrew Conway also testified that he believed that the Defendants were retaining none

of the money transferred to them (except when specifically identified on the invoices) and relied

upon that belief in his decision to make repeated payments to the Defendants.  I find both his

testimony regarding his belief that they were retaining none of the transferred funds, beyond the

small amount explicitly authorized, and his testimony that he relied on that belief as a condition

of his repeated payments to the Defendants to be incredible.

Andrew Conway had innumerable conversations with the Defendants regarding the bills,

the costs, the arc of the project, and the services rendered.  He saw Stone and Hall at many of the

various activities and understood the significant logistical and organizational support they were

providing for each event.  He fully understood the effort they were expending and the significant

portion of their time they were devoting to Liana Conway.

Further, the line items for marketing amounted to exactly $25,000 on every monthly

invoice.  See generally ex. 514.  There is no documentary evidence that credits or debits were

applied to that fee if the Defendants went overbudget or came in underbudget for the preceding

month.  This fact further discredits Andrew Conway's testimony, because assuming that budget

was for pass-through expenses only, common sense dictates that a budget made up of many

discrete expenses (something Andrew Conway understood from the budget "breakdowns" he

received, ex. 52 at 490, ex. 53 at 614-15) would not total a round number month over month.  I

find that Andrew Conway knew the Defendants were not doing the work for free and, further,

that he understood that they were retaining at least some portion of the amounts he was paying every month for marketing and other invoice line items.[8]

Liana Conway also testified that the Defendants repeatedly told her that they were not retaining any of the money Andrew Conway was paying and that they "would not make a dime until you made a dime."  I find, however, that Liana Conway was not substantively involved in the conversations or negotiations about the project's finances and thus did not have personal knowledge about any discussions Andrew Conway, Stone, and Hall had about their business relationship.

Hall's testimony about the parties' relationship was contrary to the testimony of the Conways.  Hall testified that the $25,000 marketing fee was compensation for the Defendants' agreement to work exclusively on promoting Liana Conway and that the Defendants were entitled to retain the entirety of that amount.  Hall clarified that, in any given month, the Defendants would spend some amount of that money on marketing expenses for Liana Conway, but did so as a matter of good will and to contribute to the career development of Liana Conway, not out of any obligation to pay for expenses out of the $25,000.  Hall further testified that Andrew Conway understood that they were being compensated for their services in other line items in the invoices, separate from the marketing fee.

Apart from this conflicting testimony, it is undisputed by the parties that the Defendants retained much of the money transferred to them by Andrew Conway during their relationship. The propriety of retaining that money and the overall nature and terms of the parties' relationship, however, are matters of great dispute.  I find that the parties never clearly

---

[8] The Court makes note that it is not finding that Andrew Conway understood that the Defendants were retaining all of the amounts transferred.  Andrew Conway did, however, understand that they were retaining some portion of the transferred money.

articulated their expectations for the Defendants' compensation for their services or the specific

limitations on the funds transferred by Andrew Conway to the Defendants.  This failure of

communication resulted in differing understandings on the extent to which the Defendants would

be compensated out of those funds.

The parties' relationship ended in September of 2012.  On September 11th, Andrew

Conway sent Hall a text message stating that "no further funding will be advanced on this project

excepting costs related to live performances."  Ex. 501 at 278-79 (capitalization different from

original).  The parties did not work together in any meaningful way after that text message.[9]

The parties dispute why the working relationship stopped.  Andrew Conway contends it

was principally due to his consistent dissatisfaction with the lack of transparency in the invoices.

I reject that assertion as incredible.  The level of detail set out in the invoices never changed

throughout the course of the relationship.  See generally ex. 514.  A substantial part of the

communication between the parties about the content of the invoices was oral.  When Andrew

Conway did complain about insufficient detail in the bills, for example in January of 2012, Hall

provided some more detail.  See ex. 53.  He then paid that bill and continued to pay each

subsequent bill despite the lack of any similar level of detail in the bills that followed.  Whether

or not he lacked a detailed knowledge of how the Defendants were allocating the money, this

was not the principal cause of the end of the relationship.  This was simply not a matter of

consistent interest to Andrew Conway for the majority of the period that the parties worked

---

[9] I note that there are emails in evidence showing Liana Conway and Hall to be communicating after
September 11th, apparently without regard to Andrew Conway's text message stating his intent to stop
financing the project.  See ex. 505.  I find that this communication between Liana Conway and Hall does
not show Andrew Conway's decision to stop funding the project to be temporary or equivocal.  Rather,
the Defendants knew Andrew Conway to be the final decisionmaker as to the finances of the project.

together.[10]  Notwithstanding Andrew Conway's testimony, the evidence suggests different

reasons for the termination of the parties' relationship, which I credit.

Andrew Conway testified that his daughters' social life and alcohol consumption was not

a significant factor in ending the relationship with the Defendants and that his concern was

limited to the typical concerns held by the parent of a young adult child.  This testimony is

undermined by texts and voicemails in which Andrew Conway evinces serious concern about his

daughter's lifestyle.  See e.g., ex. 35 at 266 (urging Hall to call him "sooner [rather] than later"

"given [his] worsening disposition on Liana[']s social habits and the fate of this entire project")

(capitalization different from original); ex. 508 (entries for August 9, 2012 and August 27, 2012).

I find Andrew Conway's testimony on the subject incredible, and I find that these concerns

played some role in the termination of the parties' working relationship.[11]

In addition, the evidence shows that Andrew Conway, during the summer of 2012 had

started seeking the advice of third parties regarding his daughter's career.  In the beginning of

September, in a set of talking points he drafted for a call with Hall, Andrew Conway questioned

whether the Defendants "need[ed] help" and considered whether "outside/2nd opinions" were

necessary.  Ex. 504.  Andrew Conway became increasingly convinced that his daughter could or

should break soon and that these third parties had an important role to play in "breaking" her.

---

[10] The evidence does show that Andrew Conway, in September of 2012, repeatedly requested additional documentation from Hall regarding expenses.  Ex. 200 at 321; ex. 202 at 707; ex. 203 at 325; ex. 501 at 278-79.  While this reveals that Andrew Conway was focused on documentation at the very end of the relationship, it does not affect the Court's credibility finding rejecting Andrew Conway's testimony that he was consistently asking for more documentation of expenses throughout the course of the relationship. Considered in conjunction with the other explanations for the end of the parties' relationship set out below, it appears as though those other concerns weighed heavier in the decision to end the relationship than complaints about transparency.

[11] In his testimony, Andrew Conway was asked whether his daughter was an alcoholic or had an alcohol problem and rejected both contentions.  I do not find that Liana Conway is or was an alcoholic, only that Andrew Conway was reasonably concerned about his daughter's well-being after learning about her social habits.

Ex. 501 at 272-73 (text message from Andrew Conway to Hall stating that he had spoken with someone else in the industry, intended to use him to accelerate breaking his daughter, and expected Hall's support).  I find that, eventually, Andrew Conway came to the conclusion that these third parties would be better at orchestrating his daughter's commercial "break" than the Defendants and this decision contributed to the end of the parties' working relationship.

III.    CONCLUSIONS OF LAW

    A.  The Conways' Unjust Enrichment Claim

    The Conways are seeking recovery, on the basis of unjust enrichment, of the more than $800,000 they claim the Defendants retained for themselves from the amounts transferred to them by Andrew Conway.

    To recover on a claim of unjust enrichment, the Conways must prove 1) the Defendants knowingly received a benefit 2) at the Conways' expense 3) under circumstances that would make retention of that benefit unjust.  See Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 58 (1st Cir. 2011).  Here, there is no dispute that the Defendants received a benefit in the amount of money retained by them from the transfers by Andrew Conway.  Nor is there any dispute that the funds retained by the Defendants came at the expense of Andrew Conway.  Thus, this claim boils down to the question of whether the retention of those funds was unjust under all of the relevant circumstances.

    The unjust enrichment claim fails because the Conways have not established by a preponderance of the evidence that retention of funds was unfair even though the project ultimately did not succeed.  The claim fails because the Conway's bore the burden of proof and did not satisfy their burden.  The viability of the Conway's claim depends, almost entirely, on the credibility of Andrew Conway's testimony.  Specifically, the claims depends on Andrew

Conway's testimony that he did not know that the Defendants were retaining any funds transferred to them (save some minor exceptions), that he clearly articulated to the Defendants that they were not permitted to retain any of those funds unless explicitly authorized, and that the funds were to be used solely to pay third party vendors.  The Court has found Andrew Conway's testimony in this regard not to be credible.

To the extent Liana Conway's testimony is consistent with Andrew Conway's, it is not substantially probative on the issue of the parties' relationship.  Liana Conway was not significantly involved in discussions between Andrew Conway, Stone, and Hall regarding the financial arrangements related to the project or the parties' business relationship.  Accordingly, she does not have personal knowledge as to the parties' financial relationship.  Liana Conway also testified that the Defendants stated numerous times that they would "not make a dime until you made a dime," and other similar statements.  The Conways read these statements as supporting their view of the relationship in which the Defendants were working for free.  To the contrary, such statements show that the Defendants were discounting their services for the prospect of a future huge payoff should Liana Conway break, something all concerned believed would occur.  This is just one example of the incomplete and imprecise communications between the parties which resulted in differing understandings regarding their relationship.  In light of the Court's findings on Andrew and Liana Conway's testimony, the Conways have not met their burden of proof regarding their unjust enrichment claim, which ends the matter.[12]

---

[12] To the extent the Conways are arguing a "malpractice" theory of unjust enrichment recovery on the basis that the Defendants' management or counsel was not worth the money paid, the claim fails as well. The Defendants presented a viable path to commercial success and implemented it generally as described. As noted below, given the Defendants' history and associations in the music industry, they charged significant fees for their services.  The Conways were generally pleased with the Defendants' services, and Andrew Conway paid for those services with an awareness that there was no guarantee of success for this project.  Andrew Conway approved the projects and payments on a monthly basis.  He and his daughter witnessed many of the services they received.  Neither the fact that the Conways perhaps could

Hall's testimony provided additional evidence regarding the parties' relationship.[13]  That evidence, however, is entirely inconsistent with the Conway's description of the relationship, and thus provides no support for the Conways' claim.

While the foregoing reasoning denying the Conway's unjust enrichment claim stands on its own, three further reasons, each independently sufficient to support the Court's conclusion, also apply here.  First, the jury awarded Andrew Conway $393,248 as damages for Hall's negligent misrepresentation.  Unjust enrichment, as an equitable claim, is not available to those with a remedy at law.  Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010).  Here, the factual allegations underlying the Conways' unjust enrichment claim are substantially identical to those offered in support of their negligent misrepresentation claim.  The availability of such a claim at law—never mind success on that claim—forecloses relief on a theory of unjust enrichment.  See Depianti v. Jan-Pro Franchising Int'l, Inc., 39 F. Supp. 3d 112, 143 (D. Mass. 2014) (quoting Taylor Woodrow Blitman Const. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982)); see also Fernandes, 731 F. Supp. 2d at 114 (noting that the availability of a claim at law, whether successful or not, will foreclose an unjust enrichment claim).  This limitation on unjust enrichment is particularly applicable here, where the jury made an award on the basis of a claim at law.  Any unjust enrichment that might have accrued to the Defendants as a result of some lack of clarity attributable to them regarding the disposition of marketing fees has been remedied and addressed.[14]

---

have accomplished more for less money nor the fact that Liana Conway did not "break" in the course of the parties' relationship renders the Defendants' retention of the funds unfair.

[13] Because Hall's testimony does not support the Conway's claim, even if credited by the Court, there is no need for the Court to make a finding as to the credibility of Hall's testimony.  The Court notes, however, that Hall's testimony regarding the issue of the parties' relationship is not without inconsistencies.  See Doc. No. 80-46 ¶¶ 2-4.

[14] In fact, the jury awarded the Conways more than $393,000 in damages on the negligent misrepresentation claim.  Doc. No. 297 at 5.  The Conways calculate that the Defendants retained slightly

Second, Andrew Conway, under long-standing equitable principles, is not entitled to relief on his unjust enrichment claim.  Both the First Circuit and the Supreme Judicial Court of Massachusetts have noted that "[c]onsiderations of equity and morality play a large part in constructing a quasi contract."  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009) (quoting Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985)).  In this case, Andrew Conway's conduct in this case implicates the equitable doctrine of unclean hands.  The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945); see Fid. Mgmt. & Research Co. v. Ostrander, 662 N.E.2d 699, 704 (Mass. App. Ct. 1996).

The jury found that Andrew Conway committed negligent misrepresentation against Stonehall Records.  The jury was instructed that the claim of negligent misrepresentation stemmed from Andrew Conway's alleged representation that he intended to provide the Defendants with a share of Liana Conway's future profits in exchange for their efforts to promote her career.  I have adopted the jury's finding on negligent misrepresentation, and I specifically find that Andrew Conway's negligent misrepresentation related to statements by him regarding his intent to compensate the Defendants from Liana Conway's future profits or the profits of her intellectual property.

Andrew Conway's conduct in negligently misrepresenting his intent to provide a share of future profits by way of compensation for the Defendants' work to promote Liana Conway is

_____

more than $800,000 in undisclosed fees over the course of the relationship.  Doc. No. 306 at 23.  Thus, the award amounted to almost fifty percent of the retained fees.

directly related to his attempt to recoup amounts retained by the Defendants as compensation. That misconduct bars equitable relief here.

Third, the claim fails because the Defendants' retention of the money simply was not unjust under the facts and circumstances of this case (especially after the jury trimmed the retention by awarding $393,248 in damages). The evidence presented at trial shows that the Conways bargained for several things which cost money: the services, skills, and attention of individuals with a long track record working with recognized individuals in the music industry. The Conways specifically sought out the Defendants, and both the Conways admitted to being aware of and impressed by their credentials and associations with famous musical acts, including the Backstreet Boys, NSYNC, and Britney Spears. The evidence establishes that the Defendants had relationships with many individuals in the music industry, and that these relationships, among other things, had facilitated "joint venture" projects with major labels in the past. In an industry where preexisting relationships can be closely linked to future opportunities, it is reasonable for people with these relationships to charge for their services promoting and exploiting the talents of an unproven, new act.

It is also beyond dispute that the Conways benefitted from the services that the Defendants provided. By the end of the relationship, the parties produced a full-length album; a shorter "E.P."; single remixes of several songs; numerous music videos; interviews with various forms of media; and meetings with various radio, marketing, and music industry insiders. The products that resulted reflected high production values and involved the application of the Defendants' music production, aesthetic, marketing, and logistic skills. The Defendants also used their relationships with individuals in the music industry to further Liana Conway's career by orchestrating meetings with individuals in the music and entertainment industries and

arranging for her recordings and performances to be heard by individuals in the music industry.

See, e.g., ex. 108 at 617.  In these ways, the Defendants provided valuable services that furthered

Liana Conway's career as a recording artist.[15]

The Conways enjoyed extensive access to both Stone and Hall over the course of their

two-year working relationship.  Liana Conway testified that Stone and Hall were like second

parents to her and advised her on all aspects of her musical career.  Testimony also established

that Andrew Conway and Stone or Hall were in daily or weekly contact from the summer of

2010 up to the fall of 2012.  The record is replete with emails, text messages, voice mail

transcripts, and a "contact record"[16] that corroborates this extensive level of communication.

This sort of constant access and attention is another valuable resource of which the Conways

were the beneficiaries and which necessarily constituted an opportunity cost to the Defendants

who could not pursue other productive activities during such times as they were working on

behalf of the Conways.

In addition, the retention of the funds was not unfair in light of the control the Conways

exercised over the entire project.  Andrew and Liana Conway controlled all of the major and

minor decisions regarding every aspect of the development of her career.  They decided whether

and when the project would proceed.  Nothing could or did happen without their approval.

---

[15] The Court adds that the fact that the Defendants reasonably relied upon Andrew Conway's representation that they would receive some form of compensation for their efforts on Liana Conway's behalf—a conclusion that necessarily follows from the negligent misrepresentation finding—further speaks to both parties' understanding that the Defendants were providing a service that was due to be compensated.  Insofar as "[t]he injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations," Salamon, 477 N.E.2d at 1031 (quoting 1 A. Corbin, Contracts § 19 (1963)), this mutual understanding is a strong indication that neither the enrichment of the Defendants nor the detriment to the Conways was unjust as a general matter.

[16] The "contact record," ex. 509, was admitted as a record of regularly conducted activity" under Federal Rule of Evidence 803(6).  Evaluating the document entry-by-entry, however, I am not convinced that many of the entries were "made at or near the time" of the relevant event as required by the rule.  Fed. R. Evid. 803(6)(a).  Thus, I do not give much weight to the contact record generally.  I do credit the document to the extent it shows frequent contact between Andrew Conway and the Defendants.

Moreover, the Conways were not simply approving projects brought to them by the Defendants, they were, in many instances, directing the Defendants to take certain actions or achieve certain results, for example increasing social media traffic and setting a timetable for Liana Conway to break. Ex. 501 at 261, 272-73. In this way, the Defendants were hired to provide services to the Conways, and the Conways were specifically using their services to achieve a direct and rapid path to commercial success. The Conways specifically chose this path with full knowledge that it would involve large expenditures of money and affirmed their choice of this strategy continually throughout the process.

Significantly, nothing said or done by the Defendants prevented or even impaired the ability or capacity possessed by the Conways to consult with others regarding how best to proceed with Liana Conway's career and Andrew Conway's investment in it. Both of the Conways knew that many musicians focus, at least initially, on non-commercial distribution of their music on websites such as YouTube or SoundCloud. The Conways also generally understood that many young, aspiring musicians, in the course of trying to develop a career in music, join school musical groups, form their own bands with friends or acquaintances, or perform at parties or other small venues. There is no evidence that Liana Conway engaged in any of these activities during any relevant time. The Conways wanted, sought, and selected the "rock star" experience and the directly commercial pathway to musical success presented to them by the Defendants. The Conways made this choice, both initially when they decided to record with the Defendants and repeatedly on a daily, weekly, and monthly basis when they elected to continue working with the Defendants and approved and paid for particular activities.

Turning to the Defendants, they do not stand in the shoes of angels. They were not clear regarding the portion of the funds that they were retaining. Their accounting left much to be

desired.  They never sought to obtain an executed copy of the Great Lines Agreement nor did they implement it.  Notwithstanding the foregoing, in light of all the facts noted, the Conways have not established that the retention of money was unjust.

For the foregoing reasons, the Conways have not established an entitlement to relief on their unjust enrichment claim.

B. <u>The Conways' Chapter 93A Claim</u>

The Conways assert that the Defendants' conduct constituted unfair and deceptive practices prohibited by chapter 93A and are seeking recovery of more than $1.16 million—not accounting for the multiple damages they seek—which consists of expenses paid to third parties which the Conways claim are unsubstantiated, amounts the Defendants retained in fees throughout the parties' relationship, and $1,700 for merchandise the Conways believe was sold during the summer camp tour but for which they did not receive any proceeds.

The Conways point to eight instances of conduct they argue to be unfair or deceptive, specifically that the Defendants: 1) did not disclose that they were retaining significant portions of the $25,000 monthly marketing fee; 2) charged excessive production expenses and did not disclose that they retained portions of those charges; 3) charged excessive expenses related to the summer camp tour and did not disclose that they retained portions of those charges; 4) purchased fake social media traffic while citing that traffic as indicia of Liana Conway's success; 5) transmitted two inaccurate accountings to Andrew Conway by email in November 2011 and February 2012; 6) transmitted three invoices to Andrew Conway that are alleged to be false; 7) did not disclose that they were retaining fees from various line item expenses listed on the invoices; and 8) charged excessive radio budget fees and did not disclose that they retained portions of those charges.  Doc. No. 306 at 3-20.

The claim for unfair or deceptive practices fails for the same reason as the unjust enrichment claim.  The conduct alleged to constitute unfair or deceptive practices, particularly alleged failures of disclosure and excessive fees, depends on Andrew Conway's testimony about the parties' relationship and the nature of the services the Defendants were providing.  The Court has found Andrew Conway's testimony not to be credible as to the relationship between the parties and that the Conways, in fact, sought out the exact experience the Defendants provided.  Liana Conway's testimony on these subjects either lacks personal knowledge or is not substantially probative on the question of the relationship between the parties.  As with the unjust enrichment claim, Hall's testimony regarding the parties' relationship provides no support for the Conway's claim.  These findings undermine the claim that the Defendants engaged in unfair or deceptive trade practices as alleged.

The chapter 93A claim also fails for other reasons.  Significantly, all of these alleged unfair and deceptive practices, and all of the evidence upon which the Conways rely, were before the jury in support of the Conways' claims for breach of fiduciary duty and fraudulent misrepresentation.[17]  The jury specifically, unanimously, unequivocally, and, in the Court's judgment, correctly rejected the Conways' claims that any Defendant breached any fiduciary duty owed to either Conway and that any Defendant committed fraud.  The jury similarly (and correctly) rejected the Conways' claim of negligent misrepresentation except as to Hall,

---

[17] A possible exception is the Conways' argument that expenditures on Liana Conway's career were made improvidently, incompetently, or wastefully.  Even if true, such conduct would need to be paired with an unfair or deceptive practice to make out a claim for a chapter 93A violation.  See Baker v. Goldman, Sachs & Co., 771 F.3d 37, 55 (1st Cir. 2014) (noting that "sloppy and unforthcoming" conduct is not automatically unfair or deceptive so as to implicate the protections of chapter 93A).  The Conways have not established that the Defendants accepted Andrew Conway's money knowing that they could not or would not provide management or other services that were reasonably related to a viable strategy to achieve commercial success.  On these facts, there is no other basis for the Conways to establish that the Defendants' incompetent management or wasteful spending constituted a chapter 93A violation.

Stonehall Records, and Stonehall Entertainment, who the jury found to have committed negligent misrepresentation only against Andrew Conway.  These findings, which have been adopted by the Court, narrow the Conway's chapter 93A claim significantly.

While conduct constituting negligent misrepresentation can be part of an unfair or deceptive practice, negligent misrepresentation, without more, is insufficient to give rise to liability under chapter 93A.  Damon v. Sun Co., 87 F.3d 1467, 1484 n.10 (1st Cir. 1996).  ("[N]egligence can provide the basis for chapter 93A liability, so long as it is paired with an unfair or deceptive act or practice . . . .").  The First Circuit also recently noted that "negligent misrepresentations . . . give rise to ch. 93A liability only if they are 'extreme' or 'egregious.'" Baker v. Goldman, Sachs & Co., 771 F.3d 37, 54 (1st Cir. 2014) (quoting Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1032 (Mass. 2004)).

Here, no extreme or egregious conduct occurred so as to elevate the negligent misrepresentation into an unfair or deceptive practice under chapter 93A.  The evidence offered at trial and submitted post-trial reveals that the Defendants and the Conways did not communicate effectively about the purposes for the transferred money, any limitations the Conways intended to place on that money, and how the Defendants would be compensated for their services.  It was, however, obvious that the Defendants were retaining some amount of the money Andrew Conway was paying, and he understood that fact.  Further, the misunderstanding that resulted as to the authority for or the extent of the Defendants' retention of the funds was due in no small part to the conduct of Andrew Conway, including: informing the Defendants, in January 2012, of his agreement with the terms of the final revised version of the Great Lines Agreement; failing to sign the Great Lines Agreement; deciding not to tell the Defendants that he did not, and would not, sign the Great Lines Agreement; and deciding not to propose, request, or

require a different written agreement to govern the parties' relationship or to define specifically

the use of the funds paid to the Defendants.  The result of these actions and decisions left the

parties holding differing expectations regarding proper expenditures of that money.  Although

Hall and the defendant-business entities were negligent in their representations to Andrew

Conway regarding those funds, the evidence does not support the conclusion that their

misrepresentations were fraudulent, intentional, or otherwise extreme or egregious.

 While the Conways argue that the Defendants made false statements regarding Liana

Conway's social media traffic as an indicia of the project's success and transmitted false invoices

or budget breakdowns to Andrew Conway, the jury notably found no fraudulent or intentional

misrepresentations.  The Court has adopted this finding.  Notably, Hall testified that, at least

twice, she learned of improper purchases of social media traffic by vendors and, in each instance,

terminated the vendor.  Far from constituting extreme or egregious conduct, at most, this

involved negligent misstatements and does not support chapter 93A liability for the reasons set

out above.

 The negligent misrepresentation also was not a constituent of a larger course of unfair or

deceptive conduct.  The transfers made by Andrew Conway to the Defendants were spread over

the course of the parties' more than two-year relationship.  The Defendants provided invoices

that described the services underlying the charges, see generally ex. 514, and allowed Andrew

Conway the opportunity to—and the evidence shows he, in fact, did—review the invoices, ask

questions about the charges, and assess what he was purchasing with his money before making

payment.  The Conways also witnessed the provision of most of the services and received

delivery of the goods they purchased.  They were generally satisfied with what they received.

They had the opportunity to comment, complain, or correct the nature and scope of goods and

services provided.  They availed themselves of these opportunities on a regular basis on matters large and small.  Although Andrew Conway may have had some hesitation at some points about the amounts he was spending, he continued transferring the money to the Defendants because he was purchasing, intentionally, the services that the Defendants were providing in repeated, arms-length transactions between relatively sophisticated business people.

Two further issues—though not necessarily directly raised by the Conways—bear mention: first, whether Liana Conway possessed any meaningful talent and second, the almost entirely separate question of whether there was any possibility she would become a commercially successful musician.  I find that Stone and Hall each possessed a genuine, good-faith belief at all relevant times that the answer to both questions was "Yes."  That is, the Defendants made an honest, sincere evaluation of Liana Conway, believed her to possess significant talent both as a composer and as a singer, and genuinely believed their efforts could succeed in developing her commercial success in music.  I find that Andrew and Liana Conway also each possessed the same genuine, good-faith belief at all relevant times.  Finally, based on the evidence, I find that the substantive answer to both questions, as a matter of fact, is "Yes."  The evidence before the Court shows Liana Conway to be a young woman vested with significant talent both as a musician and a songwriter.  Notably, the record contains no contrary evidence on this point.  While experts may disagree on whether the pathway to direct commercial success pursued by the Defendants for Liana Conway was the best choice or presented the greatest likelihood of success, I credit the evidence and testimony that it was a viable choice and that the Conways voluntarily chose it with knowledge of (a) the existence of other available methods to develop Liana Conway's musical career and (b) their ability to consult with others regarding the development of her musical career.  I reject as incredible and

not supported by the evidence any contention that the Defendants convinced the Conways to

engage in a fool's errand to promote the career of Liana Conway, all the while collecting fees on

that futile endeavor, so long as it lasted.

For all these reasons, I find the negligent misrepresentation committed by Hall and the

defendant-entities—and the conduct of the Defendants generally—were not part of a pattern or

course of unfair or deceptive conduct nor did it constitute an isolated instance of unfair or

deceptive conduct.[18]  Accordingly, the Court concludes that the Conways have not established a

violation of chapter 93A.[19]

C.  The Defendants' Unjust Enrichment Claim

The Defendants, in a counterclaim, are seeking recovery, on a theory of unjust

enrichment, of an unpaid $25,000 marketing fee from September 2012 and a $10,000 fee for

production services rendered in relation to Liana Conway's recording of the National Anthem.

As stated above, to prevail on their claim of unjust enrichment, the Defendants must

prove 1) the Conways knowingly received a benefit 2) at the Defendants' expense 3) under

circumstances that would make retention of that benefit unjust.  See Frappier, 645 F.3d at 58.

---

[18] While the Court notes the superficial appearance that the negligent misrepresentations by Hall were part of a larger scheme to maintain the flow of money from Andrew Conway while surreptitiously profiting from those payments, the Court finds that not to be true upon examination.  First, this was not the case where there were a series of intentional or fraudulent misstatements perpetrated over an extended period. The misstatements in this case were negligent, and reflected the misunderstanding between the parties as to the approved uses and limitations on the funds Andrew Conway transferred.  Second, as set out above, the Defendants frequently discussed with Andrew Conway, who has significant experience in business transactions, the strategy underlying their expenditures to promote Liana, the charges, and how resources should be expended to further her career.  Third, the evidence shows that the Defendants engaged in significant efforts to promote Liana and did so armed with a genuine, good-faith belief, in part arising from their own experience in the music industry, that those efforts could succeed.  In short, this is not a case, as sometimes suggested by the Conways, of "D-List celebrities" stringing along an investor to keep his wallet open as long as possible before the charade collapses.

[19] Because the Court has determined that there was no unfair or deceptive conduct, it need not address the Defendants' arguments regarding jurisdictional defects or the existence of a partnership which otherwise attack the Conways' chapter 93A claim.

The Defendants offer the affidavit of Hall, who testifies that she received a text message from Andrew Conway on September 11, 2012 stating that no further funding would be advanced on the project except for expenses associated with live performances.  Doc. No. 305 ¶ 5.  Hall further states that Stonehall Records provided significant services from September 1 through September 11, 2012 and that Stonehall Records produced Liana Conway's rendition of the National Anthem, without receiving payment for either.  Id. ¶¶ 4, 6, 9-11.

As to the Defendants' claim for the $25,000 marketing fee for the month of September 2012, the doctrine of unclean hands applies, as it applied to Andrews Conway's unjust enrichment claim.  Defendants Hall, Stonehall Records, and Stonehall Entertainment negligently misrepresented how they were using the funds transferred by Andrew Conway in response to the invoices issued by Stonehall Records.  "[W]hile 'equity does not demand that its suitors shall have led blameless lives' . . . as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue."  Fid. Mgmt. & Research Co., 662 N.E.2d at 704 (quoting Precision Instrument Mfg. Co., 324 U.S. at 814-815).  Although Stonehall Records' conduct[20] did not rise to fraudulent or intentional misstatements, their negligent misrepresentation was specific to the marketing fee and resulted in a benefit to the Defendants.[21]  The Defendants cannot now use the Court's equity powers to obtain relief from non-payment of the last marketing fee given that their misconduct infected many of the preceding monthly marketing payments.  Accordingly, the Court concludes that the Defendants are not entitled to restitution of the September 2012 marketing fee.

---

[20] In her affidavit, Hall states that the $25,000 marketing fee for September was owed to Stonehall Records, and thus the Court focuses on Stonehall Records' conduct.  Doc. No. 305 ¶¶ 3, 4.

[21] The Court notes that the jury awarded almost $400,000 in damages resulting from the Defendants negligent misrepresentation claim.  The Court, from this award, understands the jury to have found that the negligent misrepresentations encompassed the disposition of some of the monthly marketing fees.  The Court has adopted that finding.

A further consideration informs the Court's judgment. In August, Liana Conway released her first album. The evidence shows she indulged in the full "rock star" experience. On August 8, 2012, the night of the album release party (which was also the night before an important audition at Nickelodeon) Hall and Stone were concerned with her drinking. Ex. 502 at 068; ex. 508 (August 9, 2012 entry). They told her to be careful of how much she drank and to go to bed. Andrew Conway and his wife were also at that party. At that time, Andrew Conway, like any responsible parent, shared Stone and Hall's concern.[22] Ex. 508 (August 9, 2012 entry). Three weeks after the release party, Andrew Conway texted Hall urging her to call him "sooner [rather] than later" "given [his] worsening disposition on Liana[']s social habits and the fate of this entire project." Ex. 501 at 266 (capitalization different from original). Given the seriousness with which he expressed his concern arising from Liana Conway's behavior— behavior that the Defendants were also observing—the Defendants were aware that those concerns might overwhelm the reasons for continuing the project, resulting in a temporary or permanent end to Liana Conway's musical career. Andrew Conway's text on September 11 ceasing all funding of the project except for live performances came, not out of the blue, but in the context of known, discussed difficulties.

Finally, turning to the $10,000 production fee, the Defendants seek to recover this amount for their services producing Liana Conway's rendition of the National Anthem, which was recorded on or about August 22, 2012. Ex. 502 at 090; ex. 508 (August 23, 2012 entry). The Court infers from the evidence that the Conways received a master tape or other sound recording resulting from the production of the National Anthem. That master tape or recording is a valuable benefit that, the Court further infers, reflects the high production values that marked

---

[22] At trial, Andrew Conway testified differently. See p. 16, supra.

the other products produced by the parties' relationship.  That master tape may be distributed or, as the Defendants suggest, Doc. No. 305 ¶ 9, may be used to solicit opportunities to perform. Thus, the Conways received a benefit from Stonehall's production.  The Defendants point to no evidence, however, that they ever billed or sought payment from the Conways for this service prior to August of 2013, almost one year after the parties' relationship ended and not long before this action was filed.  <u>See</u> ex. 1009; Doc. No. 1.

The Court denies this aspect of the Defendants' unjust enrichment claim for two reasons. First, their unclean hands, as described above, warrants denial of relief.  Second, the parties were unclear on the extent to which the monthly marketing fee encompassed non-marketing services rendered by the Defendants or third parties.  All the Defendants bear some responsibility for this lack of clarity.  Given that, and given the Defendants' failure to bill within a reasonable amount of time or otherwise contemporaneously seek payment for the production of the National Anthem, the Defendants are left without a basis to establish that their production services were not included in a separately billed line item or gratuitously offered in light of the other services for which the Conways were paying.  Accordingly, the Defendants have not established that Andrew or Liana Conway were unjustly enriched at the expense of any or all of the Defendants.

IV.      <u>CONCLUSION</u>

For the foregoing reasons, the Court determines that the Conways have not met their

burden to establish unjust enrichment or a violation of chapter 93A.  Similarly, the Defendants

have not met their burden to establish unjust enrichment.  If the Conways wish to pursue the

award of attorneys' fees for their claim of copyright infringement, they shall file a petition for

fees within ten days of this Order.  Judgment shall enter forthwith.


SO ORDERED.

   /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge